# EXHIBIT A

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 2 of 221

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of )<br><br>ENDURANCE SPECIALTY INSURANCE )<br>LIMITED, )<br>                Petitioner )<br><br>        - and - )<br>              )<br>HORSESHOE RE LIMITED, on behalf of and )<br>for the benefit of its Separate Accounts HS0083 )<br>and HS0084, )<br>             )<br>          Respondents. )<br>             ) | Index No. _____/_____<br><br><br><br><br>**VERIFIED PETITION** |

Petitioner Endurance Specialty Insurance Limited ("Endurance") respectfully petitions this Court to commence a special proceeding pursuant to N.Y. C.P.L.R. § 7502, and to issue an order and judgment: (1) staying arbitration, pending resolution of this special proceeding; (2) removing Bernard Eder from service as an arbitrator in Endurance's arbitration against Respondent, "Horseshoe Re Limited, on behalf of and for the benefit of its Separate Accounts HS0083 and HS0084" ("Horseshoe"); and (3) appointing a qualified and unbiased arbitrator to replace Eder. A Memorandum of Law is filed herewith.

## **Parties**

1.     Endurance is a corporation organized under the laws of Bermuda, with its principal place of business located in Pembroke, Bermuda.

2.     Horseshoe is, on information and belief, a corporation organized under the laws of Bermuda, with its principal place of business located in Hamilton, Bermuda.

Case 1:23-cv-01831-JGK Document 1-1 Filed 03/02/23 Page 3 of 221

**Jurisdiction And Venue**

3.      As a court of general jurisdiction, this Court has subject matter jurisdiction over this special proceeding. N.Y. CONST. art. VI, § 7(a).

4.      Endurance and Horseshoe consummated two reinsurance contracts effective January 1, 2020 (the "Contracts").  This Court has personal jurisdiction over Horseshoe because the parties' reinsurance contracts provide that Horseshoe will, as an aid to compelling and enforcing arbitration, submit to the jurisdiction of any court of competent jurisdiction within the United States and accept service of process via Mendes & Mount, LLP, 750 Seventh Avenue, New York, New York 10019-6829.  New York state courts have customarily accepted this form of service of suit clause, which is commonplace in the reinsurance industry, as consent to jurisdiction. *See e.g., Dornoch Ltd. v. PBM Holdings, Inc.*, 666 F. Supp. 2d 366, 370 (S.D.N.Y. 2009).

5.      The Contracts provide that, subject to their respective arbitration clauses, the Contracts are subject to the laws of the State of New York.

6.      Venue in New York County is proper pursuant to N.Y. C.P.L.R. § 7502(a)(ii).

7.      A significant portion of the events giving rise to this Petition took place in New York, New York.  By way of non-exclusive example: (1) the decision by the Secretary General of the Court of Arbitration of the International Chamber of Commerce ("ICC") to appoint Eder took place in New York City; (2) all of Horseshoe's communications (through its New York City-based counsel) concerning this matter emanated from New York City; (3) the ICC's decision to decline to remove Eder was issued from New York City; and, (4) the ICC's communications related to this matter all emanated from New York City.

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 4 of 221

### Nature Of The Petition

8.      This special proceeding arises from a dispute pending between Endurance and Horseshoe in connection with their Contracts.

9.      Endurance and Horseshoe are engaged in an arbitration proceeding initiated by Endurance with respect to this dispute.

10.     The Contracts are identical in most material respects, including their dispute resolution provisions. They require the parties to refer all disputes to arbitration before a three-member tribunal.  The Contracts further specify that arbitration procedure will be governed by the Bermuda Arbitration Act of 1986, and that New York substantive law will apply.

11.     The Contracts provide that each party may appoint an arbitrator and that the two party-appointed arbitrators will select a third arbitrator (commonly known as the "umpire" or, in some markets, "tribunal chair").  If the party-appointed arbitrators fail to appoint an umpire, either party may apply to the ICC for appointment of a qualified umpire.

12.     The Contracts mandate that "the arbitration tribunal shall consist of persons who are active or retired lawyers with not less than ten (10) years' experience in insurance or reinsurance law or active or retired officers of insurance or reinsurance companies, and **will not have a personal** or financial **interest** in the parties or the outcome of the arbitration. For the avoidance of doubt, the arbitrators will be **completely impartial and disinterested** in their respective appointing parties and in the result of the arbitration."  (Emphasis added.)

13.     Endurance and Horseshoe each appointed an arbitrator. When the party-appointed arbitrators failed to agree on an umpire, Horseshoe applied to ICC for appointment of an umpire.

14.     During the ICC's umpire appointment process, Horseshoe submitted a written "Application For Appointment Of Tribunal Chair", which vigorously demanded appointment of a

London-based Queen's Counsel ("QC") -- a very small subset of the global arbitrator pool otherwise available for selection under the Contracts.  Endurance objected repeatedly to the appointment of a London-based QC.  It contended that the parties' dispute is highly technical and requires resolution by a global reinsurance underwriting expert -- not a QC who may, from time to time, dabble in reinsurance law.  Endurance also objected because it understood that Horseshoe's lawyers regularly practice and otherwise consort with London-based QCs.

15.     In the face of Endurance's objections, on October 6, 2022, the ICC named Bernard Eder, a London-based QC, as Umpire.

16.     The Contracts require that all arbitrators "*be completely impartial*."

17.     When appointing Eder, the ICC sent Eder copies of the parties' correspondence where Horseshoe aggressively demanded appointment of a London-based QC and where Endurance vehemently objected.  In other words, the ICC directly informed Eder that Horseshoe supported his appointment, while Endurance had aggressively opposed it.

18.     On this basis alone, Eder cannot be "*completely impartial"* toward Endurance, and he must be removed from the provisionally named arbitration panel.

19.     In addition, Bernard Eder has a complicated and deeply problematic history with Endurance's lead counsel, David Attisani.

20.     Less than three years ago, Eder served as umpire in an arbitration involving different parties, where Attisani also served as lead counsel.

21.     The prior arbitration presented unusual ethical and procedural problems, which repeatedly pitted Eder against Attisani and his client.

22.     The arbitration panel, including Eder as Umpire and final decision-maker, declined to consolidate the prior arbitration with another contemporaneous and plainly-related arbitration.

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 6 of 221

In response, Attisani obtained a consolidation order from a separate arbitration panel, which terminated Eder's service as umpire and accordingly precluded him from obtaining future fee payments.

23.     Against that backdrop, it would be impossible for Eder to be "completely impartial" vis-a-vis Attisani or his client, Endurance.  As a practical matter, this arbitration will have been decided in Horseshoe's favor and against Endurance, if the Court permits Eder to "serve" here.

24.     In addition, Eder has argued to retain this appointment and declined to recuse himself from serving as Umpire, which represents yet another reason to remove him forthwith. Eder will only step down if Horseshoe endorses that move, and he knows that Horseshoe – sitting in the catbird seat – will never seek Eder's recusal.

25.     Because Eder is not close to "*completely impartial*", the ICC has failed to appoint a qualified arbitration panel.  The proposed composition of any arbitration panel to include Eder would be directly contrary to the terms of the Contracts' arbitration provisions.

26.     On October 28, 2022, Endurance requested that the ICC replace Eder.

27.     On January 26, 2023, the ICC rejected Endurance's challenge.

28.     The parties' Contracts provide that the "arbitration shall be conducted under, and the arbitration tribunal shall be governed by, the provisions of the Bermuda Arbitration Act [of] 1986".  The Bermuda Arbitration Act of 1986 states: "Where an arbitrator or umpire has misconducted himself or the proceedings, the Court may remove him." *Bermuda Arbitration Act of 1986 Sec. 34*.  The plain wording accordingly empowers a court to remove an arbitrator who is not *"completely impartial"* but nonetheless declines to recuse himself.  Namely, Eder.

29.    Under Bermuda law, an arbitrator should be removed if "there is a *real danger* of bias".  *Raydon Underwriting Mgmt. Co. v. Stockholm Re (Bermuda) Ltd. ((in Liquidation))* 1998 Civil Jur. No. 23 (emphasis added).

30.    Bermuda modelled the 1986 Act after the UK Arbitration Acts of 1950 and 1979, and the associated English law authorities confirm that courts should remove biased arbitrators prior to issuance of any arbitration award. *See, e.g.,* Jan W. Woloniecki & Shannon Dyer, *Arbitration procedures and practice in Bermuda: Overview*, ASW Law Limited ("The 1986 Act… is based on the UK Arbitration Acts 1950 to 1979"); *Tracomin S.A. v. Gibbs Nathaniel (Canada) Ltd. and George Bridge*, 1 Lloyd's Rep. 586 [1985] (finding that there was "a real likelihood of bias" and indicating that the court would remove the arbitrator pre-award if he did not resign); *High Seas Steamship (Pte) Ltd v. Kirupamurthy and Another*, EWHC (QC) Lexis Citation 1064 [1985] (ordering an arbitrator's removal pre-award after finding there was "a real possibility of bias").

31.    New York law also empowers this Court to replace Eder.  N.Y. C.P.L.R. § 7504 directs the Court to appoint an arbitrator if "the agreed method [to appoint an arbitrator] fails or for any reason is not followed".  N.Y. C.P.L.R. § 7504 ("If the arbitration agreement does not provide for a method of appointment of an arbitrator, or if the agreed method fails or for any reason is not followed, or if an arbitrator fails to act and his successor has not been appointed, the court, on application of a party, shall appoint an arbitrator.").  Here, the agreed method to appoint an Umpire failed, because ICC did not appoint a "*completely impartial*" arbitrator.

32.    The Court should replace Eder because he is not "*completely impartial*" and refuses to recuse himself.

6

33.     The Court should replace Eder with a completely impartial, qualified Umpire –
devoid even of the appearance of bias. In the alternative, the Court should strike Eder and direct
ICC to appoint a completely impartial, qualified Umpire – devoid even of the appearance of bias.

34.     Any arbitration award issued by Eder would, in any event, be unenforceable. As a
result, it is better for all parties to address the issue now before they undertake the costs and burden
associated with a tainted arbitration that would culminate in an unenforceable award. New York
law understandably commends that result: "New York courts have inherent power
to disqualify an arbitrator before an award has been rendered. Indeed, where a party to an
arbitration proceeding becomes aware of the . . . **probable partiality of an arbitrator**, there would
appear to be **no reason why the court should not exercise its equitable jurisdiction** on the
application of the party **at any time during the proceeding, rather than require the party to
wait for the award, and then move to vacate**". *Huntsman Int'l, LLC v. Albemarle Corp.*, 2021
NY Slip Op 31073(U) (Sup. Ct.) (quotations omitted and emphasis added).

35.     A prior application has not been made in any court for the relief now requested.

36.     Contemporaneous with the filing of this Petition, Endurance has filed: (1) a
memorandum of law supporting an order staying the arbitration until a replacement Umpire is
named; and (2) a memorandum of law supporting an order replacing Eder as Umpire. Endurance
has also filed the supporting Affirmation of David A. Attisani. The facts and arguments contained
in these additional filings are incorporated into this Petition, as if they were fully set forth herein.

**Prayer For Relief**

WHEREFORE, Endurance respectfully requests that the Court:

1.      Stay the parties' arbitration pending resolution of this special proceeding;

7

2.      Enter an order and judgment removing Bernard Eder and prohibiting him from serving as Umpire in the pending arbitration;

3.      Appoint a replacement Umpire who is completely impartial and does not harbor any actual or apparent bias against Endurance or its counsel; or, in the alternative, direct the ICC to appoint a replacement Umpire who is completely impartial and devoid of actual or apparent bias against Endurance or its counsel.

4.      Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

David A. Attisani
CHOATE, HALL & STEWART LLP
2 International Place
Boston, MA 02110
(617) 248-5000
dattisani@choate.com

Melissa R. Ginsberg
BRAUNHAGEY & BORDEN LLP
118 W 22nd Street, 12th Floor
New York, NY 10011
(646) 829-9403
ginsberg@braunhagey.com

Dated: February 13, 2022

8

## VERIFICATION

DAVID A. ATTISANI affirms, deposes, and says:

1.      I am an equity partner at the law firm of Choate, Hall & Stewart, LLP, where I have worked for thirty-one years. My colleagues and I represent Endurance in this matter. I am a member of the New York bar.

2.      I have read the foregoing Petition and know the contents thereof. Based on my personal knowledge together with the information reasonably available in the ordinary course of business, I hereby verify that the Petition's contents are true, except those statements made upon information and belief, which to the best of my knowledge, information, and belief, are also true.

3.      I affirm this 13th day of February, 2023 under the penalties of perjury under the laws of New York that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

David A. Attisani

9

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

In the Matter of the Application of )
)
ENDURANCE SPECIALTY INSURANCE )
LIMITED, )
                Petitioner )
)
         - and - )        **NOTICE OF PETITION**
)
HORSESHOE RE LIMITED, on behalf of and )        Index No.
for the benefit of its Separate Accounts HS0083 )
and HS0084, )
)
             Respondents. )
)

---

    **PLEASE TAKE NOTICE** that upon the annexed Verified Petition of Endurance

Specialty Insurance Limited ("Endurance"), Affirmation of David A. Attisani and the Exhibits

attached thereto, and Memorandum of Law in support of the Verified Petition, pursuant to CPLR

§§ 7502 and 7504 Endurance will petition this Court, located at 60 Centre Street, New York, New

York, on March 23, 2023 at 9:30 a.m., or as soon thereafter as counsel may be heard, for an order:

(1) directing that the controversies described in the Petition and arbitration between Endurance

and Horseshoe Re Limited, on behalf of and for the benefit of its Separate Accounts HS0083 and

HS0084 (the "Arbitration"), are stayed pending resolution of this special proceeding and

appointment of a qualified and unbiased umpire; (2) removing Bernard Eder from serving as an

arbitrator in the Arbitration; (3) appointing a qualified and unbiased umpire to replace Eder; and,

(4) granting such other and further relief as this Court may deem just and proper.

    **PLEASE TAKE FURTHER NOTICE** that a demand is hereby made for the service of

an answer and supporting affidavits, if any, by March 16, 2023.

Case 1:23-cv-01831-JGK Document 1-1 Filed 03/02/23 Page 12 of 221

Petitioner designates New York County as the venue for this proceeding. Venue is appropriate pursuant to CPLR § 7502(a)(ii), as explained in the accompanying Petition.

Dated: February 13, 2022
New York, NY

David A. Attisani
CHOATE, HALL & STEWART LLP
2 International Place
Boston, MA 02110
(617) 248-5000
dattisani@choate.com

Melissa R. Ginsberg
BRAUNHAGEY & BORDEN LLP
118 W 22nd Street, 12th Floor
New York, NY 10011
(646) 829-9403
ginsberg@braunhagey.com

To:

Peter Chaffetz
Steven C. Schwartz
David Blackman
Chaffetz Lindsey LLP
1700 Broadway, Fl. 33
New York, NY 10019
peter.chaffetz@chaffetzlindsey.com
steven.schwartz@chaffetzlindsey.com
david.blackman@chaffetzlindsey.com

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of | ) Index No. _____/_____ |
| | ) |
| ENDURANCE SPECIALTY INSURANCE | ) |
| LIMITED, on behalf of itself, and its branches | ) |
| and affiliates, | ) |
| Petitioners | ) |
| | ) |
| - and - | ) |
| | ) |
| HORSESHOE RE LIMITED, on behalf of and | ) |
| for the benefit of its Separate Accounts HS0083 | ) |
| and HS0084, | ) |
| | ) |
| Respondents. | ) |

## AFFIRMATION OF DAVID A. ATTISANI

I, David A. Attisani, an attorney admitted to practice in the State of New York, affirm
pursuant to CPLR 2106(a) as follows:

1.  I am an equity partner at the law firm of Choate, Hall & Stewart, LLP, where I have
worked for thirty-one years.  My colleagues and I represent Endurance in this matter.  I am a
member of the New York bar.

2.  I submit this Affirmation in support of Endurance's (a) Verified Petition for relief
concerning an arbitration pending between Endurance and Horseshoe Re Limited on behalf of and
for the benefit of its Separate Accounts HS0083 and HS0084, and (b) Order to Show Cause for an
interim stay of that arbitration pending resolution of this special proceeding.

11140757v9

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 14 of 221

3.      Attached as <u>Exhibit 1</u> is a true and correct copy of 2020 Catastrophe Aggregate Excess of Loss Reinsurance Contract No. XA200910M, which Endurance and Horseshoe executed on or about March 9, 2020.

4.      Attached as <u>Exhibit 2</u> is a true and correct copy of 2020 Catastrophe Aggregate Excess of Loss Reinsurance Contract No. XA200911M, which Endurance and Horseshoe executed on or about March 9, 2020.

5.      Attached as <u>Exhibit 3</u> is a true and correct copy of Endurance's arbitration demand dated February 1, 2022.

6.      Attached as <u>Exhibit 4</u> is a true and correct copy of Horseshoe's arbitration counter-demand dated March 3, 2022.

7.      Attached as <u>Exhibit 5</u> is a true and correct copy of Horseshoe's application to the ICC for appointment of an umpire dated June 29, 2022.

8.      Attached as <u>Exhibit 6</u> is a true and correct copy of Endurance's response to Horseshoe's application to the ICC for appointment of an umpire dated July 7, 2022.

9.      Attached as <u>Exhibit 7</u> is a true and correct copy of Endurance's consolidated reply to Horseshoe's application to the ICC for appointment of an umpire dated July 25, 2022. Endurance has redacted two sentences from Exhibit 7, because they describe Endurance's confidential arbitration position which is not material to the Court's consideration of Endurance's pending Petition.

10.     Attached as <u>Exhibit 8</u> is a true and correct copy of excerpted correspondence, dated October 6, 2022, from the Secretary General of the Court of Arbitration of the International Chamber of Commerce.

11140757v9

2

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 15 of 221

11.     I have served as counsel in reinsurance arbitrations and other reinsurance/commercial disputes for roughly thirty years.   In my experience, parties and appointing authorities do not advise umpire candidates or umpires of the identities of those parties that favored (or opposed) their appointments.   It is also highly unusual in my experience for an umpire or umpire candidate subject to a bias challenge to contend in writing or otherwise that the subject challenge is unavailing and/or to argue to retain a pending appointment.

12.     Attached as Exhibit 9 is a true and correct copy of an email dated October 31, 2022, which was authored by Bernard Eder.

13.     Attached as Exhibit 10 is a true and correct copy of an email dated November 19, 2022, which was authored by Bernard Eder.

14.     Attached as Exhibit 11 is a true and correct copy of the ICC's "Reasons" dated February 9, 2023.

15.     Attached as Exhibit 12 is a true and correct copy of the Bermuda Arbitration Act of 1986.

16.     Attached as Exhibit 13 is a true and correct copy of *Raydon Underwriting Mgmt. Co. v. Stockholm Re (Bermuda) Ltd. ((in Liquidation))* 1998 Civil Jur. No. 23.

17.     Attached as Exhibit 14 is a true and correct copy of *Tracomin S.A. v. Gibbs Nathaniel (Canada) Ltd. and George Bridge*, 1 Lloyd's Rep. 586 [1985].

18.     Attached as Exhibit 15 is a true and correct copy of *High Seas Steamship (Pte) Ltd v. Kirupamurthy and Another*, EWHC (QC) Lexis Citation 1064 [1985].

15.     In late 2020, I served as lead counsel in an arbitration involving parties other than Endurance and Horseshoe, where Bernard Eder was appointed Umpire.  The party adverse to my client was, like Hudson here, a hedge fund.

11140757v9                                               3

16.     During the Umpire selection process in the prior case involving Bernard Eder, opposing counsel disclosed to me that he had engaged in *ex parte* contacts with unnamed potential umpires for the purpose of assessing their potential availability and interest in serving.  After Eder's appointment, and understanding that I was constrained by duty to my client to question Eder's integrity, I asked Eder whether he was one of the potential umpires who had engaged in ethically inappropriate *ex parte* contacts.  Eder replied that he had not done so and otherwise sought to retain his appointment.

17.     During the same prior arbitration, Eder issued preliminary scheduling rulings unfavorable to and over the objection of my client, which favored its hedge fund adversary.

18.     Eder also rejected my client's rational and legally supported election to consolidate the arbitration before Eder into a parallel U.S. arbitration. Thereafter, I nonetheless persuaded the U.S. arbitration panel to order consolidation of Eder's arbitration into the then-contemporaneous U.S. arbitration, which had the effect of terminating Eder's role as Umpire and depriving him of additional revenue emanating from an engagement of potentially protracted duration.

19.     Although Horseshoe/Hudson have complained about delay, they have also taken every opportunity to natter over the composition of the tribunal and to submit briefing in support of Eder that has consumed several months.

Signed under the pains and penalties of perjury on this 13th day of February 2023.

D. A. C

David A. Attisani

11140757v9                                4

## CERTIFICATION OF WORD COUNT

I, David A. Attisani, hereby certify that the word count of this affirmation complies with the word limits of 22 N.Y.C.R.R. § 202.8-b and Commercial Division Rule 17.  According to the word-processing system used to prepare this affidavit, the total word count for all printed text exclusive of the material omitted under 22 N.Y.C.R.R. § 202.8-b(b) and Commercial Division Rule 17 is 876 words.

Respectfully submitted,

David A. Attisani
CHOATE, HALL & STEWART LLP
2 International Place
Boston, MA 02110
(617) 248-5000
dattisani@choate.com

*Counsel for Petitioner*
*Endurance Specialty Insurance Limited*

Dated: February 13, 2023
      Boston, Massachusetts



# TigerRisk Partners LLC

## MARKET REFORM CONTRACT

**Reinsured:** Endurance Specialty Insurance Limited, (Bermuda) on behalf of itself and on behalf of its branches, affiliates, Endurance Worldwide Insurance Limited (London, England) and its branch office, SI Insurance (Europe), SA, Lloyd's Syndicate Number 5151 (London, England), Endurance Assurance Corporation (New York, USA) and/or their Quota Share reinsurers if applicable, including any and/or all of the subsidiary or affiliate companies that are now or may hereafter come under the ownership, management and/or control of Sompo International Holdings Ltd.

**Type:** **CATASTROPHE AGGREGATE EXCESS OF LOSS REINSURANCE CONTRACT**

**Period:** **Loss Occurring during the twelve month period effective 1 January, 2020**

**Tiger Risk Reference:** **XA200910M**

**Intermediary:** **TigerRisk Partners LLC**

**NEW / RENEWAL:** **Renewal**

FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM INDEX NO. 650832/2023
DocuSign Envelope ID: 29C718B3-C79E-4847-9101-8108CF07E23F
NYSCEF DOC. NO. 4    Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 19 of 221   RECEIVED NYSCEF: 02/13/2023

## Risk Details

**Tiger Risk Reference:**    **XA200910M**

**Type:**    **CATASTROPHE AGGREGATE EXCESS OF LOSS REINSURANCE CONTRACT**

**Reinsured:**    Endurance Specialty Insurance Limited, (Bermuda) on behalf of itself and on behalf of its branches, affiliates, Endurance Worldwide Insurance Limited (London, England) and its branch office, SI Insurance (Europe), SA, Lloyd's Syndicate Number 5151 (London, England), Endurance Assurance Corporation (New York, USA) and/or their Quota Share reinsurers if applicable, including any and/or all of the subsidiary or affiliate companies that are now or may hereafter come under the ownership, management and/or control of Sompo International Holdings Ltd. (hereinafter referred to collectively as the "Reinsured").

**Reinsurer:**    The subscribing Insurance and/or Reinsurance Companies and/or Underwriting Members of Lloyd's (hereinafter referred to as the Reinsurers) for a participation as stated in the individual signing pages.

**Period:**    This Reinsurance Contract shall apply to losses occurring during the period from 1 January 2020 to 31 December 2020 both days inclusive, Local Standard Time at the place where the loss occurs.

**Class of Business:**    This Reinsurance Contract shall indemnify the Reinsured in respect of all policies and/or contracts of reinsurance for all NATURAL PERILS, as defined below, for Property Catastrophe, Risk and Pro-Rata losses derived from their Reinsurance Global Catastrophe Strategic Business Unit and their Reinsurance Global Property Strategic Business Unit occurring with the Territorial Scope hereon.

For the purposes of this Reinsurance Contract NATURAL PERILS shall be understood to include, but not be limited to Earthquake, Seaquake, Earthquake Shock, Seismic and/or Volcanic Disturbance/Eruption, Hurricane, Rainstorm, Storm, Storm Surge, Severe Storm, Winter Storm, Thunderstorm, Windstorm, Tropical Storm, Tempest, Tornado, Cyclone, Typhoon, Tidal Wave, Tsunami, Flood, Hail/Hailstorm, Winter Weather/Freeze, Winter Storm, Ice Storm, Weight of Snow, Avalanche, Meteor/Asteroid Impact, Mudslip, Landslide, Mudslide, Bush Fire, Forest Fire, Wildfires/Brushfires, Lightning, Sinkhole Collapse and Earth Movement. Natural Perils losses shall include all ensuing losses arising directly or indirectly therefrom, which shall include, but not be limited to, ensuing collapse, water damage (including flood), fire and/or explosion following the Natural Peril and shall be included within the scope of coverage hereunder.

**Territorial Scope:**    As defined in the Limits section of this Reinsurance Contract hereunder.

**Limits:**    **Section A -** losses wheresoever occurring, but excluding Windstorm and Earthquake losses in Japan, Named Hurricane losses in the United States of America, Canada and the Caribbean, Windstorm losses in Europe (Europe Windstorm further defined as Extra-Tropical Cyclone by Perils AG) and Earthquake losses in the state of California part of the United States of America.

---

Effective: January 1, 2020
TR Ref: XA200910M
DJH – Final 1.01 / 15.01.20



FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM
NYSCEF DOC. NO. 4

| Tiger Risk Reference | XA200910M | | TigerRisk Partners LLC |
|---|---|---|---|

EXCESS

To pay in excess of an Ultimate Net Loss to the Reinsured of USD 75,000,000 Ultimate Net Loss, in the aggregate.

LIMIT

Up to a further USD 75,000,000 Ultimate Net Loss, in the aggregate.

Notwithstanding the foregoing, before any loss can be applied to the LIMIT of Section A set out above, the Reinsured's Ultimate Net Loss shall be first subject to an excess of USD 5,000,000.

**Section B** – Windstorm Losses in Japan Only

EXCESS

To pay in excess of an Ultimate Net Loss to the Reinsured of USD 75,000,000 Ultimate Net Loss, Each and Every Loss.

LIMIT

Up to a further USD 50,000,000 Ultimate Net Loss, Each and Every Loss.

**Reset Provision** – In respect of Section B only

The Reinsured's expected loss for the business covered hereunder for the period of this Reinsurance Contract (the "Expected Loss") shall be calculated by the Intermediary using the Catastrophe Model. The Reinsured's Expected Loss as of the Inception of this Reinsurance Contract (the "Initial EL") is:

3.31%;

If the Reinsured's Expected Loss for the business covered hereunder increases or decreases as of and at 1 April 2020 (the "Reset Date") from the Initial EL (a "Reset Event"), the attachment point of this Reinsurance Contract (the "Provisional Attachment Point") shall be reset so that the Reinsured's Expected Loss as of and at the Reset Date equals and is the same as the Initial EL (the "Adjusted Attachment Point"). If a Reset Event occurs, the Provisional Attachment Point of this Reinsurance Contract shall be revised to the "Adjusted Attachment Point," which shall apply with respect to any and all losses occurring hereunder from Inception to expiration of this Reinsurance Contract. Furthermore, this Reinsurance Contract shall be amended such that the Adjusted Attachment Point shall be endorsed in place of the relevant Retention(s). If the Expected Loss for the business covered does not increase or decrease as of and at the Reset Date from the Initial EL then no Reset Event has occurred and the Provisional Attachment Point shall not be reset.

Within 21 business days (being a day other than Saturday or Sunday that the banks in Bermuda are open for business) of the Reset Date, the Intermediary shall provide to the Reinsurer an Expected Loss calculation as of and at the Reset Date and, to the extent a Reset Event has occurred, the Reinsured shall also provide an Adjusted Attachment Point. When calculating the Expected Loss as of and at the Reset Date, the Intermediary shall use the same exposure coding, including



Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 21 of 221

**Tiger Risk Reference**   **XA200910M**                    **TigerRisk Partners LLC**

secondary modifiers, used to determine the Initial EL and shall follow the same practice and standards in all material respects that were used for the input data used in determining the Initial EL. Within five business days of receipt of the Expected Loss calculation, the Reinsurer will review the Expected Loss calculation and any Adjusted Attachment Point and advise in writing whether the Reinsurer is in agreement with such calculation. The Reinsurer will be granted full access to the Intermediary's records for the purpose of confirming the Expected Loss calculation. The Reinsurer, at its option, may request a joint review of the Expected Loss calculation by the head of the Intermediary's modelling division (or an appropriate substitute) in lieu of the Intermediary's operational personnel. In the event that the Reinsured and the Reinsurer cannot, after such review, agree on the Expected Loss calculation, it is hereby agreed that the Intermediary's Expected Loss calculation shall stand.

**Definitions:**   For all purposes of this Reinsurance Contract:

a) the term "Each and Every Loss" shall be understood to mean "each and every loss and/or occurrence and/or catastrophe and/or disaster and/or calamity and/or series of losses and/or occurrences and/or catastrophes and/or disasters and/or calamities arising out of one event".

b) "United States of America" shall be defined as the 50 states of the Union and the District of Columbia.

c) "Caribbean" shall be defined as all islands situated off North, Central and South America between Latitude 10 degrees North and 35 degrees North and Longitude 55 degrees West and 100 degrees West.

d) "Europe" shall be defined as Albania, Andorra, Armenia, Austria, Belarus, Belgium, Bosnia and Herzegovina, Bulgaria, Croatia, Cyprus, the Czech Republic, Denmark, Estonia, Faroe Islands, Finland, France, Georgia, Germany, Gibraltar, Greece, Hungary, Iceland, Ireland, Italy, Latvia, Liechtenstein, Lithuania, Luxembourg, Macedonia, Malta, Moldova, Monaco, Montenegro, the Netherlands, Norway, Poland, Portugal, Romania. San Marino, Serbia, Slovakia, Slovenia, Spain, Sweden, Switzerland, Turkey, the Ukraine, and the United Kingdom of Great Britain and Northern Ireland (together with the Channel Islands and the Isle of Man) and/or any other names by which such territories may become known.

e) "Named Hurricane" shall be defined as those windstorms that are allocated names (including Greek alphabet symbols) by the World Meteorological Organization (WMO) and/or United States National Weather Service (NWS) and/or tracked by the services of the National Oceanic and Atmospheric Administration (NOAA) and attain wind speeds in excess of 74 miles per hour or are rated Hurricane Category One or higher on the Saffir-Simpson Scale at landfall. Named Hurricane losses shall include all ensuing losses arising directly or indirectly therefrom, which shall include, but not be limited to, ensuing collapse, water damage (including flood), fire and/or explosion following the Named Hurricane and shall be included within the scope of coverage hereunder.

f) "Windstorm" shall be defined as windstorm. Windstorm losses shall include all ensuing losses arising directly or indirectly therefrom,



DocuSign Envelope ID: ...

| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
|---|---|---|

which shall include, but not be limited to, ensuing collapse, water damage (including flood), fire and/or explosion following the Windstorm and shall be included within the scope of coverage hereunder.

g) "Earthquake" shall be defined as Earthquake, Seaquake, Tsunami, Earthquake Shock, Seismic and/or Volcanic Disturbance/Eruption. Earthquake losses shall include all ensuing losses arising directly or indirectly therefrom, which shall include, but not be limited to, ensuing collapse, water damage (including flood), fire and/or explosion following the Earthquake and shall be included within the scope of coverage hereunder.

**Aggregate Limit:** The maximum recoverable under each Section of this Reinsurance Contract is USD 75,000,000 and in all hereunder.

**Reinstatement Provisions:** Nil.

**Premium:** The Premium for this Reinsurance Contract shall be USD 29,250,000 (for 100%), payable within 10 business days of execution of the Trust Agreement.

The Reinsurer hereby agrees that the Premium, net of brokerage, shall be deposited directly by the Reinsured (or by the Intermediary as directed by the Reinsured) into the Trust Account (as defined in the Obligations Clause) when due.

**Premium Payment Terms:** None.

**Conditions:** The clauses hereunder are applicable to this Reinsurance Contract and are outlined in full in the following pages:

| Clause | Page |
|---|---|
| Ultimate Net Loss | 6 |
| Net Retained Lines | 6 |
| Currency Conversion | 6 |
| Offset | 6 |
| Aggregate Extraction | 7 |
| Inspection of Records | 7 |
| Notification of Loss | 7 |
| Loss Settlements | 8 |
| Extended Expiration | 8 |
| Extra Contractual Obligations | 8 |
| Loss in Excess of Policy Limits | 9 |
| Insolvency | 10 |
| Contracts (Rights of Third Parties) | 11 |
| Amendments and Alterations (LSW 319) | 11 |
| Errors and Omissions (LSW 321) | 11 |
| Confidentiality | 11 |
| Sanctions | 11 |
| Foreign Account Tax Compliance Act (FATCA) | 12 |
| Agency Agreement | 12 |
| Reinsurance Allocation | 12 |
| Multiple Reinsured | 13 |
| Severability | 13 |
| Data Privacy | 13 |
| Other Reinsurance | 15 |
| Mode of Execution | 15 |
| Intermediary | 15 |



DocuSign Envelope ID: 2B6A3A01-C34F-4BA8-98A8-8A40DFF0F64C

| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
|---|---|---|

### Ultimate Net Loss Clause

The term "Ultimate Net Loss" shall mean the sum actually paid or payable by the Reinsured in settlement of losses or liability (including any Extra Contractual Obligations and Loss in Excess of Policy Limits as defined herein) after making deductions for all recoveries and all salvages that are actually received and all claims upon other reinsurances whether collected or not, and shall include all costs and adjustment expenses (including costs of litigation and legal expenses, if any) arising from the settlement of claims other than the salaries of employees and the office expenses of the Reinsured.

All salvages, recoveries or payments recovered or received subsequent to a loss settlement under this Reinsurance Contract shall be applied as if recovered or received prior to the aforesaid settlement, and all necessary adjustments shall be made by the parties hereto.  Provided always that nothing in this clause shall be construed to mean that losses under this Reinsurance Contract are not recoverable until the Reinsured's Ultimate Net Loss has been ascertained.

Except as is otherwise provided for herein it is understood and agreed that recoveries under all Underlying Excess of Loss Reinsurances (as far as applicable) are for the sole benefit of the Reinsured and shall not be taken into account in computing the ultimate net loss or losses in excess of which this Reinsurance Contract attaches nor in any way prejudice the Reinsured's right of recovery hereunder.

Notwithstanding the foregoing, it is understood and agreed that reinsurances, if any, effected by Treaty Reinsurers (if applicable) protected hereunder shall not be taken into account in computing the ultimate net loss or losses in excess of which this Reinsurance Contract attaches, nor in any way affect the amounts recoverable hereunder.

### Net Retained Lines Clause

This Reinsurance Contract shall protect only that portion of any insurance or reinsurance which the Reinsured, acting in accordance with its established practices at the time of the commencement of this Reinsurance Contract, retains net for its own account. The Reinsurers' liability hereunder shall not be increased due to any error or omission which results in the Reinsured's net retention being larger than it would normally have been nor by the Reinsured's failure to reinsure and maintain reinsurance in accordance with its established practice as aforesaid, nor by the inability of the Reinsured to collect from any other reinsurers any amounts which may have become due from them for any reason whatsoever.

### Currency Conversion Clause

For the purpose of this Reinsurance Contract currencies other than the currency in which this Reinsurance Contract is written shall be converted into such currency at the rates of exchange used in the Reinsured's books or where there is a specific remittance for a loss settlement at the rates of exchange used in making such remittance.

### Offset Clause

The Reinsured or the Reinsurers may elect to offset any amount, whether on account of premiums, claims or any other amount due from

---



FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM
NYSCEF DOC. NO. 4
DocuSign Envelope ID: 2F8A14B0-C3BE-4CE1-834C-E9ES82B07 C46
Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23

one party to the other in respect of this Reinsurance Contract.

However, in the event of the insolvency of any party hereto, offset shall only be allowed in accordance with applicable statutes and regulations.

**Aggregate Extraction Clause**

With regard to policies which provide an Aggregate Limit of Liability, it is understood and agreed that the Reinsured shall extract from such Aggregate Policy the amount of loss sustained by them arising from any one occurrence in order that such loss can be added to the Reinsured's losses from the same occurrence on other policies provided that the loss occurs during the period of this Reinsurance Contract.

For the purpose of this clause, the amount of a loss from one occurrence on an aggregate policy shall be deemed to be that percentage of the aggregate loss to the Reinsured on the original policy that the total loss to the Original Insured from the particular occurrence bears to the total aggregate losses to the Original Insured on the business protected.

**Inspection of Records Clause**

Provided that all undisputed billings have been paid, no further particulars shall be required by the Reinsurers, but the books of the Reinsured so far as they concern the policies and/or contracts falling within the scope of this Reinsurance Contract shall be open to the inspection of an authorised representative of the Reinsurers at any reasonable time during the continuance of this Reinsurance Contract or of liability hereunder.

For purposes of this Clause, an undisputed billing is one that remains unpaid more than 60 days from receipt by the Reinsurer and the Reinsurer has not provided a written response to the Reinsured specifying why it remains unpaid.

The Reinsurers or their duly appointed representatives may arrange for copies to be made, at the Reinsurers' expense, of any of the records or documents containing such information that they may require.

Further, it is understood and the Reinsurer agrees that such access will be subject to a reasonable confidentiality agreement and may be restricted, in certain circumstances, by confidentiality agreements between the Reinsured and its ceding company clients, or by government restrictions.

The right of inspection shall not be construed to allow Reinsurers the right to delay or withhold payment for any losses which fall due under this Reinsurance Contract in accordance with terms and conditions as stated herein.

**Notification of Loss Clause**

The Reinsured undertakes to advise Reinsurers as soon as possible of any circumstances likely to give rise to a claim hereunder and thereafter keep Reinsurers fully informed of any material developments regarding the claim.

The Reinsured shall upon receiving any formal notification of any loss(es) or occurrence(s) (including any potential loss(es) or



FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM
NYSCEF DOC. NO. 4

| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
|---|---|---|

occurrence(s)) which may give rise to a claim recovery hereunder advise Reinsurers as soon as such formal notification is received.

**Loss Settlements Clause**

All loss settlements made by the Reinsured shall be binding upon Reinsurers provided such settlements are within the terms and conditions of this Reinsurance Contract, the true intent of this Reinsurance Contract being that the Reinsured shall follow the fortunes of the Reinsurer, and amounts falling to the share of the Reinsurers shall be payable by them upon reasonable evidence of the amount paid being given by the Reinsured.

**Extended Expiration Clause**

If this Reinsurance Contract should expire or be terminated whilst a loss covered hereunder is in progress, it is understood and agreed that subject to the other conditions of this Reinsurance Contract, the Reinsurers are responsible as if the entire loss or damage had occurred prior to the expiration or termination of this Reinsurance Contract, provided that no part of that loss is claimed against any renewal of this Reinsurance Contract.

**Extra Contractual Obligations Clause**

This Reinsurance Contract shall exclude all cover in respect of Extra Contractual Obligations, howsoever arising, such Extra Contractual Obligations being defined as any award made by a court of competent jurisdiction against an Insurer or Reinsurer, which award is not within the coverage granted by any insurance and/or reinsurance contract made between the parties in dispute.

Notwithstanding the foregoing, this Reinsurance Contract shall extend to cover any loss arising from a "Claims Related Extra Contractual Obligation":

a) awarded against the Reinsured; or

b) incurred by the Reinsured where he has paid his share of a "Claims Related Extra Contractual Obligation" awarded against one or more of his Co-Insurers.

Any recovery under this Reinsurance Contract in respect of "Claims Related Extra Contractual Obligation" shall only be for that part of any award which corresponds to the Reinsured's share of the insurance and/or reinsurance policy and/or contract giving rise to the award and all proportional protection effected by the Reinsured shall provide or shall be deemed to provide pro rata coverage for such obligations.

This Reinsurance Contract shall also extend to cover all loss from Extra Contractual Obligations howsoever arising where the loss is incurred by the Reinsured as a result of his participation in any insurance or reinsurance which provides cover for such loss, it being understood and agreed that such loss results from a contractual liability incurred by the Reinsured.

A "Claims Related Extra Contractual Obligation" shall be defined as the amount awarded against an Insurer or Reinsurer found liable by a court of competent jurisdiction to pay damages to an Insured or Reinsured in



Case 1:23-cv-01831-JGK Document 1-1 Filed 03/02/23 Page 26 of 221

Tiger Risk Reference          XA200910M                              TigerRisk Partners LLC

respect of the conduct of a claim made under an insurance and/or reinsurance policy and/or contract, where such liability has arisen because of:

a)  the failure of the Insurer or Reinsurer to agree or pay a claim within the policy limits or to provide a defence against such claims as required by law; or

b)  bad faith or negligence in rejecting an offer of settlement; or

c)  negligence or breach of duty in the preparation of the defence or the conduct of a trial or the preparation or prosecution of any appeal and/or subrogation and/or any subsequent action resulting therefrom.

There shall be no liability under this Reinsurance Contract in respect of:

a)  any assumption of liability by way of participation in any mutual scheme designed specifically to cover Extra Contractual Obligation; or

b)  any Extra Contractual Obligation arising from an adjudicated finding of fraud of a director, officer or employee of the Reinsured acting individually or collectively or in collusion with an individual or corporation or with any other organisation or party involved in the presentation, defence or settlement or any claim.

Any loss arising under this Reinsurance Contract in respect of "Claims Related Extra Contractual Obligations" shall be deemed to be a loss arising from the same event as that giving rise to the claim to which the Extra Contractual Obligation is related; but recovery hereunder is subject to the Insurance and/or Reinsurance policy and/or contract which gives rise to the Extra Contractual Obligation falling within the scope of this Reinsurance Contract.

**Loss in Excess of Policy Limits Clause**

This Reinsurance Contract shall protect the Reinsured, within the limits hereof, in connection with Ultimate Net Loss in excess of the limit of its original policy, such loss in excess of the limit having been incurred because of failure by it to settle within the policy limit or by reason of alleged or actual negligence, fraud, or bad faith in rejecting an offer of settlement or in the preparation of the defence or in the trial of any action against its insured or reinsured or in the preparation or prosecution of an appeal consequent upon such action.

However, this Clause shall not apply where the loss has been incurred due to an adjudicated finding of fraud by a member of the Board of Directors or a corporate officer of the Reinsured acting individually or collectively or in collusion with any individual or corporation or any other organization or party involved in the presentation, defence or settlement of any claim covered hereunder.

For the purpose of this Clause, the word "loss" shall mean any amounts for which the Reinsured would have been contractually liable to pay had it not been for the limit of the original policy.

The Reinsured shall be indemnified in accordance with this Clause to the extent permitted by applicable law.



DocuSign Envelope ID: 29C47BB3-C79E-4N47-BFA5-5C84DBE0EFC2

| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
|---|---|---|

### Insolvency Clause

Where an Insolvency Event occurs in relation to the Reinsured the following terms shall apply (and, in the event of any inconsistency between these terms and any other terms of this Reinsurance Contract, these terms shall prevail):

1.  Notwithstanding any requirement in this Reinsurance Contract that a Reinsured shall actually make payment in discharge of its liability to its policyholder before becoming entitled to payment from the Reinsurers:

    a)  the Reinsurers shall be liable to pay the Reinsured even though the Reinsured is unable to actually pay, or to discharge its liability to, its policyholder; but

    b)  nothing in this clause shall operate to accelerate the date for payment by the Reinsurers of any sum which may be payable to the Reinsured, which sum shall only become payable as and when the Reinsured would have discharged, by actual payment, its liability for its current net loss but for it being the subject of an Insolvency Event.

2.  The existence, quantum, valuation and date for payment of any sums which the Reinsurers are liable to pay the Reinsured under this Reinsurance Contract shall be those and only those for which the Reinsurers would be liable to the Reinsured if the liability of the Reinsured had been determined without reference to any term in any composition or scheme of arrangement or any similar arrangement, entered into between the Reinsured and all or any part of its policyholders, unless and until the Reinsurers serve written notice to the contrary on the Reinsured in relation to any composition or scheme of arrangement.

3.  The Reinsurers shall be entitled (but not obliged) to set-off, against any sum which it may be liable to pay the Reinsured, any sum for which the Reinsured is liable to pay the Reinsurers.

An Insolvency Event shall occur if:

A.  i.   (in relation to 1., 2., and 3. above) a winding up petition is presented in respect of the Reinsured or a provisional liquidator is appointed over it or if the Reinsured goes into administration, administrative receivership or receivership or if the Reinsured has a scheme of arrangement proposed in relation to all or any parts of its affairs, or

    ii.  (in relation to 1. above) if the Reinsured goes into compulsory or voluntary liquidation.

or, in each case, if the Reinsured becomes subject to any other similar insolvency process (whether under the laws of England and Wales or elsewhere); and

B.  the Reinsured is unable to pay its debts as and when they fall due within the meaning of Section 162 of the Bermuda Companies Act 1981 (or any statutory amendment or re-enactment of that section).



| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
| --- | --- | --- |

### Contracts (Rights of Third Parties) Clause

Nothing in this Reinsurance Contract shall in any manner create any obligations or establish any rights against the Reinsurer in favour of any third party or any persons not parties to this Reinsurance Contract.

### Amendments and Alterations Clause (LSW 319)

Any amendments or alterations to this Reinsurance Contract that are agreed between the parties herein shall be automatically binding and shall be considered as forming an integral part of this Reinsurance Contract.

### Errors and Omissions Clause (LSW 321)

Any inadvertent delays, omissions or errors made in connection with this Reinsurance Contract shall not be held to relieve either of the parties hereto from any liability which would have attached to them hereunder if such delay, omission or error had not been made, provided rectification be made as soon as practicable after discovery.

### Confidentiality Clause

The Reinsurer, except with the express prior written consent of the Reinsured, shall not communicate, disclose or divulge to any third party, any knowledge or information that may be acquired as a result of its participation in the Reinsurance Contract. The restrictions as outlined in this Clause shall not apply to communication or disclosures that the Reinsurer is required to make to auditors, both internal and external, outside actuaries, consultants, retrocessionaires, legal counsel, Reinsurer's shareholders and capital providers, arbitrators involved in any arbitration procedures under this Reinsurance Contract or disclosures required upon subpoena or other duly-issued order of a court or other governmental agency or regulatory authority; however, such third parties are to be informed of these confidentiality restrictions by the Reinsurer. The Reinsurer shall not share, communicate or otherwise disseminate the Reinsured's confidential information obtained by virtue of its participation on this Reinsurance Contract with any employees not involved in this reinsurance transaction.

Any breach or threatened breach of this Clause will constitute a breach that might cause irreparable injury, not readily measured in money, and for which the Reinsured, without waiving any other remedies or rights at law or in equity, will be entitled to injunctive relief or other equitable relief. Any such right or remedy and any and all other rights or remedies provided for herein will be cumulative and not exclusive and in addition to any and all other rights or remedies which the Reinsured may have under this Reinsurance Contract or otherwise.

The Reinsurer will comply with all applicable data protection laws/regulations with respect to the handling and/or processing of Confidential Information, including personally identifiable information, in connection with this Reinsurance Contract and will ensure that any third parties to whom any Confidential Information is shared have appropriate information security safeguards in place consistent with applicable laws/regulations.



DocuSign Envelope ID: 20CA... Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 29 of 221

| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
|---|---|---|

**Sanctions Clause**

Neither the Reinsured nor the Reinsurer shall be liable for any premium or loss under this Reinsurance Contract if it would result in a violation of any mandatory sanction, prohibition or restriction under the trade or economic sanctions, laws or regulations of any applicable jurisdiction.

**Foreign Account Tax Compliance Act (FATCA) Clause**

A. The Reinsurer will provide to the Reinsured its FATCA compliant documentation on or before the effective date of this Reinsurance Contract. To the extent the Reinsurer is subject to the deduction and withholding of premium payable hereon and has not provided the requisite filing form as set forth in the Foreign Account Tax Compliance Act (Sections 1471-1474 of the Internal Revenue Code), the Reinsurer agrees to allow such withholding from the premium payable under this Reinsurance Contract.

B. For purposes hereof, such amounts withheld will not be subject to offset under the Offset Clause.

C. The Reinsurer agrees to indemnify the Reinsured for any liability, expense, interest or penalty the Reinsured may incur by reason of the Reinsurer's breach of this Clause.

**Agency Agreement Clause**

If more than one Reinsured company is named as a party to this Reinsurance Contract, the first named Reinsured will be deemed the agent of the other Reinsured companies for purposes of sending or receiving notices required by the terms and conditions of this Reinsurance Contract and for purposes of remitting or receiving any monies due any party.

**Reinsurance Allocation Clause**

A. While having no effect on the settlements or liabilities of the parties to this Reinsurance Contract, it is established that:

1. If a loss covered under this Reinsurance Contract involves multiple member companies, the Reinsured shall allocate the Reinsurer's limit of liability for the loss to each member company involved, proportionately, based on the percentage that the affected member company's loss bears to the total of all losses contributing to that loss; and

2. With respect to reinsurance premium due to the Reinsurers hereunder, each member company shall be responsible for its proportionate share of the reinsurance premium. The final reinsurance premium, as determined under the terms of this Reinsurance Contract, shall be apportioned to each member company by the Reinsured in the same proportion that each member company's subject premium bears to the total subject premium.

B. Records of these allocations shall be maintained in sufficient detail to identify both the Reinsurer's loss obligations allocated to each member company and each member company's share of premium allocation.



Tiger Risk Reference    XA200910M    TigerRisk Partners LLC

**Multiple Reinsured Clause**

This Reinsurance Contract is a composite agreement covering a number of separate legal entities within the Sompo International Holdings Ltd. group of companies. The conduct or misconduct of one legal entity comprising the Reinsured ceding policies hereto shall not affect the validity of the cover available to those other legal entities comprising the Reinsured ceding policies hereto. In the event of a dispute, or disputes, arising between the Reinsurer and one or more legal entities comprising the Reinsured, it is agreed hereon, that such dispute or disputes shall not prejudice the validity of the cover available to those other legal entities not in dispute.

**Severability Clause**

If any provision of this Reinsurance Contract shall be rendered illegal or unenforceable by the laws or regulations of any applicable jurisdiction, such provision shall be considered void in such jurisdiction, but this shall not affect the validity or enforceability of any other provision of this Reinsurance Contract or the enforceability of such provision in any other jurisdiction.

**Data Privacy Clause**

<u>Definitions</u>

A.  The terms data subject, personal data, controller, processor and processing, together with other terms defined in the General Data Protection Regulation (Regulation (EU) 2016/679) ("GDPR"), will have meanings as defined in the GDPR as read with the UK Data Protection Act 2018. For the avoidance of doubt, personal data includes sensitive personal data as defined in Article 9(1) of the GDPR.

<u>Processing</u>

B.  This Clause applies to all personal data processed by either party under, or in connection with, this reinsurance.

C.  Whilst the arrangements in place between the parties from time to time will determine the role of each party in respect of personal data from time to time, it is anticipated that, as between the Reinsured and the Reinsurer under this Reinsurance Contract:

1.  The Reinsured will be a controller where it is processing personal data in relation to placing reinsurance, administering claims and providing information to the Reinsurer for audit and/or inspection.

2.  The Reinsurer will be a controller where it is processing personal data in relation to consideration, review and settlement of reinsurance claims, and inspection and/or audit of reinsurance claim data.

D.  Neither party will act as a processor in respect of personal data unless expressly appointed as a processor by the other party. Should such an appointment become necessary, the parties will undertake all reasonable endeavours to agree in good faith



Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 31 of 221
DocuSign Envelope ID: 29C7EB68-C3FE-4D13-8FBA-5C4F3BF5CF02

| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
| --- | --- | --- |

processor obligations that comply with any applicable data protection legislation.

<u>Data Controller Obligations</u>

E.  Where the Reinsured and the Reinsurer each act as a controller, each party will:

1.  comply at all times with applicable data protection legislation, including without limitation, New York State Department of Financial Services Cyber Security Requirements for Financial Service Companies (23 NYCRR 500) (the "NYS Cyber Security Requirements"), including by maintaining appropriate written records of all processing of personal data as required by Article 30 of the GDPR;

2.  not cause the other party to breach its respective obligations under the applicable data protection legislation, whether by act or omission;

3.  ensure that it has the ability to lawfully process personal data and to lawfully transfer, disclose and grant access to personal data to the other party as required for the performance of this Reinsurance Contract;

4.  ensure that the personal data transferred, disclosed or accessed by the other party is (i) accurate and (where necessary) kept up to date, (ii) relevant and adequate but not excessive, (iii) not retained by the providing party for longer than is necessary to enable the processing of personal data under this Reinsurance Contract, meeting the requirements set out in Article 5(1)(c) to (e) of the GDPR and the NYS Cyber Security Requirements;

5.  maintain appropriate technical and organisational security measures, sufficient to (at least) comply with its obligations as a controller under any applicable data protection legislation and, in particular, complying with the measures in Article 32(1) of the GDPR considering the matters in Article 32(2) of the GDPR;

6.  procure that all of its personnel who have access to or process personal data are subject to legally binding confidentiality obligations in relation to that personal data;

7.  where it reasonably believes that a data subject, or the representative of a data subject, has made a subject access request or notice or complaint in connection with any matter relating to this Reinsurance Contract to it that should have been directed to the other party, promptly (and in any event within forty-eight 48 hours) notify the other party.

<u>Other Obligations</u>

F.  Personal data received by the Reinsurer from the Reinsured will not be transferred to a third country without the Reinsurer having implemented appropriate safeguards in accordance with the applicable law and regulation (e.g. laws based on European Directive 95/46/CEP relating to the processing of Personal Data and / or its replacement Regulation 2016/679 on 25 May 2018 as



amended from time to time), unless required to do so by European Union or Member State law to which the Reinsurer is subject; in such a case, the Reinsurer will inform the Reinsured prior to transfer to the extent it is legally permitted to do so.

G.    Personal Data will not be transferred to a processor or any third party without the Reinsured's prior written consent save for transfers within the European Union or to countries subject to an adequacy level of protection recognized by the European Commission (as updated from time to time) ("Authorized Location").  Notwithstanding the foregoing, the Reinsured may at any time request the Reinsurer to provide a list of retrocessionaires within the European Union or in Authorized Locations to whom the Personal Data has been transferred.  The Reinsurer must ensure the same data protection obligations as set out in this Reinsurance Contract apply to its processors or any other third party to whom the data is transferred by way of a contract or otherwise.

H.    To the extent permitted by the applicable law, each party will notify the other party without undue delay upon becoming aware of a breach of security leading to the accidental or unlawful destruction, loss, alteration, unauthorised disclosure of, or access to, Personal Data processed under, or in connection with, this Reinsurance Contract.

**Other Reinsurance Clause**

The Reinsured shall be permitted to carry other reinsurance, recoveries under which shall inure solely to the benefit of the Reinsured and be entirely disregarded in applying all of the provisions of this Reinsurance Contract

**Mode of Execution Clause**

A.    This Contract (including any addenda thereto) may be executed by any of the following methods:

1.    An original written ink signature of paper documents;

2.    Facsimile or electronic copies of paper documents showing an original ink signature; and/or

3.    Electronic signature technology employing computer software and a digital signature or digitizer pad to capture a person's handwritten signature in such a manner that the signature is unique to the person signing, is under the sole control of the person signing, is capable of verification to authenticate the signature and is linked to the document signed in such a manner that if the data is changed, such signature is invalidated.

B.    The use of any one or a combination of the methods set forth in paragraph A. above shall constitute a valid execution of this Contract.  This Contract may be executed in one or more counterparts, each of which, when duly executed, shall be deemed an original.

**Intermediary Clause**

TigerRisk Partners LLC is hereby recognized as the Intermediary negotiating this Reinsurance Contract for all business hereunder.  All



DocuSign Envelope ID: 2C5A7633-C72E-4A17-872B-50649B9ECF9C
Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23

| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
|---|---|---|

communications (including notices, statements, premiums, return premiums, commissions, taxes, losses, Loss Adjustment Expenses, salvages, and loss settlements) relating thereto shall be transmitted to the Reinsured or the Reinsurer through the Intermediary. Payments by the Reinsured to the Intermediary shall be deemed payment to the Reinsurer. Payments by the Reinsurer to the Intermediary shall be deemed payment to the Reinsured only to the extent that such payments are actually received by the Reinsured.

Brokerage for this Reinsurance Contract is 10.00% (ten percent) of the Premium payable to the Reinsurer(s) hereunder to TigerRisk Partners LLC

**Exclusions:**

This Reinsurance Contract shall exclude:

1. the Reinsured's interest whether direct or by way of reinsurance in a loss arising from a claim or claims against an insured by another party or parties.

   Notwithstanding the foregoing, this Reinsurance Contract shall not exclude:

   (a) any Physical Damage and/or Consequential Loss coverage contingent thereon affected by an insured on behalf of another party.

   (b) Workers Compensation and/or Employers Liability when written on a catastrophe basis.

2. liability arising out of any Reinsurance Assumed and Excess of Loss and/or Pro-Rata Reinsurances issued in the name of a Lloyd's Syndicate and/or of an insurance or reinsurance company, whether such liability is accepted directly or under any form of reinsurance from other Insurers and/or Reinsurers, and all such liability is excluded from the protection of this Reinsurance Contract and cannot be taken into account in arriving at the amount in excess of which this Reinsurance Contract attaches.

   The Reinsured shall be the sole judge as to which insurance or reinsurance companies come within the scope of this definition.

   Notwithstanding the foregoing, it is understood and agreed that:

   (a) Excess of Loss and/or Pro-Rata Reinsurances of Direct and Facultative Accounts and/or Pro-Rata Reinsurances of Pro Rata treaties covering Direct and/or Facultative Accounts.

   (b) Specific retrocessions of an original insurance company's or regional reinsurer's account and retrocessions written on a single, specific or regional territorial basis.

   (c) any Reinsurance of business underwritten by the Reinsured and accepted via Lloyd's Insurance Company S.A., Brussels or any business underwritten by the Reinsured and accepted on behalf of the Reinsured by an authorised entity, for regulatory, legislative or similar purposes.

   shall not fall within the scope of the above definition.



FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM
NYSCEF DOC. NO. 4

| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
|---|---|---|

3. loss of or damage to property situated Offshore and all losses consequent upon such loss or damage.

For the purposes of this exclusion "Offshore" means:

(i) places where the tide ebbs and flows; and/or

(ii) other navigable waters or waterways which shall mean any water which is in fact navigable by ships or vessels, whether or not the tide ebbs and flows there, and whether or not there is a public right of navigation in that water.

Nothing contained herein shall exclude losses arising from bridges, tunnels, dams, piers, jetties and/or causeways and/or policies and/or contracts written to cover Fine Arts, Specie, Jewellery, Personal Effects, and other similar items including items covered under a Householders or Personal Lines policy and/or contract.

4. absolutely any loss, damage, claim, cost, expense, sum or other obligation of any kind or description directly or indirectly caused by, contributing to, or resulting from mould, fungus, mildew or spores.

This exclusion will apply regardless of whether or not:

i. the mould, fungus, mildew or spores is/are caused by, contributed to, or results from an insured peril;

ii. the Reinsured's original policy(ies) provide coverage;

iii. the Reinsured's original obligations are contractual, extra-contractual, or otherwise;

iv. the Reinsurance presentation is for settlement(s), judgement(s) or any other form of resolution.

5. all above ground transmission and distribution lines, including wire, cables, poles, pylons, standards, towers, other supporting structures and any equipment of any type which may be attendant to such installations of any description, for the purpose of transmission or distribution of electrical power, telephone or telegraph signals, and all communication signals whether audio or visual.

This exclusion applies to all equipment other than that which is on or within 1 (one) statute mile of an insured structure.

This exclusion applies both to physical loss or damage to the equipment and all business interruption, consequential loss, and/or other contingent losses related to transmission and distribution lines, other than contingent property damage/business interruption losses (including expenses), arising from loss and/or damage to lines of third parties.

6. Aviation War.

7. Aviation and Satellite business.

8. Workers Compensation business, but not in respect of Earthquake losses occurring in the United States of America.

9. Hail on Crops.



| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
|---|---|---|

10. Life, Financial Guarantee and Insolvency business.

11. Loss or damage arising from contamination by biological and/or chemical substances.

12. Industry Loss Warranties.

13. third party liability as a result of Wildfire loss or losses under policies issued to any California Utilities or their captives.

Furthermore, this Reinsurance Contract shall also exclude business in accordance with the following established market referenced exclusion clauses:

i. Nuclear Energy Risks as per the Nuclear Energy Risks Exclusion Clause (Reinsurance) 1994 (Worldwide excluding U.S.A. and Canada) - NMA 1975a. (Japanese amendment).

ii. Nuclear Incident as per the Nuclear Incident Exclusion Clauses, Reinsurance – USA and Canada NMA 1590, NMA 1119, NMA 1166, NMA 1979a, NMA 1980a, NMA 1251.

iii. War and Terrorism as per the War and Terrorism Exclusion Clause (NMA2919).

iv. Information Technology Hazards Clarification Clause (NMA2912).

v. Information Technology Hazards (Risk) Exclusion Clause (NMA2928).

<u>Invalidation</u>

Should any arbitration, judicial or regulatory entity having jurisdiction invalidate any exclusion in the Reinsured's policy or the underlying policy on which the Reinsured's policy follows form that is also the subject of one or more of the exclusions herein, then loss for which the Reinsured is liable because of such invalidation will not be excluded hereunder.

<u>Incidental</u>

The exclusions enumerated herein shall not apply when they are merely incidental to the main operations or exposures of the insured, provided such main operations or exposures are also covered by the Reinsured and are not themselves excluded from the scope of this Reinsurance Contract. The Reinsured shall be the sole judge of what is "incidental".

<u>Inadvertence</u>

Should the Reinsured, by reason of an inadvertent act, error, or omission, be bound to afford coverages excluded hereunder or should an existing insured extend its operations to include coverage excluded hereunder, the Reinsurer will waive the exclusion(s). The duration of said waiver will not extend beyond the time that notice of such coverage has been received by the responsible underwriting authority of the Reinsured plus the minimum time period required thereafter for the Reinsured to terminate such coverage.

**Express Warranty:** It is hereby warranted that no loss shall attach hereunder unless the Reinsured sustains loss from two or more risks involved in the same loss event.



| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
|---|---|---|

For the purposes of the above warranty, aa "risk" is defined as all values at one location including all business interruption and/or time element exposures whether by way of Contingent Business Interruption, Suppliers or Customers extensions.

**Special Acceptances:**

Business which is beyond the terms, conditions or limitations of this Reinsurance Contract may be submitted to the Reinsurer in writing for special acceptance hereunder, and such business, if accepted in writing by the Reinsurer, shall be subject to all the terms, conditions and limitations of this Reinsurance Contract except as modified by the Special Acceptance. The Reinsurer shall provide the Reinsured with a five business day turnaround on all Special Acceptances hereunder. Policies submitted for special acceptance shall be deemed accepted by those Reinsurer(s) failing to respond within this timeframe. The five business day response time shall begin from the time the Special Acceptance is received by the Reinsurer.

**Limited Recourse and Bermuda Regulations:**

The liability of the Reinsurer for the performance and discharge of all of its obligations, however they may arise, in relation to this Reinsurance Contract (together "Obligations" for purposes of this provision), shall be limited to and payable solely from the proceeds of realization of the assets of the Trust Account and accordingly there shall be no recourse to any other assets of Horseshoe Re Limited, whether or not allocated to any other separate account or the general account of Horseshoe Re Limited. In the event that the proceeds of realization of the assets of the Trust Account are insufficient to meet all Obligations, any Obligations remaining after the application of such proceeds shall be extinguished, and the Reinsured undertakes in such circumstances to take no further action against the Reinsurer in respect of any such Obligations. In particular, neither the Reinsured nor any party acting on its behalf shall petition or take any steps for the winding up or receivership of the Reinsurer or Horseshoe Re Limited.

Notwithstanding any matter referred to herein, the Reinsured understands and accepts that the Reinsurer is a separate account of Horseshoe Re Limited and that all corporate matters relating to the creation of the Reinsurer, capacity of the Reinsurer, operation and liquidation of the Reinsurer and any matters relating to the Reinsurer thereof shall be governed by, and construed in accordance with, the laws of Bermuda. The Reinsured has had the opportunity to take advice and to obtain all such additional information that it considers necessary to evaluate the terms, conditions and risks of entering into this Reinsurance Contract with the Reinsurer.

**Obligations Clause**

The Reinsurer agrees to establish a Trust Account in accordance with the trust agreement entered into by Endurance Specialty Insurance Limited ("ESIL"), as representative for the Reinsured, and the Reinsurer (the "Trust Agreement") and to deposit therein sufficient Permitted Investments (as defined in the Trust Agreement) to cover 100% of its Obligations hereon.

The term "Obligations" shall mean:

(a)   During the Period of this Reinsurance Contract, USD 75,000,000 (for 100%) less any unpaid premium (net of Federal Excise Tax) and brokerage, less Ultimate Net Loss recovered from the Reinsurer;



| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
|---|---|---|

(b) On expiration of this Reinsurance Contract, it is agreed that the collateral will be released in accordance with the Collateral Release Clause.

The Reinsured and the Reinsurer further agree, notwithstanding anything to the contrary in this Reinsurance Contract, that said Trust Account may be drawn upon by ESIL or its successors in interest at any time, without diminution because of the insolvency of the Reinsured or the Reinsurer, but only for one or more of the following purposes:

1) To reimburse itself for the Reinsurer's share of unearned premiums on the account of cancellations, unless paid in cash by the Reinsurer;

2) To reimburse itself for the Reinsurer's share of losses and/or loss expense paid under the terms of policies reinsured hereunder, unless paid in cash by the Reinsurer;

3) To fund a separate cash account, apart from its other assets, in the name of the Beneficiary or any bank or trust company acceptable to the Reinsured and the Reinsurer, in the amount equal to the Reinsurer's Obligations, ten days prior to the effective date of termination of the Trust Account;

4) To refund to the Reinsurer any sum in excess of the actual amount required to fund the Reinsurer's Obligations, if so requested by the Reinsurer.

In the event the amount drawn by ESIL on any Trust Account is in excess of the actual amount required for 1), 2), or 3), the actual amount determined to be due, the Reinsured shall promptly return to the Reinsurer the excess amount so drawn. For the avoidance of doubt, any withdrawal of funds made by ESIL in accordance with the provisions of this Reinsurance Contract and the Trust Agreement shall satisfy the obligations of the Reinsurer to the Reinsured hereunder in an amount equal to such withdrawal.

**Collateral Release**

On the expiration of this Reinsurance Contract, if the Trust Account has not yet been terminated, the Reinsured shall calculate, on a monthly basis, how much, if any, of the collateral shall be released from the Trust Account, as follows:

1) For each potentially covered event, the Reinsured shall multiply the Loss Amount (the sum of [i] losses and loss expenses paid, [ii] reserves for losses reported and outstanding and [iii] reserves for losses incurred but not reported) by the appropriate Buffer Loss Factor from the table below, based upon the type of event and the number of months which have elapsed since the event. The product of this calculation shall be defined as the Buffered Loss Amount ("BLA").

2) The BLA will then be reduced by inuring reinsurance recoveries and the appropriate flat deductible to compute its contribution to the Presumed Ultimate Net Loss. The Presumed Ultimate Net Loss will equal the sum of these contributions.

3) The Presumed Ceded Loss will be defined as the lesser of the Presumed Ultimate Net Loss and the Limit of USD 75,000,000 (or



| Tiger Risk Reference | XA200910M | | TigerRisk Partners LLC |

100%). An amount equal to the Presumed Ceded Net Loss less losses paid by the Reinsurer shall be retained in the Trust Account and any excess in the Trust Account over such amount shall be released to the Reinsurer.

| Buffer Loss Factor Table | | | |
|---|---|---|---|
| Number of Calendar Months Since Date of Event | Windstorm* / Brushfire | Earthquake & Fire Following | Other |
| 0 to 3 | 200% | 300% | 250% |
| > 3 to 6 | 150% | 200% | 175% |
| > 6 to 9 | 125% | 175% | 150% |
| > 9 to 12 | 110% | 150% | 130% |
| > 12 to 15 | 105% | 125% | 115% |
| > 15 to 18 | 100% | 120% | 110% |
| Thereafter | 100% | 100% | 100% |

\*   For the purpose of this Collateral Release provision, the term "Windstorm" shall include Hurricane, Rainstorm, Storm, Tempest, Tornado, Cyclone, Typhoon and Hail.

So long as there is any security on deposit in the Trust Account, the Reinsured shall perform the calculation set forth above within 10 business days after the expiration or the Risk Period and thereafter 10 business days after the end of each calendar month and deliver a report to the Reinsurer and the Trustee named in the Trust Agreement. Collateral will be adjusted monthly based on this calculation. To the extent the calculation indicates that collateral may be reduced, the Reinsurer shall deliver to the Trustee a 'Grantor Excess Withdrawal Notice', as defined in the Trust Agreement, which shall constitute a directive to return the excess collateral to the Reinsurer. Any release of collateral as outlined in this clause shall release the Reinsurer from any future liability under this Reinsurance Contract for that released amount.  It is further understood and agreed that if all Collateral is returned to the Reinsurer, then this shall constitute a full and final commutation of this Reinsurance Contract.

For the avoidance of doubt, any obligation to effect or procure the deposit of additional assets in the Trust Account shall be subject in all instances to the Limited Recourse and Bermuda Regulations clause.

In the event that collateral remains in the Trust Account 24 months following the expiration of this Reinsurance Contract, the Reinsurer shall have the option to commute this Reinsurance Contract at the Reinsured's estimated Ultimate Net Loss (including incurred but not reported) by sending the Reinsured written notice thereof.

**Arbitration:**   All matters in difference between the Reinsured and the Reinsurers (hereinafter referred to as "the parties") in relation to this Reinsurance Contract, including its formation and validity, and whether arising during or after the period of this Reinsurance Contract, shall be referred to an arbitration tribunal in the manner hereinafter set out.

Unless the parties agree upon a single arbitrator within thirty days of one



Case 1:23-cv-01831-JGK Document 1-1 Filed 03/02/23 Page 39 of 221

| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
|---|---|---|

receiving a written request from the other for arbitration, the claimant (the party requesting arbitration) shall appoint their arbitrator and give written notice thereof to the respondent. Within thirty days of receiving such notice the respondent shall appoint their arbitrator and give written notice thereof to the claimant, failing which the claimant may apply to the appointor hereinafter named to nominate an arbitrator on behalf of the respondent.

Should the arbitrators fail to agree, then they shall within thirty days of such disagreement appoint an umpire to whom the matter in difference shall be referred. Should the arbitrators fail within such period to appoint an umpire, then either of them or either of the parties may apply to the appointor for the appointment of an umpire.

Unless the parties otherwise agree, the arbitration tribunal shall consist of persons who are active or retired lawyers with not less than ten (10) years' experience in insurance or reinsurance law or active or retired officers of insurance or reinsurance companies, and will not have a personal or financial interest in the parties or the outcome of the arbitration. For the avoidance of doubt, the arbitrators will be completely impartial and disinterested in their respective appointing parties and in the result of the arbitration.

The arbitration tribunal shall have power to fix all procedural rules for the holding of the arbitration including discretionary power to make orders as to any matter which it may consider proper in the circumstances of the case with regard to pleadings, discovery, inspection of documents, examination of witnesses and any other matter whatsoever relating to the conduct of the arbitration and may receive and act upon such evidence whether oral or written strictly admissible or not as it shall in its discretion think fit.

The appointor shall be the Secretary General for the time being of the Court of Arbitration of the International Chamber of Commerce.

Each party shall bear the expense of its own arbitrator, and shall jointly and equally bear with the other the expense of the Umpire and of the arbitration. In the event that the two arbitrators are chosen by one party, as provided above, the expenses of the arbitrators, the Umpire and the arbitration shall be equally divided between the two parties.

The seat of the arbitration shall be in Hamilton, Bermuda and the arbitration tribunal shall apply the laws of the state of New York as the proper law of this Reinsurance Contract.

The arbitration shall be conducted under, and the arbitration tribunal shall be governed by, the provisions of the Bermuda Arbitration Act 1986 and/or any statutory modifications or amendments thereto for the time being in force.

The award of the arbitration tribunal shall be in writing and binding upon the parties who hereby covenant to carry out the same. If a party fails to carry out the award the other(s) may apply for its enforcement to a court of competent jurisdiction in any territory in which the party in default is domiciled or has assets or carries on business.

**Choice of Law and Jurisdiction:**

Except with respect to the Seperate Accounts Company status of the Reinsurer which is governed by the laws of Bermuda, this Reinsurance Contract, subject to the Arbitration Clause contained herein, is subject to

---



FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM INDEX NO. 650832/2023
NYSCEF DOC. NO. 4 RECEIVED NYSCEF: 02/13/2023

| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
|---|---|---|

the laws of the state of New York and Bermuda jurisdiction.

**Service of Suit Clause**

In respect of Endurance Assurance Corporation only, this Clause only applies to Reinsurers domiciled outside of the United States and/or unauthorized in any state, territory, or district of the United States having jurisdiction over the Reinsured. Nothing in this Clause will be construed to override the provisions of the Arbitration Clause. This Clause is intended as an aid to compelling arbitration, or enforcing such arbitration, or arbitral award, and not as an alternative to the Arbitration Clause for resolving disputes arising out of this Reinsurance Contract.

It is agreed that in the event of the failure of the Reinsurer hereon to perform its obligations hereunder, the Reinsurer hereon, at the request of the Reinsured, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this Clause constitutes or should be understood to constitute a waiver of the Reinsurer's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Mendes & Mount, LLP, 750 Seventh Avenue, New York, New York 10019-6829, and that in any suit instituted, the Reinsurer will abide by the final decision of such court or of any appellate court in the event of an appeal.

The above-named are authorized and directed to accept service of process on behalf of the Reinsurer in any such suit and/or upon the request of the Reinsured to give a written undertaking to the Reinsured that they will enter a general appearance upon the Reinsurer's behalf in the event such a suit will be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Reinsurer hereon hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Reinsured or any beneficiary hereunder arising out of this Reinsurance Contract, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

**Recording, Transmitting and Storing Information:** Where the Intermediary maintains risk and claim, the data, information or documents may be held electronically.

**Reinsurer Contract Documentation:** The document contained herein illustrates the full terms and conditions to which the participating Reinsurers have agreed and constitutes the Contract Document.

Reinsurers' acceptance of a share in this Reinsurance Contract, whether by direct signature of the attached Signing Schedule(s) (whether attached hereto or otherwise), or by correspondence, shall constitute their formal signature of this Reinsurance Contract and no further documentation shall be issued.



FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM
DocuSign Envelope ID: 29C13BB3-CBE-4D13-AF41-5D1FBD8CFE3E Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 41 of 221

| **Tiger Risk Reference** | **XA200910M** | **TigerRisk Partners LLC** |
|---|---|---|

Evidence of cover will be provided to the Reinsured in the form of a fully scanned copy of this Reinsurance Contract.

Signed Lines available to Reinsurers at inception and written confirmation to be sent to them within thirty (30) days of inception.

**Order Hereon:**  20.000% of Limit

## Information

**Information:**  Reinsured's 2020 Information seen and noted by Reinsurers hereon.

Tiger Risk Reference       XA200910M                    TigerRisk Partners LLC

---

## Reinsured Signing Schedule

**IN WITNESS WHEREOF**, the parties hereto have caused this Reinsurance Contract to be executed by their duly authorized representatives.

Signed for and on behalf of:

**Endurance Specialty Insurance Limited, (Bermuda) on behalf of itself and on behalf of its branches, affiliates, Endurance Worldwide Insurance Limited (London, England) and its branch office, SI Insurance (Europe), SA, Lloyd's Syndicate Number 5151 (London, England), Endurance Assurance Corporation (New York, USA) and/or their Quota Share reinsurers if applicable, including any and/or all of the subsidiary or affiliate companies that are now or may hereafter come under the ownership, management and/or control of Sompo International Holdings Ltd.**

In _____ this _____ day of _____, 201__

BY: _John Del Col_____ 3/9/2020
    370292FF2EC646B...

TITLE: ___General Counsel_____

REFERENCE NO.: _____



| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
|---|---|---|

## Reinsurer Signing Schedule

**Attaching to and forming Tiger Reference: XA200910M**

**Type:**            **CATASTROPHE AGGREGATE EXCESS OF LOSS REINSURANCE CONTRACT**

**Reinsured:**       Endurance Specialty Insurance Limited, (Bermuda) on behalf of itself and on behalf of its branches, affiliates, Endurance Worldwide Insurance Limited (London, England) and its branch office, SI Insurance (Europe), SA, Lloyd's Syndicate Number 5151 (London, England), Endurance Assurance Corporation (New York, USA) and/or their Quota Share reinsurers if applicable, including any and/or all of the subsidiary or affiliate companies that are now or may hereafter come under the ownership, management and/or control of Sompo International Holdings Ltd. (hereinafter referred to collectively as the "Reinsured").

The Subscribing Reinsurer hereby agrees to the terms and conditions of the reinsurance as contained in the attached Contract. The Intermediary is allowed to subsequently apportion signed lines as respects the layers below. The signed lines shall be notified to the Subscribing Reinsurer separately.

For and on behalf of:

**SIGNED LINES:**

| Written Line % | Signed Line % [Entered by Intermediary] | Reference |
|---|---|---|
|  |  |  |

**Authorised Signatory** _~~Ranceis~~_    **Date** Mar. 6, 2020

HORSESHOE RE LIMITED ON BEHALF OF
AND FOR THE BENEFIT OF ITS
SEPARATE ACCOUNT  H Soo 83

USD   15,000,000 (20%)



DocuSign Envelope ID: 2C2A3B5A-CF1C-4A95-824B-CE8C6F87FDE6 Case 1:23-cv-01831-JGK Document 1-1 Filed 03/02/23 Page 44 of 221



# TigerRisk Partners LLC

## MARKET REFORM CONTRACT

| | |
|---|---|
| **Reinsured:** | Endurance Specialty Insurance Limited, (Bermuda) on behalf of itself and on behalf of its branches, affiliates, Endurance Worldwide Insurance Limited (London, England) and its branch office, SI Insurance (Europe), SA, Lloyd's Syndicate Number 5151 (London, England), Endurance Assurance Corporation (New York, USA) and/or their Quota Share reinsurers if applicable, including any and/or all of the subsidiary or affiliate companies that are now or may hereafter come under the ownership, management and/or control of Sompo International Holdings Ltd. |
| **Type:** | **CATASTROPHE AGGREGATE EXCESS OF LOSS REINSURANCE CONTRACT** |
| **Period:** | **Loss Occurring during the twelve month period effective 1 January, 2020** |
| **Tiger Risk Reference:** | **XA200911M** |
| **Intermediary:** | **TigerRisk Partners LLC** |
| **NEW / RENEWAL:** | **Renewal** |

FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM INDEX NO. 650832/2023
NYSCEF DOC. NO. 5 RECEIVED NYSCEF: 02/13/2023

| Tiger Risk Reference | XA200911M | TigerRisk Partners LLC |
|---|---|---|

## Risk Details

**Tiger Risk Reference:** **XA200911M**

**Type:** **CATASTROPHE AGGREGATE EXCESS OF LOSS REINSURANCE CONTRACT**

**Reinsured:** Endurance Specialty Insurance Limited, (Bermuda) on behalf of itself and on behalf of its branches, affiliates, Endurance Worldwide Insurance Limited (London, England) and its branch office, SI Insurance (Europe), SA, Lloyd's Syndicate Number 5151 (London, England), Endurance Assurance Corporation (New York, USA) and/or their Quota Share reinsurers if applicable, including any and/or all of the subsidiary or affiliate companies that are now or may hereafter come under the ownership, management and/or control of Sompo International Holdings Ltd. (hereinafter referred to collectively as the "Reinsured").

**Reinsurer:** The subscribing Insurance and/or Reinsurance Companies and/or Underwriting Members of Lloyd's (hereinafter referred to as the Reinsurers) for a participation as stated in the individual signing pages.

**Period:** This Reinsurance Contract shall apply to losses occurring during the period from 1 January 2020 to 31 December 2020 both days inclusive, Local Standard Time at the place where the loss occurs.

**Class of Business:** This Reinsurance Contract shall indemnify the Reinsured in respect of all policies and/or contracts of reinsurance for all NATURAL PERILS, as defined below, for Property Catastrophe, Risk and Pro-Rata losses derived from their Reinsurance Global Catastrophe Strategic Business Unit and their Reinsurance Global Property Strategic Business Unit occurring with the Territorial Scope hereon.

For the purposes of this Reinsurance Contract NATURAL PERILS shall be understood to include, but not be limited to Earthquake, Seaquake, Earthquake Shock, Seismic and/or Volcanic Disturbance/Eruption, Hurricane, Rainstorm, Storm, Storm Surge, Severe Storm, Winter Storm, Thunderstorm, Windstorm, Tropical Storm, Tempest, Tornado, Cyclone, Typhoon, Tidal Wave, Tsunami, Flood, Hail/Hailstorm, Winter Weather/Freeze, Winter Storm, Ice Storm, Weight of Snow, Avalanche, Meteor/Asteroid Impact, Landslip, Landslide, Mudslide, Bush Fire, Forest Fire, Wildfires/Brushfires, Lightning, Sinkhole Collapse and Earth Movement. Natural Perils losses shall include all ensuing losses arising directly or indirectly therefrom, which shall include, but not be limited to, ensuing collapse, water damage (including flood), fire and/or explosion following the Natural Peril and shall be included within the scope of coverage hereunder.

**Territorial Scope:** This Reinsurance Contract shall apply to losses wheresoever occurring, but subject to the definitions of the Limits Section hereon.

**Limits:** EXCESS

To pay in excess of an Ultimate Net Loss to the Reinsured of USD 250,000,000 Ultimate Net Loss, in the aggregate.

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 46 of 221

| Tiger Risk Reference | XA200911M | TigerRisk Partners LLC |
|---|---|---|

LIMIT

Up to a further USD 300,000,000 Ultimate Net Loss, in the aggregate.

Notwithstanding the foregoing, before any loss can be applied to the LIMIT set out above, the Reinsured's Ultimate Net Loss shall be first subject to an excess of:

USD 15,000,000 Each and Every Loss in respect of Named Hurricane losses in the United States of America, Canada and the Caribbean and Windstorm losses in Europe and Earthquake losses occurring in the State of California (being part of the United States of America), and Japan; or

USD 5,000,000 Each and Every Loss in respect of losses wheresoever occurring excluding Named Hurricane losses in the United States of America, Canada and the Caribbean and Windstorm losses in Europe and Earthquake losses occurring in the State of California (being part of the United States of America), and Japan.

**Definitions:**    For all purposes of this Reinsurance Contract:

a)  the term "Each and Every Loss" shall be understood to mean "each and every loss and/or occurrence and/or catastrophe and/or disaster and/or calamity and/or series of losses and/or occurrences and/or catastrophes and/or disasters and/or calamities arising out of one event".

b)  "United States of America" shall be defined as the 50 states of the Union and the District of Columbia.

c)  "Caribbean" shall be defined as all islands situated off North, Central and South America between Latitude 10 degrees North and 35 degrees North and Longitude 55 degrees West and 100 degrees West.

d)  "Europe" shall be defined as Albania, Andorra, Armenia, Austria, Belarus, Belgium, Bosnia and Herzegovina, Bulgaria, Croatia, Cyprus, the Czech Republic, Denmark, Estonia, Faroe Islands, Finland, France, Georgia, Germany, Gibraltar, Greece, Hungary, Iceland, Ireland, Italy, Latvia, Liechtenstein, Lithuania, Luxembourg, Macedonia, Malta, Moldova, Monaco, Montenegro, the Netherlands, Norway, Poland, Portugal, Romania. San Marino, Serbia, Slovakia, Slovenia, Spain, Sweden, Switzerland, Turkey, the Ukraine, and the United Kingdom of Great Britain and Northern Ireland (together with the Channel Islands and the Isle of Man) and/or any other names by which such territories may become known.

e)  "Named Hurricane" shall be defined as those windstorms that are allocated names (including Greek alphabet symbols) by the World Meteorological Organization (WMO) and/or United States National Weather Service (NWS) and/or tracked by the services of the National Oceanic and Atmospheric Administration (NOAA) and attain wind speeds in excess of 74 miles per hour or are rated Hurricane Category One or higher on the Saffir-Simpson Scale at landfall. Named Hurricane losses shall include all ensuing losses arising directly or indirectly therefrom, which shall include, but not be limited to, ensuing collapse, water damage (including flood), fire and/or explosion following the Named Hurricane and shall be

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 47 of 221

| Tiger Risk Reference | XA200911M | TigerRisk Partners LLC |
|---|---|---|

included within the scope of coverage hereunder.

f) "Windstorm" shall be defined as windstorm. Windstorm losses shall include all ensuing losses arising directly or indirectly therefrom, which shall include, but not be limited to, ensuing collapse, water damage (including flood), fire and/or explosion following the Windstorm and shall be included within the scope of coverage hereunder.

g) "Earthquake" shall be defined as Earthquake, Seaquake, Tsunami, Earthquake Shock, Seismic and/or Volcanic Disturbance/Eruption. Earthquake losses shall include all ensuing losses arising directly or indirectly therefrom, which shall include, but not be limited to, ensuing collapse, water damage (including flood), fire and/or explosion following the Earthquake and shall be included within the scope of coverage hereunder.

**Aggregate Limit:** The maximum amount recoverable in all hereunder shall not exceed USD 300,000,000.

**Reinstatement Provisions:** Nil.

**Premium:** The Premium for this Reinsurance Contract shall be USD 115,500,000 (for 100%), payable within 10 business days of execution of the Trust Agreement.
The Reinsurer hereby agrees that the Premium, net of brokerage, shall be deposited directly by the Reinsured (or by the Intermediary as directed by the Reinsured) into the Trust Account (as defined in the Obligations Clause) when due.

**Premium Payment Terms:** None.

**Conditions:** The clauses hereunder are applicable to this Reinsurance Contract and are outlined in full in the following pages:

| Clause | Page |
|---|---|
| Ultimate Net Loss | 5 |
| Net Retained Lines | 5 |
| Currency Conversion | 5 |
| Offset | 6 |
| Aggregate Extraction | 6 |
| Inspection of Records | 6 |
| Notification of Loss | 6 |
| Loss Settlements | 7 |
| Extended Expiration | 7 |
| Extra Contractual Obligations | 7 |
| Loss in Excess of Policy Limits | 8 |
| Insolvency | 9 |
| Contracts (Rights of Third Parties) | 10 |
| Amendments and Alterations (LSW 319) | 10 |
| Errors and Omissions (LSW 321) | 10 |
| Confidentiality | 10 |
| Sanctions | 11 |
| Foreign Account Tax Compliance Act (FATCA) | 11 |
| Agency Agreement | 11 |
| Reinsurance Allocation | 11 |
| Multiple Reinsured | 12 |
| Severability | 12 |
| Data Privacy | 12 |



FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM
NYSCEF DOC. NO. 5

| Tiger Risk Reference | XA200911M | TigerRisk Partners LLC |

**Other Reinsurance**     14
**Mode of Execution**     14
**Intermediary**     14

**Ultimate Net Loss Clause**

The term "Ultimate Net Loss" shall mean the sum actually paid or payable by the Reinsured in settlement of losses or liability (including any Extra Contractual Obligations and Loss in Excess of Policy Limits as defined herein) after making deductions for all recoveries and all salvages that are actually received and all claims upon other reinsurances whether collected or not, and shall include all costs and adjustment expenses (including costs of litigation and legal expenses, if any) arising from the settlement of claims other than the salaries of employees and the office expenses of the Reinsured.

All salvages, recoveries or payments recovered or received subsequent to a loss settlement under this Reinsurance Contract shall be applied as if recovered or received prior to the aforesaid settlement, and all necessary adjustments shall be made by the parties hereto.  Provided always that nothing in this clause shall be construed to mean that losses under this Reinsurance Contract are not recoverable until the Reinsured's Ultimate Net Loss has been ascertained.

Except as is otherwise provided for herein it is understood and agreed that recoveries under all Underlying Excess of Loss Reinsurances (as far as applicable) are for the sole benefit of the Reinsured and shall not be taken into account in computing the ultimate net loss or losses in excess of which this Reinsurance Contract attaches nor in any way prejudice the Reinsured's right of recovery hereunder.

Notwithstanding the foregoing, it is understood and agreed that reinsurances, if any, effected by Treaty Reinsurers (if applicable) protected hereunder shall not be taken into account in computing the ultimate net loss or losses in excess of which this Reinsurance Contract attaches, nor in any way affect the amounts recoverable hereunder.

**Net Retained Lines Clause**

This Reinsurance Contract shall protect only that portion of any insurance or reinsurance which the Reinsured, acting in accordance with its established practices at the time of the commencement of this Reinsurance Contract, retains net for its own account. The Reinsurers' liability hereunder shall not be increased due to any error or omission which results in the Reinsured's net retention being larger than it would normally have been nor by the Reinsured's failure to reinsure and maintain reinsurance in accordance with its established practice as aforesaid, nor by the inability of the Reinsured to collect from any other reinsurers any amounts which may have become due from them for any reason whatsoever.

**Currency Conversion Clause**

For the purpose of this Reinsurance Contract currencies other than the currency in which this Reinsurance Contract is written shall be converted into such currency at the rates of exchange used in the Reinsured's books or where there is a specific remittance for a loss settlement at the rates of exchange used in making such remittance.



FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM
NYSCEF DOC. NO. 5

### Offset Clause

The Reinsured or the Reinsurers may elect to offset any amount, whether on account of premiums, claims or any other amount due from one party to the other in respect of this Reinsurance Contract.

However, in the event of the insolvency of any party hereto, offset shall only be allowed in accordance with applicable statutes and regulations.

### Aggregate Extraction Clause

With regard to policies which provide an Aggregate Limit of Liability, it is understood and agreed that the Reinsured shall extract from such Aggregate Policy the amount of loss sustained by them arising from any one occurrence in order that such loss can be added to the Reinsured's losses from the same occurrence on other policies provided that the loss occurs during the period of this Reinsurance Contract.

For the purpose of this clause, the amount of a loss from one occurrence on an aggregate policy shall be deemed to be that percentage of the aggregate loss to the Reinsured on the original policy that the total loss to the Original Insured from the particular occurrence bears to the total aggregate losses to the Original Insured on the business protected.

### Inspection of Records Clause

Provided that all undisputed billings have been paid, no further particulars shall be required by the Reinsurers, but the books of the Reinsured so far as they concern the policies and/or contracts falling within the scope of this Reinsurance Contract shall be open to the inspection of an authorised representative of the Reinsurers at any reasonable time during the continuance of this Reinsurance Contract or of liability hereunder.

For purposes of this Clause, an undisputed billing is one that remains unpaid more than 60 days from receipt by the Reinsurer and the Reinsurer has not provided a written response to the Reinsured specifying why it remains unpaid.

The Reinsurers or their duly appointed representatives may arrange for copies to be made, at the Reinsurers' expense, of any of the records or documents containing such information that they may require.

Further, it is understood and the Reinsurer agrees that such access will be subject to a reasonable confidentiality agreement and may be restricted, in certain circumstances, by confidentiality agreements between the Reinsured and its ceding company clients, or by government restrictions.

The right of inspection shall not be construed to allow Reinsurers the right to delay or withhold payment for any losses which fall due under this Reinsurance Contract in accordance with terms and conditions as stated herein.

### Notification of Loss Clause

The Reinsured undertakes to advise Reinsurers as soon as possible of any circumstances likely to give rise to a claim hereunder and thereafter



FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM
NYSCEF DOC. NO. 5

Tiger Risk Reference          XA200911M                                TigerRisk Partners LLC

keep Reinsurers fully informed of any material developments regarding the claim.

The Reinsured shall upon receiving any formal notification of any loss(es) or occurrence(s) (including any potential loss(es) or occurrence(s)) which may give rise to a claim recovery hereunder advise Reinsurers as soon as such formal notification is received.

**Loss Settlements Clause**

All loss settlements made by the Reinsured shall be binding upon Reinsurers provided such settlements are within the terms and conditions of this Reinsurance Contract, the true intent of this Reinsurance Contract being that the Reinsured shall follow the fortunes of the Reinsurer, and amounts falling to the share of the Reinsurers shall be payable by them upon reasonable evidence of the amount paid being given by the Reinsured.

**Extended Expiration Clause**

If this Reinsurance Contract should expire or be terminated whilst a loss covered hereunder is in progress, it is understood and agreed that subject to the other conditions of this Reinsurance Contract, the Reinsurers are responsible as if the entire loss or damage had occurred prior to the expiration or termination of this Reinsurance Contract, provided that no part of that loss is claimed against any renewal of this Reinsurance Contract.

**Extra Contractual Obligations Clause**

This Reinsurance Contract shall exclude all cover in respect of Extra Contractual Obligations, howsoever arising, such Extra Contractual Obligations being defined as any award made by a court of competent jurisdiction against an Insurer or Reinsurer, which award is not within the coverage granted by any insurance and/or reinsurance contract made between the parties in dispute.

Notwithstanding the foregoing, this Reinsurance Contract shall extend to cover any loss arising from a "Claims Related Extra Contractual Obligation":

a)    awarded against the Reinsured; or

b)    incurred by the Reinsured where he has paid his share of a "Claims Related Extra Contractual Obligation" awarded against one or more of his Co-Insurers.

Any recovery under this Reinsurance Contract in respect of "Claims Related Extra Contractual Obligation" shall only be for that part of any award which corresponds to the Reinsured's share of the insurance and/or reinsurance policy and/or contract giving rise to the award and all proportional protection effected by the Reinsured shall provide or shall be deemed to provide pro rata coverage for such obligations.

This Reinsurance Contract shall also extend to cover all loss from Extra Contractual Obligations howsoever arising where the loss is incurred by the Reinsured as a result of his participation in any insurance or reinsurance which provides cover for such loss, it being understood and



FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM INDEX NO. 650832/2023
NYSCEF DOC. NO. 5 RECEIVED NYSCEF: 02/13/2023

Tiger Risk Reference     XA200911M        TigerRisk Partners LLC

agreed that such loss results from a contractual liability incurred by the Reinsured.

A "Claims Related Extra Contractual Obligation" shall be defined as the amount awarded against an Insurer or Reinsurer found liable by a court of competent jurisdiction to pay damages to an Insured or Reinsured in respect of the conduct of a claim made under an insurance and/or reinsurance policy and/or contract, where such liability has arisen because of:

a)  the failure of the Insurer or Reinsurer to agree or pay a claim within the policy limits or to provide a defence against such claims as required by law; or

b)  bad faith or negligence in rejecting an offer of settlement; or

c)  negligence or breach of duty in the preparation of the defence or the conduct of a trial or the preparation or prosecution of any appeal and/or subrogation and/or any subsequent action resulting therefrom.

There shall be no liability under this Reinsurance Contract in respect of:

a)  any assumption of liability by way of participation in any mutual scheme designed specifically to cover Extra Contractual Obligation; or

b)  any Extra Contractual Obligation arising from an adjudicated finding of fraud of a director, officer or employee of the Reinsured acting individually or collectively or in collusion with an individual or corporation or with any other organisation or party involved in the presentation, defence or settlement or any claim.

Any loss arising under this Reinsurance Contract in respect of "Claims Related Extra Contractual Obligations" shall be deemed to be a loss arising from the same event as that giving rise to the claim to which the Extra Contractual Obligation is related; but recovery hereunder is subject to the Insurance and/or Reinsurance policy and/or contract which gives rise to the Extra Contractual Obligation falling within the scope of this Reinsurance Contract.

**Loss in Excess of Policy Limits Clause**

This Reinsurance Contract shall protect the Reinsured, within the limits hereof, in connection with Ultimate Net Loss in excess of the limit of its original policy, such loss in excess of the limit having been incurred because of failure by it to settle within the policy limit or by reason of alleged or actual negligence, fraud, or bad faith in rejecting an offer of settlement or in the preparation of the defence or in the trial of any action against its insured or reinsured or in the preparation or prosecution of an appeal consequent upon such action.

However, this Clause shall not apply where the loss has been incurred due to an adjudicated finding of fraud by a member of the Board of Directors or a corporate officer of the Reinsured acting individually or collectively or in collusion with any individual or corporation or any other organization or party involved in the presentation, defence or settlement of any claim covered hereunder.



FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM
NYSCEF DOC. NO. 5

| Tiger Risk Reference | XA200911M | TigerRisk Partners LLC |

For the purpose of this Clause, the word "loss" shall mean any amounts for which the Reinsured would have been contractually liable to pay had it not been for the limit of the original policy.

The Reinsured shall be indemnified in accordance with this Clause to the extent permitted by applicable law.

**Insolvency Clause**

Where an Insolvency Event occurs in relation to the Reinsured the following terms shall apply (and, in the event of any inconsistency between these terms and any other terms of this Reinsurance Contract, these terms shall prevail):

1.  Notwithstanding any requirement in this Reinsurance Contract that a Reinsured shall actually make payment in discharge of its liability to its policyholder before becoming entitled to payment from the Reinsurers:

    a)  the Reinsurers shall be liable to pay the Reinsured even though the Reinsured is unable to actually pay, or to discharge its liability to, its policyholder; but

    b)  nothing in this clause shall operate to accelerate the date for payment by the Reinsurers of any sum which may be payable to the Reinsured, which sum shall only become payable as and when the Reinsured would have discharged, by actual payment, its liability for its current net loss but for it being the subject of an Insolvency Event.

2.  The existence, quantum, valuation and date for payment of any sums which the Reinsurers are liable to pay the Reinsured under this Reinsurance Contract shall be those and only those for which the Reinsurers would be liable to the Reinsured if the liability of the Reinsured had been determined without reference to any term in any composition or scheme of arrangement or any similar arrangement, entered into between the Reinsured and all or any part of its policyholders, unless and until the Reinsurers serve written notice to the contrary on the Reinsured in relation to any composition or scheme of arrangement.

3.  The Reinsurers shall be entitled (but not obliged) to set-off, against any sum which it may be liable to pay the Reinsured, any sum for which the Reinsured is liable to pay the Reinsurers.

An Insolvency Event shall occur if:

A.  i.    (in relation to 1., 2., and 3. above) a winding up petition is presented in respect of the Reinsured or a provisional liquidator is appointed over it or if the Reinsured goes into administration, administrative receivership or receivership or if the Reinsured has a scheme of arrangement proposed in relation to all or any parts of its affairs, or

    ii.   (in relation to 1. above) if the Reinsured goes into compulsory or voluntary liquidation.

or, in each case, if the Reinsured becomes subject to any other similar insolvency process (whether under the laws of England and Wales or elsewhere); and

---



FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM
NYSCEF DOC. NO. 5

Tiger Risk Reference     XA200911M          TigerRisk Partners LLC

---

B. the Reinsured is unable to pay its debts as and when they fall due within the meaning of Section 162 of the Bermuda Companies Act 1981 (or any statutory amendment or re-enactment of that section).

### Contracts (Rights of Third Parties) Clause

Nothing in this Reinsurance Contract shall in any manner create any obligations or establish any rights against the Reinsurer in favour of any third party or any persons not parties to this Reinsurance Contract.

### Amendments and Alterations Clause (LSW 319)

Any amendments or alterations to this Reinsurance Contract that are agreed between the parties herein shall be automatically binding and shall be considered as forming an integral part of this Reinsurance Contract.

### Errors and Omissions Clause (LSW 321)

Any inadvertent delays, omissions or errors made in connection with this Reinsurance Contract shall not be held to relieve either of the parties hereto from any liability which would have attached to them hereunder if such delay, omission or error had not been made, provided rectification be made as soon as practicable after discovery.

### Confidentiality Clause

The Reinsurer, except with the express prior written consent of the Reinsured, shall not communicate, disclose or divulge to any third party, any knowledge or information that may be acquired as a result of its participation in the Reinsurance Contract. The restrictions as outlined in this Clause shall not apply to communication or disclosures that the Reinsurer is required to make to auditors, both internal and external, outside actuaries, consultants, retrocessionaires, legal counsel, Reinsurer's shareholders and capital providers, arbitrators involved in any arbitration procedures under this Reinsurance Contract or disclosures required upon subpoena or other duly-issued order of a court or other governmental agency or regulatory authority; however, such third parties are to be informed of these confidentiality restrictions by the Reinsurer. The Reinsurer shall not share, communicate or otherwise disseminate the Reinsured's confidential information obtained by virtue of its participation on this Reinsurance Contract with any employees not involved in this reinsurance transaction.

Any breach or threatened breach of this Clause will constitute a breach that might cause irreparable injury, not readily measured in money, and for which the Reinsured, without waiving any other remedies or rights at law or in equity, will be entitled to injunctive relief or other equitable relief. Any such right or remedy and any and all other rights or remedies provided for herein will be cumulative and not exclusive and in addition to any and all other rights or remedies which the Reinsured may have under this Reinsurance Contract or otherwise.

The Reinsurer will comply with all applicable data protection laws/regulations with respect to the handling and/or processing of Confidential Information, including personally identifiable information, in connection with this Reinsurance Contract and will ensure that any third parties to whom any Confidential Information is shared have appropriate information security safeguards in place consistent with applicable laws/regulations.

---



FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM
NYSCEF DOC. NO. 5
INDEX NO. 650832/2023
RECEIVED NYSCEF: 02/13/2023

| Tiger Risk Reference | XA200911M | TigerRisk Partners LLC |
|---|---|---|

### Sanctions Clause

Neither the Reinsured nor the Reinsurer shall be liable for any premium or loss under this Reinsurance Contract if it would result in a violation of any mandatory sanction, prohibition or restriction under the trade or economic sanctions, laws or regulations of any applicable jurisdiction.

### Foreign Account Tax Compliance Act (FATCA) Clause

A.  The Reinsurer will provide to the Reinsured its FATCA compliant documentation on or before the effective date of this Reinsurance Contract. To the extent the Reinsurer is subject to the deduction and withholding of premium payable hereon and has not provided the requisite filing form as set forth in the Foreign Account Tax Compliance Act (Sections 1471-1474 of the Internal Revenue Code), the Reinsurer agrees to allow such withholding from the premium payable under this Reinsurance Contract.

B.  For purposes hereof, such amounts withheld will not be subject to offset under the Offset Clause.

C.  The Reinsurer agrees to indemnify the Reinsured for any liability, expense, interest or penalty the Reinsured may incur by reason of the Reinsurer's breach of this Clause.

### Agency Agreement Clause

If more than one Reinsured company is named as a party to this Reinsurance Contract, the first named Reinsured will be deemed the agent of the other Reinsured companies for purposes of sending or receiving notices required by the terms and conditions of this Reinsurance Contract and for purposes of remitting or receiving any monies due any party.

### Reinsurance Allocation Clause

A.  While having no effect on the settlements or liabilities of the parties to this Reinsurance Contract, it is established that:

1.  If a loss covered under this Reinsurance Contract involves multiple member companies, the Reinsured shall allocate the Reinsurer's limit of liability for the loss to each member company involved, proportionately, based on the percentage that the affected member company's loss bears to the total of all losses contributing to that loss; and

2.  With respect to reinsurance premium due to the Reinsurers hereunder, each member company shall be responsible for its proportionate share of the reinsurance premium. The final reinsurance premium, as determined under the terms of this Reinsurance Contract, shall be apportioned to each member company by the Reinsured in the same proportion that each member company's subject premium bears to the total subject premium.

B.  Records of these allocations shall be maintained in sufficient detail to identify both the Reinsurer's loss obligations allocated to each member company and each member company's share of premium allocation.

Case 1:23-cv-01831-JGK Document 1-1 Filed 03/02/23 Page 55 of 221

| Tiger Risk Reference | XA200911M | | TigerRisk Partners LLC |
|---|---|---|---|

### Multiple Reinsured Clause

This Reinsurance Contract is a composite agreement covering a number of separate legal entities within the Sompo International Holdings Ltd. group of companies. The conduct or misconduct of one legal entity comprising the Reinsured ceding policies hereto shall not affect the validity of the cover available to those other legal entities comprising the Reinsured ceding policies hereto. In the event of a dispute, or disputes, arising between the Reinsurer and one or more legal entities comprising the Reinsured, it is agreed hereon, that such dispute or disputes shall not prejudice the validity of the cover available to those other legal entities not in dispute.

### Severability Clause

If any provision of this Reinsurance Contract shall be rendered illegal or unenforceable by the laws or regulations of any applicable jurisdiction, such provision shall be considered void in such jurisdiction, but this shall not affect the validity or enforceability of any other provision of this Reinsurance Contract or the enforceability of such provision in any other jurisdiction.

### Data Privacy Clause

<u>Definitions</u>

A. The terms data subject, personal data, controller, processor and processing, together with other terms defined in the General Data Protection Regulation (Regulation (EU) 2016/679) ("GDPR"), will have meanings as defined in the GDPR as read with the UK Data Protection Act 2018. For the avoidance of doubt, personal data includes sensitive personal data as defined in Article 9(1) of the GDPR.

<u>Processing</u>

B. This Clause applies to all personal data processed by either party under, or in connection with, this reinsurance.

C. Whilst the arrangements in place between the parties from time to time will determine the role of each party in respect of personal data from time to time, it is anticipated that, as between the Reinsured and the Reinsurer under this Reinsurance Contract:

1. The Reinsured will be a controller where it is processing personal data in relation to placing reinsurance, administering claims and providing information to the Reinsurer for audit and/or inspection.

2. The Reinsurer will be a controller where it is processing personal data in relation to consideration, review and settlement of reinsurance claims, and inspection and/or audit of reinsurance claim data.

D. Neither party will act as a processor in respect of personal data unless expressly appointed as a processor by the other party. Should such an appointment become necessary, the parties will undertake all reasonable endeavours to agree in good faith



Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 56 of 221

Tiger Risk Reference        XA200911M                        TigerRisk Partners LLC

processor obligations that comply with any applicable data protection legislation.

Data Controller Obligations

E.  Where the Reinsured and the Reinsurer each act as a controller, each party will:

1.  comply at all times with applicable data protection legislation, including without limitation, New York State Department of Financial Services Cyber Security Requirements for Financial Service Companies (23 NYCRR 500) (the "NYS Cyber Security Requirements"), including by maintaining appropriate written records of all processing of personal data as required by Article 30 of the GDPR;

2.  not cause the other party to breach its respective obligations under the applicable data protection legislation, whether by act or omission;

3.  ensure that it has the ability to lawfully process personal data and to lawfully transfer, disclose and grant access to personal data to the other party as required for the performance of this Reinsurance Contract;

4.  ensure that the personal data transferred, disclosed or accessed by the other party is (i) accurate and (where necessary) kept up to date, (ii) relevant and adequate but not excessive, (iii) not retained by the providing party for longer than is necessary to enable the processing of personal data under this Reinsurance Contract, meeting the requirements set out in Article 5(1)(c) to (e) of the GDPR and the NYS Cyber Security Requirements;

5.  maintain appropriate technical and organisational security measures, sufficient to (at least) comply with its obligations as a controller under any applicable data protection legislation and, in particular, complying with the measures in Article 32(1) of the GDPR considering the matters in Article 32(2) of the GDPR;

6.  procure that all of its personnel who have access to or process personal data are subject to legally binding confidentiality obligations in relation to that personal data;

7.  where it reasonably believes that a data subject, or the representative of a data subject, has made a subject access request or notice or complaint in connection with any matter relating to this Reinsurance Contract to it that should have been directed to the other party, promptly (and in any event within forty-eight 48 hours) notify the other party.

Other Obligations

F.  Personal data received by the Reinsurer from the Reinsured will not be transferred to a third country without the Reinsurer having implemented appropriate safeguards in accordance with the applicable law and regulation (e.g. laws based on European Directive 95/46/CEP relating to the processing of Personal Data and / or its replacement Regulation 2016/679 on 25 May 2018 as



Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 57 of 221

Tiger Risk Reference        XA200911M                    TigerRisk Partners LLC

amended from time to time), unless required to do so by European Union or Member State law to which the Reinsurer is subject; in such a case, the Reinsurer will inform the Reinsured prior to transfer to the extent it is legally permitted to do so.

G.   Personal Data will not be transferred to a processor or any third party without the Reinsured's prior written consent save for transfers within the European Union or to countries subject to an adequacy level of protection recognized by the European Commission (as updated from time to time) ("Authorized Location"). Notwithstanding the foregoing, the Reinsured may at any time request the Reinsurer to provide a list of retrocessionaires within the European Union or in Authorized Locations to whom the Personal Data has been transferred. The Reinsurer must ensure the same data protection obligations as set out in this Reinsurance Contract apply to its processors or any other third party to whom the data is transferred by way of a contract or otherwise.

H.   To the extent permitted by the applicable law, each party will notify the other party without undue delay upon becoming aware of a breach of security leading to the accidental or unlawful destruction, loss, alteration, unauthorised disclosure of, or access to, Personal Data processed under, or in connection with, this Reinsurance Contract.

**Other Reinsurance Clause**

The Reinsured shall be permitted to carry other reinsurance, recoveries under which shall inure solely to the benefit of the Reinsured and be entirely disregarded in applying all of the provisions of this Reinsurance Contract

**Mode of Execution Clause**

A.   This Contract (including any addenda thereto) may be executed by any of the following methods:

1.   An original written ink signature of paper documents;

2.   Facsimile or electronic copies of paper documents showing an original ink signature; and/or

3.   Electronic signature technology employing computer software and a digital signature or digitizer pad to capture a person's handwritten signature in such a manner that the signature is unique to the person signing, is under the sole control of the person signing, is capable of verification to authenticate the signature and is linked to the document signed in such a manner that if the data is changed, such signature is invalidated.

B.   The use of any one or a combination of the methods set forth in paragraph A. above shall constitute a valid execution of this Contract. This Contract may be executed in one or more counterparts, each of which, when duly executed, shall be deemed an original.

**Intermediary Clause**

TigerRisk Partners LLC is hereby recognized as the Intermediary negotiating this Reinsurance Contract for all business hereunder. All



FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM
NYSCEF DOC. NO. 5

| Tiger Risk Reference | XA200911M | TigerRisk Partners LLC |
|---|---|---|

communications (including notices, statements, premiums, return premiums, commissions, taxes, losses, Loss Adjustment Expenses, salvages, and loss settlements) relating thereto shall be transmitted to the Reinsured or the Reinsurer through the Intermediary. Payments by the Reinsured to the Intermediary shall be deemed payment to the Reinsurer. Payments by the Reinsurer to the Intermediary shall be deemed payment to the Reinsured only to the extent that such payments are actually received by the Reinsured.

Brokerage for this Reinsurance Contract is 10.00% (ten percent) of the Premium payable to the Reinsurer(s) hereunder to TigerRisk Partners LLC

**Exclusions:**    This Reinsurance Contract shall exclude:

1.   the Reinsured's interest whether direct or by way of reinsurance in a loss arising from a claim or claims against an insured by another party or parties.

   Notwithstanding the foregoing, this Reinsurance Contract shall not exclude:

   (a)   any Physical Damage and/or Consequential Loss coverage contingent thereon affected by an insured on behalf of another party.

   (b)   Workers Compensation and/or Employers Liability when written on a catastrophe basis.

2.   liability arising out of any Reinsurance Assumed and Excess of Loss and/or Pro-Rata Reinsurances issued in the name of a Lloyd's Syndicate and/or of an insurance or reinsurance company, whether such liability is accepted directly or under any form of reinsurance from other Insurers and/or Reinsurers, and all such liability is excluded from the protection of this Reinsurance Contract and cannot be taken into account in arriving at the amount in excess of which this Reinsurance Contract attaches.

   The Reinsured shall be the sole judge as to which insurance or reinsurance companies come within the scope of this definition.

   Notwithstanding the foregoing, it is understood and agreed that:

   (a)   Excess of Loss and/or Pro-Rata Reinsurances of Direct and Facultative Accounts and/or Pro-Rata Reinsurances of Pro Rata treaties covering Direct and/or Facultative Accounts.

   (b)   Specific retrocessions of an original insurance company's or regional reinsurer's account and retrocessions written on a single, specific or regional territorial basis.

   (c)   any Reinsurance of business underwritten by the Reinsured and accepted via Lloyd's Insurance Company S.A., Brussels or any business underwritten by the Reinsured and accepted on behalf of the Reinsured by an authorised entity, for regulatory, legislative or similar purposes.

   shall not fall within the scope of the above definition.



FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM
NYSCEF DOC. NO. 5

| Tiger Risk Reference | XA200911M | TigerRisk Partners LLC |
|---|---|---|

3.  loss of or damage to property situated Offshore and all losses consequent upon such loss or damage.

    For the purposes of this exclusion "Offshore" means:

    (i)   places where the tide ebbs and flows; and/or

    (ii)  other navigable waters or waterways which shall mean any water which is in fact navigable by ships or vessels, whether or not the tide ebbs and flows there, and whether or not there is a public right of navigation in that water.

    Nothing contained herein shall exclude losses arising from bridges, tunnels, dams, piers, jetties and/or causeways and/or policies and/or contracts written to cover Fine Arts, Specie, Jewellery, Personal Effects, and other similar items including items covered under a Householders or Personal Lines policy and/or contract.

4.  absolutely any loss, damage, claim, cost, expense, sum or other obligation of any kind or description directly or indirectly caused by, contributing to, or resulting from mould, fungus, mildew or spores.

    This exclusion will apply regardless of whether or not:

    i.    the mould, fungus, mildew or spores is/are caused by, contributed to, or results from an insured peril;

    ii.   the Reinsured's original policy(ies) provide coverage;

    iii.  the Reinsured's original obligations are contractual, extra-contractual, or otherwise;

    iv.   the Reinsurance presentation is for settlement(s), judgement(s) or any other form of resolution.

5.  all above ground transmission and distribution lines, including wire, cables, poles, pylons, standards, towers, other supporting structures and any equipment of any type which may be attendant to such installations of any description, for the purpose of transmission or distribution of electrical power, telephone or telegraph signals, and all communication signals whether audio or visual.

    This exclusion applies to all equipment other than that which is on or within 1 (one) statute mile of an insured structure.

    This exclusion applies both to physical loss or damage to the equipment and all business interruption, consequential loss, and/or other contingent losses related to transmission and distribution lines, other than contingent property damage/business interruption losses (including expenses), arising from loss and/or damage to lines of third parties.

6.  Aviation War.

7.  Aviation and Satellite business.

8.  Workers Compensation business, but not in respect of Earthquake losses occurring in the United States of America.

9.  Hail on Crops.



FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM
NYSCEF DOC. NO. 5

| Tiger Risk Reference | XA200911M | TigerRisk Partners LLC |
|---|---|---|

10. Life, Financial Guarantee and Insolvency business.

11. Loss or damage arising from contamination by biological and/or chemical substances.

12. Industry Loss Warranties.

13. third party liability as a result of Wildfire loss or losses under policies issued to any California Utilities or their captives.

Furthermore, this Reinsurance Contract shall also exclude business in accordance with the following established market referenced exclusion clauses:

i.    Nuclear Energy Risks as per the Nuclear Energy Risks Exclusion Clause (Reinsurance) 1994 (Worldwide excluding U.S.A. and Canada) - NMA 1975a. (Japanese amendment).

ii.   Nuclear Incident as per the Nuclear Incident Exclusion Clauses, Reinsurance – USA and Canada NMA 1590, NMA 1119, NMA 1166, NMA 1979a, NMA 1980a, NMA 1251.

iii.  War and Terrorism as per the War and Terrorism Exclusion Clause (NMA2919).

iv.   Information Technology Hazards Clarification Clause (NMA2912).

v.    Information Technology Hazards (Risk) Exclusion Clause (NMA2928).

<u>Invalidation</u>

Should any arbitration, judicial or regulatory entity having jurisdiction invalidate any exclusion in the Reinsured's policy or the underlying policy on which the Reinsured's policy follows form that is also the subject of one or more of the exclusions herein, then loss for which the Reinsured is liable because of such invalidation will not be excluded hereunder.

<u>Incidental</u>

The exclusions enumerated herein shall not apply when they are merely incidental to the main operations or exposures of the insured, provided such main operations or exposures are also covered by the Reinsured and are not themselves excluded from the scope of this Reinsurance Contract.  The Reinsured shall be the sole judge of what is "incidental".

<u>Inadvertence</u>

Should the Reinsured, by reason of an inadvertent act, error, or omission, be bound to afford coverages excluded hereunder or should an existing insured extend its operations to include coverage excluded hereunder, the Reinsurer will waive the exclusion(s).  The duration of said waiver will not extend beyond the time that notice of such coverage has been received by the responsible underwriting authority of the Reinsured plus the minimum time period required thereafter for the Reinsured to terminate such coverage.

**Express Warranty:**    It is hereby warranted that no loss shall attach hereunder unless the Reinsured sustains loss from two or more risks involved in the same loss event.



FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM
NYSCEF DOC. NO. 5

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 61 of 221

| Tiger Risk Reference | XA200911M | TigerRisk Partners LLC |
|---|---|---|

For the purposes of the above warranty, aa "risk" is defined as all values at one location including all business interruption and/or time element exposures whether by way of Contingent Business Interruption, Suppliers or Customers extensions.

**Special Acceptances:** Business which is beyond the terms, conditions or limitations of this Reinsurance Contract may be submitted to the Reinsurer in writing for special acceptance hereunder, and such business, if accepted in writing by the Reinsurer, shall be subject to all the terms, conditions and limitations of this Reinsurance Contract except as modified by the Special Acceptance. The Reinsurer shall provide the Reinsured with a five business day turnaround on all Special Acceptances hereunder. Policies submitted for special acceptance shall be deemed accepted by those Reinsurer(s) failing to respond within this timeframe. The five business day response time shall begin from the time the Special Acceptance is received by the Reinsurer.

**Limited Recourse and Bermuda Regulations:** The liability of the Reinsurer for the performance and discharge of all of its obligations, however they may arise, in relation to this Reinsurance Contract (together "Obligations" for purposes of this provision), shall be limited to and payable solely from the proceeds of realization of the assets of the Trust Account and accordingly there shall be no recourse to any other assets of Horseshoe Re Limited, whether or not allocated to any other separate account or the general account of Horseshoe Re Limited. In the event that the proceeds of realization of the assets of the Trust Account are insufficient to meet all Obligations, any Obligations remaining after the application of such proceeds shall be extinguished, and the Reinsured undertakes in such circumstances to take no further action against the Reinsurer in respect of any such Obligations. In particular, neither the Reinsured nor any party acting on its behalf shall petition or take any steps for the winding up or receivership of the Reinsurer or Horseshoe Re Limited.

Notwithstanding any matter referred to herein, the Reinsured understands and accepts that the Reinsurer is a separate account of Horseshoe Re Limited and that all corporate matters relating to the creation of the Reinsurer, capacity of the Reinsurer, operation and liquidation of the Reinsurer and any matters relating to the Reinsurer thereof shall be governed by, and construed in accordance with, the laws of Bermuda. The Reinsured has had the opportunity to take advice and to obtain all such additional information that it considers necessary to evaluate the terms, conditions and risks of entering into this Reinsurance Contract with the Reinsurer.

**Obligations Clause** The Reinsurer agrees to establish a Trust Account in accordance with the trust agreement entered into by Endurance Specialty Insurance Limited ("ESIL"), as representative for the Reinsured, and the Reinsurer (the "Trust Agreement") and to deposit therein sufficient Permitted Investments (as defined in the Trust Agreement) to cover 100% of its Obligations hereon.

The term "Obligations" shall mean:

(a) During the Period of this Reinsurance Contract, USD 300,000,000 (for 100%) less any unpaid premium (net of Federal Excise Tax) and brokerage, less Ultimate Net Loss recovered from the Reinsurer;



(b)   On expiration of this Reinsurance Contract, it is agreed that the collateral will be released in accordance with the Collateral Release Clause.

The Reinsured and the Reinsurer further agree, notwithstanding anything to the contrary in this Reinsurance Contract, that said Trust Account may be drawn upon by ESIL or its successors in interest at any time, without diminution because of the insolvency of the Reinsured or the Reinsurer, but only for one or more of the following purposes:

1)   To reimburse itself for the Reinsurer's share of unearned premiums on the account of cancellations, unless paid in cash by the Reinsurer;

2)   To reimburse itself for the Reinsurer's share of losses and/or loss expense paid under the terms of policies reinsured hereunder, unless paid in cash by the Reinsurer;

3)   To fund a separate cash account, apart from its other assets, in the name of the Beneficiary or any bank or trust company acceptable to the Reinsured and the Reinsurer, in the amount equal to the Reinsurer's Obligations, ten days prior to the effective date of termination of the Trust Account;

4)   To refund to the Reinsurer any sum in excess of the actual amount required to fund the Reinsurer's Obligations, if so requested by the Reinsurer.

In the event the amount drawn by ESIL on any Trust Account is in excess of the actual amount required for 1), 2), or 3), the actual amount determined to be due, the Reinsured shall promptly return to the Reinsurer the excess amount so drawn. For the avoidance of doubt, any withdrawal of funds made by ESIL in accordance with the provisions of this Reinsurance Contract and the Trust Agreement shall satisfy the obligations of the Reinsurer to the Reinsured hereunder in an amount equal to such withdrawal.

**Collateral Release**   On the expiration of this Reinsurance Contract, if the Trust Account has not yet been terminated, the Reinsured shall calculate, on a monthly basis, how much, if any, of the collateral shall be released from the Trust Account, as follows:

1)   For each potentially covered event, the Reinsured shall multiply the Loss Amount (the sum of [i] losses and loss expenses paid, [ii] reserves for losses reported and outstanding and [iii] reserves for losses incurred but not reported) by the appropriate Buffer Loss Factor from the table below, based upon the type of event and the number of months which have elapsed since the event.  The product of this calculation shall be defined as the Buffered Loss Amount ("BLA").

2)   The BLA will then be reduced by inuring reinsurance recoveries and the appropriate flat deductible to compute its contribution to the Presumed Ultimate Net Loss.  The Presumed Ultimate Net Loss will equal the sum of these contributions.

3)   The Presumed Ceded Loss will be defined as the lesser of the Presumed Ultimate Net Loss and the Limit of USD 300,000,000 (or



FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM
NYSCEF DOC. NO. 5

**Tiger Risk Reference**     **XA200911M**          **TigerRisk Partners LLC**

100%). An amount equal to the Presumed Ceded Net Loss less losses paid by the Reinsurer shall be retained in the Trust Account and any excess in the Trust Account over such amount shall be released to the Reinsurer.

| Buffer Loss Factor Table | | | |
|---|---|---|---|
| Number of Calendar Months Since Date of Event | Windstorm* / Brushfire | Earthquake & Fire Following | Other |
| 0 to 3 | 200% | 300% | 250% |
| > 3 to 6 | 150% | 200% | 175% |
| > 6 to 9 | 125% | 175% | 150% |
| > 9 to 12 | 110% | 150% | 130% |
| > 12 to 15 | 105% | 125% | 115% |
| > 15 to 18 | 100% | 120% | 110% |
| Thereafter | 100% | 100% | 100% |

\*    For the purpose of this Collateral Release provision, the term "Windstorm" shall include Hurricane, Rainstorm, Storm, Tempest, Tornado, Cyclone, Typhoon and Hail.

So long as there is any security on deposit in the Trust Account, the Reinsured shall perform the calculation set forth above within 10 business days after the expiration or the Risk Period and thereafter 10 business days after the end of each calendar month and deliver a report to the Reinsurer and the Trustee named in the Trust Agreement. Collateral will be adjusted monthly based on this calculation. To the extent the calculation indicates that collateral may be reduced, the Reinsurer shall deliver to the Trustee a 'Grantor Excess Withdrawal Notice', as defined in the Trust Agreement, which shall constitute a directive to return the excess collateral to the Reinsurer. Any release of collateral as outlined in this clause shall release the Reinsurer from any future liability under this Reinsurance Contract for that released amount. It is further understood and agreed that if all Collateral is returned to the Reinsurer, then this shall constitute a full and final commutation of this Reinsurance Contract.

For the avoidance of doubt, any obligation to effect or procure the deposit of additional assets in the Trust Account shall be subject in all instances to the Limited Recourse and Bermuda Regulations clause.

In the event that collateral remains in the Trust Account 24 months following the expiration of this Reinsurance Contract, the Reinsurer shall have the option to commute this Reinsurance Contract at the Reinsured's estimated Ultimate Net Loss (including incurred but not reported) by sending the Reinsured written notice thereof.

**Arbitration:**     All matters in difference between the Reinsured and the Reinsurers (hereinafter referred to as "the parties") in relation to this Reinsurance Contract, including its formation and validity, and whether arising during or after the period of this Reinsurance Contract, shall be referred to an arbitration tribunal in the manner hereinafter set out.



| Tiger Risk Reference | XA200911M | TigerRisk Partners LLC |
|---|---|---|

Unless the parties agree upon a single arbitrator within thirty days of one receiving a written request from the other for arbitration, the claimant (the party requesting arbitration) shall appoint their arbitrator and give written notice thereof to the respondent. Within thirty days of receiving such notice the respondent shall appoint their arbitrator and give written notice thereof to the claimant, failing which the claimant may apply to the appointor hereinafter named to nominate an arbitrator on behalf of the respondent.

Should the arbitrators fail to agree, then they shall within thirty days of such disagreement appoint an umpire to whom the matter in difference shall be referred. Should the arbitrators fail within such period to appoint an umpire, then either of them or either of the parties may apply to the appointor for the appointment of an umpire.

Unless the parties otherwise agree, the arbitration tribunal shall consist of persons who are active or retired lawyers with not less than ten (10) years' experience in insurance or reinsurance law or active or retired officers of insurance or reinsurance companies, and will not have a personal or financial interest in the parties or the outcome of the arbitration. For the avoidance of doubt, the arbitrators will be completely impartial and disinterested in their respective appointing parties and in the result of the arbitration.

The arbitration tribunal shall have power to fix all procedural rules for the holding of the arbitration including discretionary power to make orders as to any matter which it may consider proper in the circumstances of the case with regard to pleadings, discovery, inspection of documents, examination of witnesses and any other matter whatsoever relating to the conduct of the arbitration and may receive and act upon such evidence whether oral or written strictly admissible or not as it shall in its discretion think fit.

The appointor shall be the Secretary General for the time being of the Court of Arbitration of the International Chamber of Commerce.

Each party shall bear the expense of its own arbitrator, and shall jointly and equally bear with the other the expense of the Umpire and of the arbitration. In the event that the two arbitrators are chosen by one party, as provided above, the expenses of the arbitrators, the Umpire and the arbitration shall be equally divided between the two parties.

The seat of the arbitration shall be in Hamilton, Bermuda and the arbitration tribunal shall apply the laws of the state of New York as the proper law of this Reinsurance Contract.

The arbitration shall be conducted under, and the arbitration tribunal shall be governed by, the provisions of the Bermuda Arbitration Act 1986 and/or any statutory modifications or amendments thereto for the time being in force.

The award of the arbitration tribunal shall be in writing and binding upon the parties who hereby covenant to carry out the same. If a party fails to carry out the award the other(s) may apply for its enforcement to a court of competent jurisdiction in any territory in which the party in default is domiciled or has assets or carries on business.

**Choice of Law and Jurisdiction:** Except with respect to the Separate Accounts Company status of the Reinsurer which is governed by the laws of Bermuda, this Reinsurance



FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM
NYSCEF DOC. NO. 5

| Tiger Risk Reference | XA200911M | TigerRisk Partners LLC |
|---|---|---|

Contract, subject to the Arbitration Clause contained herein, is subject to the laws of the state of New York and Bermuda jurisdiction.

**Service of Suit Clause**

In respect of Endurance Assurance Corporation only, this Clause only applies to Reinsurers domiciled outside of the United States and/or unauthorized in any state, territory, or district of the United States having jurisdiction over the Reinsured. Nothing in this Clause will be construed to override the provisions of the Arbitration Clause. This Clause is intended as an aid to compelling arbitration, or enforcing such arbitration, or arbitral award, and not as an alternative to the Arbitration Clause for resolving disputes arising out of this Reinsurance Contract.

It is agreed that in the event of the failure of the Reinsurer hereon to perform its obligations hereunder, the Reinsurer hereon, at the request of the Reinsured, will submit to the jurisdiction of a court of competent jurisdiction within the United States.  Nothing in this Clause constitutes or should be understood to constitute a waiver of the Reinsurer's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.  It is further agreed that service of process in such suit may be made upon Mendes & Mount, LLP, 750 Seventh Avenue, New York, New York 10019-6829, and that in any suit instituted, the Reinsurer will abide by the final decision of such court or of any appellate court in the event of an appeal.

The above-named are authorized and directed to accept service of process on behalf of the Reinsurer in any such suit and/or upon the request of the Reinsured to give a written undertaking to the Reinsured that they will enter a general appearance upon the Reinsurer's behalf in the event such a suit will be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Reinsurer hereon hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Reinsured or any beneficiary hereunder arising out of this Reinsurance Contract, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

**Recording, Transmitting and Storing Information:**
Where the Intermediary maintains risk and claim, the data, information or documents may be held electronically.

**Reinsurer Contract Documentation:**
The document contained herein illustrates the full terms and conditions to which the participating Reinsurers have agreed and constitutes the Contract Document.

Reinsurers' acceptance of a share in this Reinsurance Contract, whether by direct signature of the attached Signing Schedule(s) (whether attached hereto or otherwise), or by correspondence, shall constitute their formal signature of this Reinsurance Contract and no further documentation shall be issued.



DocuSign Envelope ID: 2E4A4BA2-C5E7-48E4-8134-BABE5F71DC57    Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 66 of 221

| **Tiger Risk Reference** | **XA200911M** | | **TigerRisk Partners LLC** |
|---|---|---|---|

Evidence of cover will be provided to the Reinsured in the form of a fully scanned copy of this Reinsurance Contract.

Signed Lines available to Reinsurers at inception and written confirmation to be sent to them within thirty (30) days of inception.

**Order Hereon:**        5.000% of Limit

---

# Information

**Information:**        Reinsured's 2020 Information seen and noted by Reinsurers hereon.

FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM
NYSCEF DOC. NO. 5

Tiger Risk Reference     XA200911M              TigerRisk Partners LLC

---

# Reinsured Signing Schedule

**IN WITNESS WHEREOF**, the parties hereto have caused this Reinsurance Contract to be executed by their duly authorized representatives.

Signed for and on behalf of:

**Endurance Specialty Insurance Limited, (Bermuda) on behalf of itself and on behalf of its branches, affiliates, Endurance Worldwide Insurance Limited (London, England) and its branch office, SI Insurance (Europe), SA, Lloyd's Syndicate Number 5151 (London, England), Endurance Assurance Corporation (New York, USA) and/or their Quota Share reinsurers if applicable, including any and/or all of the subsidiary or affiliate companies that are now or may hereafter come under the ownership, management and/or control of Sompo International Holdings Ltd.**

In _____ this _____ day of _____, 201___

BY: _John Del Col_    3/9/2020

TITLE: __General Counsel__

REFERENCE NO.: _____

**TigerRisk**

FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM
NYSCEF DOC. NO. 5
INDEX NO. 650832/2023
RECEIVED NYSCEF: 02/13/2023

Tiger Risk Reference        XA200911M                      TigerRisk Partners LLC

## Reinsurer Signing Schedule

**Attaching to and forming Tiger Reference:** XA200911M

**Type:**          **CATASTROPHE AGGREGATE EXCESS OF LOSS REINSURANCE CONTRACT**

**Reinsured:**      Endurance Specialty Insurance Limited, (Bermuda) on behalf of itself and on behalf of its branches, affiliates, Endurance Worldwide Insurance Limited (London, England) and its branch office, SI Insurance (Europe), SA, Lloyd's Syndicate Number 5151 (London, England), Endurance Assurance Corporation (New York, USA) and/or their Quota Share reinsurers if applicable, including any and/or all of the subsidiary or affiliate companies that are now or may hereafter come under the ownership, management and/or control of Sompo International Holdings Ltd. (hereinafter referred to collectively as the "Reinsured").

The Subscribing Reinsurer hereby agrees to the terms and conditions of the reinsurance as contained in the attached Contract. The Intermediary is allowed to subsequently apportion signed lines as respects the layers below. The signed lines shall be notified to the Subscribing Reinsurer separately.

For and on behalf of:

**SIGNED LINES:**

| Written Line % | Signed Line % [Entered by Intermediary] | Reference |
|---|---|---|
|  |  |  |

**Authorised Signatory** _U. Jarvis_                  **Date** MAR. 6, 2020

HORSESHOE RE LIMITED ON BEHALF OF
AND FOR THE BENEFIT OF ITS
SEPARATE ACCOUNT   H30084

USD  15,000,000 ( 5% )



**TIGERRISK**

Case 1:23-cv-01831-JGK  Document 1-1  Filed 03/02/23  Page 69 of 221

# CHOATE

David A. Attisani
t 617-248-5271
dattisani@choate.com

February 1, 2022

**VIA EMAIL AND OVERNIGHT MAIL**

Yulanda Francis
Horseshoe Re Limited
Wessex House
45 Reid Street, 3rd Floor
Hamilton HM12
PO Box HM3352
Hamilton HM PX, Bermuda
yulanda@horseshoeglobal.com

Alex Bridges
Tiger Risk Partners LLC
69 Pitts Bay Road
Belvedere Building, 4th Floor
Pembroke HM08, Bermuda
abridges@tigerrisk.com

Nick Eromin
HSCM Bermuda Management Company
Wellesley House South, 1st Floor
90 Pitts Bay Road
Pembroke HM08
Bermuda
nick.eromin@hscm.com

**Re:** **Arbitration Demand: 2020 Catastrophe Aggregate XOL Reinsurance Contract No. XA200910M ("Cold Spot Contract") – Propounded To Horseshoe Re Ltd. And Its Separate Account HS0083** _____

Dear Madam and Sirs:

We represent Endurance Specialty Insurance Limited (Bermuda), on behalf of itself and its branches, affiliates, Endurance Worldwide Insurance Limited (London, England) and its branch office, SI Insurance (Europe), SA, Lloyd's Syndicate Number 5151 (London, England), Endurance Assurance Corporation (New York, USA) and/or their Quota Share reinsurers to the extent applicable, including any and all of the subsidiary or affiliate companies that are now or may hereafter come under the ownership, management and/or control of Sompo International Holdings Ltd. (collectively, "Sompo").

Sompo and Horseshoe Re Limited On Behalf Of And For The Benefit Of Its Separate Account HS0083 ("Hudson") are parties to 2020 Catastrophe Aggregate Excess of Loss Reinsurance Contract No. XA200910M (the "Cold Spot Contract"). Contrary to Hudson's unsupported contentions, COVID-19 is covered by the Cold Spot Contract.

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 70 of 221

February 1, 2022
Page 2


Accordingly, Sompo hereby demands arbitration under the Cold Spot Contract.  At arbitration, Sompo will seek an award from the Panel which, among other things: (1) orders payment of Sompo's claims; (2) declares that the Cold Spot Contract covers Sompo's COVID-19 losses; and (3) prescribes such further relief, including but not limited to attorneys' fees and costs, as the Panel deems appropriate.

Sompo hereby appoints Thomas L. Forsyth as an arbitrator.  Under the Cold Spot Contract, Hudson is required to appoint an arbitrator within 30 days.

Sompo reserves all rights in connection with this claim and all other matters involving Hudson, including but not limited to its right to interpose additional claims as warranted by development of the record.  Further communications concerning this matter should be directed to me and my colleague, J.P. Jaillet.

Regards,

David A. Attisani


cc:      J.P. Jaillet, Esq.

2

# CHAFFETZ LINDSEY LLP

1700 BROADWAY, 33RD FLOOR, NEW YORK, NY 10019
MAIN: +1 212 257 6960 | FAX: +1 212 257 6950

PETER CHAFFETZ, PARTNER
DIRECT: +1 212 257 6961
PETER.CHAFFETZ@CHAFFETZLINDSEY.COM

March 3, 2022

*Via E-Mail and Federal Express*

David A. Attisani
J.P. Jaillet
Choate Hall & Stewart LLP
Two International Place
Boston, Massachusetts 02110
+1 (617) 248-5271

Re:    Response to Demand for Arbitration Under 2020 Catastrophe Aggregate XOL Reinsurance Contract No. XA200910M and Counter-Demand for Arbitration Under 2020 Catastrophe Aggregate XOL Reinsurance Contract No. XA200911M

Dear David and J.P.:

I write on behalf of our client, Horseshoe Re Ltd. and Its Separate Account HS0083 ("Hudson"), and in response to your letter dated February 1, 2022 demanding arbitration under the 2020 Catastrophe Aggregate XOL Reinsurance Contract No. XA200910M ("Non-Peak Perils Contract") on behalf of Endurance Specialty Insurance Limited (Bermuda) and various other entities included as "the Reinsured" in the relevant contract, all of whom you define collectively as "Sompo." In that letter, you appointed Thomas L. Forsyth as an arbitrator.

Hudson hereby appoints Mr. Stephan Knipper as arbitrator pursuant to the provisions of the Non-Peak Perils Contract. Hudson reiterates that Covid-19 loss is not within the coverage of the Non-Peak Perils Contract and will seek an Award from the Tribunal declaring that such coverage does not exist, awarding Hudson its attorneys' fees and costs and ordering such other relief as the Tribunal deems appropriate.

Further, Hudson hereby demands arbitration against Sompo (as defined in your Demand) under the Catastrophe Aggregate XOL Reinsurance Contract No. XA200911M ("Peak Perils Contract" and together with the Non-Peak Perils Contract, the "Contracts")). Hudson will request that the Tribunal issue an award declaring that Sompo is not entitled to coverage of COVID 19 losses under the Peak Perils Contract, awarding Hudson its attorneys' fees and costs and ordering such other and further relief as the Tribunal may see fit to award.

Hudson further appoints Mr. Stephan Knipper as arbitrator pursuant to the provisions of the Peak Perils Contract. Under the Peak Perils Contract, Sompo has 30 days to appoint an arbitrator for the dispute under the Peak Perils contract.

March 3, 2022
Page 2

     Due to the identity of the parties and the similarity between the contracts and issues in each case, Hudson requests that Sompo consent to their consolidation into a single proceeding.  If Sompo does not consent, Hudson expects to request that the first Tribunal to be constituted consolidate the disputes under the Contracts into a single proceeding pursuant to the Contracts and Bermuda Law.

     For the avoidance of doubt, Hudson expressly reserves all procedural and substantive rights, claims, and defenses.

Best regards,

*/s/ Peter Chaffetz*

Peter Chaffetz

**IN THE MATTER OF THE *AD HOC* ARBITRATION IN HAMILTON, BERMUDA**

**between**

**ENDURANCE SPECIALTY INSURANCE LIMITED (BERMUDA), ON BEHALF OF ITSELF AND ITS BRANCHES, AFFILIATES, ENDURANCE WORLDWIDE INSURANCE LIMITED (LONDON, ENGLAND), AND ITS BRANCH OFFICE, SI INSURANCE (EUROPE), SA, LLOYD'S SYNDICATE NUMBER 5151 (LONDON, ENGLAND), ENDURANCE ASSURANCE CORPORATION (NEW YORK, USA), AND/OR THEIR QUOTA SHARE REINSURERS TO THE EXTENT APPLICABLE, INCLUDING ANY AND ALL OF THE SUBSIDIARY OR AFFILIATE COMPANIES THAT ARE NOW OR MAY HEREAFTER COME UNDER THE OWNERSHIP, MANAGEMENT, AND/OR CONTROL OF SOMPO INTERNATIONAL HOLDINGS, LTD.,**

**Claimant, Counter-Respondent**

**and**

**HORSESHOE RE LTD. ON BEHALF OF AND FOR THE BENEFIT OF ITS SEPARATE ACCOUNT HS0083,**

**Respondent,**

**HORSESHOE RE LTD. ON BEHALF OF AND FOR THE BENEFIT OF ITS SEPARATE ACCOUNT HS0084,**

**Counter-Claimant.**

_____

**RESPONDENT–COUNTER-CLAIMANT'S APPLICATION FOR APPOINTMENT OF TRIBUNAL CHAIR IN *AD HOC* NON-UNCITRAL ARBITRATION**

_____

**29 June 2022**

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 74 of 221

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................ 1

II.   THE PARTIES ............................................................................................................ 2

III.  THE CONTRACTS ..................................................................................................... 4

IV.   THE ARBITRATION .................................................................................................. 6

V.    THE SERVICES REQUESTED.................................................................................. 9

VI.   CONCLUSION .......................................................................................................... 11

1.     Respondent–Counter-Claimant Horseshoe Re Ltd., On Behalf Of And For the Benefit Of Its Separate Accounts Nos. HS0083 ("Cell HS0083") and HS0084 ("Cell HS0084" and together with Cell HS0083, the "Horseshoe Cells"), hereby requests the International Chamber of Commerce ("ICC") International Court of Arbitration ("Court") to act as appointing authority for the chair of an *ad hoc* arbitral tribunal pursuant to the agreement of the Parties[1] and the Rules of ICC As Appointing Authority in UNCITRAL or Other Arbitration Proceedings (2018) ("ICC Appointing Authority Rules").[2]

## I.     **INTRODUCTION**

2.     This case concerns a dispute over retrocessional reinsurance coverage for losses arising from the COVID-19 pandemic.  Yet although Claimant–Counter-Respondent Endurance (as hereinafter defined) demanded arbitration nearly ***five months ago***, this dispute still lacks an arbitral tribunal.  This delay was caused in large part by Endurance's refusal for nearly three months to agree to consolidate the identical disputes raised by the demand and counter-demand for arbitration.  Then, after the Parties were not able to agree on a procedure for appointing a neutral Chair for the Tribunal,[3] Endurance delayed for weeks in responding to our requests that it work with us to make this a joint submission to the ICC.

3.     Now, the Horseshoe Cells face an urgent need for relief because, we have learned, during this long period of delay in forming a Tribunal, Endurance has begun draining the disputed

---

[1] **R-1**, Catastrophe Aggregate Excess of Loss Reinsurance Contract No. XA200911M [hereinafter the "Peak Perils Contract"] at 21; **R-2,** Catastrophe Aggregate Excess of Loss Reinsurance Contract No. XA200910M [hereinafter the "Non-Peak Perils Contract"] at 22.

[2] **RL-1**, Art. 4(1), Rules of ICC As Appointing Authority in UNCITRAL or Other Arbitration Proceedings (2018).

[3] Specifically, the Parties disagreed over the extent to which Endurance could nominate as potential chairs arbitrators whom it or its counsel had serially appointed in the recent past.

1

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 76 of 221

funds from the reinsurance trusts.  Unfortunately, there is still no Tribunal constituted to hear a claim for interim relief by the Horseshoe Cells that would maintain the status quo.

4.      Consequently, the ICC as appointing authority should act promptly to appoint a neutral chair of the arbitral Tribunal, pursuant to the Parties' agreements and the ICC Appointing Authority Rules, in order to effect the Parties' agreement and ensure that the arbitral tribunal is capable of rendering an effective award.  The ICC should also immediately fix a date by which Endurance must give notice of which of its two named party appointed arbitrators it intends to proceed with in the arbitration, failing which the ICC will make the selection on its behalf.

## II.      <u>THE PARTIES</u>

5.      Endurance Specialty Insurance (Bermuda) is part of Sompo International Holdings, Ltd., a global provider of property and casualty insurance and reinsurance.  It entered into the reinsurance contracts at issue "on behalf of itself and . . . its branches, affiliates, Endurance Worldwide Insurance Limited (London, England), and its branch office, SI Insurance (Europe), SA, Lloyd's Syndicate Number 5151 (London, England), Endurance Assurance Corporation (New York, UDS), and/or their quota share reinsurers to the extent applicable, including any and all of the subsidiary or affiliate companies that are now or may hereafter come under the ownership, management, and/or control of Sompo International Holdings, Ltd." ("Endurance" will be used to refer collectively to the cedents under the reinsurance contracts at issue.)

6.      The Horseshoe Cells understand that Endurance's address and contact details are:

Sompo International Holdings, Ltd.
Waterloo House
100 Pitts Bay Road
Pembroke, HM 08
Bermuda
+1.441.278.0400

2

7.      The Horseshoe Cells understand that Endurance's legal representatives in this matter are:

> Mr. David A. Attisani
> Mr. J.P. Jaillet
> Choate, Hall & Stewart LLP
> Two International Place
> Boston, Massachusetts 02110
> United States of America
> +1.617.248.5000
> jjaillet@choate.com
> dattisani@choate.com

8.      The Horseshoe Cells are special purpose insurers which, pursuant to certain provisions of Bermuda insurance law, act as collateralized reinsurance cells.  The Horseshoe Cells are beneficially owned by certain investment fund clients of Hudson Structured Capital Management Ltd. ("HSCM"), an investment manager with operations in the United States and Bermuda, focused on alternative investments in, *inter alia*, the reinsurance sector.

9.      The Horseshoe Cells' address and contact details are:

> Hudson Structured Capital Management Ltd.
> Wellesley House South, Fl. 1
> 90 Pitts Bay Road
> Pembroke, HM08
> Bermuda
> +1.441.542.0810
> With copy to: Ajay.Mehra@hscm.com

10.     The Horseshoe Cells' legal representatives in this matter are:

> Mr. Peter Chaffetz
> Mr. Steven C. Schwartz
> Mr. David S. Blackman
> Chaffetz Lindsey LLP
> 1700 Broadway, Fl. 33
> New York, New York 10019
> United States of America
> +1.212.257.6960
> Peter.Chaffetz@chaffetzlindsey.com
> Steven.Schwartz@chaffetzlindsey.com
> David.Blackman@chaffetzlindsey.com

3

Case 1:23-cv-01831-JGK  Document 1-1  Filed 03/02/23  Page 78 of 221

## III.      **THE CONTRACTS**

11.      The Parties entered into two contracts of retrocessional reinsurance on or about

9 March 2020.[4]  Under the first, Catastrophe Aggregate Excess of Loss Reinsurance Contract No.

XA200910M (the "Non-Peak Perils Contract"), Cell HS0083 reinsures "all NATURAL PERILS"

as defined, subject to certain exclusions.  The relevant part of the contract covers US$75 million

excess US$75 million.  The Non-Peak Perils Contract is annexed hereto as **Exhibit R-2**.

12.      Under the second, Catastrophe Aggregate Excess of Loss Reinsurance Contract No.

XA200911M (the "Peak Perils Contract", and, together with the Non-Peak Perils Contract, the

"Contracts"), Cell HS0084 also reinsures "all NATURAL PERILS."  The Peak Perils Contract

covers US$300 million excess US$250 million, and is annexed hereto as **Exhibit R-1**.

13.      The Contracts are identical in most material respects, including in their dispute

resolution provisions.  In particular, the Contracts provide for *ad hoc* arbitration under the

substantive law of New York, seated in Bermuda, and for the ICC to act as appointing authority,

as follows:

> **All matters in difference** between the Reinsured and the Reinsurers
> . . . in relation to this Reinsurance Contract, including its formation
> and validity, and whether arising during or after the period of this
> Reinsurance Contract, **shall be referred to an arbitration tribunal
> in the manner hereinafter set out**.  Unless the parties agree upon
> a single arbitrator within thirty days of one receiving a written
> request from the other for arbitration, the claimant . . . shall appoint
> their arbitrator and give written notice thereof to the respondent.
> Within thirty days of receiving such notice the respondent shall
> appoint their arbitrator and give written notice thereof to the
> claimant, failing which the claimant may apply to the appointor
> hereinafter named to nominate an arbitrator on behalf of respondent.
> Should the arbitrators fail to agree, then they shall within thirty days
> of such disagreement appoint an umpire to whom the matter in
> difference shall be referred.  **Should the arbitrators fail within
> such period to appoint an umpire**, then either of them or **either of**

---

[4] **R-1**, Peak Perils Contract at 24; **R-2**, Non-Peak Perils Contract at 25.

**the parties may apply to the appointor for the appointment of an umpire**.  Unless the parties otherwise agree, **the arbitration tribunal shall consist of persons who are active or retired lawyers with not less than ten (10) years' experience in insurance or reinsurance law or active or retired officers of insurance or reinsurance companies,** and will not have a personal or financial interest in the outcome of the arbitration.  **For the avoidance of doubt, the arbitrators will be completely impartial and disinterested** in their respective appointing parties and in the results of the arbitration.  The arbitration tribunal shall have power to fix all procedural rules for the holding of the arbitration including discretionary power to make orders as to any matter which it may consider proper in the circumstances of the case with regard to pleadings, discovery, inspection of documents, examination of witnesses and any other matter whatsoever relating to the conduct of the arbitration and may receive and act upon such evidence whether oral or written strictly admissible or not as it shall in its discretion think fit. **The appointer shall be the Secretary General for the time being of the Court of Arbitration of the International Chamber of Commerce.**  Each party shall bear the expense of its own arbitrator, and shall jointly and equally bear with the other the expense of the Umpire and of the arbitration. . . . **The seat of the arbitration shall be Hamilton, Bermuda and the arbitration tribunal shall apply the laws of the state of New York as the proper law of this Reinsurance Contract.  The arbitration shall be conducted under, and the arbitration tribunal shall be governed by, the provisions of the Bermuda Arbitration Act 1986 and/or any statutory modifications or amendments thereto for the time being in force.**  The award of the arbitration tribunal shall be in writing and binding upon the parties who hereby covenant to carry out the same.  If a party fails to carry out the award the other(s) may apply for its enforcement to a court of competent jurisdiction in any territory in which the party in default is domiciled or has assets or carries on business.[5]

14.     Because the Contracts select the Secretary General for the ICC Court of Arbitration as the appointing authority, the ICC Court is empowered to act as appointing authority pursuant to Article 1 of the ICC Appointing Authority Rules.[6]

---

[5] **R-1**, Peak Perils Contract at 20-21 (emphasis added); **R-2**, Non-Peak Perils Contract at 21-22 (emphasis added).

[6] **RL-1**, Art. 1(1), Rules of ICC As Appointing Authority in UNCITRAL or Other Arbitration Proceedings (2018) ("The Rules of ICC as Appointing Authority in UNCITRAL or Other Arbitration Proceedings . . . shall apply when the International Chamber of Commerce **or any authority within ICC** ("ICC") is empowered to act as appointing

IV.        **THE ARBITRATION**

15.     On 1 February 2022, Endurance demanded arbitration under the Non-Peak Perils Contract.[7]  In that communication, Endurance named Mr. Thomas L. Forsyth as its party-appointed arbitrator.[8]  The Demand for Arbitration is annexed hereto as **Exhibit R-3**.  Mr. Forsyth is American and resides in New Hampshire.  Thirty days later, on 3 March 2022, the Horseshoe Cells replied to Endurance's demand for arbitration, as provided in the Contracts, naming Mr. Stephan Knipper as its party-appointed arbitrator.[9]  Mr. Knipper is a German national who resides in Zurich, Switzerland.  The Response to the Demand for Arbitration is annexed hereto as **Exhibit R-4**.

16.     In their reply to Endurance's arbitration demand, the Horseshoe Cells also counter-demanded arbitration under the Peak Perils Contract.  Because the two Contracts, as well as the issue in dispute, are essentially the same, the Horseshoe Cells also named Mr. Knipper as their arbitrator in the second arbitration and asked Endurance to consent to the consolidation of the two proceedings.[10]

17.     Initially, Endurance declined to consent to consolidation.[11]  Instead, on 6 April 2022, Endurance named Mr. Paul Dassenko as its party-appointed arbitrator for the dispute under the Peak Perils Contract.[12]  Mr. Dassenko resides in New York and, like Mr. Forsyth, is American.

---

authority by agreement of the parties. . . ." (emphasis added)); *id.* Art. 1(2) ("Under the Rules, the function of appointing authority shall be carried out exclusively by the ICC International Court of Arbitration (the "Court").

[7] **R-3**, Endurance's Demand for Arbitration.

[8] *Id.*

[9] **R-4**, Horseshoe Cells' Reply to Demand for Arbitration.

[10] *Id.*

[11] *See* **R-6**, E-mail of 11 Apr. 2022 from J.P. Jaillet (Choate Hall for Endurance) to P. Chaffetz (Chaffetz Lindsey for the Horseshoe Cells) and others re "Hudson/Sompo Arbitrations – Umpire Selection."

[12] **R-5**, E-mail of 6 Apr. 2022 from J.P. Jaillet (Choate Hall for Endurance) to P. Chaffetz (Chaffetz Lindsey for the Horseshoe Cells) re "Horseshoe Re/Endurance – Response to Arbitration Demand and Counter Demand for Arbitration."  Though the terms of the Contracts required Endurance to name its arbitrator within 30 days, Endurance requested, and the Horseshoe Cells consented to, an extension of this deadline. *Id.*

18.    On 9 May 2022, the Horseshoe Cells provided Endurance a draft petition to the court in Bermuda for consolidation of the two arbitrations under the Bermuda Arbitration Act 1986,[13] and again requested that Endurance consent.[14]   On 30 May 2022, Endurance finally agreed.[15]

19.    Also in the 9 May 2022 communication, the Horseshoe Cells noted that the Parties had been unable to agree on a mechanism to appoint the chair of the Tribunal without resort to the ICC as appointing authority, as provided for in the Contracts.[16]   Thus, on 6 June 2022, the Horseshoe Cells sent to Endurance a proposed joint submission to the ICC requesting appointment of a chair in the consolidated arbitration.[17]   The proposal contained blanks for Endurance to confirm which of its two arbitrators it intended to proceed with in the consolidated arbitration, and to provide any comments or information on its position that it wished to communicate to the ICC.[18]

20.    Thus far, Endurance has not provided this information, or committed to doing so by a date certain.[19]   Initially Endurance's counsel explained that they were tied up with another

---

[13] The Parties agreed that "[t]he seat of the arbitration shall be Hamilton, Bermuda" and that "[t]he arbitration shall be conducted under, and the arbitration tribunal shall be governed by, the provisions of the Bermuda Arbitration Act 1986," as previously explained.  **R-1**, Peak Perils Contract at 21; **R-2**, Non-Peak Perils Contract at 22.

[14] *See* **R-7**, E-mail of 9 May 2022 from S. Schwartz (Chaffetz Lindsey for the Horseshoe Cells) to J.P. Jaillet (Choate Hall for Endurance) and others re "Hudson/Sompo Arbitrations – Umpire Selection."

[15] *See* **R-8**, E-mail of 30 May 2022 from J.P. Jaillet (Choate Hall for Endurance) to P. Chaffetz (Chaffetz Lindsey for the Horseshoe Cells) and others re "Sompo/Hudson:  Consolidation Proposal & Umpire Selection Protocol."

[16] **R-7**, E-mail of 9 May 2022 from S. Schwartz (Chaffetz Lindsey for the Horseshoe Cells) to J.P. Jaillet (Choate Hall for Endurance) and others re "Hudson/Sompo Arbitrations – Umpire Selection."

[17] **R-9**, Email of 6 June 2022 from P. Chaffetz (Chaffetz Lindsey for the Horseshoe Cells) to D. Attisani (Choate Hall for Endurance) and others re "2022.06.06 CL Draft - Joint Application to ICC for Appointment of Arbitrator – Confidential."

[18] *Id.*, Attachment (Draft Proposal) at 7, 8.

[19] **R-10**, Email of 21 June 2022 from D. Attisani (Choate Hall for Endurance) to P. Chaffetz (Chaffetz Lindsey for the Horseshoe Cells) and others re "2022.06.06 CL Draft - Joint Application to ICC for Appointment of Arbitrator – Confidential" at 1 (taking position that "[w]e are not going to accept any artificial deadline from you or pin ourselves to a particular day" and requests for any date certain was "dogging me" [*sic*]).

arbitration hearing.[20]  Subsequently, and after we were led to understand that the hearing would have ended, Endurance's lead counsel refused our polite request to indicate a date on which his client would respond to our request to work toward a joint submission.[21]  In the meantime, on 21 June 2022, HSCM learned that Endurance was drawing down on the funds in trust that are the subject of this arbitration, presenting an urgent need for relief from the Tribunal to maintain the status quo.

21.     As Endurance has not yet substantively responded to their proposal, the Horseshoe Cells are not aware of the person with whom Endurance intends to go forward as party-appointed arbitrator in the consolidated arbitration.  However, they understand that the contact information for the two persons that might potentially be named as party-appointed arbitrator by Endurance is:

> Mr. Thomas L. Forsyth
> P.O. Box 795
> Sunapee, New Hampshire  03782
> United States of America
> thomaslforsyth@gmail.com
>
> Mr. Paul Edward Dassenko
> AzuRe Advisors, Inc.
> 445 Park Avenue, Fl. 9
> New York, New York 10022
> United States of America
> +1.212.223.1606
> pedassenko@aol.com

22.     The contact information for the person named as party-appointed arbitrator by the Horseshoe Cells is:

> Mr. Stephan Knipper
> SkRe Consulting GmbH
> Breitloostrasse 24
> 8802 Klichberg, ZH
> Switzerland

---

[20] *Id.* at 2-3.

[21] *Id.* at 1.

+41 79 307 2825
skreconsulting@gmail.com

23.     No panel has been constituted and no decisions or orders have been made in the
arbitration.  Because the Horseshoe Cells named Mr. Knipper on 3 March 2022, the 30 days
provided for in the Contracts for appointment of an Umpire by the party-appointed arbitrators has
elapsed.  Therefore, "either of the parties may apply to the appointor for the appointment of an
umpire."[22]

## V.    THE SERVICES REQUESTED

24.     The Horseshoe Cells respectfully request that, pursuant to Article 7(1)(c) of the
ICC Appointing Authority Rules, the ICC International Court of Arbitration urgently appoint a
presiding arbitrator in the consolidated non-UNCITRAL *ad hoc* arbitration described herein.  The
Horseshoe Cells also request that, pursuant to Article 1(2) of the ICC Appointing Authority Rules,
all aspects of these services, including this application and all documents submitted therewith, be
kept strictly confidential.[23]  The Horseshoe Cells further request that the ICC fix a deadline by
which either Endurance shall confirm which party-appointed arbitrator it intends to use, or, failing
such election, the ICC shall make the selection on Endurance's behalf, pursuant to the terms of the
Contracts.[24]

25.     Under the Contracts, arbitrators must be "active or retired lawyers with not less
than ten (10) years' experience in insurance or reinsurance law or active or retired officers of

---

[22] **R-2**, Non-Peak Perils Contract at 22.

[23] **RL-1**, Art. 1(2), Rules of ICC As Appointing Authority in UNCITRAL or Other Arbitration Proceedings (2018) (incorporating by reference the Statutes and Internal Rules of the ICC International Court of Arbitration, which provide for confidentiality).

[24] **R-1**, Peak Perils Contract at 21 ("Within thirty days of receiving such notice, the respondent shall appoint their arbitrator and give written notice thereof to the claimant, failing ***failing which the claimant may apply to the appointer hereinafter named to nominate an arbitrator on behalf of respondent***." (emphasis added)); **R-2**, Non-Peak Perils Contract at 22 (same).

9

insurance or reinsurance companies."[25]   Additionally, they must be "completely impartial and disinterested in their respective appointing parties and in the results of the arbitration."[26]   The ICC Court should therefore appoint as Chair someone who both (a) is qualified to act as a presiding arbitrator and has at least 10 years' experience in insurance or reinsurance law, and (b) is "completely impartial" as the Parties agreed.  The Horseshoe Cells understand that the language of the consolidated arbitration will be English.

26.     The Horseshoe Cells believe that these twin aims can be best served by appointment of a respected, London-based Queens Counsel ("QC") with the requisite knowledge of the reinsurance market.  The relevant contracts are similar to the widely-used "Bermuda Form" insurance policy in that they provide for application of New York substantive law, but arbitration in Bermuda under the supervision of the Bermuda courts. There is a deep pool of highly qualified QCs with extensive experience in both Bermuda arbitration law and New York contract law through their participation in the many "Bermuda Form" arbitrations that have been completed since the 1980s.[27]

27.     The Horseshoe Cells also note that the party-appointed arbitrators are American and Swiss/German, and that, in accordance with usual ICC practice, another arbitrator from those jurisdictions should be avoided.  Moreover, because the substantive law of the dispute is that of New York, and the *lex arbitri* is that of Bermuda, a chair with a common-law background would be best.  As England is a common-law jurisdiction that is not connected to the Parties,[28] and which

---

[25] **R-2**, Non-Peak Perils Contract at 22.

[26] *Id.*

[27] *See generally* **RL-2**, *Haliburton Co. v. Chubb Bermuda Ins. Ltd.* [2020] UKSC 48, ¶ 11 (explaining the origins and features of the Bermuda Form and its connection to London).

[28] The Horseshoe Cells note that, if anything, Endurance, whose claims are on behalf of, *inter alia,* "Endurance Worldwide Insurance Limited (London, England)" would be advantaged by the choice of a U.K. lawyer as chair.  By

10

is home to a large and diverse set of lawyers with insurance and reinsurance experience, including under New York substantive law in *ad hoc* arbitrations seated in Bermuda, the Horseshoe Cells respectfully suggest that an English QC with insurance law experience should be appointed chair.

28.    The Horseshoe Cells further suggest that, in exercising its discretion pursuant to Article 7(2) of the ICC Appointing Authority Rules, the ICC Court employ the list-procedure set out at Article 8(2) of the UNCITRAL Rules and incorporated by reference at Article 6 of the ICC Appointing Authority Rules.

## VI.    <u>CONCLUSION</u>

29.    Therefore, having received the enclosed filing fee of US$5,000.00 (without prejudice to the Horseshoe Cells' right to reimbursement of this and any other costs of the ICC's services from Endurance), the ICC Court should urgently appoint a presiding arbitrator for the above-captioned *ad hoc* arbitration and, should Endurance fail to confirm which of is two named potential party-appointed arbitrators it elects to proceed with, select one on its behalf so that the Tribunal may be finally constituted.

---

contrast, the Horseshoe Cells are Bermuda vehicles affiliated with an American investment manager, and thus lack any connection to the U.K.

Dated:  29 June 2022                              Respectfully Submitted,
New York, New York.


                                                 CHAFFETZ LINDSEY LLP


                                                 BY: _____ /s/ Peter Chaffetz _____
                                                 Peter Chaffetz
                                                 Steven C. Schwartz
                                                 David S. Blackman
                                                 1700 Broadway, Fl. 33
                                                 New York, New York 10019
                                                 United States of America
                                                 +1.212.257.6960
                                                 Peter.Chaffetz@chaffetzlindsey.com
                                                 Steven.Schwartz@chaffetzlindsey.com
                                                 David.Blackman@chaffetzlindsey.com

IN THE MATTER OF THE *AD HOC* ARBITRATION IN HAMILTON, BERMUDA

**between**

**ENDURANCE SPECIALTY INSURANCE LIMITED (BERMUDA), ON BEHALF OF ITSELF AND ITS BRANCHES, AFFILIATES, ENDURANCE WORLDWIDE INSURANCE LIMITED (LONDON, ENGLAND), AND ITS BRANCH OFFICE, SI INSURANCE (EUROPE), SA, LLOYD'S SYNDICATE NUMBER 5151 (LONDON, ENGLAND), ENDURANCE ASSURANCE CORPORATION (NEW YORK, USA), AND/OR THEIR QUOTA SHARE REINSURERS TO THE EXTENT APPLICABLE, INCLUDING ANY AND ALL OF THE SUBSIDIARY OR AFFILIATE COMPANIES THAT ARE NOW OR MAY HEREAFTER COME UNDER THE OWNERSHIP, MANAGEMENT, AND/OR CONTROL OF SOMPO INTERNATIONAL HOLDINGS, LTD.,**

**Claimants**

**and**

**HORSESHOE RE LTD. ON BEHALF OF AND FOR THE BENEFIT OF ITS SEPARATE ACCOUNTS HS0083 AND HS0084,**

**Respondent.**

--------------------------------------------------

**ENDURANCE'S RESPONSE TO HORSESHOE RE'S APPLICATION FOR APPOINTMENT OF TRIBUNAL CHAIR IN *AD HOC* NON-UNCITRAL ARBITRATION**

--------------------------------------------------

**July 7, 2022**

i

## I.   <u>INTRODUCTION</u>.

1.      Claimant Endurance Specialty Insurance Limited - Bermuda ("Endurance") hereby responds to the application of Respondent, Horseshoe Re Ltd., On Behalf Of And For the Benefit Of Its Separate Accounts Nos. HS0083 and HS0084 (the "Horseshoe Cells"), for appointment of the chair of an *ad hoc* arbitration between Endurance and the Horseshoe Cells.

2.      Endurance agrees that the International Chamber of Commerce International Court of Arbitration ("ICC Court") should act as the appointing authority, according to the Rules of ICC As Appointing Authority in UNCITRAL or Other Arbitration Proceedings (2018).

3.      Per the analysis below, however, Endurance objects to Horseshoe Cells' attempt to engineer the appointment of a London-based Queens Counsel ("QC") as tribunal chair.

## II.   <u>ENDURANCE'S POSITIONS</u>.

### A.   <u>Identity Of The Third Arbitrator.</u>

4.      Under the parties' Contracts, "the arbitration tribunal shall consist of persons who are [1] [a] active or retired lawyers with not less than ten (10) years' experience in insurance or reinsurance law or [b] active or retired officers of insurance or reinsurance companies, [2] will not have a personal or financial interest in the outcome of the arbitration… and [3] will be completely impartial and disinterested in their respective appointing parties and in the results of the arbitration".  The parties could have included -- but did not bargain for -- any "*QC requirement*".

5.      Endurance accordingly requests that the ICC Court appoint a presiding arbitrator who satisfies the agreed requirements set forth above, and who is deeply inured to the customs and practices of the reinsurance industry as a **participant in that market**.  By material contrast, Horseshoe Cells' submission evinces their focus on steering the appointment away from a current

or former officer of an insurance/reinsurance company, so that they can obtain the services of an outside lawyer working in the London market (specifically, a QC). It bears emphasis that the Contractual experience qualification can be satisfied by an active or retired officer of an insurance or reinsurance company, which is generally an asset to an industry arbitration proceeding and will be material to disposition of the pending matter.

6. Endurance designates Paul E. Dassenko as its arbitrator in the consolidated arbitration. Mr. Dassenko is a U.S. national. Horseshoe Cells' party-appointed arbitrator, Mr. Knipper, is a German national who resides in Zurich.

7. Endurance and Horseshoe Cells agree that the ICC Court of Arbitration should not appoint a presiding arbitrator who is American, German, or Swiss -- jurisdictions represented by their party-appointed arbitrators. Endurance requests instead that the ICC Court appoint a presiding arbitrator from Australia, Canada, India, Ireland, Malaysia, New Zealand, Philippines or Singapore, which are common law jurisdictions that host a significant community of English-speaking arbitrators.

8. Endurance maintains a robust objection to Horseshoe Cells' request that the ICC Court appoint a London-based QC with experience conducting "Bermuda Form" arbitrations. For the avoidance of any genuine doubt, this is ***not*** a Bermuda Form arbitration and, although these sophisticated parties easily could have done so, they did not insert any *QC requirement* -- to the contrary, they refrained from doing so. Otherwise stated, we are familiar with the employment of Queen's Counsel on international arbitration tribunals; Endurance did not bargain for one in its Contract; and, we do not wish to submit our case to one.

9. It requires little imagination to conclude that Horseshoe Cells advanced this unusually-specific request, because they believe that a QC would inure to their advantage. The

website of Chaffetz Lindsey LLP ("Chaffetz"), the law firm representing Horseshoe Cells, hammers home the point. Chaffetz touts its experience conducting Bermuda Form arbitrations, and it proclaims: "No firm is better suited to handle arbitrations involving the Bermuda Form".[1] In that connection, Chaffetz no doubt rubs elbows with QC's and other denizens of the English legal/reinsurance world on a regular basis, and they hope to obtain unfair advantage by requesting (albeit in the guise of "fairness") that the ICC Court seat one such familiar face in the middle chair.

10.  It appears that the Horseshoe Cells seek to seat an English QC as the presiding arbitrator here, because the Horseshoe Cells' counsel maintains ties to -- and has experience of -- the English QC community. Otherwise stated, the ICC Court should be suspicious when a party concertedly homes in on and seeks appointment of an arbitrator from a specific and limited repository of individuals, who are not identified (let alone required) by its Contracts. In other words, English QC's populate a club of sorts -- a small coterie of professionals who know each other and selected foreign counsel -- and Chaffetz is manifestly targeting them for Horseshoe Cells' unfair advantage, contrary to the Contractual requirement that the ICC Court seat a chair who is "completely impartial and disinterested".

11.  Endurance accordingly requests that the ICC Court decline to appoint a QC as tribunal chair, but instead appoint a qualified English-speaking arbitrator from Australia, Canada, India, Ireland, Malaysia, New Zealand, Philippines or Singapore.

**B.    The List Procedure.**

12.  Horseshoe Cells further request that, when choosing the third arbitrator, the ICC Court employ the list-procedure outlined in Article 8(2) of the UNCITRAL Rules.

---

[1]    See Insurance & Reinsurance Disputes | Chaffetz Lindsey LLP.

13.    Endurance has no objection to this particular request.


Respectfully Submitted,


CHOATE HALL & STEWART LLP


By:

Date: July 7, 2022

Mr. David A. Attisani
Mr. J.P. Jaillet
Choate, Hall & Stewart LLP
Two International Place
Boston, Massachusetts 02110
United States of America
+1.617.248.5000
jjaillet@choate.com
dattisani@choate.com

*Attorneys for Claimant Endurance*

(ICC CASE NN 529/PDP)

**IN THE MATTER OF THE *AD HOC* ARBITRATION IN HAMILTON, BERMUDA**

*between*

**ENDURANCE SPECIALTY INSURANCE LIMITED (BERMUDA), ON BEHALF OF ITSELF AND ITS BRANCHES, AFFILIATES, ENDURANCE WORLDWIDE INSURANCE LIMITED (LONDON, ENGLAND), AND ITS BRANCH OFFICE, SI INSURANCE (EUROPE), SA, LLOYD'S SYNDICATE NUMBER 5151 (LONDON, ENGLAND), ENDURANCE ASSURANCE CORPORATION (NEW YORK, USA), AND/OR THEIR QUOTA SHARE REINSURERS TO THE EXTENT APPLICABLE, INCLUDING ANY AND ALL OF THE SUBSIDIARY OR AFFILIATE COMPANIES THAT ARE NOW OR MAY HEREAFTER COME UNDER THE OWNERSHIP, MANAGEMENT, AND/OR CONTROL OF SOMPO INTERNATIONAL HOLDINGS, LTD.,**

**Claimants**

*and*

**HORSESHOE RE LTD. ON BEHALF OF AND FOR THE BENEFIT OF ITS SEPARATE ACCOUNTS HS0083 AND HS0084,**

**Respondent.**

———————————————————————

**ENDURANCE'S CONSOLIDATED REPLY TO HORSESHOE'S APPLICATION FOR APPOINTMENT OF TRIBUNAL CHAIR IN *AD HOC* NON-UNCITRAL ARBITRATION**

———————————————————————

**July 25, 2022**

i

## I.    INTRODUCTION.

1.    Claimant Endurance Specialty Insurance Limited - Bermuda ("Endurance") hereby submits this consolidated reply to: (a) the 29 June Application of Respondent, Horseshoe Re Ltd., On Behalf Of And For the Benefit Of Its Separate Accounts Nos. HS0083 and HS0084 ("Horseshoe"), for appointment of the chair in an *ad hoc* arbitration between Endurance and Horseshoe; and, (b) the email submitted by Horseshoe's counsel on 11 July, which advanced three additional arguments in the guise of a "*request for leave*".

2.    Because it appears that the International Chamber of Commerce International Court of Arbitration ("ICC Court") did not receive Endurance's initial response dated 7 July, Endurance has consolidated its responses into this Reply and attached its 7 July response.  *See* Ex. 1.

3.    In sum, Endurance agrees that the ICC Court should act as the appointing authority, according to the Rules of ICC As Appointing Authority In UNCITRAL Or Other Arbitration Proceedings (2018),

4.    Endurance further confirms that the parties' Contracts contemplate a tripartite arbitration Panel, and Endurance agrees that the ICC Court should appoint the Umpire/chair/president of the three-arbitrator Panel specified by the parties' Contracts.

5.    As discussed below, however, Endurance objects to Horseshoe's unilateral attempt to engineer the appointment of a London-based Queens Counsel ("QC") as tribunal chair -- over Endurance's repeated and robust objections.

## II.      ENDURANCE'S POSITIONS.

### A.      <u>Identity Of The Third Arbitrator.</u>

6.      Under the parties' Contracts, "the arbitration tribunal shall consist of persons who are [1] [a] active or retired lawyers with not less than ten (10) years' experience in insurance or reinsurance law or [b] active or retired officers of insurance or reinsurance companies, [2] will not have a personal or financial interest in the outcome of the arbitration… and [3] will be completely impartial and disinterested in their respective appointing parties and in the results of the arbitration".  The parties could have included -- but did not bargain for -- any "*QC requirement*" or "*litigator requirement*" to govern this industry arbitration.

7.      Endurance accordingly requests that the ICC Court appoint a presiding arbitrator who satisfies the agreed requirements set forth above, and who is deeply inured to the customs and practices of the reinsurance industry as a *participant* in that market.  By material contrast, Horseshoe's submissions amply evince its focus on steering the appointment away from a current or former officer of an insurance/reinsurance company, so that Horseshoe can obtain the services of an outside lawyer working in the London market (specifically, a QC).  It bears emphasis that the Contractual experience qualification can be satisfied by an active or retired officer of an insurance or reinsurance company, which is generally an asset to an industry arbitration proceeding and will be material to disposition of the pending matter.

8.      ████████████████████████████████████████ ████████████████████████████████ Industry experience, including hands on experience with property catastrophe reinsurance contracts and the reinsurance collateral market, are essential attributes of an Umpire tasked with adjudicating this dispute, because it implicates reinsurance underwriting and wording principles that would be foreign -- or, at least, anecdotal in nature -- to

a lawyer who has not worked in the industry. For the avoidance of any doubt, Endurance acknowledges that some English QC's do a good deal of reinsurance work -- and even bill themselves as *"reinsurance experts"* -- but any such second-hand experience cannot transform them into underwriters or reinsurance claims executives.

9.      As noted in our 7 July Response, Endurance designated Paul E. Dassenko as its arbitrator in the consolidated arbitration. Mr. Dassenko is a U.S. national. Horseshoe's party-appointed arbitrator, Mr. Knipper, is a German national who resides in Zurich.

10.     Endurance and Horseshoe agree that the ICC Court should not appoint a presiding arbitrator who is American, German, or Swiss -- jurisdictions represented collectively by their party-appointed arbitrators. Endurance requests instead that the ICC Court appoint a presiding arbitrator from Australia, Canada, India, Ireland, Malaysia, New Zealand, Philippines or Singapore, which are common law jurisdictions that host a significant community of English-speaking arbitrators.

11.     Endurance maintains a robust objection to Horseshoe's request that the ICC Court appoint a London-based QC with experience conducting "Bermuda Form" arbitrations. For the avoidance of any genuine doubt, this is ***not*** a Bermuda Form arbitration and, although these sophisticated parties easily could have done so, they did not insert any *QC requirement* -- to the contrary, they refrained from doing so. Otherwise stated, we are familiar with the employment of Queen's Counsel on international arbitration tribunals; Endurance did not bargain for one in its Contract; and, we do not wish to submit our case to one.

12.     It requires little imagination to conclude that Horseshoe advanced this unusually-specific request, because they believe that a QC would inure to their advantage. The website of Chaffetz Lindsey LLP ("Chaffetz"), the law firm representing Horseshoe, hammers home the

point.  Chaffetz touts its experience conducting Bermuda Form arbitrations, and it proclaims: *"No firm is better suited to handle arbitrations involving the Bermuda Form".*[1]  In that connection, Chaffetz no doubt rubs elbows with QC's and other denizens of the English legal/reinsurance world on a regular basis, and they hope to obtain unfair advantage by requesting (albeit in the guise of "fairness") that the ICC Court seat one such familiar face in the middle chair.

13.   Chaffetz's insistence on the selection of an English QC has been habitual and pointed, and it is therefore difficult to miss.  *See, e.g.*, Horseshoe Application (June 29, 2022), ¶ 26 (requesting the appointment "of a respected, London-based Queens Counsel ('QC')"), ¶ 27 ("Horseshoe Cells respectfully suggest that an English QC with insurance law experience should be appointed chair"); Chafftez email (July 11, 2022) ("a distinguished UK-based QC would bring a needed, complementary perspective to the Tribunal").

14.   It appears that Horseshoe seeks to seat an English QC as the presiding arbitrator here, because Hudson's counsel maintains ties to -- and has experience of -- the English QC community.  The ICC Court should be suspicious, and take a dim view, when a party concertedly homes in on and seeks appointment of an arbitrator from a specified and limited repository of individuals, who are not identified (let alone required) by its Contracts.  In other words, English QC's populate a club of sorts -- a small coterie of professionals who know each other and selected foreign counsel well -- and Chaffetz is manifestly targeting them for Horseshoe's unfair advantage, contrary to the Contractual requirement that the ICC Court seat a chair who is "completely impartial and disinterested".

15.   In the 11 July email submitted by Horseshoe's counsel, Horseshoe raises three arguments.  <u>First</u>, Horseshoe argues that Endurance "errs in suggesting that a UK-based Queen's

---

[1]       *See* <u>Insurance & Reinsurance Disputes | Chaffetz Lindsey LLP</u>.

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 97 of 221

Counsel ('QC') with insurance experience is not fully qualified to serve under the Parties' arbitration agreements". In its haste to ram an English QC down Endurance's corporate gullet, Horseshoe and Chaffetz misstate Endurance's position. Endurance has never maintained that English QCs are inherently unqualified. Instead, Endurance has observed that English QCs represent only a tiny slice of the arbitration community qualified for service according to the Parties' Contracts, and the ICC Court should be loath to indulge one party's demand to narrow the repository of otherwise available candidates accordingly. In essence, Horseshoe is attempting to re-write the parties' arbitration clause in order to ensure selection of a candidate likely to tilt the playing field in Horseshoe's direction. The Contract drafters could not possibly have specified the ICC Court as appointing authority for that ignoble purpose.

16.   <u>Second</u>, Horseshoe argues -- in the same email purporting only to seek *"leave"* to respond -- that Endurance "falsely… speculates that [Horseshoe's counsel's] experience with Bermuda Form arbitrations would give Horseshoe an undue advantage in a proceeding chaired by a UK-based QC". Tellingly, Horseshoe's counsel avoids any express denial of its experience with the insular community of English QCs who serve as arbitrators, together with its website's blustering representation of experience and expertise in an arena (*i.e.* Bermuda Form arbitrations) heavily and notoriously populated by English QC's. The ICC Court must rationally ask itself: *Why does Horseshoe continue to push aggressively and repeatedly for appointment of an English QC as the third arbitrator?* Horseshoe has now made multiple submissions -- and, unless the ICC Court stanches further briefing in the name of parity, will soon advance another -- pushing the very specific request that the ICC Court eliminate from consideration all qualified arbitrators, apart from the small and insular pool of English QCs, the vast majority of whom have never served as employees of any re/insurer.

17.     The **only reasonable conclusion** is that Horseshoe fervently believes an English QC will bring some advantage to Horseshoe. Whether that advantage arises from its Chaffetz's experience in presenting prior cases in Bermuda Form arbitrations before or adverse to English QCs or not, it is beyond obvious that Horseshoe views selection of an English QC as an edge favoring Horseshoe. It would be unfair and inequitable to confer that advantage on Horseshoe out of the gate, when Horseshoe did not bargain for it in the Contracts.

18.     <u>Third</u>, Horseshoe rationalizes that Endurance "fails to acknowledge the skills that an experienced litigation and arbitration lawyer would bring to the complex task of presiding over an efficient evidentiary hearing". Horseshoe's "*please appoint a litigator at all costs*" argument amounts to nothing more than a contrived "justification" aimed at buttressing its request for the appointment of an English QC. Endurance's counsel have more than 50 combined years of lawyering experience, and we are aware of the skillset typically associated with lawyers at arbitration. But, this case requires industry experience; not an advocate's litigation or arbitration background.

19.     ███████████████████████████████████████████ ███████████████████████████████ Specifically, the Umpire will need to understand: the underwriting purpose behind this type of coverage; the ways in which the reinsurance industry drafts and applies wording in the collateralized reinsurance market; and, the common responses of reinsurance claims personnel when their clients suffer catastrophic losses. An industry veteran is needed; not a litigator who has represented reinsurance clients in the past. *See, e.g., Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 679 (7th Cir. 1983) ("Thus, people who arbitrate do so because they prefer a tribunal knowledgeable about the subject matter of their dispute to a generalist court with its austere impartiality but limited knowledge of subject matter….

**No matter how determinedly judge and lawyer work to acquire an understanding of a given business or industry, they cannot hope to approximate the practical wisdom distilled from 30 or 40 years of experience**.")

20.　　In its relentless pursuit of a singular advantage, Horseshoe is again buzzing around the same hive by reducing the enormously wide field of candidates qualified by the parties' Contracts to a narrowly drawn repository of litigators who, according to Horseshoe's actions, will no doubt favor horseshoe. *See, e.g.*, *Enniss Family Realty I, LLC v. Schneider Nat'l Carriers, Inc.*, No. 3:11cv739-KS-MTP, 2013 U.S. Dist. LEXIS 80264, at *27 (S.D. Miss. June 7, 2013) ("The parties' performance is often the best evidence of what the contract requires of them"); *AstenJohnson v. Columbia Cas. Co.*, 483 F. Supp. 2d 425, 467 (E.D. Pa. 2007) ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning"). Horseshoe's actions tell you all you need to know -- they continue to pester the ICC Court for appointment of an English QC, because they obviously believe that orientation will benefit Horseshoe. Endurance plainly does not agree that equivalent benefit would be conferred on Endurance, which is why we object.

21.　　In the process, Horseshoe ignores its own Contracts, which specify that qualified arbitrators can be "active or retired lawyers with not less than ten (10) years' experience in insurance or reinsurance law or active or retired officers of insurance or reinsurance companies". Horseshoe is improperly seeking to eliminate the ICC Court's prerogative to appoint an active or retired officer of a re/insurance company as Umpire. As the ICC Court is no doubt aware, non-lawyers serve everyday as reinsurance industry arbitrators and expertly manage the administration of hearings and formulation of awards, while infusing the proceedings with their first-hand industry expertise. *See, e.g., Certain Underwriting Members of Lloyds of London v.*

8

*Florida*, 892 F.3d 501, 507 (2d Cir. 2018) ("But reinsurers and ceding insurers affirmatively seek arbitral panels with expertise.  The best informed and most capable potential arbitrators are repeat players with deep industry connections, who will understand the trade's norms of doing business and the consequences of proposed lines of decision") (quotations omitted).

22.     In this case, and as described above, industry expertise will be critical to the fair and conscientious disposition of the matter currently before the ICC Court.  *Supra* at ¶¶ 6-9.

23.     Again, these sophisticated Parties could have bargained for English *QC-only* or *litigator-only* limitations, but they did not.  The ICC Court can (and, it should) interpret the omission as the knowing choice of sophisticated commercial parties.  *See, e.g., Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 30 N.Y.3d 508, 518-19 (2017) ("[W]here an agreement is negotiated between sophisticated, counseled business people negotiating at arm's length, courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include"); *Skanska USA Bldg. Inc. v. Atl. Yards B2 Owner, LLC*, 31 N.Y.3d 1002, 1006 (2018) ("It is axiomatic that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. . . . In that regard, courts may not, through their interpretation of a contract, add or excise terms or distort the meaning of any particular words or phrases, thereby creating a new contract under the guise of interpreting the parties' own agreements.").

24.     Endurance accordingly requests that the ICC Court decline to appoint a QC as tribunal chair, but instead appoint a qualified English-speaking arbitrator from Australia, Canada, India, Ireland, Malaysia, New Zealand, Philippines or Singapore.

### B. **The List Procedure**.

25.     Horseshoe further requests that, when choosing the third arbitrator, the ICC Court employ the list-procedure outlined in Article 8(2) of the UNCITRAL Rules.

26.     Endurance has no objection to this particular request.

### C. **No Further Submission Is Warranted**.

27.     As the ICC Court may recall, in an effort to limit Endurance's opportunity to respond, Horseshoe made a number of forceful and histrionic representations to the ICC Court and the Court should hold Horseshoe to them now, even if they were advanced at the time only to inhibit Endurance's further submission.  In that connection, based on the 15 July representations of Horseshoe's counsel to the ICC Court, *a full ten days ago*, that "there is _**urgent**_ need for the Tribunal to be constituted so that it can entertain an application for interim measures to preserve the _**status quo**_" -- and its companion request that the ICC Court receive all "submissions by Friday, 22 July 2022" -- we assume that there will be no further submission from Horseshoe's counsel. *See* Blackman Email (7/15/22) (emphasis added).

28.     In other words, if bona fide *"urgency"* trumped the need for further considered content ten days ago, it is difficult to imagine that Horseshoe and its counsel can justify a further submission at this time – particularly when each Party has made multiple submissions to date.

29.     For the avoidance of doubt, Horseshoe and its counsel have already submitted repetitive argument seeking to seat an English QC as Umpire **on three occasions**. *See, e.g.*, Horseshoe Application (June 29, 2022) (requesting an English QC); Chaffetz email (July 11, 2022) (requesting an English QC); Blackman email (July 15, 2022) (emphasizing the "urgent" need to appoint an Umpire).

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 102 of 221

30.     Endurance made two substantive submissions on 7 July and 11 July.  *See* Endurance Response (July 7, 2022); Jaillet email (July 11, 2022).  With the submission of this Reply, each party has now made three substantive submissions concerning the ICC Court's appointment of an Umpire.

31.     We respectfully and accordingly request that the ICC Court enforce this parity; take Horseshoe at its vehement word that time was of the essence ten days ago; and, declare the record closed but for the ICC Court's implementation of the list procedure.

Respectfully Submitted,

CHOATE HALL & STEWART LLP

Mr. David A. Attisani
Mr. J.P. Jaillet
Choate, Hall & Stewart LLP
Two International Place
Boston, Massachusetts 02110
United States of America
+1.617.248.5000
dattisani@choate.com
jjaillet@choate.com

*Attorneys for Claimant Endurance*



6 October 2022/mle/pdp

**NN 529/PDP**

ENDURANCE SPECIALTY INSURANCE LIMITED (BERMUDA), ON BEHALF OF ITSELF AND ITS BRANCHES, AFFILIATES, ENDURANCE WORLDWIDE INSURANCE LIMITED (LONDON, ENGLAND), AND ITS BRANCH OFFICE, SI INSURANCE (EUROPE), SA, LLOYD'S SYNDICATE NUMBER 5151 (LONDON, ENGLAND), ENDURANCE ASSURANCE CORPORATION (NEW YORK, USA), AND/OR THEIR QUOTA SHARE REINSURERS TO THE EXTENT APPLICABLE, INCLUDING ANY AND ALL OF THE SUBSIDIARY OR AFFILIATE COMPANIES THAT ARE NOW OR MAY HEREAFTER COME UNDER THE OWNERSHIP, MANAGEMENT, AND/OR CONTROL OF SOMPO INTERNATIONAL HOLDINGS, LTD. (Bermuda) **vs/ 1.** HORSESHOE RE LTD. ON BEHALF OF AND FOR THE BENEFIT OF ITS SEPARATE ACCOUNT HS0083 (Bermuda) **2.** HORSESHOE RE LTD. ON BEHALF OF AND FOR THE BENEFIT OF ITS SEPARATE ACCOUNT HS0084 (Bermuda)

| | | |
|---|---|---|
| **Counsel in charge of the file: Paul Di Pietro** | (Tel: | **+1 646 699 5704)** |
| **Deputy Counsel: Kellie Portie** | (Tel: | **+1 646 699 5716)** |
| | (Fax: | **+1 212 221 1295)** |
| | (Email: | <u>ica9@iccwbo.org</u>) |

Sir. Bernard Eder
24 Lincoln's Inn Fields
London WC2A 3EG
U.K.

*By email: be@bernardeder.com*

Mr. Peter Chaffetz
Mr. Steven C. Schwartz
Mr. David S. Blackman
CHAFFETZ LINDSEY LLP
1700 Broadway, Fl. 33
New York, NY 10019
U.S.A.

*By email: Peter.Chaffetz@chaffetzlindsey.com;*
*Steven.Schwartz@chaffetzlindsey.com; David.Blackman@chaffetzlindsey.com*

Mr. David A. Attisani
Mr. J.P. Jaillet
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
U.S.A.

*By email: jjaillet@choate.com; dattisani@choate.com*

…/…

International Chamber of Commerce (ICC) | Secretariat of ICC International Court of Arbitration **iccwbo.org/arbitration**

**Paris**
33-43 avenue du Président Wilson
75116 Paris, France
+33 (0)1 49 53 28 28  arb@iccwbo.org

**New York**
in affiliation with Sicana, Inc.
140 East 45th Street, Suite 14C
New York, NY 10017, USA
+1 646 699 5704  ica9@iccwbo.org

**Singapore**
in affiliation with SICAS
28 Maxwell Road #02-01, Maxwell Chambers
Suites, Singapore 069120
+65 6983 5580  ica11@iccwbo.org

**Hong Kong**
Room 102, 1/F., West Wing, Justice Place,
11 Ice House Street, Central, Hong Kong
+852 3954 9504  ica8@iccwbo.org

**Sao Paulo**
in affiliation with SCIAB LTDA.
rua Surubim, 504, Brooklin Novo
CEP 04571-050, Sao Paulo, Brazil
+55 11 3040 8830  ica10@iccwbo.org

**Abu Dhabi**
ADGM Square, Level 20, Al Maqam Tower
Al Maryah Island, P.O. Box 111999
Abu Dhabi, United Arab Emirates
+971 56 333 2781  ica12@iccwbo.org

Dear Sirs,

On 6 October 2022, the International Court of Arbitration of the International Chamber of Commerce ("Court") appointed Bernard Eder as presiding arbitrator (Article 7(1)(c)).

A copy of the Statement of Acceptance, Availability, Impartiality and Independence, as well as the *curriculum vitae,* of Bernard Eder is enclosed for the parties' and co-arbitrators' information.

A copy of the Application for the Court to act as appointing authority with exhibits, as well as Responding Party's comments are enclosed for the presiding arbitrator. We further enclose a Case Information.

We invite the parties and the arbitrators to correspond directly with each other. We also invite the parties to provide a copy of this correspondence to the co-arbitrators.

We are now closing this case. In this regard, we enclose the Financial Table which details the costs of this Application. The ICC administrative expenses are payments already made by the Applicant.

We may destroy any documents, communications or correspondence submitted, unless a party requests that we return the same by **31 October 2022**. If a party does so, we will ask the requesting party to pay all related costs and expenses.

Yours faithfully,

Paul Di Pietro
Counsel
International Court of Arbitration® | International Chamber of Commerce
SICANA Inc.

encl.  - Case Information
       - Financial Table
       - Statement of Acceptance, Availability, Impartiality and Independence of Bernard Eder
       - *Curriculum vitae* of Bernard Eder
       - Application, Responding Party's comments and Secretariat's correspondences

**Jaillet, Jean-Paul**

| | |
|---|---|
| **From:** | Bernard Eder <be@bernardeder.com> |
| **Sent:** | Monday, October 31, 2022 12:13 PM |
| **To:** | Attisani, David A.; Peter Chaffetz; Steven Schwartz; Jaillet, Jean-Paul; David Blackman; DI PIETRO Paul |
| **Cc:** | Paul E. Dassenko (pedassenko@aol.com); skreconsulting@gmail.com; Rachel Newman |
| **Subject:** | Endurance Specialty & Ors |

**\*\*External Email\*\***

Dear Colleagues,

On behalf of the Tribunal, I acknowledge receipt of the recent email correspondence.

The challenge both to me personally as well as the Tribunal as a whole is duly noted.

I do not consider that it is appropriate to comment on the matters raised.

For present purposes, it is sufficient to say that (i) I regard the allegations of bias against me to be entirely groundless; (ii) all three members of the Tribunal consider that the Tribunal has been properly constituted; and (iii) all concerned may be assured that the members of the Tribunal will act impartially in carrying out  their function as arbitrators.

The Tribunal continues to urge the parties to seek to agree the terms of the Procedural Order and hereby directs Endurance to file with the Tribunal by the close of business EDT on Wednesday, 2 November 2022 any additional points it wishes to make in relation to the draft PO1 previously provided following which the Tribunal will make such order as may be appropriate without further notice.

kind regards

Bernard Eder
(for the Tribunal)

**Sir Bernard Eder**
24 Lincoln's Inn Fields, London WC2A 3EG
E: BE@bernardeder.com - Mob: +44 (0) 7711139771
Clerk: Rachel Newman: E: RN@bernardeder.com -  Tel: +44 (0) 20 7147 7233
www.bernardeder.com

---

**From:** Attisani, David A. <dattisani@choate.com>
**Date:** Monday, 31 October 2022 at 15:32
**To:** Peter Chaffetz <Peter.Chaffetz@chaffetzlindsey.com>, Bernard Eder <be@bernardeder.com>, Paul E. Dassenko (pedassenko@aol.com) <pedassenko@aol.com>, skreconsulting@gmail.com <skreconsulting@gmail.com>
**Cc:** Jaillet, Jean-Paul <jjaillet@choate.com>, Steven Schwartz <Steven.Schwartz@chaffetzlindsey.com>, David Blackman <David.Blackman@chaffetzlindsey.com>, DI PIETRO Paul <Paul.DIPIETRO@iccwbo.org>
**Subject:** Re: [External] 2022.10.28 - RESPONDENT COUNTER-CLAIMANT DRAFT - Procedural Order No. 1

Dear Mr DiPietro,

There is no "tribunal", and we are more than entitled to decline to accept Bernard Eder.  Again, we decline to accept him, and we call upon him to forego this matter in the interest of moving this case along.

In addition, Mr. Chaffetz has misstated certain facts concerning the timeline, Choate's prior matter, and Endirance's actions with respect to the trust.  I am currently with another client, and we will respond more fully this afternoon.  All rights remain reserved.

Kind regards,
David

---

**From:** Peter Chaffetz <Peter.Chaffetz@chaffetzlindsey.com>
**Sent:** Monday, October 31, 2022 9:46:53 AM
**To:** 'Bernard Eder' <be@bernardeder.com>; Paul E. Dassenko (pedassenko@aol.com) <pedassenko@aol.com>; skreconsulting@gmail.com <skreconsulting@gmail.com>
**Cc:** Attisani, David A. <dattisani@choate.com>; Jaillet, Jean-Paul <jjaillet@choate.com>; Steven Schwartz <Steven.Schwartz@chaffetzlindsey.com>; David Blackman <David.Blackman@chaffetzlindsey.com>; DI PIETRO Paul <Paul.DIPIETRO@iccwbo.org>
**Subject:** RE: [External] 2022.10.28 - RESPONDENT COUNTER-CLAIMANT DRAFT - Procedural Order No. 1

**\*\*External Email\*\***

---

Dear Members of the Tribunal:

This responds to Mr. Attisani's October 28 email, which he improperly addressed to me personally.  Neither Mr. Attisani's suggestion that the Tribunal has not yet been constituted, nor his attacks on the neutrality of the Tribunal's President should be allowed to derail this arbitration.

*First*, the Tribunal was properly constituted when the ICC appointed Sir Bernard as President. The ICC made that appointment pursuant to the terms of the governing arbitration clauses. Nothing in those provisions, nor in governing law, provides that the Tribunal is not constituted until Mr. Attisani says it is. Moreover, the governing Bermuda arbitration statute contains no provision for an automatic stay of arbitration proceedings pending an arbitrator challenge. *See* Bermuda Arbitration Act 1986; *see also* Bermuda International Conciliation and Arbitration Act 1993, Art. 23 & Schedule II, Art. 13(3) (no automatic stay provision, and instead providing that "while [a challenge] is pending, the arbitral tribunal, including the challenged arbitrator, may continue the arbitral proceedings and make an award."). Consistent with that legal framework, the prevailing practice is that proceedings may continue pending the final resolution of a challenge to an arbitrator. *E.g. Haliburton Co. v. Chubb Bermuda Ins. Ltd.* [2020] UKSC 48 ¶¶ 22-27 (proceedings continued and hearing held as challenge to arbitrator proceeded). Nor, to the extent they have any relevance to this *ad hoc* arbitration, do any major commercial arbitration rules—including the ICC Rules—provide for automatic stays of arbitration pending resolution of a challenge to an arbitrator.

*Second*, Mr. Attisani has advanced no colorable basis for his attacks on Sir Bernard. We know nothing about Mr. Attisani's prior arbitration before Sir Bernard. But we cannot imagine that a seasoned international lawyer like Mr. Attisani would have conducted himself in anything less than a professional manner. And, while it is not for us to say, we also think it most unlikely that a distinguished KC and former High Court judge such as Sir Bernard would hold a grudge in the way that Mr. Attisani purportedly fears. We accept that Mr. Attisani and Sir Bernard may have disagreed on the issues in the prior dispute. But arbitrations would not happen without disagreements. Surely disagreements are not disqualifying.

One thing we do know for certain is that Sir Bernard was never, as Mr. Attisani asserts, "told expressly that [I] and [my] client wanted him." This is false. Even assuming that Sir Bernard read the parties' briefs to the ICC, those discussed only the general qualifications the parties sought in the Tribunal President. Neither the name of Sir Bernard nor that of any other individual candidate was on the table. We have never had a case with Sir Bernard as counsel or judge.

In short, Mr. Attisani's contention that this Tribunal is "a biased arbitration panel certain to do [Chaffetz Lindsey's] client's bidding to our client's detriment" is frivolous. If a party's decision to accuse a Tribunal member of bias were enough to establish that bias, parties would be free to torpedo Tribunals at will. The Tribunal should not reward Mr. Attisani's insulting strategy by further delaying this proceeding.

We renew our request that the Tribunal move forward with the framing of PO1 on the schedule set forth in my email of October 28, which appears at the bottom of this email chain.

Respectfully,

**Peter R. Chaffetz**
Chaffetz Lindsey llp
1700 Broadway, 33rd Floor, New York, NY 10019
+1 212 257 6961 (Direct)  |  +1 646 327 6862 (Mobile)  |  +1 212 257 6950 (Fax)
Peter.Chaffetz@chaffetzlindsey.com |  www.chaffetzlindsey.com

CONFIDENTIALITY NOTICE: The information contained in this message and any attachment is confidential and may be subject to the attorney-client privilege, or otherwise protected from disclosure by applicable law. Any disclosure, distribution, copying, or use of the information contained in this message or any attachment by anyone other than the intended recipient, regardless of address or routing, is strictly prohibited. If you are not the intended recipient, please telephone or email the sender and delete this message and any attachment from your system.

**From:** Attisani, David A. <dattisani@choate.com>
**Sent:** Friday, October 28, 2022 10:15 PM
**To:** Peter Chaffetz <Peter.Chaffetz@chaffetzlindsey.com>
**Cc:** Jaillet, Jean-Paul <jjaillet@choate.com>; Steven Schwartz <Steven.Schwartz@chaffetzlindsey.com>; David Blackman

<David.Blackman@chaffetzlindsey.com>; Paul E. Dassenko (pedassenko@aol.com) <pedassenko@aol.com>;
skreconsulting@gmail.com; 'Bernard Eder' <be@bernardeder.com>; DI PIETRO Paul <Paul.DIPIETRO@iccwbo.org>
**Subject:** RE: [External] 2022.10.28 - RESPONDENT COUNTER-CLAIMANT DRAFT - Procedural Order No. 1

Dear Peter,

This will respond to your misguided email below, which intentionally misstates the record and evades the only pertinent
issues facing the Parties and the ICC Court.

As a threshold matter, you have intentionally placed the cart before the horse. Three arbitrators who have not been
accepted as a "tribunal" have no authority to order anything, and you and your client are constrained to await responses
from Bernard Eder, first, and then the ICC Court. We note in this connection that your email below omits any reference
to the bargained for ICC rules which completely repudiate the procedurally inverted arguments you wish to advance
below.

As you know after practicing in this area for roughly four decades, reinsurance arbitration is a creature of mutual
consent. There is no "tribunal", because Endurance has never come close to acceding to the authority of one. We have
taken care never to acknowledge Bernard Eder as "President" or "Chair", or to accept any properly constituted
"tribunal" because none exists. As such, the arbitrators you have sought to approach below have no "authority" to
impose any order of any kind – whether crafted or amended by you or anyone else – on Endurance. Otherwise stated,
contractual reference to the ICC is not tantamount to acceptance of a biased arbitration panel certain to do your client's
bidding to our client's detriment.

More fundamentally, you and your client are in no position to determine that Endurance's challenge is "*frivolous*" or
"*unserious*". Barring the unauthorized disclosure of facts by Bernard Eder or some other tribunal member sitting in the
prior matter referenced in our challenge directed to the ICC, *you know absolutely nothing* about its conduct or Bernard
Eder's attendant actions inimical to Choate's other client in that case. (To the extent that Bernard Eder or anyone else
has taken it upon themselves to inform you of it, please let us know immediately so that we can address their breach of
the confidentiality order entered in that proceeding.) In other words, Horseshoe's commentary on Endurance's
challenge is inherently "frivolous *and* "unserious", because it is entirely ignorant. In a similar connection, your email
below elides the stubborn fact that the ICC Court disclosed both sides' preferences to the candidate it selected – *i.e.,*
Eder was told expressly that you and your client wanted him; and that my client and I do not. It is no wonder that you
have completely ducked that ineluctable fact below.

Finally, over a period of months, you and Horseshoe have repeated the refrain that "*time is of the essence*", but only
selectively. At every turn, when you sought to submit an additional briefing to the ICC Court or you otherwise wanted
more time to consolidate your position, you arrogated to your side whatever time you wanted. Even if time were
demonstrably "*of the essence*" to Horseshoe – a mantra plainly at odds with your actions -- that fact could not possibly
justify imposition on Endurance of a "President" so obviously biased against it. If time really were "*of the essence*", you
and your client would have rethought your demand for a QC/KC, and you remain free now to join Endurance in
requesting that the ICC Court replace Bernard Eder forthwith which certainly would move this matter along. Please let
us know if you wish to do so in the service of temporal economy.

Against that backdrop, your email below amounts to nothing more than a vacant cavil about your own characterization
of the "meet and confer" process. Since it does nothing to address the panel formation problem facing both Parties,
Endurance continues to reserve all rights.

David

**From:** Peter Chaffetz <Peter.Chaffetz@chaffetzlindsey.com>
**Sent:** Friday, October 28, 2022 7:55 PM
**To:** 'Bernard Eder' <be@bernardeder.com>; PEDassenko@aol.com; skreconsulting@gmail.com
**Cc:** Jaillet, Jean-Paul <jjaillet@choate.com>; Attisani, David A. <dattisani@choate.com>; Steven Schwartz
<Steven.Schwartz@chaffetzlindsey.com>; David Blackman <David.Blackman@chaffetzlindsey.com>
**Subject:** 2022.10.28 - RESPONDENT COUNTER-CLAIMANT DRAFT - Procedural Order No. 1

**\*\*External Email\*\***

---

Dear Members of the Tribunal,

I write on behalf of Respondent—Counter-Claimant ("Horseshoe") to submit an updated version of our proposed Procedural Order No. 1 as originally submitted on 21 October.  Unfortunately, we have received no input on that original submission from our opponents.  In addition, Claimant—Counter-Respondent ("Endurance") has both ignored the Tribunal's direction to meet and confer with us (as well as  our own repeated requests that it do so) and failed to submit its own proposal on October 28, the extended deadline the Tribunal granted at Endurance's request.

Instead , this afternoon, through its counsel, Choate Hall, Endurance filed a challenge with the ICC, the contractually designated appointing authority, asking it to vacate its appointment of the President on the basis of alleged bias on his part against Choate Hall lawyer David A. Attisani.  Should the ICC even consent to consider this frivolous challenge, we will vigorously oppose it.

For now we wish to make three points.  First, Endurance has been less than candid with the Tribunal and Horseshoe.  Everything Endurance offers to the ICC as purported support for its request to remove the President was known to its counsel at the time the ICC announced the appointment. Yet, on the day of the original, 21 October deadline for submitting drafts of Procedural Order  No. 1, counsel asked the Tribunal for more time on the basis that,  "Horseshoe has proposed a detailed draft procedural order for which Endurance ***needs additional time to review and confer***." (E-mail from J.P. Jaillet to Tribunal and Parties of 21 Oct. 2022 (emphasis added).)  In reliance on that representation, we did not oppose Endurance's request for an extension and confirmed that we remained available to meet and confer with Endurance.  (E-mail of D. Blackman to Tribunal and Parties of 21 Oct. 2022.)  Now, however, it seems clear that Endurance's request for more time to meet and confer was a pretext for further delaying this arbitration (first noticed by Endurance on 1 February 2022) and for garnering additional time to prepare its unserious challenge to the President of the Tribunal.

Second, time is of the essence for Horseshoe.  As the Tribunal is aware from its draft Procedural Order submitted on 21 October, Horseshoe intends to seek interim relief from the Tribunal in order to restrain Endurance from continuing to withdraw and to require it to  restore millions of dollars held in the reinsurance trusts that Horseshoe contends should have been released to it months ago.

Third, and most importantly, Endurance's ICC filing can have no effect on the authority of this contractually constituted Tribunal unless and until the ICC itself grants the relief requested—an extremely unlikely eventuality.  In the meantime Endurance has no basis to ignore deadlines set by the  Tribunal or unilaterally to suspend these proceedings by doing so.  Consequently, Horseshoe respectfully requests that the Tribunal consider with all due speed Horseshoe's attached proposal for Procedural Order No. 1.  We have revised the draft to reflect the one week delay already caused by Endurance's extension as well as the Tribunal's input regarding the hearing date.  (*See* E-mail from the President to the Tribunal and Parties of 23 Oct. 2022.)  Horseshoe further requests that the Tribunal then enter its Procedural Order No. 1, fixing a time for briefing on interim measures as soon as possible, and in any event in parallel to the resolution of Endurance's frivolous challenge.

While Endurance has no excuse for its unilateral refusal to participate in this proceeding, we also recognize that, as a practical matter, it would still be better for the Tribunal to have input from Endurance.  Therefore, Horseshoe stands ready to confer in good faith with Endurance regarding the conduct of this arbitration and requests that the Tribunal

again direct Endurance to do so and to file with the Tribunal by the close of business EDT on Wednesday, 2 November 2022 any additional points it wishes to make following those communications.

Respectfully,

**Peter R. Chaffetz**
**Chaffetz Lindsey llp**
1700 Broadway, 33rd Floor, New York, NY 10019
+1 212 257 6961 (Direct)  |  +1 646 327 6862 (Mobile)  |  +1 212 257 6950 (Fax)
Peter.Chaffetz@chaffetzlindsey.com |  www.chaffetzlindsey.com

**CONFIDENTIALITY NOTICE**:  The information contained in this message and any attachment is confidential and may be subject to the attorney-client privilege, or otherwise protected from disclosure by applicable law. Any disclosure, distribution, copying, or use of the information contained in this message or any attachment by anyone other than the intended recipient, regardless of address or routing, is strictly prohibited.  If you are not the intended recipient, please telephone or email the sender and delete this message and any attachment from your system.

---

Choate Hall & Stewart LLP Confidentiality Notice:
This message is transmitted to you by or on behalf of the law firm of Choate, Hall & Stewart LLP. It is intended exclusively for the individual or entity to which it is addressed. The substance of this message, along with any attachments, may contain information that is proprietary, confidential and/or legally privileged or otherwise legally exempt from disclosure. If you are not the designated recipient of this message, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please destroy and/or delete all copies of it and notify the sender of the error by return e-mail or by calling 1-617-248-5000. If you are a resident of California, please see Choate's Notice to California Consumers Concerning Privacy Rights, which is posted at https://www.choate.com/terms-of-use.html#privacy-statement.
For more information about Choate, Hall & Stewart LLP, please visit us at choate.com

---

Choate Hall & Stewart LLP Confidentiality Notice:

This message is transmitted to you by or on behalf of the law firm of Choate, Hall & Stewart LLP. It is intended exclusively for the individual or entity to which it is addressed. The substance of this message, along with any attachments, may contain information that is proprietary, confidential and/or legally privileged or otherwise legally exempt from disclosure. If you are not the designated recipient of this message, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please destroy and/or delete all copies of it and notify the sender of the error by return e-mail or by calling 1-617-248-5000. If you are a resident of California, please see Choate's Notice to California Consumers Concerning Privacy Rights, which is posted at https://www.choate.com/terms-of-use.html#privacy-statement.

For more information about Choate, Hall & Stewart LLP, please visit us at choate.com

---

## Jaillet, Jean-Paul

| | |
|---|---|
| **From:** | Bernard Eder <be@bernardeder.com> |
| **Sent:** | Saturday, November 19, 2022 3:14 AM |
| **To:** | Jaillet, Jean-Paul; Peter.Chaffetz@chaffetzlindsey.com; Steven.Schwartz@chaffetzlindsey.com; David.Blackman@chaffetzlindsey.com; Attisani, David A.; Fay, Anastasia R.; PORTIE Kellie |
| **Cc:** | pedassenko@aol.com; skreconsulting@gmail.com; DI PIETRO Paul; ica9; Rachel Newman |
| **Subject:** | Re: ICC Case NN 529/PDP |

**External Email**

Dear All,

I acknowledge receipt of the below email and attached letter.

I remain of the view that this challenge is baseless.

The English authorities make it plain that in such circumstances I should continue in my role as duly appointed arbitrator unless and until the challenge succeeds or all parties agree otherwise.

However, I am concerned about the continuing delay in resolving this pending challenge.

In such circumstances, I wish to confirm that if all parties agree that I should resign, I will happily do so.

Subject to any such agreement, all concerned may be assured that I will continue in my role as arbitrator with due impartiality as I always seek to do to the best of my ability.

kind regards

Bernard Eder

**Sir Bernard Eder**
**24 Lincoln's Inn Fields, London WC2A 3EG**
**E: BE@bernardeder.com - Mob: +44 (0) 7711139771**
**Clerk: Rachel Newman: E: RN@bernardeder.com  -  Tel: +44 (0) 20 7147 7233**
**www.bernardeder.com**

**From:** Jaillet, Jean-Paul <jjaillet@choate.com>
**Date:** Friday, 18 November 2022 at 20:54
**To:** ica9 <ica9@iccwbo.org>, DI PIETRO Paul <Paul.DIPIETRO@iccwbo.org>
**Cc:** PORTIE Kellie <Kellie.PORTIE@iccwbo.org>, pedassenko@aol.com <pedassenko@aol.com>, Bernard Eder <be@bernardeder.com>, skreconsulting@gmail.com <skreconsulting@gmail.com>, Peter.Chaffetz@chaffetzlindsey.com <Peter.Chaffetz@chaffetzlindsey.com>, Steven.Schwartz@chaffetzlindsey.com <Steven.Schwartz@chaffetzlindsey.com>, David.Blackman@chaffetzlindsey.com <David.Blackman@chaffetzlindsey.com>, Attisani, David A. <dattisani@choate.com>, Fay, Anastasia R. <afay@choate.com>
**Subject:** RE: ICC Case NN 529/PDP

All,

Good afternoon.  Please see the attached correspondence.

Have a good weekend.

Regards, JP


J.P. Jaillet

## CHOATE

Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
t 617-248-5259
f 617-248-4000
jjaillet@choate.com
www.choate.com




**From:** ica9 <ica9@iccwbo.org>
**Sent:** Friday, November 11, 2022 1:26 PM
**To:** be@bernardeder.com; pedassenko@aol.com; skreconsulting@gmail.com; Peter.Chaffetz@chaffetzlindsey.com; Steven.Schwartz@chaffetzlindsey.com; David.Blackman@chaffetzlindsey.com; Jaillet, Jean-Paul <jjaillet@choate.com>; Attisani, David A. <dattisani@choate.com>
**Cc:** ica9 <ica9@iccwbo.org>; DI PIETRO Paul <Paul.DIPIETRO@iccwbo.org>; PORTIE Kellie <Kellie.PORTIE@iccwbo.org>
**Subject:** ICC Case NN 529/PDP

**\*\*External Email\*\***

Dear Sirs,

Please see attached the Secretariat's correspondence of today.

Sincerely,

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 113 of 221

**Kamoya Wilson** | Assistant | International Court of Arbitration®

   

SICANA Inc. | 140 East 45th Street, Suite 14C, New York, NY 10017 | T +1 (646) 699-5709 | kamoya.wilson@iccwbo.org | www.iccwbo.org

Choate Hall & Stewart LLP Confidentiality Notice:
This message is transmitted to you by or on behalf of the law firm of Choate, Hall & Stewart LLP. It is intended exclusively for the individual or entity to which it is addressed. The substance of this message, along with any attachments, may contain information that is proprietary, confidential and/or legally privileged or otherwise legally exempt from disclosure. If you are not the designated recipient of this message, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please destroy and/or delete all copies of it and notify the sender of the error by return e-mail or by calling 1-617-248-5000. If you are a resident of California, please see Choate's Notice to California Consumers Concerning Privacy Rights, which is posted at https://www.choate.com/terms-of-use.html#privacy-statement.
For more information about Choate, Hall & Stewart LLP, please visit us at choate.com



9 February 2023/pdp

**NN 529/PDP**

ENDURANCE SPECIALTY INSURANCE LIMITED (BERMUDA), ON BEHALF OF ITSELF AND ITS BRANCHES, AFFILIATES, ENDURANCE WORLDWIDE INSURANCE LIMITED (LONDON, ENGLAND), AND ITS BRANCH OFFICE, SI INSURANCE (EUROPE), SA, LLOYD'S SYNDICATE NUMBER 5151 (LONDON, ENGLAND), ENDURANCE ASSURANCE CORPORATION (NEW YORK, USA), AND/OR THEIR QUOTA SHARE REINSURERS TO THE EXTENT APPLICABLE, INCLUDING ANY AND ALL OF THE SUBSIDIARY OR AFFILIATE COMPANIES THAT ARE NOW OR MAY HEREAFTER COME UNDER THE OWNERSHIP, MANAGEMENT, AND/OR CONTROL OF SOMPO INTERNATIONAL HOLDINGS, LTD. (Bermuda) **vs/ 1.** HORSESHOE RE LTD. ON BEHALF OF AND FOR THE BENEFIT OF ITS SEPARATE ACCOUNT HS0083 (Bermuda) **2.** HORSESHOE RE LTD. ON BEHALF OF AND FOR THE BENEFIT OF ITS SEPARATE ACCOUNT HS0084 (Bermuda)

| | | |
|---|---|---|
| **Counsel: Paul Di Pietro** | **(Tel:** | **+1 646 699 5704)** |
| **Deputy Counsel: Kellie Portie** | **(Tel:** | **+1 646 699 5716)** |
| | **(Fax:** | **+1 212 221 1295)** |
| | **(Email:** | **ica9@iccwbo.org)** |

Sir Bernard Eder
24 Lincoln's Inn Fields
London WC2A 3EG
U.K.

*By email: be@bernardeder.com*

Mr. Paul E. Dassenko

*By email: pedassenko@aol.com*

Mr. Stephan Knipper

*By email: skreconsulting@gmail.com*

…/…

International Chamber of Commerce (ICC) | Secretariat of ICC International Court of Arbitration    **iccwbo.org/arbitration**

**Paris**
33-43 avenue du Président Wilson
75116 Paris, France
+33 (0)1 49 53 28 28   arb@iccwbo.org

**New York**
in affiliation with Sicana, Inc.
140 East 45th Street, Suite 14C
New York, NY 10017, USA
+1 646 699 5704   ica9@iccwbo.org

**Singapore**
in affiliation with SICAS
28 Maxwell Road #02-01, Maxwell Chambers
Suites, Singapore 069120
+65 6983 5580   ica11@iccwbo.org

**Hong Kong**
Room 102, 1/F., West Wing, Justice Place,
11 Ice House Street, Central, Hong Kong
+852 3954 9504   ica8@iccwbo.org

**Sao Paulo**
in affiliation with SCIAB LTDA.
rua Surubim, 504, Brooklin Novo
CEP 04571-050, Sao Paulo, Brazil
+55 11 3040 8830   ica10@iccwbo.org

**Abu Dhabi**
ADGM Square, Level 20, Al Maqam Tower
Al Maryah Island, P.O. Box 111999
Abu Dhabi, United Arab Emirates
+971 56 333 2781   ica12@iccwbo.org

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 115 of 221

**NN 529/PDP**                                                                 **Page 2**

Mr. Peter Chaffetz
Mr. Steven C. Schwartz
Mr. David S. Blackman
CHAFFETZ LINDSEY LLP
1700 Broadway, Fl. 33
New York, NY 10019
U.S.A.

*By email: Peter.Chaffetz@chaffetzlindsey.com*
*Steven.Schwartz@chaffetzlindsey.com*
*David.Blackman@chaffetzlindsey.com*

Mr. David A. Attisani
Mr. J.P. Jaillet
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
U.S.A.

*By email: jjaillet@choate.com*
*dattisani@choate.com*

Dear Sirs,

On 26 January 2023, the International Court of Arbitration of the International Chamber of Commerce (the "**Court**") decided that the challenge filed by Responding Party against Sir Bernard Eder, presiding arbitrator appointed by the Court, is admissible and should be rejected on the merits (Article 7(1)(e) of the Rules of ICC as Appointing Authority in UNCITRAL or Other Arbitration Proceedings (2018) (the "**Rules**")).

Pursuant to Article 11 of the Rules, at the request of one or more parties, the Court may communicate the reasons for a decision on the challenge of an arbitrator.

In light of Applicants' request and Responding Party's non-objection, the Court decided to communicate reasons for its decision regarding the challenge.

The Court has considered all comments and materials submitted by the parties regarding this issue. A summary of the main points of the parties' comments (section I), as well as the reasons for the Court's decision (section II), are set out below:

## I.   OVERVIEW OF THE CHALLENGE AND THE PARTIES' ARGUMENTS

1.   On 6 October 2022, the Court appointed Sir Bernard Eder as presiding arbitrator, following Applicants' application for the Court to provide the service of appointing the presiding arbitrator pursuant to Article 7(1)(c) of the Rules, and having considered the parties' submissions in this regard.

…/…

Case 1:23-cv-01831-JGK Document 1-1 Filed 03/02/23 Page 116 of 221

2.  On 28 October 2022, Responding Party filed a challenge against the presiding arbitrator. Responding Party argued that Sir Bernard is not completely impartial or free from any appearance of bias as provided in the arbitration agreements (i) because the Secretariat of the Court (the "**Secretariat**") provided to the appointed president correspondence by which Responding Party "*aggressively opposed*" the appointment of a KC indicating that this "*disclosure to Eder irrevocably tainted the arbitration process, including Eder's prospective service*" and (ii) because of his treatment of Responding Party's counsel and its client in a recent unrelated reinsurance arbitration.

3.  On (i), Responding Party noted that "*by disclosing to Eder the parties' unusually strong preferences during the [president] selection process, the [Secretariat] irrevocably tainted this proceeding, including Eder's candidacy.*"

4.  On (ii), Responding Party argued that Sir Bernard has experience with Responding Party's counsel "*which pitted him against [Responding Party's counsel] and one of [his] global reinsurance clients.*" Responding Party explained that in October 2020, ARIAS-UK appointed Sir Bernard as umpire in an international reinsurance dispute involving different parties. According to Responding Party, the dispute "*precipitated an unusual degree of friction and antipathy between our side and the Umpire (Sir Bernard)*" for two reasons:

    -  Sir Bernard allegedly engaged in *ex parte* contacts with the opposing counsel in that arbitration at the stage of preparing a list of preferred candidates to act as umpire; and

    -  Sir Bernard allegedly decided that the arbitration case in which he was presiding could not be consolidated with a parallel arbitration. However, the arbitral tribunal in the parallel arbitration eventually decided to consolidate both proceedings "*at the behest of [Responding Party's counsel' client]*", which had the effect of terminating Sir Bernard's case.

5.  Responding Party argued that "*[a]t the risk of advancing a euphemism, these are uncomfortable facts and they portend a biased and irrevocably tainted arbitration proceeding here*". In addition, Responding Party stated that to their knowledge, Sir Bernard "*did not disclose any of those facts to the parties in this proceeding or to the ICC Court.*"

6.  Applicants "*vigorously oppose[d]*" the challenge indicating that such challenge "*can have no effect on the authority of this contractually constituted Tribunal.*" Applicants also asserted that Responding Party is trying to delay the proceedings, and that Responding Party had "*no basis to ignore deadlines set by the Tribunal or unilaterally suspend these proceeding*".

7.  On 28 November 2022, the Secretariat informed the parties of its understanding that the parties agreed that the Court provide the additional service of deciding on the challenge filed against the presiding arbitrator pursuant to Article 7(1)(e) of the Rules.

8.  On 10 January 2023, Responding Party insisted on the grounds for the challenge, stating that under these facts "*no reasonable person could conclude that Eder is 'completely impartial' vis-à-vis [Responding Party's counsel] and its client or free from the appearance of bias.*" Furthermore, Responding Party took issue with Sir Bernard's comments, stating that Sir Bernard judged the challenge and that he is "*already arguing against one of the parties to the arbitration.*" Responding Party submitted that beyond seeking impartiality, this challenge "*will spare the parties the cost and distraction of further challenges to Eder's ill-fated participation in this case.*"

…/…

FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM
NYSCEF DOC. NO. 14
INDEX NO. 650832/2023
RECEIVED NYSCEF: 02/13/2023

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 117 of 221

NN 529/PDP
Page 4

9.      Finally, Responding Party's counsel added to the challenge the ground that Sir Bernard wrote to the parties on 31 October 2022 that he did not consider it appropriate to comment on the matters raised but then proceeded to do so; that on 19 November 2022 he "*authored another argumentative email contending that Endurance's challenge was 'baseless' and pleading to serve as umpire*", and that in this he was "*already arguing against one of the parties to the arbitration he would be required to judge fairly and without the appearance of bias*".

10.     Also on 10 January 2023, Applicants argued that the "*ICC Court should reject this challenge*" asserting it is untimely under the UNCITRAL Rules, and that "*the facts alleged do not remotely suggest the 'appearance of bias that [Responding Party] claims.*"

## II.     THE COURT'S DECISION

### A. Admissibility of the Challenge

11.     The Court finds that the challenge is admissible. The challenge is not subject to a 15-day time limit as provided in the UNCITRAL Rules (as alleged by Applicants) as this is not an UNCITRAL arbitration. Pursuant to the arbitration agreements, this arbitration is subject to the Bermuda Arbitration Act of 1986 which does not contain a time limit for bringing a challenge. In any event, Applicants have not made reference in their submissions to any specific provision of such Act that would make the challenge inadmissible.

### B. Merits of the Challenge

12.     The Court considered Responding Party's two main grounds for the challenge: **(i)** Sir Bernard's alleged lack of impartiality; and **(ii)** Sir Bernard's alleged lack of disclosure.[1]

13.     The first ground alleging impartiality consists of three sub-grounds: **(a)** the Secretariat's disclosure of the parties' "*Umpire preferences*"; **(b)** an unrelated prior arbitration where Sir Bernard was the umpire and made procedural decisions "*which pitted him against [Responding Party's counsel] and one of [his] global reinsurance clients,*" "*precipitated an unusual degree of friction and antipathy between our side and the Umpire (Sir Bernard Eder)*" and ended as a result of a consolidation decision by another arbitral tribunal on the application of the party whose counsel represents the Responding Party in this arbitration (the arbitral tribunal over which Sir Bernard presided having refused his consolidation application); and **(c)** Sir Bernard's comments on the matters raised by Responding Party.

### *(i)     Sir Bernard's alleged lack of impartiality*

14.     With respect to **sub-ground (a)**, the Court notes that Secretariat did not disclose all communications received from the parties relating to the appointment of Sir Bernard, but only those which followed the Secretariat's usual practice, that is, Applicants' application for the appointment of a presiding arbitrator as well as Responding Party's response thereto. These documents constitute the framework upon which the Court was tasked with the appointment of the arbitrator and which were already provided to the co-arbitrators. The Court has carefully considered the content of the Responding Party's response to the application, which did state its preferences as to the profile of the presiding arbitrator. The Court finds that these comments do not give rise to a risk of the arbitrator having a bias against Responding Party or its counsel and in favor of Applicants.

         …/…

---

[1] Although lack of disclosure is not mentioned in the *"Executive Summary"* of the 28 October 2022 challenge, it states on page 4: "*To our knowledge, Eder did not disclose any of those facts to the parties in this proceeding or to the ICC Court.*"

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 118 of 221

15. The arbitration agreements provide that "*Unless the parties otherwise agree, the arbitration tribunal shall consist of persons who are active or retired lawyers with not less than ten (10) years' experience in insurance or reinsurance law or active or retired officers of insurance or reinsurance companies, and will not have a personal or financial interest in the parties or the outcome of the arbitration [ … ]*". The parties do not question that Sir Bernard complies with the qualifications provided in the arbitration agreements.

16. Absent any subsequent agreement on additional qualifications, the parties are at liberty to state their own proposals as to their preferred profile to be appointed as presiding arbitrator. However, such proposals are not binding on the appointing authority (as there is no party agreement) and cannot serve as basis to disqualify an arbitrator subsequently appointed, even if the appointed arbitrator is made aware of such comments.

17. With respect to **sub-ground (b)**, the Court notes that the previous arbitration referred to by Responding Party, which was allegedly settled in 2020, was unrelated to the present case, the alleged bias related to procedural decisions made by Sir Bernard, and the bias was alleged toward counsel and did not involve a party in the present case.  The Court considers that there is a high threshold to find bias against a party (or counsel) resulting merely from procedural decisions taken by arbitral tribunals, unless such decisions are manifestly improper or would otherwise raise due process concerns. The circumstances alleged relating to the previous case are insufficient to assume any bias or lack of impartiality in the present case. The facts alleged by Responding Party do not reach the level of enmity or animosity and are not otherwise so serious so as to suggest a risk that Sir Bernard lacks impartiality.

18. In this regard, the Court considers that the provision in the arbitration agreements which specifically provides that "*the arbitrators will be completely impartial*" does not demand a higher standard of impartiality than the one generally expected from arbitrators. The Court systematically considers such standard in making decisions on the constitution of arbitral tribunals (including when appointing arbitrators and deciding on challenges).

19. Finally, with respect to **sub-ground (c)**, Responding Party's contention is that, by commenting on the challenge, Sir Bernard was "*already arguing against one of the parties to the arbitration he would be required to judge fairly and without the appearance of bias*". The Court considers that an arbitrator is entitled to comment on an allegation of bias against him or her. The Court does not consider that the presiding arbitrator's correspondence referred to was "*argumentative*" or "*pleading*" as alleged. Accordingly, the Court finds that this correspondence does not give rise to a risk or appearance of bias.

### (ii)    Sir Bernard's alleged lack of disclosure

20. Furthermore, the Court considers that in this specific case, Sir Bernard's alleged lack of disclosure of the previous unrelated arbitration does not constitute a sufficient ground to remove him as arbitrator.  Even if a disclosure relating to a prior, unrelated arbitration settled in 2020, not involving any of the parties or entities related to any of the parties in the present arbitration and only involving the same counsel to a party, in which the arbitrator was appointed by a different institution, might have been made, a failure to make such a disclosure is in itself insufficient in this case to support a lack of impartiality and is not sufficiently aggravating to "*tip the scales*" on the outcome of the challenge. Furthermore, it is not unusual in the specialized reinsurance sector that counsel and arbitrators may be involved together in multiple cases. The circumstances in this case do not suggest any bias that would make the lack of disclosure of the appearance of counsel in the previous unrelated case an aggravating factor to justify removing the arbitrator in the present case.

…/…

21.     For the reasons above, the Court decided to reject the challenge on the merits.

Sincerely,

Paul Di Pietro
Counsel
International Court of Arbitration® | International Chamber of Commerce
SICANA Inc.



BERMUDA

ARBITRATION ACT 1986

1986 : 34

### TABLE OF CONTENTS

**PART I**
**CITATION AND INTERPRETATION**

1      Short title and commencement
2      Interpretation

**PART II**
**CONCILIATION**

3      Appointment of conciliator

**PART III**
**ARBITRATION WITHIN BERMUDA**

**Effect of Arbitration Agreements, etc.**

4      Authority of arbitrators and umpires to be irrevocable
5      Death of party
6      Bankruptcy
7      Staying court proceedings where there is submission to arbitration
8      Staying court proceedings where party proves arbitration agreement
9      Consolidation of arbitrations
10      Reference of interpleader issues to arbitration

**Arbitrators and Umpires**

11      When reference is to a single arbitrator
12      Power of parties in certain cases to supply vacancy
13      Umpires
14      Majority award of three arbitrators
15      Power of Court in certain cases to appoint an arbitrator or umpire
16      Reference to official referee

1

ARBITRATION ACT 1986

17       Power of judges to take arbitrations

**Conduct of Proceedings, Witnesses, etc.**

18       Proper law of contract
19       Procedural law
20       Conduct of proceedings, witnesses, etc.

**Provisions as to Awards**

21       Time for making award
22       Interim awards
23       Specific performance
24       Awards to be final
25       Power to correct slips

**Costs, Fees and Interest**

26       Costs
27       Taxation of arbitrator's or umpire's fees
28       Interest on awards

**Judicial Review, Determination of Preliminary Point of Law, Exclusion Agreements, Interlocutory Orders, Remission and Setting aside and enforcement of Awards, etc.**

29       Judicial review of arbitration awards
30       Determination of preliminary point of law by Court
31       Exclusion agreements affecting rights under sections 29 and 30
32       Interlocutory orders
33       Power to remit award
34       Removal of arbitrator and setting aside of award
35       Power of Court to give relief where arbitrator is not impartial or the dispute involves question of fraud
36       Power of Court where arbitrator is removed or authority of arbitrator is revoked
37       Enforcement of award

**Miscellaneous**

38       Power of Court to extend time for commencing arbitration proceedings
39       Delay in prosecuting claims
40       Terms as to costs
41       Commencement of arbitration
42       Crown to be bound
43       Application of Part III to statutory arbitrations
44       Transitional Part III   *[omitted]*

**PART IV**

**PART V**
**REPEALS**

51       Repeals   *[omitted]*

         **SCHEDULE**

2

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 122 of 221

# ARBITRATION ACT 1986

*[preamble and words of enactment omitted]*

## PART I

### CITATION AND INTERPRETATION

Short title and commencement

**1        This Act may be cited as the Arbitration Act 1986.**

Interpretation

**2        In this Act, unless the context otherwise requires—**

"arbitration agreement" means an agreement in writing (including an agreement contained in an exchange of letters, telegrams, telex messages or any other means of communication used in general business practice) to submit to arbitration present or future differences capable of settlement by arbitration whether an arbitrator is named therein or not;

"Court" means the Supreme Court;

"court" means any court in Bermuda of competent jurisdiction;

*[Section 2 amended by 1993 : 29 effective 29 June 1993]*

## PART II

### CONCILIATION

Appointment of conciliator

**3        (1) Where an arbitration agreement provides for the appointment of a conciliator by a person who is not one of the parties and that person refuses to make the appointment or does not make it within the time specified in the agreement or, if no time is so specified, within a reasonable time not exceeding two months of being informed of the existence of the dispute, any party to the agreement may serve the person in question with a written notice to appoint a conciliator (and shall forthwith serve a copy of the notice on the other parties to the agreement) and if the appointment is not made within seven clear days after service of the notice the Court or a judge thereof may, on the application of any party to the agreement, appoint a conciliator who shall have the like powers to act in the conciliation proceedings as if he had been appointed in accordance with the terms of the agreement.**

**(2) Where an arbitration agreement provides for the appointment of a conciliator and further provides that the person so appointed shall act as an arbitrator in the event of the conciliation proceedings failing to produce a settlement acceptable to the parties—**

(a)        no objection shall be taken to the appointment of such person as an arbitrator, or to his conduct of the arbitration proceedings, solely on the ground that he had acted previously as a conciliator in connexion with some or all of the matters referred to arbitration;

ARBITRATION ACT 1986

    **(b)** **if such person declines to act as an arbitrator any other person appointed as an arbitrator shall not be required first to act as a conciliator unless a contrary intention appears in the arbitration agreement.**

    **(3) Unless a contrary intention appears therein, an arbitration agreement which provides for the appointment of a conciliator shall be deemed to contain a provision that in the event of the conciliation proceedings failing to produce a settlement acceptable to the parties within three months, or such longer period as the parties may agree to, of the date of the appointment of the conciliator or, where he is appointed by name in the arbitration agreement, of the receipt by him of written notification of the existence of a dispute the proceedings shall thereupon terminate.**

    **(4) If the parties to an arbitration agreement which provides for the appointment of a conciliator reach agreement in settlement of their differences and sign an agreement containing the terms of settlement (hereinafter referred to as the "settlement agreement") the settlement agreement shall, for the purposes of its enforcement, be treated as an award on an arbitration agreement and may, by leave of the Court or a judge thereof, be enforced in the same manner as a judgment or order to the same effect, and where leave is so given, judgment may be entered in terms of the agreement,**

PART III

ARBITRATION WITHIN BERMUDA

*Effect of Arbitration Agreements, etc.*

Authority of arbitrators and umpires to be irrevocable

**4**     **The authority of an arbitrator or umpire appointed by or by virtue of an arbitration agreement shall, unless a contrary intention is expressed in the agreement, be irrevocable except by leave of the Court or a judge thereof,**

Death of party

**5**     **(1) An arbitration agreement shall not be discharged by the death of any party thereto, either as respects the deceased or any other party, but shall in such an event be enforceable by or against the estate representative of the deceased.**

    **(2) The authority of an arbitrator shall not be revoked by the death of any party by whom he was appointed.**

    **(3) Nothing in this section shall be taken to affect the operation of any enactment or rule of law by virtue of which any right of action is extinguished by the death of a person.**

Bankruptcy

**6**     **(1) Where it is provided by a term in a contract to which a bankrupt is a party that any differences arising thereout or in connexion therewith shall be referred to arbitration, the said term shall, if the trustee in bankruptcy adopts the contract, be enforceable by or against him so far as relates to any such differences.**

ARBITRATION ACT 1986

**(2) Where a person who has been adjudged bankrupt had, before the commencement of the bankruptcy, become a party to an arbitration agreement, and any matter to which the agreement applies requires to be determined in connexion with or for the purposes of the bankruptcy proceedings, then, if the case is one to which subsection (1) does not apply, any other party to the agreement, or, with the consent of the committee of inspection, the trustee in bankruptcy, may apply to the Court for an order directing that the matter in question shall be referred to arbitration in accordance with the agreement, and the Court may, if it is of opinion that, having regard to all the circumstances of the case, the matter ought to be determined by arbitration, make an order accordingly.**

Staying court proceedings where there is submission to arbitration

**7      If any party to an arbitration agreement, or any person claiming through or under him, commences any legal proceedings in any court against any other party to the agreement, or any person claiming through or under him, in respect of any matter agreed to be referred, any party to those legal proceedings may at any time after appearance, and before delivering any pleadings or taking any other steps in the proceedings, apply to that court to stay the proceedings, and that court or a judge thereof, if satisfied that there is no sufficient reason why the matter should not be referred in accordance with the agreement, and that the applicant was, at the time when the proceedings were commenced, and still remains ready and willing to do all things necessary to the roper conduct of the arbitration, may make an order staying the proceedings.**

Staying court proceedings where party proves arbitration agreement

**8      (1) If any party to an arbitration agreement to which this section applies, or any person claiming through or under him, commences any legal proceedings in any court against any other party to the agreement, or any person claiming through or under him, in respect of any matter agreed to be referred, any party to the proceedings may at any time after appearance, and before delivering any pleadings or taking any other steps in the proceedings, apply to the court to stay the proceedings; and the court, unless satisfied that the arbitration agreement is null and void, inoperative or incapable of being performed or that there is not in fact any dispute between the parties with regard to the matter agreed to be referred, shall make an order staying the proceedings.**

**(2) Subsection (1)—**

   **(a)  does not apply in relation to a domestic arbitration agreement, but**

   **(b)  applies, in relation to other arbitration agreements, instead of section 7.**

**(3) In this section "domestic arbitration agreement" means an arbitration agreement which does not provide, expressly or by implication, for arbitration in a State or territory other than Bermuda and to which neither—**

   **(a)  an individual who is a national of, or habitually resident in, any State or territory other than Bermuda; nor**

   **(b)  a body corporate which is incorporated in, or whose central management and control is exercised in, any State or territory other than Bermuda; nor**

ARBITRATION ACT 1986

(c) **an exempted undertaking as defined in the Companies Act 1981 [*title 17 item 5*],**

is a party at the time the proceedings are commenced.

Consolidation of arbitrations

**9      (1)  Where in relation to two or more arbitration proceedings in respect of identical parties it appears to the Court—**

(a) **that some common question of law or fact arises in both or all of them, or**

(b) **that the rights to relief claimed therein are in respect of or arise out of the same transaction or series of transactions, or**

(c) **that for some other reason it is desirable to make an order under this section,**

the Court may order those arbitration proceedings to be consolidated on such terms as it thinks just or may order them to be heard at the same time, or one immediately after another, or may order any of them to be stayed until after determination of any other of them.

(2) Where the Court orders arbitration proceedings to be consolidated under subsection (1) and all parties to the consolidated arbitration proceedings are in agreement as to the choice of arbitrator or umpire for those proceedings the same shall be appointed by the Court but if all parties cannot agree the Court shall have power to appoint an arbitrator or umpire for those proceedings.

Reference of interpleader issues to arbitration

**10      Where relief by way of interpleader is granted and it appears to the Court that the claims in question are matters to which an arbitration agreement to which the claimants are parties, applies, the Court may direct the issue between the claimants to be determined in accordance with the agreement.**

*Arbitrators and Umpires*

When reference is to a single arbitrator

**11      Unless a contrary intention is expressed therein, every arbitration agreement shall, if no other mode of reference is provided, be deemed to include a provision that the reference shall be to a single arbitrator.**

Power of parties in certain cases to supply vacancy

**12      Where an arbitration agreement provides that the reference shall be to two arbitrators, one to be appointed by each party, then, unless a contrary intention is expressed therein—**

(a) **if either of the appointed arbitrators refuses to act, or is incapable of acting, or dies, the party who appointed him may appoint a new arbitrator in his place;**

6

ARBITRATION ACT 1986

(b) if, on such a reference, one party fails to appoint an arbitrator, either originally, or by way of substitution as aforesaid, for fourteen clear days after the other party, having appointed his arbitrator, has served the party making default with notice to make the appointment, the party who has appointed an arbitrator may appoint that arbitrator to act as sole arbitrator in the reference and his award shall be binding on both parties as if he had been appointed by consent:

Provided that the Court or a judge thereof may set aside any appointment made in pursuance of this section.

## Umpires

**13** (1) Unless a contrary intention is expressed therein, every arbitration agreement shall, where the reference is to two arbitrators, be deemed to include a provision that the two arbitrators may appoint an umpire at any time after they are themselves appointed and shall do so forthwith if they cannot agree.

(2) Unless a contrary intention is expressed therein, every arbitration agreement shall, where such a provision is applicable to the reference, be deemed to include a provision that if the arbitrators have delivered to any party to the arbitration agreement, or to the umpire, a notice in writing stating that they cannot agree, the umpire may forthwith enter on the reference in lieu of the arbitrators.

(3) At any time after the appointment of an umpire, however appointed, the Court may, on the application of any party to the reference and notwithstanding anything to the contrary in the arbitration agreement, order that the umpire shall enter upon the reference in lieu of the arbitrators and as if he were a sole arbitrator.

## Majority award of three arbitrators

**14** Unless the contrary intention is expressed in the arbitration agreement, where there is a reference to three arbitrators, the award of any two of the arbitrators shall be binding and in the event that no two of the arbitrators agree to the award, the award of the arbitrator appointed by the arbitrators to be chairman shall be binding.

## Power of Court in certain cases to appoint an arbitrator or umpire

**15** (1) In any of the following cases:

(a) where an arbitration agreement provides that the reference shall be to a single arbitrator, and all the parties do not, after differences have arisen, concur in the appointment of an arbitrator;

(b) if an appointed arbitrator refuses to act, or is incapable of acting, or dies, and the arbitration agreement does not show that it was intended that the vacancy should not be supplied and the parties do not supply the vacancy;

(c) where the parties or two arbitrators are required or are at liberty to appoint an umpire or third arbitrator and do not appoint him;

(d) where an appointed umpire or third arbitrator refuses to act, or is incapable of acting, or dies, and the arbitration agreement does not show

ARBITRATION ACT 1986

> **that it was intended that the vacancy should not be supplied, and the parties or arbitrators do not supply the vacancy,**

**any party may serve the other parties or the arbitrators, as the case may be, with a written notice to appoint, or, as the case may be, concur in appointing, an arbitrator, umpire or third arbitrator, and if the appointment is not made within fourteen clear days after the service of the notice, the Court or a judge thereof may, on application by the party who gave the notice, appoint an arbitrator, umpire or third arbitrator who shall have the like powers to act in the reference and make an award as if he had been appointed by consent of all parties.**

> **(2) Where—**
>
> > **(a)  an arbitration agreement provides for the appointment of an arbitrator or umpire by a person who is neither one of the parties nor an existing arbitrator (whether the provision applies directly or in default of agreement by the parties or otherwise); and**
> >
> > **(b)  that person refuses to make the appointment or does not make it within the time specified in the agreement or, if no time is so specified, within a reasonable time,**

**any party to the agreement may serve the person in question with a written notice to appoint an arbitrator or umpire and, if the appointment is not made within fourteen clear days after the service of the notice, the Court or a judge thereof may, on the application of the party who gave the notice, appoint an arbitrator or umpire who shall have the like powers to act in the reference and make an award as if he had been appointed in accordance with the terms of the agreement.**

Reference to official referee

**16      Where an arbitration agreement provides that the reference shall be to an official referee, any official referee to whom application is made shall, subject to any order of the Court or a judge thereof as to transfer or otherwise, hear and determine the matters agreed to be referred.**

Power of judges to take arbitrations

**17      (1)  Subject to the following provisions of this section, a judge, magistrate or public officer, may, if in all the circumstances he thinks fit, accept appointment as a sole or joint arbitrator, or as umpire, by or by virtue of an arbitration agreement.**

**(2)  A judge or a magistrate shall not accept appointment as an arbitrator or umpire unless the Chief Justice has informed him that he can be made available to do so.**

**(3)  A public officer shall not accept appointment as an arbitrator or umpire unless the Attorney General has informed him that he can be made available to do so.**

**(4)  The fees payable (if any) for the services of a judge, magistrate or public officer as an arbitrator or umpire shall be paid into the Consolidated Fund.**

**(5)  The Schedule shall have effect for modifying, and in certain cases replacing, provisions of this Act in relation to arbitration by a judge as a sole arbitrator or umpire and,**

ARBITRATION ACT 1986

in particular, for substituting the Court of Appeal for the Court in provisions whereby arbitrators and umpires, their proceedings and awards, are subject to control and review by the Court.

(6) Subject to section 32(3), any jurisdiction which is exercisable by the Court in relation to arbitrators and umpires otherwise than under this Act shall, in relation to a judge appointed as a sole arbitrator or umpire, be exercisable instead by the Court of Appeal.

*Conduct of Proceedings, Witnesses, etc.*

Proper law of contract

**18**     An agreement out of which the dispute or arbitration arises shall, if the arbitration is held in Bermuda, be governed by the municipal law of Bermuda unless—

(a)  the agreement expresses a contrary intention;

(b)  a subsequent agreement entered into by all the parties to the dispute or arbitration concerned expresses a contrary intention; or

(c)  the parties agree to leave the arbitrator to determine the proper law.

Procedural law

**19**     Unless a contrary intention is expressed in an arbitration agreement, where an arbitration is held in Bermuda the arbitration proceedings shall be governed by the procedural law of Bermuda.

Conduct of proceedings, witnesses, etc.

**20**     (1)  Unless a contrary intention is expressed therein, every arbitration agreement shall, where such a provision is applicable to the reference, be deemed to contain a provision that the parties to the reference, and all persons claiming through them respectively, shall, subject to any legal objection, submit to be examined by the arbitrator or umpire, on oath or affirmation, in relation to the matters in dispute, and shall, subject as aforesaid, produce before the arbitrator or umpire all documents within their possession or power respectively which may be required or called for, and do all other things which during the proceedings on the reference the arbitrator or umpire may require.

(1A)  For the purposes of subsection (1) the examination of witnesses on oath or affirmation and the administering of oaths or the taking of affirmations of witnesses in the arbitration may be conducted by appropriate electronic means.

(2)  Unless a contrary intention is expressed therein, every arbitration agreement shall, where such a provision is applicable to the reference, be deemed to contain a provision that the witnesses on the reference shall, if the arbitrator or umpire thinks fit, be examined on oath or affirmation.

(3)  An arbitrator or umpire shall, unless a contrary intention is expressed in the arbitration agreement, have power to administer oaths to, or take the affirmations of, the parties to and witnesses on a reference under the agreement and shall also have power to adjourn the arbitration proceedings to such place as he thinks fit.

ARBITRATION ACT 1986

(4)  Any party to a reference under an arbitration agreement may sue out a writ of *subpoena ad testificandum* or a writ of *subpoena duces tecum* but no person shall be compelled under any such writ to produce any document which he could not be compelled to produce on the trial of an action, and the Court or a judge thereof may order that a writ of *subpoena ad testificandum* or of *subpoena duces tecum* shall issue to compel the attendance before an arbitrator or umpire of a witness wherever he may be within Bermuda.

(5)  The Court or a judge thereof may also order that a writ of *habeas corpus* shall issue to bring up a prisoner for examination before an arbitrator or umpire.

(6)  The Court shall have, for the purpose of and in relation to a reference, the same power of making orders in respect of—

(a)  discovery of documents and interrogatories;

(b)  the giving of evidence by affidavit;

(c)  payment into court;

(d)  examination on oath of any witness before an officer of the Court or any other person, and the issue of a commission or request for the examination of a witness out of the jurisdiction;

(e)  the preservation, interim custody or sale of any goods which are the subject matter of the reference;

(f)  securing the amount in dispute in the reference;

(g)  the detention, preservation or inspection of any property or thing which is the subject of the reference or as to which any question may arise therein, and authorizing for any of the purposes aforesaid any person to enter upon or into any land or building in the possession of any party to the reference, or authorizing any samples to be taken or any observation to be made or experiment to be tried which may be necessary or expedient for the purpose of obtaining full information or evidence; and

(h)  interim injunctions or the appointment of a receiver,

as it has for the purpose of and in relation to an action or matter in the Court:

Provided that nothing in this subsection shall be taken to prejudice any power which may be vested in an arbitrator or umpire of making orders with respect to any of the matters aforesaid.

*[Section 20(1A) inserted by 1999:26 s.33 & Sch effective 4 October 1999]*

*Provisions as to Awards*

Time for making award

21       (1) Subject to section 33(2) and anything to the contrary in the arbitration agreement, an arbitrator or umpire shall have power to make an award at any time.

ARBITRATION ACT 1986

(2) The time, if any, limited for making an award, whether under this Act or otherwise, may from time to time be enlarged by order of the Court or a judge thereof, whether that time has expired or not.

(3) The Court may, on the application of any party to a reference, remove an arbitrator or umpire who fails to use all reasonable dispatch in entering on and proceeding with the reference and making an award, and an arbitrator or umpire who is removed by the Court under this subsection shall not be entitled to receive any remuneration in respect of his services.

(4) For the purposes of subsection (3) "proceeding with the reference" includes, in a case where two arbitrators are unable to agree, giving notice of that fact to the parties and to the umpire.

Interim awards

**22** Unless a contrary intention is expressed therein, every arbitration agreement shall, where such a provision is applicable to the reference, be deemed to contain a provision that the arbitrator or umpire may, if he thinks fit, make an interim award, and any reference in this Part to an award includes a reference to an interim award.

Specific performance

**23** Unless a contrary intention is expressed therein, every arbitration agreement shall, where such a provision is applicable to the reference, be deemed to contain a provision that the arbitrator or umpire shall have the [*sic*] power as the Court to order specific performance of any contract other than a contract relating to land or any interest in land.

Awards to be final

**24** Unless a contrary intention is expressed therein, every arbitration agreement shall, where such a provision is applicable to the reference, be deemed to contain a provision that the award to be made by the arbitrator or umpire shall be final and binding on the parties and the persons claiming under them respectively.

Power to correct slips

**25** Unless a contrary intention is expressed in the arbitration agreement, the arbitrator or umpire shall have power to correct in an award any clerical mistake or error arising from any accidental slip or omission.

*Costs, Fees and Interest*

Costs

**26** (1) Unless a contrary intention is expressed therein, every arbitration agreement shall be deemed to include a provision that the costs of the reference and award shall be in the discretion of the arbitrator or umpire, who may direct to and by whom and in what manner those costs or any part thereof shall be paid, and may tax or settle the amount of costs to be so paid or any part thereof, and may award costs to be paid as between attorney and client.

ARBITRATION ACT 1986

     (2) Any costs directed by an award to be paid shall, unless the award otherwise directs, be taxable in the Court.

     (3) Any provision in an arbitration agreement to the effect that the parties or any party thereto shall in any event pay their or his own costs of the reference or award or any part thereof shall be void, and this Part shall, in the case of an arbitration agreement containing any such provision, have effect as if that provision were not contained therein:

     Provided that nothing in this subsection shall invalidate such a provision when it is a part of an agreement to submit to arbitration a dispute which has arisen before the making of that agreement.

     (4) If no provision is made by an award with respect to the costs of the reference, any party to the reference may, within fourteen days of the publication of the award or such further time as the Court or a judge thereof may direct, apply to the arbitrator for an order directing by and to whom those costs shall be paid, and thereupon the arbitrator shall, after hearing any party who may desire to be heard, amend his award by adding thereto such direction as he may think proper with respect to the payment of the costs of the reference.

Taxation of arbitrator's or umpire's fees

**27**     (1) If in any case an arbitrator or umpire refuses to deliver his award except on payment of the fees demanded by him, the Court may, on an application for the purpose, order that the arbitrator or umpire shall deliver the award to the applicant on payment into court by the applicant of the fees demanded, and further that the fees demanded shall be taxed by the taxing officer and that out of the money paid into court there shall be paid out to the arbitrator or umpire by way of fees such sum as may be found reasonable on taxation and that the balance of the money, if any, shall be paid out to the applicant.

     (2) An application for the purposes of this section may be made by any party to the reference unless the fees demanded have been fixed by a written agreement between him and the arbitrator or umpire.

     (3) A taxation of fees under this section may be reviewed in the same manner as a taxation of costs.

     (4) The arbitrator or umpire shall be entitled to appear and be heard on any taxation or review of taxation under this section.

Interest on awards

**28**     (1) A sum directed to be paid by an award shall, unless the award otherwise directs, carry interest as from the date of the award and at the same rate as a judgment debt.

     (2) An arbitrator shall have the power, unless the award otherwise directs, to award interest at such rate as he may determine, up to the date of his award.

## ARBITRATION ACT 1986

*Judicial Review, Determination of Preliminary Point of Law, Exclusion Agreements,
Interlocutory Orders, Remission and Setting aside and enforcement of Awards, etc.*

Judicial review of arbitration awards

**29    (1) Without prejudice to the right of appeal conferred by subsection (2), the
Supreme Court or the Court of Appeal shall not have jurisdiction to set aside or remit an
award on an arbitration agreement on the ground of errors of fact or law on the face of the
award.**

**(2) Subject to subsection (3), an appeal shall lie to the Court of Appeal on any
question of law arising out of an award made on an arbitration agreement; and on the
determination of such an appeal the Court of Appeal may by order—**

**(a) confirm, vary or set aside the award; or**

**(b) remit the award to the reconsideration of the arbitrator or umpire together
with the Court's opinion on the question of law which was the subject of
the appeal;**

**and where the award is remitted under paragraph (b) the arbitrator or umpire shall, unless
the order otherwise directs, make his award within three months after the date of the order.**

**(3) An appeal under this section may be brought by any of the parties to the
reference—**

**(a) with the consent of all the other parties to the reference; or**

**(b) subject to section 31, with the leave of the Supreme Court.**

**(4) The Supreme Court shall not grant leave under subsection (3)(b) unless it
considers that, having regard to all the circumstances, the determination of the question of
law concerned could substantially affect the rights of one or more of the parties to the
arbitration agreement; and the Court may make any leave which it gives conditional upon
the applicant complying with such conditions as it considers appropriate.**

**(5) Subject to subsection (6), if an award is made and, on an application made by
any of the parties to the reference—**

**(a) with the consent of all the other parties to the reference; or**

**(b) subject to section 31, with the leave of the Supreme Court,**

**it appears to the Supreme Court that the award does not or does not sufficiently set out the
reasons for the award, the Supreme Court may order the arbitrator or umpire concerned to
state the reasons for his award in sufficient detail to enable the Court of Appeal, should an
appeal be brought under this section, to consider any question of law arising out of the
award.**

**(6) Where an award is made without any reason being given, the Supreme Court
shall not make an order under subsection (5) unless it is satisfied—**

ARBITRATION ACT 1986

> (a) that before the award was made one of the parties to the reference gave notice to the arbitrator or umpire concerned that a reasoned award would be required; or
>
> (b) that there is some special reason why such a notice was not given.

(7) Where the award of an arbitrator or umpire is varied on appeal, the award as varied shall have effect (except for the purposes of this section) as if it were the award of the arbitrator or umpire.

Determination of preliminary point of law by Court

**30** (1) Subject to subsection (2) and section 31, on an application to the Supreme Court made by any of the parties to a reference—

> (a) with the consent of an arbitrator who has entered on the reference or, if an umpire has entered on the reference, with his consent, or
>
> (b) with the consent of all the other parties,

the Supreme Court shall have jurisdiction to determine any question of law arising in the course of the reference.

(2) The Supreme Court shall not entertain an application under subsection (1)(a) with respect to any question of law unless it is satisfied that—

> (a) the determination of the application might produce substantial savings in costs to the parties; and
>
> (b) the question of law is one in respect of which leave to appeal would be likely to be given under section 29(3)(b).

(3) A decision of the Supreme Court under subsection (1) shall be deemed to be a judgment of the Court within the meaning of section 12 of the Court of Appeal Act 1964 [*title 8 item 4*] (appeals to the Court of Appeal), but no appeal shall lie from such a decision unless the Supreme Court or the Court of Appeal gives leave.

(4) Proceedings in the Supreme Court or the Court of Appeal under this section and section 29 may, if the Supreme Court or the Court of Appeal consider it necessary or expedient in circumstances where publicity would prejudice the interest of justice, be conducted otherwise than in open court.

Exclusion agreements affecting rights under sections 29 and 30

**31** (1) Subject to the following provisions of this section and section 32—

> (a) the Supreme Court shall not, under section 29(3)(b), grant leave to appeal with respect to a question of law arising out of an award; and
>
> (b) the Supreme Court shall not, under section 29(5)(b), grant leave to make an application with respect to an award; and
>
> (c) no application may be made under section 30(1)(a) with respect to a question of law,

ARBITRATION ACT 1986

if the parties to the reference in question have entered into an agreement in writing (in this section referred to as an "exclusion agreement") which excludes the right of appeal under section 29 in relation to that award or, in a case falling within paragraph (c), in relation to an award to which the determination of the question of law is material.

(2) If the parties to an exclusion agreement subsequently enter into agreement in writing to revoke the exclusion agreement subsection (1) shall cease to apply to the reference or references in question until such time as a further exclusion agreement is entered into by the parties.

(3) An exclusion agreement may be expressed so as to relate to a particular award, to awards under a particular reference or to any other description of awards, whether arising out of the same reference or not; and an agreement may be an exclusion agreement for the purposes of this section whether it is entered into before or after the passing of this Act and whether or not it forms part of an arbitration agreement.

(4) Where—

    (a) an arbitration agreement, other than a domestic arbitration agreement, provides for disputes between the parties to be referred to arbitration; and

    (b) a dispute to which the agreement relates involves the question whether a party has been guilty of fraud; and

    (c) the parties have entered into an exclusion agreement which is applicable to any award made on the reference of that dispute,

then, except in so far as the exclusion agreement otherwise provides, the Supreme Court shall not exercise its powers under section 35(2) in relation to that dispute.

(5) Except as provided by subsection (1), sections 29 and 30 shall have effect notwithstanding anything in any agreement purporting—

    (a) to prohibit or restrict access to the Supreme Court or the Court of Appeal; or

    (b) to restrict the jurisdiction of the Supreme Court or the Court of Appeal; or

    (c) to prohibit or restrict the making of a reasoned award.

(6) An exclusion agreement shall be of no effect in relation to an award made on, or a question of law arising in the course of a reference under a statutory arbitration, that is to say, such an arbitration as is referred to in section 43(1).

(7) An exclusion agreement shall be of no effect in relation to an award made on, or a question of law arising in the course of a reference under an arbitration agreement which is a domestic arbitration agreement unless the exclusion agreement is entered into after the commencement of the arbitration in which the award is made or, as the case may be, in which the question of law arises.

(8) In this section "domestic arbitration agreement" means an arbitration agreement which does not provide, expressly or by implication, for arbitration in a State or territory other than Bermuda and to which neither—

15

ARBITRATION ACT 1986

      (a)  **an individual who is a national of, or habitually resident in, any State or territory other than Bermuda; nor**

      (b)  **a body corporate which is incorporated in, or whose central management and control is exercised in, any State or territory other than Bermuda; nor**

      (c)  **an exempted undertaking as defined in the Companies Act 1981 [*title 17 item 5*],**

is a party at the time the arbitration agreement is entered into.

Interlocutory orders

**32      (1)  If any part to a reference under an arbitration agreement fails within the time specified in the order or, if no time is so specified, within a reasonable time to comply with an order made by the arbitrator or umpire in the course of the reference, then, on the application of the arbitrator or umpire or of any party to the reference, the Court may make an order extending the powers of the arbitrator or umpire as mentioned in subsection (2).**

      **(2)  If an order is made by the Court under this section, the arbitrator or umpire shall have power, to the extent and subject to any conditions specified in that order, to continue with the reference in default of appearance or of any other act by one of the parties in like manner as a judge of the Court might continue with proceedings in that court where a party fails to comply with an order of that court or a requirement of rules of court.**

      **(3)  Section 17(6) shall not apply in relation to the power of the Court to make an order under this section, but in the case of a reference to a judge-arbitrator or judge-umpire that power shall be exercisable as in the case of any other reference to arbitration and also by the judge-arbitrator or judge-umpire himself.**

      **(4)  Anything done by a judge-arbitrator or judge-umpire in the exercise of the power conferred by subsection (3) shall be done by him in his capacity as judge of the Court and have effect as if done by that Court.**

      **(5)  The preceding provisions of this section have effect notwithstanding anything in any agreement but do not derogate from any powers conferred on an arbitrator or umpire, whether by an arbitration agreement or otherwise.**

      **(6)  In this section "judge-arbitrator" and "judge-umpire" have the same meaning as in the Second Schedule.**

Power to remit award

**33      (1)  In all cases of reference to arbitration the Court or a judge thereof may from time to time remit the matters referred, or any of them, to the arbitrator or umpire for reconsideration.**

      **(2)  Where an award is remitted, the arbitrator or umpire shall, unless the order otherwise directs, make his award within three months after the date of the order.**

ARBITRATION ACT 1986

Removal of arbitrator and setting aside of award

**34     (1)  Where an arbitrator or umpire has misconducted himself or the proceedings, the Court may remove him.**

**(2)  Where an arbitrator or umpire has misconducted himself or the proceedings, or an arbitration or award has been improperly procured, the Court may set the award aside.**

**(3)  Where an application is made to set aside an award, the Court may order that any money made payable by the award shall be brought into court or otherwise secured pending the determination of the application.**

Power of Court to give relief where arbitrator is not impartial or the dispute involves question of fraud

**35     (1)  Where an agreement between any parties provides that disputes which may arise in the future between them shall be referred to an arbitrator named or designated in the agreement, and after a dispute has arisen any party applies, on the ground that the arbitrator so named or designated is not or may not be impartial, for leave to revoke the authority of the arbitrator or for an injunction to restrain any other party or the arbitrator from proceeding with the arbitration, it shall not be a ground for refusing the application that the said party at the time when he made the agreement knew, or ought to have known, that the arbitrator, by reason of his relation towards any other party to the agreement or of his connexion with the subject referred, might not be capable of impartiality.**

**(2)  Where an agreement between any parties provides that disputes which may arise in the future between them shall be referred to arbitration, and a dispute which so arises involves the question whether any such party has been guilty of fraud, the Court shall, so far as may be necessary to enable that question to be determined by the Court, have power to order that the agreement shall cease to have effect and power to give leave to revoke the authority of any arbitrator or umpire appointed by or by virtue of the agreement.**

**(3)  Where by virtue of this section the Court has power to order that an arbitration agreement shall cease to have effect or to give leave to revoke the authority of an arbitrator or umpire, the Court may refuse to stay any action brought in breach of the agreement.**

Power of Court where arbitrator is removed or authority of arbitrator is revoked

**36     (1)  Where an arbitrator, not being a sole arbitrator, or two or more arbitrators, not being all the arbitrators, or an umpire who has not entered on the reference is or are removed by the Court, the Court may, on the application of any party to the arbitration agreement, appoint a person or persons to act as arbitrator or arbitrators or umpire in place of the person or persons so removed.**

**(2)  Where the authority of an arbitrator or arbitrators or umpire is revoked by leave of the Court, or a sole arbitrator or all the arbitrators or an umpire who has entered on the reference is or are removed by the Court, the Court may, on the application of any party to the arbitration agreement, either—**

**(a)  appoint a person to act as sole arbitrator in place of the person or person removed; or**

ARBITRATION ACT 1986

(b) order that the arbitration agreement shall cease to have effect with respect to the dispute referred.

(3) A person appointed under this section by the Court as an arbitrator or umpire shall have the like power to act in the reference and to make an award as if he had been appointed in accordance with the terms of the arbitration agreement.

(4) Where it is provided, whether by means of a provision in the arbitration agreement or otherwise, that an award under an arbitration agreement shall be a condition precedent to the bringing of an action with respect to any matter to which the agreement applies, the Court, if it orders, whether under this section or under any other enactment, that the agreement shall cease to have effect as regards any particular dispute, may further order that the provision making an award a condition precedent to the bringing of an action shall also cease to have effect as regards that dispute.

### Enforcement of award

**37**   An award on an arbitration agreement may, by leave of the Court or a judge thereof, be enforced in the same manner as a judgment or order to the same effect, and where leave is so given, judgment may be entered in terms of the award.

*Miscellaneous*

### Power of Court to extend time for commencing arbitration proceedings

**38**   Where the terms of an agreement to refer future disputes to arbitration provide that any claims to which the agreement applies shall be barred unless notice to appoint an arbitrator is given or an arbitrator is appointed or some other step to commence arbitration proceedings is taken within a time fixed by the agreement, and a dispute arises to which the agreement applies, the Court, if it is of opinion that in the circumstances of the case undue hardship would otherwise be caused, and notwithstanding that the time so fixed has expired, may, on such terms, if any, as the justice of the case may require, but without prejudice to the provisions of any enactment limiting the time for the commencement of arbitration proceedings, extend the time for such period as it thinks proper.

### Delay in prosecuting claims

**39**   (1) In every arbitration agreement, unless the contrary be expressly provided therein, there is an implied term that in the event of a difference arising which is capable of settlement by arbitration it shall be the duty of the claimant to exercise due diligence in the prosecution of his claim.

(2) Where there has been undue delay by a claimant in instituting or prosecuting his claim pursuant to an arbitration agreement, then, on the application of the arbitrator or umpire or of any party to the arbitration proceedings, the Court may make an order terminating the arbitration proceedings and prohibiting the claimant from commencing further arbitration proceedings in respect of any matter which was the subject of the terminated proceedings.

(3) The Court shall not make an order under subsection (2) unless it is satisfied that—

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 138 of 221

ARBITRATION ACT 1986

    (a)  the delay has been intentional and vexatious; or

    (b)  there has been inordinate and inexcusable delay on the part of the claimant or his advisers; and that—

        (i)  the delay will give rise to a substantial risk that it is not possible to have a fair trial of the issues in the arbitration proceedings, or

        (ii)  the delay is such as is likely to cause or to have caused serious prejudice to the other parties to the arbitration proceedings either as between themselves and the claimant or between each other or between them and a third party.

    **(4)** A decision of the Court under subsection (2) shall be deemed to be a judgment of the Court within the meaning of section 12 of the Court of Appeal Act 1964 [*title 8 item 4*] (appeals to the Court of Appeal) but no appeal shall lie from such a decision unless the Court or the Court of Appeal gives leave.

Terms as to costs

**40**     Any order made under this Part may be made on such terms as to costs or otherwise (including, the case of an order under section 39, the remuneration of the arbitrator in respect of his services) as the authority making the order thinks just.

Commencement of arbitration

**41**     **(1)** An arbitration shall, unless otherwise agreed, be deemed to be commenced when one party to the arbitration agreement serves on the other party or parties a notice requiring him or them to appoint or concur in appointing an arbitrator, or, where the arbitration agreement provides that the reference shall be to a person named or designated in the agreement, requiring him or them to submit the dispute to the person so named or designated.

    **(2)** Any such notice as is mentioned in subsection (1) may be served either—

    (a)  by delivering it to the person on whom it is to be served; or

    (b)  by leaving it at the usual or last known place of abode in Bermuda of that person and in the case of a company at its registered office; or

    (c)  by sending it by post in a registered letter addressed to that person at his usual or last known place of abode in Bermuda,

as well as in any other manner provided in the arbitration agreement, and where a notice is sent by post in manner prescribed by paragraph (c), service thereof shall, unless the contrary is proved, be deemed to have been effected at the time at which the letter would have been delivered in the ordinary course of post.

Crown to be bound

**42**     This Part shall apply to any arbitration to which the Crown is a party.

19

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 139 of 221

## ARBITRATION ACT 1986

Application of Part III to statutory arbitrations

**43      (1) Subject to section 44, this Part, except the provisions thereof specified in subsection (2), shall apply to every arbitration under any other enactment other than the Labour Relations Act 1975 [*title 18 item 1*], whether passed before or after 25 August 1986, as if the arbitration were pursuant to an arbitration agreement and as if that other enactment were an arbitration agreement, except in so far as this Act is inconsistent with that other enactment or with any rules or procedure authorized or recognized thereby.**

**(2) The provisions referred to in subsection (1) are sections 5(1), 6, 10, 26(3), 35 and 38.**

Transitional Part III

**44       *[omitted]***


## PART IV

*[Repealed by  1993 : 29 effective 29 June 1993]*


## PART V

## REPEALS

Repeals

**51       *[omitted]***

*[The original First Schedule repealed by  1993 : 29 effective 29 June 1993]*

ARBITRATION ACT 1986

SCHEDULE

**(Sections 17(5), 32(6))**

APPLICATION OF THIS ACT TO JUDGE-ARBITRATORS

**1**      In this Schedule "judge-arbitrator" and "judge-umpire" mean a judge appointed as sole arbitrator or, as the case may be, as umpire by or by virtue of an arbitration agreement.

**2**      In section 4 (authority of arbitrator to be irrevocable except by leave of the Court), in its application to a judge-arbitrator or judge-umpire, the Court of Appeal shall be substituted for the Court.

**3**      The power of the Court under section 12 (vacancy among arbitrators supplied by parties) to set aside the appointment of an arbitrator shall not be exercisable in the case of the appointment of a judge-arbitrator.

**4**      Section 13(3) (power of Court to order umpire to enter on reference as sole arbitrator) shall not apply to a judge-umpire; but a judge-umpire may, on the application of any party to the reference and notwithstanding anything to the contrary in the arbitration agreement, enter on the reference in lieu of the arbitrators and as if he were the sole arbitrator.

**5**      (1) The powers conferred on the Court or a judge thereof by section 20(4), (5) and (6) (summoning of witnesses, interlocutory orders, etc.) shall be exercisable in the case of a reference to a judge-arbitrator or judge-umpire as in the case of any other reference to arbitration, but shall in any such case be exercisable also by the judge-arbitrator or judge-umpire himself.

      (2) Anything done by an arbitrator or umpire in the exercise of powers conferred by this paragraph shall be done by him in his capacity as judge of the Court and have effect as if done by that court; but nothing in this paragraph prejudices any power vested in the arbitrator or umpire in his capacity as such.

**6**      Section 21 (2) and (3) (extension of time for making award; provision for ensuring that reference is conducted with reasonable dispatch) shall not apply to a reference to a judge-arbitrator or judge-umpire; but a judge-arbitrator or judge-umpire may enlarge any time limited for making his award (whether under this Act or otherwise), whether that time has expired or not.

**7**      Section 26(4) (provision enabling a party in an arbitration to obtain an order for costs) shall apply, in the case of a reference to a judge-arbitrator, with the omission of the following—

      ", within fourteen days of the publication of the award or such further time as the Court or a judge thereof may direct,".

21

ARBITRATION ACT 1986

**8**      (1)  Section 27 (power of Court to order delivery of award on payment of arbitrator's fees into court) shall not apply with respect to the award of a judge-arbitrator or judge-umpire.

(2)  A judge-umpire may withhold his award until the fees payable to the arbitrators have been paid into the Court,

(3)  Arbitrators' fees paid into court under this paragraph shall be paid out in accordance with rules of court, subject to the right of any party to the reference to apply (in accordance with the rules) for any fee to be taxed, not being a fee which has been fixed by written agreement between him and the arbitrator.

(4)  A taxation under this paragraph may be reviewed in the same manner as a taxation of the costs of an award.

(5)  On a taxation under this paragraph, or on a review thereof, an arbitrator shall be entitled to appear and be heard.

**9**      In sections 33 and 34 (remission and setting aside of awards, etc.), in their application to a judge-arbitrator or judge-umpire, and to a reference to him and to his award thereon, the Court of Appeal shall be substituted for the Court.

**10**      (1)  Section 35(2) (removal of issue of fraud for trial in the Court) shall not apply to an agreement under or by virtue of which a judge-arbitrator or judge-umpire has been appointed; nor shall leave be given by the Court under that subsection to revoke the authority of a judge-arbitrator or judge-umpire.

(2)  Where, on a reference of a dispute to a judge-arbitrator or judge-umpire, it appears to the judge that the dispute involves the question whether a party of the dispute has been guilty of fraud, he may, so far as may be necessary to enable that question to be determined by the Court, order that the agreement by or by virtue of which he was appointed shall cease to have effect and revoke his authority as arbitrator or umpire.

(3)  An order made by a judge-arbitrator or judge-umpire under this paragraph shall have effect as if made by the Court.

**11**      Section 36 (powers of Court on removal of arbitrator or revocation of arbitration agreement) shall be amended as follows—

(a)  after the words "the Court" where they first occur in subsection (1), where they occur for the first and second time in subsection (2), and in subsections (3) and (4), there shall be inserted the words "or the Court of Appeal"; and

(b)  after those words where they occur for the second time in subsection (1) and for the third time in subsection (2) there shall be inserted the words "or the Court of Appeal, as the case may be".

**12**      The leave required by section 37 (enforcement in Court) for an award on an arbitration agreement to be enforced as mentioned in that section may, in the case of an

ARBITRATION ACT 1986

**award by a judge-arbitrator or a judge-umpire, be given by the judge-arbitrator or judge-umpire himself.**

*[Schedule amended by  1993 : 29 effective 29 June 1993]*

[Assent Date: 28 July 1986]


[this Act was brought into operation on 25 August 1986]

*[Amended by:*
    **1993 : 29**
    **1999 : 26]**

printed by dgoldman@choate.com (Professional edition)

ID vLex: 806104433
http://bm.vlex.com/vid/raydon-underwriting-management-company-806104433

# Raydon Underwriting Management Company Ltd v Stockholm Re (Bermuda) Ltd ((in Liquidation)) 1998 Civil Jur. No. 231

**Jurisdiction:** Bermuda

**Court:** Supreme Court (Bermuda)

**Judgment Date:** 14 December 1998

**Reported In:** [1998] Bda LR 73

**Date:** 14 December 1998

**Docket Number:** Civil Jurisdiction 1998: No. 231

PDF

In the Supreme Court of Bermuda

Geoffrey R Bell

Civil Jurisdiction 1998: No. 231

BETWEEN:-

Raydon Underwriting Management Company Limited

Plaintiff

-and-

Stockholm Re (Bermuda) Ltd. (In Liquidation)
Defendant

Andrew Martin for the Plaintiff

Narinder Hargun for the Defendant

*R v GoughELR* [1993] AC 646

*Bermuda Telephone Co Ltd v Minister of Communications* 1990 Civil Appeal No. 20

*Metropolitan Properties (FGC) Ltd v LannonELR* [1969] 1 QB 577

*Hamilton Properties Ltd v Minister of the Environment and Bermuda Financial Centre Ltd* 1994 Civil Jur. No. 264

*Ross v Woolridge* 1997 Criminal Appeal No. 18

*Bremer v Ets. SoulesUNK* [1985] 1 Lloyds Rep 160

Removal of **arbitrator** — Impartiality — Apparent **bias**

### **JUDGMENT**

In these proceedings, the Plaintiff seeks the removal of Mr Bryan Kellett as **arbitrator** in an arbitration commenced by the Defendant by notice of arbitration dated 29 April 1998. The grounds given for Mr Kellett's removal are that the Plaintiff reasonably perceives that there is a real danger that Mr Kellett will not be **impartial** or independent by reason of his personal and business relationship with the managers employed by the liquidator of the Defendant, which relationship, it is said, is of such a nature as to be or appear to be likely to affect Mr Kellett's judgment.

In support of the application, the Plaintiff filed an affidavit by Paul Michael Murray, the president of the Plaintiff company, sworn on 29 July 1998. In his affidavit, Mr Murray averred that:

(i) when the Defendant went into run-off and ceased underwriting, it had appointed Powerscourt Group Limited and Powerscourt Management Limited to have the day to day conduct and control of its affairs:

(ii) following their appointment on 14 September 1995, the Defendant's joint liquidators had continued to enjoy the same managers who, it is said, have effective day to day conduct of the liquidation under the supervision of the liquidators:

(iii) the employees of the two Powerscourt companies are the personnel the Plaintiff has dealt with on the details of the matters which are now the subject of the arbitration;

(iv) John Williams, who is described as a senior officer and principal of the Powerscourt group of companies has both a strong personal friendship and close business connections with Mr Kellett;

(v) the Plaintiff consequently has a very deep concern that Mr Kellett may not be an **impartial** or independent **arbitrator**, in that there is a real danger that his business and personal friendship with Mr Williams might affect his view of the merits of the arbitration.

Because of those concerns on the part of the Plaintiff, their attorneys, Mello, Hollis, Jones & Martin, wrote to the Defendant's attorneys, Conyers, Dill & Pearman, objecting to Mr Kellett's appointment by the Defendant and saying that they required the Defendant to nominate another **arbitrator** in Mr Kellett's place. Conyers, Dill & Pearman responded that they had considered matters and took the view that Mr Kellett was not disqualified from acting as an **arbitrator** in the matter. Accordingly, they asked Mello Hollis to reconsider their position. Within a matter of weeks, the present proceedings had been issued.

Directions were given lor the filing of subsequent affidavits, which led to the filing of three further affidavits which I will deal with in turn. Firstly, Mark Smith, one of the joint liquidators, swore an affidavit on 18 August 1998. In regard to Mr Kellett, this affidavit indicated that neither he nor the Defendant had any past or present business dealings with Mr Kellett, and that although he had met him once, Mr Kellett was not a friend of his. He indicated that neither Powerscourt Group Limited nor Powerscourt Management Limited provided any management or consultancy services to the Defendant, although an associated company, Castlewood Limited ('Castlewood'), was employed as consultants to the liquidators. Mr Smith indicated that any remuneration received by Castlewood by reason of its having rendered services in connection with the arbitration would lead to remuneration on an hourly basis, and would neither be affected by nor dependent upon the award in the arbitration.

Mr Smith's affidavit prompted a response from Mr Murray in the form of a second affidavit sworn on 11 September 1998, which exhibited two 1995 reports from the joint liquidators when acting as joint provisional liquidators, making reference to the retention of Powerscourt Group Limited as the Defendant's run-off managers. This elicited a response affidavit from Mr Smith on 25 November 1998, indicating that Powerscourt Group Limited had ceased to provide services to the Defendant from first quarter 1996, and that thereafter Castlewood had been employed as previously stated. Mr Smith further averred that Mr Williams had not played any significant role in the provision of services by Castlewood to the Defendant.

It is against this evidential background that Mr Martin submitted that there was a substantial and continuous social and business relationship over many years between Messrs Williams and Kellett sufficient to give rise to a reasonable apprehension on the part of the Plaintiff that there is a real danger that Mr Kellett may not be an **impartial** or independent **arbitrator**. That, Mr Martin submitted, was enough in law to justify Mr Kellett's removal as **arbitrator**.

The allegation made by the Plaintiff is, as Mr Hargun submitted, an allegation of apparent or imputed **bias**. Both counsel indicated that the test to be applied in the case of an allegation of apparent **bias** on the part of an **arbitrator** was that laid down by Lord Goff in the case of *R v GoughELR*[1993] AC 646. Both counsel referred me extensively to Lord Goff's judgment, and I would simply paraphrase from that judgment the test (which is the same whether concerning justices, members of inferior tribunals, arbitrators or jurors) applicable to an **arbitrator** where there is an allegation of apparent or imputed **bias**, as follows:-

> 'The test to be applied in the case of apparent **bias** on the part of an **arbitrator** is whether, in all the circumstances of the case, there is a real danger of **bias** on his part, in the sense that he might unfairly regard with favour, or disfavour, the case of a party to the issue under consideration by him'—paraphrased from page 670 at letters E to G.

I was referred to a number of Bermuda decisions, both at First instance and in the Court of Appeal, and both preceding and following the decision of the House of Lords in *R v Gough*. Specifically, Mr Martin referred me to the judgments of the Court of Appeal in the case of *The Bermuda Telephone Co Ltd v The Minister of Communications* (Civil Appeal No 20 of 1990). The judgments of their lordships in the Court of Appeal considered the question of apparent **bias** from the perspective of the reasonable person's expectation. Particularly, Mr Martin referred me to a passage in the judgment of Georges JA, where he said ...'The issue is whether a right-minded person would think that Telco might not have had a fair hearing before tribunals so constituted. In my view, a right-minded person could so think and accordingly the appellant succeeds on the issue of **bias** as well.'

Mr Hargun submitted that, since *R v Gough*, this is no longer the correct test. Georges JA had referred previously in his judgment to the judgment of Lord Denning in *Metropolitan Properties (FGC) Ltd v Lannon*[1969] 1QB 577 at 579, where Lord Denning had expressed the test as being whether a reasonable man would think it 'likely or probable' that the particular justice or chairman was **bias**ed. In *R v Gough*, Lord Goff said (page 668, letter B) that ...'If it is a correct reading of his judgment (and it is by no means clear on the point) that it is necessary to establish **bias** on a balance of probabilities, I for my part would regard him as having laid down too rigorous a test. In my opinion, if, in the circumstances of the case (as ascertained by the court), it appears that there was a real likelihood, in the sense of a veal possibility, of **bias** on the part of a justice or other member of an inferior tribunal, justice requires that the decision should not be allowed to stand. I am by no means persuaded that, in its original form, the real likelihood test required that any more rigorous criterion should be applied.'

Whereas Lord Goff had some doubt as to whether the 'real likelihood' test differed from the test which he enunciated, there is no doubt but that the test enunciated by Georges JA in *The Bermuda Telephone Co Ltd v The Minister of Communications case* differs materially from Lord Goff's formulation.

Accordingly, I agree with Mr Hargun's contention that the test applied by Georges JA in the *Telephone Co case* is no longer the correct test in England. In the case of *Hamilton Properties Limited v The Minister of the Environment and Bermuda Financial Centre Limited* (Civil Jurisdiction No 264 of 1994), Ground J took the relevant test in cases of apparent **bias** to be as stated by Lord Goff in *R v Gough*, noting that this reformulation of the traditional test necessarily differed from those considered previously by the Court of Appeal, while expressing confidence that the Court of Appeal would in fact now adopt such a test. This has in fact turned out to be the case, when in the case of *Ross v Woolridge* (Criminal Appeal No 18 of 1997), Kempster JA approved in terms the 'real danger of **bias**' test enunciated by Lord Goff in *R v Gough*. Accordingly, I am satisfied that Lord Goff's test now represents the law of Bermuda as well as that of England.

Before turning to the application of the law to the facts of this case, I should make it clear that in my view Mr Martin has overstated the test in his submissions. Paragraph 12 of his submissions imports into Lord Goff's test the subjective question of a reasonable apprehension on the part of the Plaintiff that there is a real danger that Mr Kellett may not be an **impartial** or independent **arbitrator** in this matter. The test simply requires that the Court should ask itself whether there is a real danger of **bias** on the part of the **arbitrator**—not whether a particular party has a reasonable apprehension of a real danger of **bias**.

In his submissions, Mr Martin relied heavily upon the material exhibited by Mr Murray to his first affidavit, said to represent 'the internationally accepted objective standard of conduct for arbitrators'. I do not propose to go through the exhibited commentary in any detail. Clearly, some of the provisions quoted represent the law of Bermuda, while others represent the appropriate code of conduct in other jurisdictions. I am concerned to apply the law of Bermuda, and in this case, where there is an allegation of apparent **bias**, I do so according to the test derived from *R v Gough* which I have set out above.

The issue then is simply whether Mr Williams' social and business relationship with Mr Kellett would lead me to conclude that there is a real danger of **bias** on his part in the sense that he might unfairly regard the Plaintiff's case to the issue under consideration by him. Mr Kellett's social and business relationship with Mr Williams has to be looked at in the context of Mr Williams' relationship to this arbitration, and in my judgment that relationship is the most tenuous possible. All that can be said (and indeed all that has been said) is that Mr Williams is a director and the president of Castlewood, a company employed by the joint liquidators to provide consulting services to the Defendant. Mr Williams is apparently not himself substantially involved in the provision of those services. Mr Smith's second affidavit identifies the two individuals who are primarily involved, adding that Mr Williams has not played 'any significant role' in the provision of consulting services to the Defendant. Neither can it be said that Mr Williams' own position would be affected in any way by the outcome of the arbitration. Castlewood is paid for its consulting services on an hourly basis, according to the consulting services it is called upon by the joint liquidators of the Defendant to perform. It is they, and nobody else, who control Castlewood's remuneration.

In his oral submissions, Mr Martin commented that the Plaintiff did not know whether Mr Williams would be a witness in the arbitration. His written submissions indicated that it was plain that the witnesses who would have to give evidence would be those persons having the day to day first-hand knowledge of the Defendant's books and records. There is no evidence that Mr Williams is such a person, and Mr Martin's written submissions went no further than to say that the witnesses would be employees in the company of which Mr Williams was a director and president.

Mr Kellett is an experienced insurance executive who has held a variety of high offices within the insurance industry. My reaction is the same as that of Mustill J in *Bremer v Ets. SoulesUNK*[1985] 1 Lloyds Law Reports 160 at 167 when he said ...'But surely nobody in the position of Mr Scott would betray his trust and put his reputation at risk for an outside chance

that he might thereby benefit the parent company of his employers in respect of arbitrations which, by comparison with the scale of the employers' dealings in all manner of commodities, were of quite small account.'

Equally, surely nobody in the position of Mr Kellett would betray his trust and put his reputation at risk by favouring the Defendant on the basis of a friendship and business relationship with Mr Williams, who does not stand to benefit in any way from the success of the Defendant in the arbitration. No doubt the joint liquidators will decide on the extent of their employment of Castlewood without reference to Mr Kellett's role as arbitrator.

Finally, I should refer to Mr Martin's submission that I should draw adverse inferences from Mr Kellett's failure to disclose his relationship with Mr Williams, and his failure to withdraw voluntarily. In regard to the former, I do not believe that in the circumstances of this arbitration Mr Kellett's social and business relationship with Mr Williams required disclosure. As to the latter, my view is that an obligation to withdraw would arise if, and only if, there was a real danger of bias on Mr Kellett's part.

In my view, there is no such danger, and certainly nothing like the real danger of bias envisaged by the *R v Gough* test. Indeed, if I were to be wrong on the test to be applied and the formulation submitted by Mr Martin were correct, namely that I should decide the issue on the basis of a reasonable apprehension on the Plaintiff's part that there is a real danger that Mr Kellett may not be an impartial or independent arbitrator, I would hold the view that, in the circumstances of this case, there could be no such reasonable apprehension.

It therefore follows that the Plaintiff's summons should be dismissed, and I so order. In regard to costs, counsel acknowledged that this was a case where costs would follow the event, and I would therefore order that the costs of these proceedings be those of the Defendant, to be agreed or taxed in default of agreement.

Geoffrey R Bell

Acting Puisne Judge

NYSCEF DOC. NO. 1

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 150 of 221

RECEIVED NYSCEF: 02/13/2023

# LLOYD'S
# LAW REPORTS

Editor:
## Miss M. M. D'SOUZA, LL.B.
of the Middle Temple, Barrister

SOCIAL LAW
LIBRARY
NOV 4  1985
BOSTON

## 1985
## Volume 1

Printed by Holmes and Sons (Printers) Ltd., 10 High Street, Andover. Tel. 0264 3456

© LLOYD'S OF LONDON PRESS LTD. 1985

charter-parties, the maximum under this one would be 25,000 tons plus 10 per cent., which is less than either figure in lines 1-4, and that amount would also presumably be the minimum. But the conflict is greater if the construction put forward by Mr. Males is accepted. On the same hypothesis the owners would not be obliged to provide any tonnage at all under this charter-party, since the figure of 120,000 less 10 per cent. would already have been reached; but they could if they chose provide another 25,000 plus 10 per cent. Thus, on Mr. Males' submission, lines 1-4 are revised so that they read "nil to 25,000 plus 10% in certain circumstances".

For those reasons I uphold the arbitrator's award.

## QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Jan. 15, 16 and 17, 1985

### TRACOMIN S.A.
v.
### GIBBS NATHANIEL (CANADA) LTD. AND GEORGE JACOB BRIDGE

Before Mr. Justice STAUGHTON

**Arbitration — Arbitrator — Removal — Applicants and arbitrator involved in three separate previous actions — Allegations that arbitrator had not behaved in an impartial manner in earlier action — Whether application for removal should be granted — Arbitration Act, 1950, s. 23 (1).**

On Jan. 14, 1983, Tracomin agreed to buy peanuts from Gibbs under two contracts providing for shipment in monthly instalments during the second half of 1983. The December portions were never shipped and Gibbs took the view that in the circumstances their obligation to ship had been discharged.

Tracomin disagreed and by telex dated Jan. 10, 1984, they claimed arbitration and appointed Mr. Sean Armstrong as their arbitrator. On Jan. 12 Gibbs appointed Mr. George Jacob Bridge as their arbitrator. Tracomin objected to this appointment but their efforts to persuade Gibbs that they should replace Mr. Bridge with some other arbitrator were unsuccessful.

On Apr. 12, 1984, Tracomin applied for an order that Mr. Bridge be removed as arbitrator pursuant to s. 23 (1) of the Arbitration Act, 1950, on the ground that there was a significant risk of bias on the part of Mr. Bridge.

Tracomin alleged that they had been involved with Mr. Bridge in three separate actions. In the first action there was a dispute between Tracomin and Sudan Oil Seeds and Mr. Bridge had been appointed arbitrator for Sudan Oil Seeds. Tracomin also started proceedings in Switzerland. In the English proceedings application was made for a declaration that the issue whether the arbitration clause formed part of the contract was res judicata and that Sudan Oil were estopped from contending that it did. That application was dismissed.

However, Tracomin contended that there were a number of aspects of the conduct of Mr. Bridge in connection with the English action and the Swiss proceedings which apparently showed that he had not behaved in an impartial manner, in particular: (1) Mr. Bridge had written a letter to Maitre Wanner, the lawyer acting for Sudan Oil in the Swiss proceedings while the arbitration between Tracomin and Sudan Oil was pending, and did not send a copy of that letter to Tracomin. (2) Early

DIVISION
COURT)

17, 1985

N S.A.

(CANADA) LTD.
COB BRIDGE

STAUGHTON

Removal — Applicants
three separate previous
at arbitrator had not
mer in earlier action —
moval should be granted
23 (1).

comin agreed to buy
nder two contracts
monthly instalments
1983. The December
ed and Gibbs took the
nces their obligation to

by telex dated Jan. 10,
tion and appointed Mr.
arbitrator. On Jan. 12
ge Jacob Bridge as their
cted to this appointment
uade Gibbs that they
dge with some other
ful.

acomin applied for an
removed as arbitrator
e Arbitration Act, 1950,
was a significant risk of
ridge.

they had been involved
separate actions. In the
pute between Tracomin
d Mr. Bridge had been
or Sudan Oil Seeds.
ceedings in Switzerland.
s application was made
the issue whether the
part of the contract was
dan Oil were estopped
d. That application was

tended that there were a
conduct of Mr. Bridge in
ish action and the Swiss
ntly showed that he had
al manner, in particular:
tten a letter to Maitre
g for Sudan Oil in the
the arbitration between
was pending, and did not
to Tracomin. (2) Early

in 1982 correspondence took place between Tracomin's English solicitors and Mr. Bridge regarding the adjournment of the arbitration and in that correspondence Mr. Bridge referred to Sudan Oil as "my principals" and said that he was going "to seek instructions from them". (3) Mr. Bridge had attended the hearing in the English Court and appeared to be participating in the instructions of Counsel for Sudan Oil.

In the second action which was between the same parties, and was for the removal of Mr. Bridge, in the event Mr. Bridge resigned voluntarily. The third action was between Tracomin and Continentale Produkten Gesellschaft Ehrhardt-Renken (G.m.b.H.) & Co. and Mr. Bridge was elected to the Board of Appeal. Tracomin commenced an action seeking inter alia the removal of Mr. Bridge as an appeal arbitrator. Agreement was eventually reached and Mr. Bridge resigned from membership of the board.

————*Held*, by Q.B. (Com. Ct.) (STAUGHTON, J.), that (1) the letter to Maitre Wanner could not be regarded as sufficient to establish by itself a case of imputed bias; it was within the practice of FOSFA whereby a FOSFA arbitrator might advise those who appointed him on the procedure prevailing in FOSFA arbitrations (*see* p. 594, col. 1);

(2) the fact that Mr. Bridge referred to his appointors as his principals and said that he was taking instructions from them was not of itself sufficient to justify a finding of imputed bias; it would have been better if Mr. Bridge had not used such language but it would be imposing too high a standard if the law were to insist on the precise use of language in this context (*see* p. 594, col. 2);

(3) for an arbitrator, while still seized of judicial functions, to sit in Court behind Counsel for one party and next to the solicitor for that party was wrong; it was still more wrong for him to *appear* to be participating in the instructions of Counsel for one party (*see* p. 594, col. 2);

(4) in the circumstances a reasonable man acquainted with the practice of FOSFA would have concluded that there was a likelihood of bias on the part of Mr. Bridge from the appearance of his conduct during the hearing of the Sudan Oil case in this Court; that impression would have been slightly fortified by the letter to Maitre Wanner, the reference to taking instructions from his principals and two occasions on which application was made to remove him; but it was on the appearance of Mr. Bridge's conduct during the Sudan Oil case in this Court that Tracomin had established that there was a significant risk of bias on his part; no order was made as Mr. Bridge agreed to resign (*see* p. 596, col. 2).

The following cases were referred to in the judgment:

Bremer Handelsgesellschaft m.b.H. v. Ets Soules et Cie., [1985] 1 Lloyd's Rep. 160;

French Government v. "Tsurushima Maru", (C.A.) (1921) 8 Ll.L.Rep. 403;

Hagop Ardahalian v. Unifert International S.A., (C.A.) [1984] 2 Lloyd's Rep. 84;

Hannam v. Bradford Corporation, (C.A.) [1970] 1 W.L.R. 937;

Metropolitan Properties Co. (F.G.C.) Ltd. v. Lannon and Others, (C.A.) [1969] 1 Q.B. 577;

R. v. Liverpool City Justices ex parte Topping, [1983] 1 W.L.R. 119;

Tracomin S.A. v. Sudan Oil Seeds Co. Ltd., (C.A.) [1983] 2 Lloyd's Rep. 384; [1983] 1 W.L.R. 1026; [1983] 1 Lloyd's Rep. 560; [1983] 1 Lloyd's Rep. 571; [1983] 1 W.L.R. 662.

This was an application by the plaintiffs Tracomin S.A. that the arbitrator Mr. George Jacob Bridge appointed by the first respondents, Gibbs Nathaniel (Canada) Ltd., be removed as arbitrator in the arbitration between Tracomin and Gibbs.

Mr. David Grace (instructed by Messrs. Richards Butler & Co.) for Tracomin; Mr. Nicholas Merriman (instructed by Messrs. Middleton Potts & Co.) for Mr. Bridge.

The further facts are stated in the judgment of Mr. Justice Staughton.

Judgment was reserved.

Monday, Jan. 28, 1985

JUDGMENT

**Mr. Justice STAUGHTON:** On Jan. 14, 1983, Tracomin S.A. (Tracomin) agreed to buy peanuts from Gibbs, Nathaniel (Canada) Ltd. (the sellers) under two contracts providing for shipment in monthly instalments during the second half of 1983. The December portions were not shipped; the sellers apparently took the view that in the circumstances, whatever they were, their obligation to ship had been discharged. Tracomin disagreed. By telex dated Jan. 10, 1984, they claimed arbitration, and appointed Mr. Sean Armstrong as arbitrator. The sellers replied on Jan. 12, 1984, appointing Mr. George Jacob Bridge, the second respondent in these proceedings, as their arbitrator. Tracomin made efforts to persuade the sellers that they should replace Mr. Bridge with some other arbitrator, but those efforts were unsuccessful. By this motion, issued on Apr. 12, 1984, they apply for an order that he be removed as arbitrator pursuant to s. 23 (1) of the Arbitration Act, 1950. That sub-section reads:

Where an arbitrator or umpire has misconducted himself or the proceedings, the High Court may remove him.

The misconduct alleged is in accepting an appointment as arbitrator, or continuing to hold that appointment, when disqualified by bias. I should make it clear at once that Tracomin do not allege or seek to prove that Mr. Bridge is in fact biased against them. Their case is that an objective observer of the situation would conclude that there is a significant risk of bias on his part. I shall have to consider later the precise test to be applied when an allegation of bias takes that form, sometimes called "imputed bias". But it is not disputed that bias may be proved in that way, or that if it is proved, a case of misconduct is made out within s. 23 (1). This is yet another instance, and a particularly serious one, where the word "misconduct", as it is used in the law relating to arbitration, is misleading if it be thought to convey moral reproach. As Mr. Grace for Tracomin pointed out in argument, when an arbitrator is removed on the ground of imputed bias the Court does not make any finding which reflects on his integrity in any way. At most the Court concludes that he would have been wiser not to accept the appointment or continue in it, and that he has made an error of judgment.

The two contracts incorporated the Rules of Arbitration and Appeal of the Federation of Oils, Seeds and Fats Associations Ltd. ("FOSFA"). Those rules provide that each party shall appoint an arbitrator and that the two arbitrators, if and when they disagree, shall appoint an umpire. Rule 1 (c) reads:

At the time of their appointment arbitrators and umpires shall be persons nominated to the Federation by a full member company or firm or persons who are full members of the Federation. No person shall be eligible to act who, or whose company or firm, has any direct or indirect interest in the transaction in dispute.

There is then provision for an appeal to a Board of Appeal, to be constituted as follows:

5. The appeal shall be determined by a Board of Appeal consisting of 5 members elected and appointed from the Appeal Panel. No member of the Appeal Panel who, or whose company or firm, has any direct or indirect interest in the transaction in dispute or who has acted as arbitrator or umpire in the case, nor any member of the same company or firm to which either of the arbitrators or the umpire belong, shall be entitled to vote for election of the Board of Appeal or be appointed a member of the Board of Appeal.

I have no evidence as to the number of persons who are qualified, suitable and willing to act as arbitrators; but I should doubt if it is very large. It includes some persons who no longer engage in trading very actively or at all, but devote a large part of their time to arbitrations. As to the appeal panel, this has 93 names on it.

Before I turn to the facts which are said to make out a case of imputed bias against Mr. Bridge, I must pause to consider the practice in arbitrations under the auspices of FOSFA. Like the practice in other commodity associations and in some arbitrations at the Baltic Exchange, it differs in a number of respects from that which prevails in a Court of law. That is not a matter for surprise or reproach. All those who fulfil judicial functions must adopt a fair procedure which is designed to result in a just conclusion; but the procedure best suited for that purpose may well be different in St. Mary Axe from what it is in Bow Street.

With the assistance of Counsel, I can identify eight respects in which the procedure that has been habitually adopted for a long time in many commercial tribunals differs from that of a Court of law.

(i) A Judge or magistrate may well regard himself as disqualified if either of the parties is known to him. By contrast, the commercial arbitrator will know many of his colleagues in the same trade and may well have at least a business acquaintance with the parties before him.

(ii) A Judge or magistrate is appointed to try a case by his superiors or by persons acting on their behalf. The commercial arbitrator is selected by one of the parties. Not infrequently there will be a continuing relationship between the arbitrator and the party appointing him, in that the party always chooses the same arbitrator if he is available. If the arbitrator is one of those who no longer engage in active trading, such appointments can form a significant part of his occupation.

(iii) Many commercial arbitrations are determined on documents alone, without oral evidence. The channel by which the documents of one party reach the tribunal will often be the arbitrator whom that party has appointed. The two arbitrators then exchange with each other the papers which they have received. There is no intermediary, such as a solicitor, to undertake the task of copying documents and placing them before both members of the tribunal at the same moment.

(iv) An arbitrator is free to provide to the party who appointed him advice as to the procedure or mechanics of the arbitration

[left column — partial text from binding]

per of persons
lling to act as
t is very large.
longer engage
but devote a
ons. As to the
n it.

ch are said to
s against Mr.
he practice in
FOSFA. Like
y associations
ltic Exchange,
m that which
s not a matter
ose who fulfil
air procedure
conclusion;
that purpose
Axe from what

I can identify
edure that has
g time in many
m that of a

y well regard
f the parties is
e commercial
colleagues in
ve at least a
parties before

pointed to try
sons acting on
arbitrator is
t infrequently
nship between
inting him, in
es the same
the arbitrator
er engage in
ts can form a

ions are deter-
without oral
he documents
ll often be the
ppointed. The
th each other
d. There is no
to undertake
placing them
al at the same

rovide to the
ce as to the
e arbitration

system. There was some discussion during the argument as to whether it was also customary for the arbitrator to advise his appointors on their evidence and any loopholes in their case. No such custom was proved, and I say nothing as to whether it would be one which the law would uphold. But I can see that when a trader is unfamiliar with commercial arbitration, and perhaps resides abroad, it may well be appropriate for the arbitrator whom he has appointed to advise him on what the customary procedure is.

(v) Arbitrators may act on their knowledge of the trade, in certain circumstances, without the need for evidence.

(vi) If the two arbitrators at first instance disagree and appoint an umpire, they may and commonly do appear before him as advocates and present the case of the parties who respectively appointed them. This practice was approved by the Court of Appeal over 60 years ago (*French Government v. Tsurushima Maru*, (1921) 8 Ll.L.Rep. 403).

(vii) Similarly, if the dispute goes to a Board of Appeal, the first-tier arbitrators may and commonly do appear before the board as advocates.

(viii) The careful seclusion of Judges and magistrates, when out of Court, from all contact with the parties who appear before them would be difficult to maintain in commercial arbitrations. Indeed, in some types of arbitration it is common for the tribunal, advocates and representatives of the parties all to have lunch together during the hearing.

Some of these features might make an outsider pause. But in the trades where some or one or all of them habitually occur, they are well understood and have worked well for many years. The fair procedure which natural justice demands may, as I have indicated, differ from one type of tribunal to another. A degree of informality in the resolution of commercial disputes may be attractive to businessmen, avoid unnecessary ill-feeling, and even encourage settlements. The great number of commercial disputes that are submitted to arbitration suggests that it has considerable attraction for businessmen, whether for those or other reasons.

But these departures from the model of justice which Courts of law seek to maintain make it the more important that arbitrators should in all other respects act with the utmost propriety. As was said by Lord Denning, M.R., in *Metropolitan Properties Co. (F.G.C.) Ltd. v. Lannon and Others*, [1969] 1 Q.B. 577 at p. 599:

Justice must be rooted in confidence: and confidence is destroyed when right-minded people go away thinking: "The judge was biased".

Many arbitrators would agree that the task of avoiding the slightest appearance of partiality is more difficult for them than for magistrates and Judges, because they are so much closer to the parties. Sometimes it is a more difficult task than that of deciding the case before them.

Where the reference is to two arbitrators, and to an umpire if they should disagree, it is clear that the arbitrators are functi officiis once disagreement has taken place. Thereafter they have no judicial function to perform, and are presumably not bound to act judicially. But equally it is clear that, until there has been disagreement, they do perform a judicial function and are bound to act judicially. That is so even if subsequent disagreement is probable or even certain. The contrary has not been argued in this case, or in any other so far as I am aware.

*The facts*

With that introduction, I turn to the facts of this case. They are to be found in three separate actions where Tracomin and Mr. Bridge have previously been involved. The first was *Tracomin S.A. v. Sudan Oil Seeds Co. Ltd.*, (1982) T No. 1211. Tracomin, as buyers, were in dispute with Sudan Oil Seeds Co. Ltd. ("S.O.S.") about two contracts for the sale of peanuts. Arbitrators were appointed under the auspices of FOSFA, S.O.S. appointing Mr. Bridge. They had not considered the claim or disagreed at the time when the following relevant events occurred. Tracomin started proceedings arising out of the dispute in Switzerland. The facts as to those proceedings are set out in my judgment, reported at [1983] 1 Lloyd's Rep. 560 and [1983] 1 W.L.R. 662, and I can summarize them. S.O.S. applied to the Swiss Court for a stay of the Swiss proceedings, on the ground that there was an agreement to arbitrate at FOSFA. That application failed. The decision of the Swiss Court was upheld on appeal. Tracomin then in the English action applied for a declaration and injunction, on the ground that the issue as to whether the arbitration clause formed part of the contract was res judicata and that S.O.S. were estopped from contending that it did. The action was tried before me on June 17, 22, 23 and 24 and Sept. 15, 1982. On Oct. 6, 1982, I gave judgment for S.O.S., holding that they were not estopped from asserting that the arbitration clause was part of the contract. An appeal from my decision was dismissed — [1983] 2 Lloyd's Rep. 384; [1983] 1 W.L.R. 1026.

Further proceedings arising out of the same dispute took place in *Tracomin v. Sudan Oil Seeds Co. Ltd.* (*No.* 2), (1982) T No. 2531. In that action Tracomin asked for leave to revoke the authority of the FOSFA arbitrators, or for an order that Mr. Bridge be removed as arbitrator. S.O.S. counterclaimed for an injunction restraining Tracomin from continuing or prosecuting or commencing any further proceedings in Switzerland.

So far as the claim was concerned, that action came before Mr. Justice Bingham on Dec. 9, 1982. It was supported by an affidavit of Mr. Michael Robinson, solicitor for Tracomin, sworn on Nov. 15, 1982. That affidavit referred to a number of aspects of the conduct of Mr. Bridge in connection with the action (1982) T No. 1211 and the Swiss proceedings, which were said to show that he had not behaved in an impartial manner. Those matters are of crucial importance to the present case, and I shall have to consider them in detail later. In answer there was an affidavit of Mr. Charles Deans, solicitor for S.O.S. Mr. Bridge was not present or represented before Mr. Justice Bingham initially; but he too had sworn an affidavit setting out the facts as he saw them.

The learned Judge decided at an early stage that he was not going to revoke the authority of the arbitrators or set aside the arbitration clause. Thereafter there is some dispute as to precisely what was said by Mr. Justice Bingham. But it is clear what conclusion was reached, and in my judgment that is what matters for present purposes. Accordingly I can take the facts as they are set out in an affidavit of Mr. Christopher Potts, solicitor for Mr. Bridge, sworn on Jan. 16, 1985:

2. In relation to the application for an order that Mr. Bridge be removed as arbitrator, I advised Mr. Bridge that he should not appear at the proceedings but that he should swear a full and frank affidavit to be tendered to the Court dealing with the factual matters which were the subject of the allegations of misconduct against him and that he should abide by any Order that the Court might make as to his removal.

3. The hearing of the application by Tracomin S.A. took place before The Honourable Mr. Justice Bingham on 9th December 1982 and Mr. Bridge was not represented by Counsel or Solicitor at that hearing. However, at approximately 1.20 p.m. on that day I received a telephone call from Mr. Charles Deans, a partner in the firm of William A. Crump & Son, the Solicitors acting for the First Defendants, Sudan Oil Seeds Company Limited. Mr. Deans informed

me that The Honourable Mr. Justice Bingham had requested, at the time of rising for the luncheon adjournment, that I, as Mr. Bridge's Solicitor, should present myself at Court at 2 p.m. I agreed to proceed to appear before the learned Judge immediately.

4. When the learned Judge sat again after the luncheon adjournment, Mr. Nicholas Merriman, who was appearing for the First Defendants, made some brief submissions to the learned Judge, who then asked me to come to the front of the Court, which I did. There followed brief exchanges between the learned Judge and me which, to the best of my recollection, I would summarize as follows:—

(1) I explained that Mr. Bridge was not represented before the Court because I advised him that, as an Arbitrator, he should not take an active part in the proceedings but should limit himself to swearing a full and frank affidavit and the learned Judge said that he fully endorsed the view that I had taken and he was sure that this was the correct approach.

(2) The learned Judge informed me that he would wish me to take instructions from Mr. Bridge as to whether or not he was prepared to stand down voluntarily as Arbitrator in the case and to let the Solicitors acting for the two parties know what Mr. Bridge's instructions were by the following Monday. The learned Judge said that he accepted and that he would wish me to communicate to Mr. Bridge his acceptance that there was no question of Mr. Bridge having misconducted himself and that it was a question of appearances, particularly bearing in mind the fact that Tracomin were foreign litigants. He went on to express the view that the matter was somewhat delicate and of wider importance because of the Swiss proceedings between Tracomin and the First Defendants and that he, the learned Judge, thought that it was a case in which it would be advantageous to both parties that there should be no question of doubt as to the impartiality of the Arbitrators and accordingly he would adjourn the application to remove Mr. Bridge to await news as to whether or not Mr. Bridge was prepared to stand down voluntarily.

(3) I undertook to communicate those views to Mr. Bridge and seek his immediate instructions as to whether or not he was prepared to stand down voluntarily.

5. On the following day I was able to speak to Mr. Bridge on the telephone when I

FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 156 of 221

reported to him the views expressed by the learned Judge. He asked me to allow him to consider the matter over the weekend and promised to revert to the instructions on the following Monday, i.e., the 30th December 1982. On the morning of the 30th December 1982 Mr. Bridge telephoned me to say that, having thought about the matter over the weekend and considered the learned Judge's views, he was happy to resign and accordingly later that day I communicated to the Solicitors acting for the parties Mr. Bridge's decision that he would resign voluntarily.

There is only one fact in that affidavit which seems to me open to doubt — the statement attributed to Mr. Justice Bingham that he accepted that there was no question of Mr. Bridge having misconducted himself. If there was no misconduct in any form, there was no jurisdiction to remove him under s. 23 (1) and no point in adjourning the application; it could have been dismissed at once. It seems to me more likely, if I may say so, that Mr. Justice Bingham said that there was no question of actual bias on the part of Mr. Bridge. That was indeed the case. At all events, Mr. Bridge resigned as arbitrator and the application was adjourned sine die.

The counterclaim in action (1982) T No. 2531 — for an injunction restraining the Swiss proceedings — came before Mr. Justice Leggatt on Feb. 1, 1983 ([1983] 1 Lloyd's Rep. 571). It is of no direct relevance to this action. The learned Judge refused to grant an injunction, on the ground that S.O.S. had failed to bring to the attention of the Swiss Courts the English law on the incorporation of arbitration clauses, which differed from Swiss law; consequently they had only themselves to blame for the failure of their application for a stay in the Swiss proceedings. The Court of Appeal took a different view and granted an injunction — [1983] 2 Lloyd's Rep. 384; [1983] 1 W.L.R. 1026.

Next there was the action *Tracomin S.A. v. Continentale Produkten Gesellschaft Ehrhardt-Renken (G.m.b.H.) & Co. and George Bridge and others,* (1983) T No. 853. In those proceedings Mr. Bridge featured not as a first-tier arbitrator appointed by either of the parties, but as a member of two Boards of Appeal. Again Tracomin were buyers, under two contracts for the purchase of Sudanese groundnuts. They went to arbitration at FOSFA and lost at first instance; then they appealed. A Board of Appeal is composed of five members, of whom three are elected by the members of the Appeal Panel and two are appointed by the Federation. In the case of each appeal Mr. Bridge was one of the elected members.

Tracomin and their solicitors made efforts to secure that Mr. Bridge should not be a member of the Boards of Appeal. In particular, on Mar. 22, 1983, they sent this telex to Mr. Reffold, the chief executive and secretary of FOSFA:

We received this morning your letter dated 18th March and we note that Mr. G. Bridge, to whose presence we have already objected, is once again a member of the Board of Appeal.

We feel this to be improper, in view of the fact that Mr. Justice Bingham agreed with us on the lack of impartiality of Mr. Bridge towards our company. Therefore, much to our regret, we must once again object to Mr. Bridge's presence on this Board of Appeal and request you to kindly arrange for a replacement.

It will be apparent that what is said there about the view of Mr. Justice Bingham was untrue. Mr. Grace admits and indeed asserts that it was a libel. After some vicissitudes, the efforts of Tracomin to secure the removal of Mr. Bridge in paix were again unsuccessful. Thereupon they commenced an action against their sellers, Mr. Bridge and the other members of the Boards of Appeal seeking the removal of Mr. Bridge, injunctions and other relief. It was supported by an affidavit to Mr. Robinson sworn on June 22, 1983. This referred again to the complaints of Tracomin about Mr. Bridge's conduct in the dispute between Tracomin and S.O.S., related what had happened before Mr. Justice Bingham in that case, and added that in the belief of the deponent Mr. Bridge "had reacted rather bitterly" to what had occurred before that learned Judge. A number of affidavits were sworn in answer. Most significantly, there was an affidavit sworn by Mr. Bridge on July 14, 1983, which contained these paragraphs:

9. I understand that the learned Judge indicated that he would reject the application by Tracomin directed against the arbitration agreements and that, consequently, arbitration under the rules of FOSFA would proceed. I was prepared in the circumstances to accept the invitation of the Judge to resign to enable the arbitration to proceed without further dispute and delay. I would not have withdrawn had I thought that it would have been taken as an admission of any misconduct by me. I would have contested any such allegation.

10. The allegation made by Tracomin in their telex of 22nd March 1983 to FOSFA, is therefore untrue. On receipt of that written notification of objection from Tracomin, I informed FOSFA that the nature of the allegation made against me made it impossible

stice Bingham rising for the s Mr. Bridge's f at Court at appear before

at again after Mr. Nicholas ; for the First submissions to ed me to come h I did. There en the learned e best of my e as follows:—

Bridge was not urt because I e Arbitrator, he e part in the nit himself to affidavit and the fully endorsed he was sure roach.

ormed me that structions from or not he was voluntarily as nd to let the o parties know ons were by the rned Judge said he would wish Mr. Bridge his no question of nducted himself of appearances, d the fact that igants. He went the matter was ider importance edings between Defendants and thought that it it would be ties that there f doubt as to rbitrators and arn the applica- o await news as ge was prepared

mmunicate those k his immediate or not he was untarily.

I was able to lephone when I

NEW YORK COUNTY CLERK 02/13/2023 00:12:11
DOC. NO. 17    Case 1:23-cv-01831-JGK    Document 1-1    Filed 03/02/23    Page 157 of 221    RECEIVED NYSCEF: 02/13/2023

for me to withdraw as to do so would be interpreted as an admission of the validity of that allegation. Inevitably, Tracomin's assertion against me was soon common knowledge at FOSFA.

11. I observe that it is alleged that I have reacted rather bitterly to what occurred before Mr. Justice Bingham and that the previous friendly relations are over. This is not so on my part. In fact, in about February or March 1983, after the hearing before Mr. Justice Bingham, I met Mr. Marcel Cohen-Dumani and we talked as usual, addressing each other by our christian names and in a normal and friendly manner. Further, a few days ago I met Mr. Habers, now a director of Tracomin, at a Committee meeting of FOSFA. Again, we talked in our usual friendly fashion addressing each other by christian names. I do deny this allegation of bitterness and further I deny any allegation about lack of impartiality. I am fully able to participate in any hearing of an arbitration involving Tracomin, with an open and independent mind. I am in no way biased against them and I believe that Tracomin have no good reason to suspect that I am.

12. I do deny that I lack impartiality and I do deny that I have been guilty of any misconduct in these appeal arbitrations, which would entitle the court to remove me under section 23 of the Arbitration Act 1950. While the allegations that have been made against me stand, I feel unable to withdraw. I have, however, already indicated to Tracomin that on condition that these allegations of lack of impartiality and misconduct which have been made are withdrawn in writing, and that further they acknowledge, also in writing, that the assertion in their telex to FOSFA dated 22nd March 1983 that "Mr. Justice Bingham agreed with us on the lack of impartiality of Mr. Bridge towards our company" was wholly untrue then I would be prepared in the interests of maintaining the high standards of London arbitration to withdraw from membership of the Boards of Appeal in FOSFA appeals nos. 569 and 571. In the absence of such withdrawals and such an acknowledgment by Tracomin, I am forced to oppose this application.

The action came before Mr. Justice Lloyd in open Court on July 26, 1983. Tracomin and Mr. Bridge were each represented by Counsel, as were the other members of the Boards of Appeal; the sellers were not represented. I have been provided with a transcript of the proceedings. The learned Judge evidently appreciated at an early stage that the problem would be resolved if Tracomin were to withdraw

their allegations against Mr. Bridge, and Mr. Bridge were thereupon to resign as a member of the Boards of Appeal. The difficulty that arose was that Tracomin wanted an undertaking that Mr. Bridge would not sit in any future case on a Board of Appeal if Tracomin were a party to the dispute — or, I think, as an arbitrator. Mr. Bridge felt unable to give that undertaking.

Considerable discussion took place between Counsel and the learned Judge. In the course of that discussion Mr. Justice Lloyd said:

. . . I think it exceedingly improbable that this situation will ever arise again . . . [p. 17E].

It seems to me highly unlikely that he would allow himself ever to be put again in the position in which this situation would occur. [p. 17H].

. . . if [Mr. Bridge] should ever sit again, which I think you can take it with 99.99 per cent. certainty that he never will . . . [p. 21C].

But there is not going to be a future occasion, if Mr. Bridge is a sensible man, which I find and believe him to be. [p. 28C].

The Judge's conviction that the situation would not occur again may have stemmed from his belief, expressed at three points of the transcript, that nobody wanted to be an arbitrator, and that Mr. Bridge would prefer to have been earning his living as a trader. That may not have been well-founded, since Mr. Bridge had retired from active trading in 1981.

At all events, agreement was eventually reached. By consent, no order was made on the summons save that Tracomin pay the costs of the other members of the Boards of Appeal. Tracomin wrote a letter to Mr. Bridge dated Aug. 15, 1983, which stated that they withdrew all allegations of bias, lack of impartiality and misconduct made against him. Mr. Bridge agreed to and did resign from membership of the two Boards of Appeal.

There were thus two occasions on which application was made to remove Mr. Bridge; on each occasion the Judge who heard the application, in my view rightly if I am permitted to say so, encouraged the parties to reach an amicable solution; and in each case Mr. Bridge did agree to resign. Then in January, 1984, less than six months later, a third commercial concern which had agreed to sell goods to Tracomin appointed Mr. Bridge as arbitrator, and he accepted the appointment. They were Gibbs Nathaniel (Canada) Ltd., the first respondents to this motion. But they have taken no part in the hearing. I have not felt it to be my duty to encourage the parties towards any

FILED: NEW YORK COUNTY CLERK 02/13/2023 06:12 PM   INDEX NO. 650832/2023

NYSCEF DOC. NO.   Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 158 of 221   RECEIVED NYSCEF: 02/13/2023

Bridge, and Mr.
gn as a member of
ifficulty that arose
n undertaking that
ny future case on a
were a party to the
n arbitrator. Mr.
t undertaking.

ook place between
ge. In the course of
oyd said:

nprobable that this
in . . . [p. 17E].

kely that he would
put again in the
ation would occur.

ld ever sit again,
e it with 99.99 per
r will . . . [p. 21C].

g to be a future
s a sensible man,
n to be. [p. 28C].

he situation would
stemmed from his
ts of the transcript,
arbitrator, and that
have been earning
may not have been
ge had retired from

t was eventually
r was made on the
in pay the costs of
Boards of Appeal.
Mr. Bridge dated
that they withdrew
of impartiality and
him. Mr. Bridge
membership of the

casions on which
ove Mr. Bridge; on
who heard the
y if I am permitted
arties to reach an
ch case Mr. Bridge
January, 1984, less
third commercial
to sell goods to
idge as arbitrator,
tment. They were
Ltd., the first
lut they have taken
not felt it to be my
ties towards any

compromise of the present dispute. It is too late
for that. The matter must be decided according
to law.

It seems to me that the key to this unhappy
dispute lies in the conduct of Mr. Bridge which
Tracomin complain about in connection with
the Sudan Oil Seeds arbitration and the Swiss
and English proceedings directly related to it. If
that conduct would justify a finding of imputed
bias, then I do not see that anything which
happened in the proceedings before Mr. Justice
Bingham or Mr. Justice Lloyd can have cured it;
in those other proceedings Mr. Bridge offered to
resign, now he does not; if anything, the
situation has escalated for the worse. If, on
the other hand, the conduct of Mr. Bridge in the
Sudan Oil Seeds case would not have justified a
finding of imputed bias, I do not see that the
subsequent proceedings would justify one. On
that hypothesis Tracomin have in the past twice
made an unfounded allegation of bias against
Mr. Bridge; on each occasion, after initial
reluctance, he agreed to resign.

Thus far I have not set out the conduct
complained of; I must now do so in some detail.
It is comprised under three heads:

(i) While the S.O.S. arbitration was pending,
Mr. Bridge wrote a letter dated May 6, 1982, to
Maitre Wanner, the lawyer acting for S.O.S. in
the Swiss proceedings. That letter read as
follows:

Dear Maitre Wanner,

Re: *Dispute between Sudan Oilseeds Co. &
Tracomin S.A.*

I have been requested by Sudan Oilseeds
Co. to write to you in connection with a claim
made by Tracomin against them and its
position under the rules of arbitration of the
Federation of Oilseeds & Fats Association
Ltd.

Tracomin telexed to Sudan Oilseeds Co. on
the 14th May 1981 as follows . . .

and then there is set out the text of the telex
which claimed arbitration and appointed Mr.
Beaton as Tracomin's arbitrator. The letter
continues:

The above telex constituted a claim
for arbitration by Tracomin against Sudan
Oilseeds Co. Whether the claim is a valid one
is immaterial. The fact is that the claim was
made and an arbitrator appointed by
Tracomin which makes it a valid claim under
the rules and my understanding in accordance
with the rules and the law of England is that at
that point an arbitration commences.

The party against whom a claim is made is
obliged to appoint an arbitrator in return and
this was done promptly by Sudan Oilseeds
Co. by their telex of the 18th May 1981 when
they telexed to Tracomin as follows:

The letter then sets out the telex of Sudan
Oilseeds in which they appointed Mr. Bridge as
arbitrator. The letter continues:

It is by no means unusual for the
respondents to reject the claim of the buyers
as has been done in this telex by Sudan
Oilseeds Co. but nevertheless to comply with
the rules they appointed an arbitrator in reply.

I hope that the above explains the position
of a claim to your satisfaction but should
there be any questions which you wish to put,
I should be happy to answer them.

I am informed that you also wish a
comment on this matter from an English
lawyer and accordingly I have requested
Messrs. William Crump & Sons to write to
you which letter you should receive about the
same time as this one.

Messrs. William A. Crump & Sons will
probably be known to you as they are a
highly regarded firm of lawyers (solicitors)
specialising in the commercial, maritime and
admiralty field.

Yours sincerely,

Mr. Bridge did not send a copy of the letter to
Tracomin nor, apparently, to his co-arbitrator.
The first that Tracomin heard of it was when it
was produced as expert evidence, so to speak, on
behalf of S.O.S. in the Swiss proceedings.

(ii) Early in 1982 correspondence took place
between Tracomin's English solicitors and
Mr. Bridge, as to whether there should be
an adjournment of the arbitration between
Tracomin and S.O.S., in which Mr. Bridge
and another were the arbitrators. In that
correspondence Mr. Bridge referred to S.O.S. as
"my principals", and said that he was going "to
seek instructions from them".

(iii) This ground is set out in par. 15 of Mr.
Robinson's affidavit sworn on Nov. 15, 1982:

The hearing of Action 1982-T-No. 1211
before the Hon. Mr. Justice Staughton lasted
from 17th June 1982 to 24th June 1982. There
was a further hearing on 15th September
1982. I attended the hearings. Mr. Bridge
attended the whole or substantially the whole
of the proceedings also. He sat behind
Counsel for the First Defendants with their
Solicitors and appeared to be discussing the
case with them and indeed participating in the
instruction of Counsel. Mr. Marcel Dumani,

594
LLOYD'S LAW REPORTS
[Q.B. (Com. Ct.)

[1985] VOL. 1]
Tracomin v. Gibbs
[STAUGHTON, J.

a Director of the Plaintiffs who attended part of the hearing, remarked to me that Mr. Bridge was "sitting in the enemy camp". This is the Plaintiffs' view and it was the impression that Mr. Bridge gave.

Mr. Deans, the solicitor for S.O.S., answered that in par. 8 of his affidavit sworn on Dec. 7, 1982:

> The third ground is that Mr. Bridge attended much of the hearing before the Honourable Mr. Justice Staughton which was in open Court, and that he gave the impression of "sitting in the enemy camp". Mr. Bridge did indeed attend much of the hearing; he is now retired from active trading and was interested in the proceedings. Outside Court he talked to Mr. Marcel Dumani and to Mr. Robinson and Counsel for the Plaintiffs as well as myself and Counsel for the First Defendants. In Court, it is true, he sat next to me. Again, I respectfully suggest, that this is not misconduct. The hearing was not concerned with the merits of the dispute between the parties but with a procedural matter.

It will be observed that Mr. Deans does not comment on Mr. Robinson's evidence as to Mr. Bridge discussing the case with him and participating in the instruction of Counsel. However, Mr. Bridge does, in par. 3 (b) of his affidavit sworn on Dec. 8, 1982:

> As to the contents of paragraph 15 of Mr. Robinson's Affidavit I would only add to the statements made in paragraph 8 of the Affidavit of Mr. Deans to say that at no time did I give any instructions to Mr. Deans or to Counsel. I attended the majority of the hearings before the Honourable Mr. Justice Staughton and from time to time I asked Mr. Deans to clarify certain arguments which were being advanced but I myself was in no position nor would I have presumed to give instructions to Mr. Deans or to Counsel.

I will consider those three allegations separately in the first instance, although, of course, it is Mr. Bridge's conduct as a whole which matters. As to (i), Mr. Bridge says, and I accept, that he did not understand that his letter to Maitre Wanner was to be used as expert evidence in the Swiss proceedings. On that basis, I would not regard it as sufficient by itself to establish a case of imputed bias. It seems to me to be within the practice, described earlier in this judgment, whereby a FOSFA arbitrator may advise those who appoint him on the procedure prevailing in FOSFA arbitrations.

Nor would I consider that point (ii) by itself would justify a finding of imputed bias. Mr.

Deans, who is the doyen of the Commercial Court solicitors and who has more experience of commodity trade arbitrations than any other practitioner, says in par. 7 of his affidavit:

> In many years experience in dealing with arbitrations under the auspices of FOSFA (to whom I have acted as a legal adviser for some years) I have regularly come across the use of the expression "instructions" in the context explained and I believe it to be a normal expression for the reasons set out above, with no sinister implication as suggested by Mr. Robinson.

Of course, it would be better if an arbitrator did not refer to his appointors as his principals, or say that he was taking instructions from them rather than seeking their comments. But it would be imposing too high a standard on trade arbitrators if the law were to insist on the precise use of language in this context.

Point (iii) — Mr. Bridge's conduct at the hearing before me — is much the most serious of Tracomin's allegations. For an arbitrator, while still seized of judicial functions, to sit in Court behind Counsel for one party and next to the solicitor for that party is, in my judgment, wrong. It is still more wrong for him to *appear* (and I emphasize that word) to be participating in the instruction of Counsel for one party. That was the impression received by Mr. Robinson, and perhaps by Tracomin's director who remarked that Mr. Bridge was "sitting in the enemy camp". Neither could know what words were in fact passing between Mr. Bridge, Mr. Deans and Counsel — they could only form a view from what they saw. Mr. Deans does not deny that Mr. Robinson might have received that impression. Nor, in terms, does Mr. Bridge, although he says that he would not have presumed to give instructions to Counsel.

*Effect of the previous proceedings*

I was at first concerned that the withdrawal (if there was one) of the allegation of misconduct before Mr. Justice Bingham, and the withdrawal (which their certainly was) of the allegation of misconduct before Mr. Justice Lloyd, might prevent Tracomin from relying on the same facts as establishing imputed bias and therefore misconduct in the present case. However, no such argument was put forward by Mr. Merriman, Counsel for Mr. Bridge, and on reflection I think that he was right not to rely on it. Any other conclusion would have caused injustice to Tracomin, since their Counsel only withdrew the allegation of misconduct before Mr. Justice Lloyd after repeated assurances from the learned Judge, which Counsel no doubt found compelling, that the situation was unlikely to occur again.

f the Commercial
more experience of
s than any other
his affidavit:

ce in dealing with
ices of FOSFA (to
al adviser for some
e across the use of
s" in the context
t to be a normal
et out above, with
suggested by Mr.

if an arbitrator did
s his principals, or
actions from them
omments. But it
standard on trade
nsist on the precise
t.

's conduct at the
the most serious of
n arbitrator, while
ns, to sit in Court
y and next to the
in my judgment,
for him to *appear*
to be participating
for one party. That
by Mr. Robinson,
n's director who
vas "sitting in the
know what words
n Mr. Bridge, Mr.
could only form a
lr. Deans does not
ight have received
s, does Mr. Bridge,
would not have
to Counsel.

*lings*

t the withdrawal (if
tion of misconduct
and the withdrawal
of the allegation of
tice Lloyd, might
g on the same facts
ias and therefore
:ase. However, no
forward by Mr.
. Bridge, and on
right not to rely on
vould have caused
their Counsel only
misconduct before
:peated assurances
n Counsel no doubt
he situation was

Mr. Grace contended that the proceedings before Mr. Justice Bingham and Mr. Justice Lloyd were of importance in another way. He submitted that both Judges evidently felt that Mr. Bridge ought to be removed for imputed bias; accordingly they made efforts to encourage a compromise so that a formal order, which would inevitably be regarded as wounding even though in point of law it conveys no moral reproach, need not be made. Hence Mr. Grace submits that I should follow the decision which those two other Judges tacitly reached. I do not think it right to give any weight to that argument. I have my own opinion as to what conclusion Mr. Justice Bingham and Mr. Justice Lloyd would have reached, if the cases before them had not been settled by agreement; but it is in essence my opinion as to what the correct answer is in law, not as to what answer Mr. Justice Bingham or Mr. Justice Lloyd had in mind. There is no sufficient material before me to establish that. Indeed the very object of the Judges in encouraging a compromise solution, and of the parties in accepting one, was to avoid the need for the Court to pronounce a conclusion.

*The law.*

Mustill and Boyd on Commercial Arbitration has this passage at p. 215:

Antecedent bias

Bias may arise either from a relationship between the arbitrator and one of the parties, or from a relationship between the arbitrator and the subject matter of the dispute. The former is the instance which comes more readily to mind. It can take the shape of a favouritism or antipathy towards one of the parties which can actually be shown to exist. Actual bias of this kind is almost impossible to prove, in the absence of some incautious remark by the person nominated, either before or after the reference begins. It is not, however, necessary to go as far as establishing actual bias, for the Court will in appropriate cases intervene if facts are proved which would lead a reasonable person, not knowing the arbitrator's true state of mind, to think it likely that there was bias.

At p. 216:

It is impossible to lay down any principle more precise than the test of what a reasonable man would think, for ascertaining whether the relationship is close enough to be objectionable. With the exercise of common sense, a situation should never arise in which the arbitrator's personal impartiality is put in question. A person who is approached with a request to act, and knows that he has some

kind of relationship with one of the parties, should remember that there is no keener sense of injustice than is felt by someone who has doubts about whether the arbitrator is doing his honest best. He should also bear in mind that the question is not just whether he really is impartial, but whether a reasonable outsider might consider that there is a risk that he is not. If the person nominated considered that a reasonable outsider might (not should) take this view, he should decline to act. If he considers that the case is on the borderline, he should disclose the circumstances which might give rise to suspicion: and he will very often find that no objection is taken to his appointment: candour is always the best way to prevent misunderstandings.

There are, in my judgment, three points of importance to the present case which emerge from the authorities. First, the test is objective, as to what a reasonable man would think; it is not an enquiry into what the party alleging bias thinks, or as to the actual views of the arbitrator who is challenged (*Metropolitan Properties Co. (F.G.C.) Ltd. v. Lannon*, [1969] 1 Q.B. 577, *Hannam v. Bradford Corporation*, [1970] 1 W.L.R. 937, *Hagop Ardahalian v. Unifert International S.A.*, [1984] 2 Lloyd's Rep. 84).

Secondly, the reasonable man forms his view "with no inside knowledge" (per Lord Justice Cross in *Hannam's* case at p. 949). In its context, that statement was directed at inside knowledge of the character of the persons who were accused of bias: see the judgment of Mr. Justice Mustill in *Bremer Handelsgesellschaft m.b.H. v. Ets Soules et Cie*, [1985] 1 Lloyd's Rep. 160, at p. 168. But the principle must, in my view, be wider than that, since the Court looks at appearances, "at the impression which would be given to other people" (per Lord Denning, M.R., in the *Metropolitan Properties* case at p. 599). While I respectfully agree with Mr. Justice Mustill that, in some circumstances, the Court may take into account an innocent explanation of facts which at first sight were suspicious, particularly when the challenge to an arbitrator is made before rather than after he has adjudicated, I do not think that this is always the case. Suppose that a reasonable man would have grounds for believing that the arbitrator was the majority shareholder in one of the parties; I do not see why it should not be established by evidence that the shareholder was not the arbitrator, but another person of the same name, or why the Court should not allow the reasonable man to revise his opinion with the benefit of that knowledge. By contrast, if an arbitrator is proved to have conferred with one of the parties about the dispute in circumstances

NEW YORK COUNTY CLERK 02/13/2023 06:12 PM
INDEX NO. 650839/2023
NYSCEF DOC. NO. 17
Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 161 of 221
RECEIVED NYSCEF: 02/13/2023

which appear improper, I do not think that the reasonable man's view should be revised by reference to subsequent evidence of what was in fact said. Given that there is a reasonable inference of impropriety in the first place, it would be wrong in my judgment that an application to remove the arbitrator should thereafter fail if the inference is displaced by inside knowledge which was not available to all at the time. Lord Hewart's famous observation is still the law. I am conscious that there must be a dividing line between the two examples that I have given, and a test to determine on which side of that line a particular case lies. With the greatest respect to what may have been the view of Mr. Justice Mustill, I cannot accept that the test is solely whether the application for relief is made before or after the arbitrator has adjudicated. But wherever else the test is to be found, it need not be determined on this motion: I am convinced that in the present case, so far as it concerns the conduct of Mr. Bridge in Court during the S.O.S. case, the view of the reasonable man ought not to be revised in the light of subsequent evidence which was not available to an observer at the time. It will be noted that, in considering another of Tracomin's complaints (the writing of Mr. Bridge's letter to Maitre Wanner) I have paid heed to Mr. Bridge's evidence that he did not know that the letter was going to be used as evidence in Switzerland. But I express no view as to whether it is right to take that evidence into account.

Before leaving that point, I would accept that the reasonable man must have some knowledge of the trade. Mr. Justice Mustill held that he must be put in the position of the complainant, having ascribed to him all the complainant's knowledge and experience of the trade, and the manner in which disputes are habitually resolved. I would be prepared if necessary to go further, and attribute to him all that is common knowledge in the trade even if not known to the complainant. But there is no reason to suppose that the point is of any importance in the present case.

Thirdly, there is some difference of view in the cases as to the precise degree of probability needed to found a charge of imputed bias. In the *Metropolitan Properties* case Lord Denning, M.R. (at p. 599) favoured real likelihood of bias, Lord Justice Danckwerts (at p. 602) reasonable doubt as to the chairman's impartiality. Lord Justice Edmund Davies (at p. 606) rejected real likelihood, and adopted, as a less stringent test, reasonable suspicion of bias. In *Hannam's* case Lord Justice Sachs (at pp. 941-942) preferred real danger to real likelihood. In *Ardahalian's* case (at p. 89) the Court of Appeal accepted real likelihood; but I do not think that there was any

contest as to the standard of probability in that case. Indeed, Lord Justice Ackner referred to the case of *R. v. Liverpool City Justices ex parte Topping*, [1983] 1 W.L.R. 119, where he himself had adopted reasonable suspicion as a test.

In many if not most cases it will make no difference which test is applied. That is so in the present case, and I am content to adopt real likelihood, which appears to lay the heaviest burden on the person alleging bias. But I do not, with great respect, share the view of Lord Justice Cross (in *Hannam's* case) and Lord Justice Ackner (in the *Liverpool City Justices* case) that there is little if any difference between the two tests. If it had been necessary to decide the point, I would have followed what was said by Lord Justice Edmund-Davies in the *Metropolitan Properties* case (1969) 1 Q.B., at p. 606:

> With profound respect to those who have propounded the "real likelihood" test, I take the view that the requirement that justice must manifestly be done operates with undiminished force in cases where bias is alleged and that any development of the law which appears to emasculate that requirement should be strongly resisted. That the different tests, even when applied to the same facts, may lead to different results is illustrated by *Reg. v. Barnsley Licensing Justices* itself, as Devlin L.J. made clear in the passage I have quoted. But I cannot bring myself to hold that a decision may properly be allowed to stand even although there is *reasonable* suspicion of bias on the part of one or more members of the adjudicating body.

*Conclusion*

In my judgment a reasonable man, acquainted with the practice at FOSFA, would conclude that there was a real likelihood of bias on the part of Mr. Bridge from the appearance of his conduct during the hearing of the S.O.S. case in this Court. That impression would not be dispelled, but rather slightly fortified, by the letter to Maitre Wanner, the reference to taking instructions from his principals, and the two occasions on which application was made to remove him. But it is on the appearance of Mr. Bridge's conduct during the S.O.S. case in this Court that my conclusion is founded.

Accordingly, I am prepared to make the order sought.

*[The parties later came to terms. No order was made because Mr. Bridge agreed to resign.]*

———————

High Seas Steamship (Pte) Ltd v Kirupamurthy and Another

*Overview*  |  **[1985] Lexis Citation 1064**

---

## *High Seas Steamship (Pte) Ltd v Kirupamurthy and Another [1985] Lexis Citation 1064*

QUEEN'S BENCH DIVISION

STAUGHTON J

29 MARCH 1985

29 March 1985

Stephen Males for the Plaintiffs; The First and Second Defendants did not appear and were not represented

Sinclair Roche & Temperley

**STAUGHTON J**

In this action the plaintiffs, High Seas Steamship (Pte) Ltd, are the owners of a vessel called the "HIGH SEA PRIDE" which was chartered to the first defendant (who trades under the business name "Newco Trading Company") for a voyage from Sri Lanka to Chittogong carrying a cargo of bagged salt. The charterparty was dated 20th June 1983. Disputes arose as to freight and demurrage; there is also some dispute as to disbursements at the loading port. The charterparty contains an arbitration clause which is in these terms:

"28. Any dispute arising from the charterparty or in regard to demurrage settlement etc shall be settled in accordance with the latest Arbitration Act in London, each party appointing an arbitrator and the two arbitrators, in the event of disagreement, appointing an umpire whose decision shall be final and binding upon both parties. The arbitrators shall be commercial men."

When these disputes arose the plaintiffs (the ship owners) appointed as arbitrator Mr Michael Mabbs of the City of London, and they called upon the first defendant to appoint an arbitrator. In response he appointed the second defendant, Mr KA Dalpatodu. It emerged that there was a dispute between the parties as to the meaning of the arbitration clause. The plaintiffs say that it means that the arbitration proceedings are to take place in London. The first defendant says that the arbitration is to be governed by the Arbitration Acts 1950 to 1979, which are part of the law prevailing in London (and indeed elsewhere in the United Kingdom), but not that the arbitration must necessarily take place in London. The first defendant says that the facts all happened in Sri Lanka and that the arbitration ought to take place there. Consequently he has appointed Mr Dalpatodu who is a resident in Sri Lanka. This has led to argument. The plaintiffs say that Mr Dalpatodu is an unsuitable arbitrator on that and other grounds and have threatened to appoint Mr Mabbs as sole arbitrator. The first defendant has threatened to appoint Mr Dalpatodu as sole arbitrator.

High Seas Steamship (Pte) Ltd v Kirupamurthy and Another [1985] Lexis Citation 1064

There is another aspect of the facts which I should mention. The evidence before me shows that Mr Dalpatodu is the father-in-law of the first defendant. There is also some evidence that he has a business connection with the first defendant in that a company with which he (Mr Dalpatodu) is connected was concerned with loading salt on board a ship which was chartered to the first defendant. It is also said that Mr Dalpatodu very probably has no experience as an arbitrator and that he is not to be found on the list maintained in Sri Lanka of people who practise as arbitrators.

The plaintiffs now apply to this court for relief under five heads in their originating summons, and I shall consider those one by one. First, they ask for a declaration that upon the true construction of a charterparty dated 20th June 1983, expressed to be made between the plaintiffs as owners and Newco Trading Company as charterers, the plaintiffs and the first defendant have agreed to refer disputes between them arising from the charterparty or in regard to demurrage settlement to arbitration in London. In my judgment the plaintiffs are entitled to that declaration. They are manifestly right in their interpretation of clause 28 of the charterparty. The suggestion that clause 28 refers to the law prevailing in London rather than the place where arbitration proceedings should be held seems to me plainly unfounded. So I am prepared to grant the declaration as sought in paragraph 1.

Paragraph 2 seks a declaration that the plaintiffs' claims against the first defendant in respect of freight demurrage and damages for detention under the said charterparty have been validly referred to arbitration in London pursuant to clause 28 thereof and that Mr Michael Mabbs of 27 Hambledon Hill, Epsom, Surrey, has been duly appointed by the plaintiffs as their arbitrator in the said arbitration. Well, it is perfectly true that Mr Mabbs has been duly appointed but I see no present need to give a declaration to that effect. If any further problems arise the matter can be brought back.

Thirdly, the plaintiffs seek a declaration that the first defendant's purported appointment of the second defendant as his arbitrator in the said arbitration is invalid and of no effect and that the second defendant has no jurisdiction in respect of any dispute between the plaintiffs and the first defendant. The ground upon which it is sought to support that claim is that one might take the view that Mr Dalpatodu was appointed to arbitrate only in Colombo; and as the clause provides for arbitration in London, then it could be said that the appointment was a nullity. I do not so read the letter appointing Mr Dalpatodu. It seems to me that he was appointed by the first defendant as arbitrator full stop. It was, it is true, contemplated that the arbitration would take place in Colombo; but I do not see that that was a condition of his appointment. So I would not grant the declaration claimed in paragraph 3 as such.

Paragraph 4 seeks an order that the second defendant be removed on the ground that he is not or may not be impartial and that Mr Michael Mabbs be appointed as sole arbitrator in the reference. It seems to me plain that Mr Dalpatodu is not a suitable person to be arbitrator in these disputes. I say that because of the evidence that he has a family connection with the first defendant. It is not necessary that I should find, and I do not find, that there is actual lack of partiality or actual bias. It is sufficient that a reasonable observer of the situation would conclude that there was a real possibility of bias: see Tracomin v Nathaniel Gibbs (unreported) and Bremer Handelsgesellschaft MBH v Ets Soules et Cie and Anthony G Scott [1985] 1 Lloyd's Rep 160 per Mustill J at p 164.

Mr Males for the plaintiffs has referred me to Burkett Sharp & Co v Eastcheap Dried Fruit Co & Another [1962] 1 Lloyd's Rep 267 where an arbitrator was declared to be unsuitable because he, in effect, managed the business of one of the parties. That is not the same as this case but it is another example of a case where an arbitrator, because of his link with one of the parties, ought not to act. That means that I have power to remove Mr Dalpatodu under section 23(1) of the Arbitration Act 1950, which provides that

High Seas Steamship (Pte) Ltd v Kirupamurthy and Another [1985] Lexis Citation 1064

where an arbitrator or umpire has misconducted himself or the proceedings the High Court may remove him. Misconduct, as I explained in Tracomin v Nathaniel Gibbs (unreported) is not by any means an appropriate word in its ordinary sense. Misconduct in this case is in accepting appointment as arbitrator or remaining in office when a reasonable observer would conclude that there was a risk of bias.

Mr Males sought to put forward an alternative ground for the removal of Mr Dalpatodu, that is to say, that he has no previous experience as an arbitrator and therefore is not suitable. It is true that Mustill J in Bremer Handelsgesellschaft MBH v Ets Soules et Cie and Anthony G Scott [1985] Lloyd's Rep 160 at p 164 did consider that an arbitrator might be removed if he is, through lack of talent, experience or diligence, incapable of conducting the reference in a manner which the parties are entitled to expect. No authority other than that passage was cited by Mr Males, and I myself cannot recall a case where an arbitrator has been removed on that ground. Nevertheless I would agree with the view of Mustill J that if an arbitrator is incapable of conducting the reference he ought to be removed. I would not however have removed Mr Dalpatodu on that ground in this case, merely because he has never been an arbitrator before -- otherwise, it seems to me, nobody would ever be qualified to act as an arbitrator for the first time. Something more in the way of incompetence or inexperience or lack of diligence must be shown before an order can be obtained on that ground. However, on the ground of imputed bias I make an order that Mr Dalpatodu be removed as arbitrator.

Paragraph 4 of the originating summons also asks for an order that Mr Mabbs be appointed sole arbitrator. I do not have power to do that. The plaintiffs may call upon the first defendant to appoint a new arbitrator within seven days and, if he fails to do so, may exercise their remedy under the Arbitration Act 1950, s 7. Alternatively the power which I could exercise is to be found in the Arbitration Act 1950, s 25(1), that is, to appoint some person in place of Mr Dalpatodu. However, that has not as yet been requested in the originating summons and I would not think it right to make such an order with the defendants not here, unless notice had been given to them that application was to be made to that effect. What I will do is give leave to amend the originating summons by adding an application that the court appoint an arbitrator in place of Mr Dalpatodu under the Arbitration Act 1950, s 25(1); and I will adjourn the rest of the action so that that application may in due course come before me. If by the time it does come before me the first defendant has appointed a suitable person as arbitrator, then I shall have to consider whether that appointment should stand or whether I should nevertheless make an appointment under s 25(1).

Finally, in paragraph 5 of the originating summons, application is made for an injunction to restrain the first defendant from taking any step to commence or proceed with arbitration proceedings against the plaintiffs in respect of any dispute arising from the said charterparty or with regard to settlement of demurrage thereunder otherwise than in London and, in particular, to restrain the first defendant as aforesaid from taking any step to proceed with the arbitration purportedly commenced by him in Colombo before the second defendant. Presently there is no sign that the first defendant is going to take any such step. In May of 1984 there was a threat to appoint Mr Dalpatodu as sole arbitrator, but nothing has happened about that since. I do not presently have any reason to believe that either the first or the second defendant will disregard what I have said and ordered in this judgment. But I give liberty to apply if matters should change, and application can in circumstances of urgency even be made ex parte.

So, I grant a declaration in terms of paragraph 1 of the originating summons; I grant an order that the second defendant be removed as arbitrator; I give leave to amend the summons by adding a claim that the court appoint an arbitrator in place of Mr Dalpatodu under the Arbitration Act 1950, s 25(1); I adjourn the further hearing of the summons in relation to that application; and I give liberty to apply.

High Seas Steamship (Pte) Ltd v Kirupamurthy and Another [1985] Lexis Citation 1064

Declaration sought granted, second Defendant removed as arbitrator, leave given to amend summons. Further hearing adjourned. First Defendant to pay Plaintiffs' costs.

---

**End of Document**

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 166 of 221

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | | |
|---|---|---|
| In the Matter of the Application of | ) | Index No. _____/_____ |
| | ) | |
| ENDURANCE SPECIALTY INSURANCE | ) | |
| LIMITED, | ) | |
|        Petitioner | ) | |
| | ) | |
|     - and - | ) | |
| | ) | |
| HORSESHOE RE LIMITED, on behalf of and | ) | |
| for the benefit of its Separate Accounts HS0083 | ) | |
| and HS0084, | ) | |
| | ) | |
|        Respondents. | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## ENDURANCE'S PETITION TO REPLACE ARBITRATOR

Endurance respectfully submits this memorandum of law, together with the affirmation of David A. Attisani ("Attisani Aff."), in support of Endurance's Verified Petition to replace Bernard Eder as the third arbitrator (or "Umpire") in Endurance's arbitration against "Horseshoe" -- an agent of Hudson Structured Capital Management Ltd., a hedge fund that is the real financial party in interest.

## I.    **PRELIMINARY STATEMENT.**

If Bernard Eder is permitted to "serve" as chair of this tribunal, there is no doubt that Horseshoe/Hudson will win and Endurance will lose.  Bias not only portends -- but also ensures -- results, and this case is no exception.

Endurance and Horseshoe consummated two reinsurance contracts, which became effective on January 1, 2020 (the "Contracts").[1]  Endurance and Horseshoe are also parties to an

---

[1]    "Reinsurance" is insurance purchased by insurance companies.

11226298v1

arbitration concerning the question whether Horseshoe must honor the reinsurance coverage it wrote with respect to Endurance's COVID-19 pandemic losses.

The Contracts contain dispute resolution clauses providing for a three-person arbitration panel. Each party is required to name an arbitrator, and the two party-appointed arbitrators must then attempt to select an Umpire. If the party-appointed arbitrators cannot agree on a *qualified* Umpire, the Contracts provide that the Secretary General of the Court of Arbitration of the International Chamber of Commerce ("ICC") will appoint a *qualified* Umpire. The Contracts expressly require that any Umpire be *"completely impartial."*

Endurance seeks relief from this Court to remedy the ICC's improvident appointment of an unqualified umpire candidate, Bernard Eder, who is not and cannot possibly be "completely impartial". There are two independently dispositive reasons why Eder cannot serve here as an impartial arbitrator, let alone chair of this tribunal.

<u>First</u>, ICC itself impermissibly made prejudicial disclosures to Eder during the panel selection process. For reasons that remain a mystery, ICC revealed the parties' correspondence in which Horseshoe/Hudson aggressively advocated for appointment of someone with Eder's precise and unique background -- a London-based "Queens Counsel" with "Bermuda Form" arbitration experience -- and Endurance repeatedly and aggressively objected. Stated in a different way, the ICC (through its representative Paul DiPietro) expressly informed Eder that Horseshoe advocated for his appointment and Endurance opposed it over and over again.

<u>Second</u>, Eder has a complicated and unfortunate history with Endurance's counsel at Choate, including and especially its lead counsel, David Attisani, which (at a minimum) gives rise to the appearance of bias. As explained below, Choate/Attisani recently served as counsel in a separate arbitration where: (1) serious questions arose concerning whether Eder had engaged in

2

unauthorized, *ex parte* communications with a party, and Attisani questioned him about the circumstances of that potential ethical violation; and (2) Attisani obtained a ruling from another arbitration panel in a contemporaneous proceeding, which overruled Eder, terminated his service as umpire, and deprived him of significant fees in the process. Eder somehow omitted to disclose *all* of those facts to the parties to this dispute or to the ICC during the panel appointment process.

Since being "reminded" of these facts and deprived of the further opportunity to conceal them, Eder has lobbied to retain this appointment over Endurance's serial objections, and Horseshoe/Hudson have argued against ICC's appointment of any unbiased, replacement umpire. Notwithstanding the bias pervading his provisional appointment, Eder is clamoring to confirm it; and, Horseshoe/Hudson is (for obvious reasons) salivating to present its case to him.

No reasonable person can conclude that Eder could serve as a "*completely impartial*" chair of this arbitration panel. Endurance accordingly requests that the Court remove Eder and replace him with a qualified and "*completely impartial*" Umpire from the attached list (*see* Addendum A), ICC's list, or some other neutral repository of qualified umpire candidates. In the alternative, the Court should issue an order removing Eder, and instructing the ICC to name a "*completely impartial*" replacement Umpire, as expressly required by the parties' bargained-for Contracts.

## II.   **BACKGROUND.**

### A.   **The Arbitration.**

The underlying arbitration addresses the question whether Horseshoe/Hudson are obliged to honor their Contracts. Horseshoe/Hudson are attempting to evade their responsibilities by arguing that the Contracts they sold do not provide reinsurance coverage with respect to Endurance's COVID-19 losses.

The Contracts contain identical arbitration provisions. *See* <u>Ex. 1</u>[2], p. 21-22; <u>Ex. 2</u>, p. 20-21.[3]  Among other provisions, the Contracts require:

> [T]he arbitration tribunal shall consist of persons who are active or retired lawyers with not less than ten (10) years' experience in insurance or reinsurance law or active or retired officers of insurance or reinsurance companies, and **will not have a personal** or financial **interest** in the parties or the outcome of the arbitration. For the avoidance of doubt, the arbitrators will be **completely impartial and disinterested** in their respective appointing parties and in the result of the arbitration.

*Id.* (emphasis added).  On February 1, 2022, Endurance demanded arbitration (<u>Ex. 3</u>) and, on March 3, 2022, in an apparent effort to create an ersatz parity of grievance, Horseshoe/Hudson counter-demanded arbitration (<u>Ex. 4</u>).  The parties agreed to consolidate their disputes into a single arbitration.  Each party appointed an arbitrator, but the arbitrators could not agree on a "*completely impartial*" Umpire.

### B. Horseshoe/Hudson Demanded That ICC Appoint A London-Based QC As Umpire Over Endurance's Objections, Even Though The Contracts Impose No "QC Requirement".

On June 29, 2022, Horseshoe applied to the ICC for appointment of an umpire. <u>Ex. 5</u>. Horseshoe's application repeatedly requested appointment of a London-based Queen's Counsel ("QC") with experience in "Bermuda Form" arbitrations.  *Id.* at 10-11. Now known as King's Counsel ("KC") due to the death of Queen Elizabeth II, QC's/KC's represent a small coterie of U.K. lawyers upon whom the Monarch has conferred the title. *See generally* Karen Sloan, *'Queen's Counsel' No More, 'King's Counsel' Return To UK Courts After 70 Years*, Reuters (Sept. 15, 2022, 2:53 PM).  "Bermuda Form" arbitrations represent a niche proceeding arising from a particular type of insurance policy contract, which is *not* at issue here.  In other words, the

---

[2]    All Exhibits are attached to the accompanying Affirmation of David A. Attisani.
[3]    The Court may observe reference to "Tiger Risk Partners" on the face of the Contracts.  Tiger Risk served as reinsurance broker.

community of QC/KC's who practice in Bermuda Form arbitrations is a relatively small one inured to a common set of legal and cultural mores, and the parties' Contracts do *not* invoke them.

On July 7, 2022 and July 25, 2022, Endurance responded to Horseshoe's ICC application and vehemently objected to Horseshoe's unusually-specific demand for a London-based QC with Bermuda Form experience. *See* Exs. 6-7. Among other objections, Endurance asked the ICC to consider the conspicuous absence of any QC or "Bermuda Form" requirements from the parties' bargained for Contracts. Ex. 7 at 4. Endurance further emphasized that an underwriting professional would be well-qualified to resolve the pending dispute, while a QC would amount to an exceptionally poor fit and likely would favor Horseshoe/Hudson. Ex. 7 at 3, 7-9.[4]

In that connection, Endurance expressed concern that Horseshoe/Hudson harbored improper motives for vigorously demanding a QC when none was required. Ex. 7 at 5. In fact, Horseshoe/Hudson's counsel emphatically advertises its experience in "Bermuda Form" arbitrations. *See id*. (citing *Insurance & Reinsurance Disputes*, Chaffetz Lindsey, https://www.chaffetzlindsey.com/our-practice/insurance-reinsurance-disputes/.). As there are only a limited number of London-based QC's who handle Bermuda Form arbitrations, Endurance understood that Horseshoe sought to shrink the global pool of otherwise qualified arbitrators in an effort to seat a friendly face in the umpire's chair. *Id.* at 4-5. Rather than bless Horseshoe/Hudson's tactics, Endurance requested that ICC appoint a true neutral -- an industry-member umpire hailing from Australia, Canada, India, Ireland, Malaysia, New Zealand, the Philippines, or Singapore -- as required by the parties' Contracts mandating *"complete[] impartial[ity]." Id.* at 4-5.

---

[4]     A reinsurance underwriting professional -- or a lawyer with reinsurance company background -- would best serve the parties here, because the issue in dispute requires interpretation of a reinsurance contract term.

5

### C.    The ICC Appointed Bernard Eder, A London-Based QC, As Umpire, And Immediately Disclosed To Eder That Horseshoe/Hudson Supported -- And Endurance Vehemently Opposed -- His Appointment.

On October 6, 2022, the ICC named Eder, a London-based QC with "Bermuda Form" arbitration experience, as Umpire, just as Horseshoe/Hudson had requested over Endurance's objections. *See* <u>Ex. 8</u>. While notifying Eder of his selection by ICC, the ICC -- in the person of Paul DiPietro -- made a prejudicial disclosure to Eder by forwarding: (1) Horseshoe's application to the ICC expressly requesting appointment of a London-based QC with Bermuda Form experience (<u>Ex. 5</u>); and, (2) Endurance's July 25, 2022 response vigorously and repeatedly objecting to the appointment of a London-based QC with Bermuda Form experience -- just like Eder (<u>Ex. 7</u>).[5]

In other words, the ICC advised Eder -- who was already known to Endurance's counsel at Choate -- that Endurance had vehemently resisted his appointment and that Horseshoe/Hudson enthusiastically supported it.[6]

### D.    Eder's Exceptionally Adversarial History With Endurance's Lead Counsel.

Unfortunately for Endurance, Eder has recent prior experience with Endurance's counsel, Choate/David Attisani.  In late 2020, Eder served as Umpire in an arbitration involving parties other than Endurance and Horseshoe, where Choate/Attisani served as lead counsel for one party.

---

[5]    We have specified Mr. DiPietro's involvement *per se*, because he signed the ICC Court's "reasoned" rejection of Endurance's ICC challenge to Eder's service on February 9.  *See* <u>Ex. 11</u>.  In other words, Mr. DiPietro -- who is in material part directly responsible for the prejudice surrounding Eder's appointment -- absolved himself from advising Eder of the parties' arguments for and against Eder's appointment.  No court or other respectable tribunal would permit the individual at the epicenter of a bias challenge to decide whether disabling bias supported that challenge.  The ICC Court's parochial mishandling of this problem is both remarkable and unacceptable.

[6]    For the avoidance of any doubt, that kind of disclosure is both anomalous at reinsurance arbitration and outrageous. *Attisani Aff.*, ¶ 11.

*Attisani Aff.*, ¶ 13.[7]  That arbitration spawned two unusual incidents giving rise to antipathy between Eder and Choate/Attisani.

First, during the umpire selection process in the earlier reinsurance arbitration, opposing counsel disclosed that he had engaged in *ex parte* contacts with unnamed potential umpires for the purpose of assessing their potential availability for service and interest in serving.  *Attisani Aff.*, ¶ 15.  Following Eder's appointment, Choate/Attisani was constrained to ask Eder whether he was one of the potential umpires who had engaged in *ex parte* contacts.  *Id.*  Eder replied that he had not done so. *Id.*  Regardless of Eder's response, Choate/Attisani had asked him directly whether he perpetrated an ethical violation – an indelible fact that cannot be ignored.

The second incident arose when Choate/Attisani's client in that dispute opted to pursue its contractual right to consolidate the subjection arbitration then pending before Eder into a parallel U.S. arbitration.  *Attisani Aff.*, ¶ 17.  Choate/Attisani ultimately persuaded the U.S.-based panel to order consolidation of the then-pending arbitrations into the U.S. arbitration, which had the effect of terminating Eder's role and employment as Umpire, undermining his authority, and depriving him of expected fees.  *Id.*  Prior to his elimination by consolidation, Eder issued rulings that placed the Attisani/Choate client at a disadvantage, including his establishment of deadlines that favored the opposing hedge fund client located in the U.K. to the palpable disadvantage to (and over the objections of) the Attisani/Choate client.  *Attisani Aff.*, ¶ 16.

---

6    Although Endurance's counsel cannot disclose the names of the parties to that matter due to a confidentiality agreement, it bears emphasize that Choate/Attisani were opposed to a hedge fund very much like Hudson, and that Eder's preliminary rulings favored that party.  *Attisani Aff.*, ¶¶ 12, 16.

E.     **The ICC Hastily Rejected Endurance's Challenge To Eder.**

On October 28, 2022, only 22 days after his selection by ICC over Endurance's objections to a Bermuda Form QC, Endurance requested that ICC replace Eder.  In response, Horseshoe/Hudson repeatedly urged the ICC to leave Eder in place at all costs.  On October 31 and November 19, 2022, to Endurance's surprise and dismay, Eder emailed the parties and ICC, in order to argue that the ICC should reject Endurance's challenge so that he could retain the engagement over Endurance's objections.  Exs. 9-10.

On January 26, 2022, ICC declined to remove Eder.  On February, 9, 2023, the ICC issued its exiguous "reasons" for declining to remove Eder.  Ex. 11.  On virtually no reasoning or authority, the ICC -- *i.e.,* Mr. DiPietro, who undeniably and inappropriately disclosed Endurance's objections to Eder's service directly to Eder (*supra* at n. 2) -- declared that the underlying facts did not give rise to any risk or appearance of bias.  It was "*a lick and a promise*" attempt to absolve ICC/DiPietro for informing Eder of the parties' divergent positions concerning his possible appointment.

Two non-exclusive examples illustrate the ICC's/DiPietro's hasty, unmoored, and self-serving conclusion.  First, according to DiPietro: "The facts alleged by Responding Party do not reach *the level of enmity or animosity* and are not otherwise so serious so as to suggest a risk that Sir Bernard lacks impartiality".  Ex. 11 at para. 17 (emphasis added).  In other words, ICC/DiPietro concocted a previously unarticulated, unspecified, and subjective standard of *"enmity or animosity"* that finds no basis in the parties' Contracts, the ICC rules, or at law, and absolved themselves and Eder of all bias or error with a few strokes of the pen.  Needless to say, Endurance cannot afford to accept that self-serving result, which has no basis in Bermuda or New York law.

Second, ICC/DiPietro declared that Eder's concealment of his prior reinsurance arbitration involvement with Choate/Attisani "is *not sufficiently aggravating* to tip the scales on the outcome of the challenge". Ex. 11 at para. 20 (emphasis added).  But the relevant standard is not whether an Umpire candidate's refusals to disclose are "sufficiently aggravating"; *any* indication of concealment or bias requires removal of an Umpire candidate who is not "*completely impartial*", or who may give the "*appearance of bias*", or who might pose that *"real danger"*.  Otherwise stated, the ICC/DiPietro's decision in this regard is contrary to the Contract requirements governing appointment of arbitrators, the ICC rules, and applicable law -- and it stands only as a failed means of absolving the ICC and DiPietro for their mishandling of the tribunal selection process.

Left with no alternative but a certain loss at arbitration, Endurance now seeks the Court's assistance to remove Eder and replace him with a "*completely impartial*" Umpire, as required by the parties' Contracts.

## III.   ARGUMENT.

### A.   Bermuda Law Authorizes This Court To Remove An Arbitrator Before A Final Award Is Issued.

The parties' Contracts provide that the Bermuda Arbitration Act of 1986 governs arbitral procedure.  *See* Ex. 1, p. 21-22; Ex. 2, p. 20-21 (the "arbitration shall be conducted under, and the arbitration tribunal shall be governed by, the provisions of the Bermuda Arbitration Act [of] 1986", and that "the arbitration tribunal shall apply the laws of the state of New York as the proper law of this Reinsurance Contract").

According to the Bermuda Arbitration Act of 1986: "Where an arbitrator or umpire has misconducted himself or the proceedings, the Court may remove him." *Bermuda Arbitration Act*

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 175 of 221

*of 1986 Sec. 34*. The plain wording accordingly empowers the Court to remove an arbitrator who is not *"completely impartial"* but nonetheless declines to recuse himself.

Reported Bermuda case law interpreting the 1986 Act is sparse, and it has not addressed arbitrator challenges. But, Bermuda modelled the 1986 Act after the UK Arbitration Acts of 1950 and 1979, and the associated English law authorities confirm that courts should remove biased arbitrators prior to issuance of any arbitration award. *See, e.g.,* Jan W. Woloniecki & Shannon Dyer, *Arbitration procedures and practice in Bermuda: Overview*, ASW Law Limited ("The 1986 Act… is based on the UK Arbitration Acts 1950 to 1979"); *Tracomin S.A. v. Gibbs Nathaniel (Canada) Ltd. and George Bridge*, 1 Lloyd's Rep. 586 [1985] (finding that there was "a real likelihood of bias" and indicating that the court would remove the arbitrator pre-award if he did not resign); *High Seas Steamship (Pte) Ltd v. Kirupamurthy and Another*, EWHC (QC) Lexis Citation 1064 [1985] (ordering an arbitrator's removal pre-award after finding there was "a real possibility of bias").

New York law expressly directs New York courts to appoint an arbitrator, if "the agreed method [to appoint an arbitrator] fails or for any reason is not followed". N.Y. C.P.L.R. § 7504 ("If the arbitration agreement does not provide for a method of appointment of an arbitrator, or if the agreed method fails or for any reason is not followed, or if an arbitrator fails to act and his successor has not been appointed, the court, on application of a party, shall appoint an arbitrator."). Here, the contractually agreed method to appoint an Umpire failed, because the ICC did not appoint a *"completely impartial"* arbitrator.

Under New York law, courts should replace a partial arbitrator before an award can be issued. *See, e.g., Huntsman Int'l, LLC v. Albemarle Corp.*, 2021 NY Slip Op 31073(U) (Sup. Ct.) ("New York courts have inherent power to disqualify an arbitrator before an award has been

rendered. Indeed, where a party to an arbitration proceeding becomes aware of the . . . probable partiality of an arbitrator, there would appear to be no reason why the court should not exercise its equitable jurisdiction on the application of the party at any time during the proceeding, rather than require the party to wait for the award, and then move to vacate") (quotations omitted).

**B. Eder Does Not Satisfy The Bargained For And Controlling Standards: The Umpire Must Be "*Completely Impartial*" And Free From Any "*Appearance*" Of Bias.**

The parties' reinsurance Contracts require the Umpire to be *"completely impartial"*. <u>Exs. 1-2</u>, p. 21. Bermuda law (which governs arbitration procedure here) and New York (which supplies the controlling substantive law under the Contracts) apply kindred standards of impartiality. Under Bermuda law, an arbitrator should be removed if "there is a *real danger* of bias". *Raydon Underwriting Mgmt. Co. v. Stockholm Re (Bermuda) Ltd. ((in Liquidation))* 1998 Civil Jur. No. 23 (emphasis added). In New York, an "arbitrator's partiality may be established by an actual bias or *the appearance* of bias." *David v. Byron*, 14 N.Y.S.3d 91, 93 (N.Y. App. Div. 2015) (emphasis added); *Rabinowitz v. Olewski*, 473 N.Y.S.2d 232, 234 (N.Y. App. Div. 1984) ("The proper standard of review for the disqualification of arbitrators is whether the arbitration process is free of the appearance of bias").

As a result, the Umpire here must be "*completely impartial*" and free from any "*appearance*" of bias, and any candidate who poses a "*real danger*" of bias must be removed forthwith. Under that standard, Eder cannot remain in place for at least two independently dispositive reasons.

1.    **Because ICC Advised Eder That Horseshoe/Hudson Supported His Appointment And Endurance Vigorously Opposed It, Eder Is Not "*Completely Impartial*" Or Free From Any "*Appearance*" Of Bias, And His Appointment Epitomizes The "*Real Danger*" Of Bias.**

By supplying Horseshoe's Application (Ex. 5) and Endurance's Response (Ex. 7) to Eder -- in derogation of the ethical standards that have governed global reinsurance arbitration for the past half-Century -- the ICC (in the person of Paul DiPietro) expressly informed Eder that Horseshoe/Hudson had requested his appointment as Umpire and that Endurance aggressively and repeatedly objected to it. *See, e.g., Nat'l Indem. Co. v. IRB Brasil Resseguros S.A.*, 164 F. Supp. 3d 457, 483 (S.D.N.Y. 2016) (when assessing potential bias, the Court examined whether the umpire "knew which party nominated him as an umpire candidate"); *see also* ARIAS-US Code of Conduct, Canon I, Comment 3(e) ("There are certain circumstances where a candidate for appointment as an arbitrator must refuse to serve… where the candidate is nominated for the role of umpire and the candidate was contacted prior to nomination by a party, its counsel or the party's appointed arbitrator with respect to the matter for which the candidate is nominated as umpire").

As an example, in one of the submissions transmitted by ICC directly to Eder, Horseshoe requested "that an English QC with insurance law experience should be appointed chair". Ex. 5, p. 11. *E.g., Amerisure Mut. Ins. Co. v. Everest Reinsurance Co.,* 109 F. Supp. 3d 969, 989 (E.D. Mich. 2015) (when assessing potential bias, the Court examined whether an Umpire "knew which party nominated him as the umpire" or "how he was ultimately selected to serve in that capacity"); *Zepeda v. Home Delivery Logistics*, 2018 Cal. Super. LEXIS 66504, *14 (directing the parties to create a list of potential arbitrators that "should not identify which party nominated which proposed arbitrator").

The ICC also forwarded to Eder a submission in which Endurance emphasized: "Endurance maintains a robust objection to Horseshoe's request that the ICC Court appoint a

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 178 of 221

London-based QC with experience conducting "Bermuda Form" arbitrations… [W]e are familiar with the employment of Queen's Counsel on international arbitration tribunals; Endurance did not bargain for one in its Contract; and, we do not wish to submit our case to one." Ex. 7, p. 4. *See also id.*, p. 4 ("It requires little imagination to conclude that Horseshoe advanced this unusually specific request, because they believe that a QC would inure to their advantage"); p. 6 ("English QCs represent only a tiny slice of the arbitration community qualified for service according to the Parties' Contracts, and the ICC Court should be loath to indulge one party's demand to narrow the repository of otherwise available candidates accordingly."). In other words, Eder knew which party wanted him; and which one most certainly did not.

The bell cannot be un-rung. No reasonable person could possibly conclude that Eder is *"completely impartial;* or free from "*the appearance of bias";* or that his appointment does not pose a "*real danger"* of bias. By disclosing to Eder the parties' unusually strong predilections during the Umpire selection process -- including the dim view Endurance took of QC's with Bermuda Form experience under Contracts containing neither criterion -- the ICC irrevocably tainted this proceeding, including and especially Eder's candidacy.

The *Coty* case is instructive here. *See Coty Inc. v. Anchor Constr., Inc.*, 776 N.Y.S.2d 795 (N.Y. App. Div. 2004) (affirming 2003 NY Slip Op 50013(U), ¶ 13 (N.Y. Sup. Ct.)). In *Coty*, the Supreme Court for New York County vacated an arbitration award because an American Arbitration Association (AAA) case administrator informed the arbitrators that one party had paid the arbitrator's fees and that the other party was unable to do so. This case, and the New York decisions it cites, stand for the common-sense proposition that an arbitrator should be removed if the appointer's communication to him tips the playing field in favor of one party. *See also Catalyst Waste-to-Energy Corp. v. Long Beach*, 164 A.D.2d 817, 820, 560 N.Y.S.2d 22, 24 (App. Div. 1st

Dept. 1990) (finding an appearance of impropriety where AAA informed arbitrators that one party was willing to pay arbitrators' increased fee and the other party objected).

That is precisely what happened here when the ICC expressly told Eder that Horseshoe/Hudson had demanded his ilk, and that Endurance wished to avoid it at all costs.

### 2. Eder Is Nowhere Close To *"Completely Impartial"* Or Free From Any *"Appearance Of Bias"* In Light Of His Behavior And Experience In An Earlier Arbitration.

As noted above, Eder's recent interactions with Endurance's counsel, Choate/Attisani, would lead any reasonable observer to conclude that Eder cannot be *"completely impartial"* here -- even though (or, perhaps, especially since) he has argued to the contrary. Attisani recently questioned Eder about his possible perpetration of an ethical violation. Attisani then procured, in the face of Eder's contrary order, a consolidation order from a different arbitration panel which terminated Eder's service as arbitrator in a significant case and deprived him accordingly of his fees thereafter. *Attisani Aff.*, ¶ 17. Prior to the extinguishment of the matter he administered, Eder issued procedural rulings over the Attisani/Choate client's objection which favored the other side's hedge fund client. *Attisani Aff.*, ¶ 18.

Eder's bias is further evinced by his omissions to disclose his prior interactions with Attisani/Choate and by his lobbying for his own appointment as Umpire. An arbitrator who is actually neutral and free of bias would have made complete and accurate disclosures and, when questions concerning his potential bias arose, would have permitted the ICC decision-makers to decide them absent his influence or self-advocacy. Against that backdrop, and considering the companion force of the ICC's unusual and indelible disclosures to Eder, no reasonable person can conclude that Eder is *"completely impartial"* toward Choate's client or free from *"the appearance*

14

*of bias*".  To the contrary, this would-be arbitration panel is now saturated with bias, and no future trier of fact could possibly accept its award as fair or legitimate.

For the avoidance of doubt, Endurance acknowledges that Eder is an experienced jurist who may well handle other disputes without *ad hominem* considerations or other bias.  However, given the ICC's improvident disclosures and the unusual facts reflecting uncommon antipathy -- and the companion deprivation of plainly wished-for compensation -- in the earlier arbitration involving Endurance's counsel, it would be impossible for Eder (or any other arbitrator in similar circumstances) to remain "*completely impartial*" and free from "*the appearance of bias*" here. Eder should therefore be removed as Umpire.


## IV.    REQUESTED RELIEF.

Endurance respectfully requests that the Court enter an order: (1) staying the arbitration until the Court rules on Endurance's Verified Petition; and, (2) removing Eder and naming a replacement Umpire who is qualified and "*completely impartial*", as required by the parties' Contracts.  Horseshoe/Hudson will not be prejudiced in any way, because the arbitration can then proceed under supervision of a fair and neutral arbitration panel.  Most fundamentally, Endurance is entitled -- under its Contracts and otherwise -- to an arbitration panel whose fairness is above reproach.  Eder cannot possibly confer that bargained-for benefit on these parties.

Respectfully submitted,

David A. Attisani
CHOATE, HALL & STEWART LLP
2 International Place
Boston, MA 02110
(617) 248-5000
dattisani@choate.com

Melissa R. Ginsberg
BRAUNHAGEY & BORDEN LLP
118 W 22nd Street, 12th Floor
New York, NY 10011
(646) 829-9403
ginsberg@braunhagey.com

Dated:    February 13, 2023

16

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 182 of 221

**ADDENDUM A – List Of Qualified Reinsurance Umpire Candidates**

- Elaine Caprio  [Profile - ARIAS•U.S. - ARIAS•U.S. (arias-us.org)]

- Louis Daviault  [cp-nomination-louis-daviault.pdf (aigassurance.fr)]

- Gunbritt Kammerer [Gunbritt Kammerer-Galahn - Taylor Wessing]

- Jacek Kugacz  [Polish Reinsurance Company – Management Board]

- W. Mark Wigmore   [Profile - ARIAS•U.S. - ARIAS•U.S. (arias-us.org)]

## CERTIFICATION OF WORD COUNT

I, David A. Attisani, hereby certify that the word count of this Memorandum of Law complies with the word limits of 22 N.Y.C.R.R. § 202.8-b and Commercial Division Rule 17. According to the word-processing system used to prepare this affidavit, the total word count for all printed text exclusive of the material omitted under 22 N.Y.C.R.R. § 202.8-b(b) and Commercial Division Rule 17 is 4,299 words.

Respectfully submitted,

David A. Attisani
CHOATE, HALL & STEWART LLP
2 International Place
Boston, MA 02110
(617) 248-5000
dattisani@choate.com

*Counsel for Petitioner*
*Endurance Specialty Insurance Limited*

Dated: February 13, 2023
        Boston, Massachusetts

18



UCS-840
(rev. 02/01/2022)

# REQUEST FOR JUDICIAL INTERVENTION

### Supreme COURT, COUNTY OF New York

Index No: _____    Date Index Issued: _____

| **CAPTION** Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet. | **For Court Use Only:** |
|---|---|
| Endurance Specialty Insurance Limited<br><br><br><br>Plaintiff(s)/Petitioner(s)<br>-against-<br><br>Horseshoe Re Limited, on behalf of and for the benefit of its Separate Accounts HS0083 and HS0084<br><br><br>Defendant(s)/Respondent(s) | **IAS Entry Date**<br><br>**Judge Assigned**<br><br>**RJI Filed Date** |

**NATURE OF ACTION OR PROCEEDING:**    Check only one box and specify where indicated.

| **COMMERCIAL** | **MATRIMONIAL** |
|---|---|
| ☐ Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)<br>☐ Contract<br>☐ Insurance (where insurance company is a party, except arbitration)<br>☐ UCC (includes sales and negotiable instruments)<br>☐ Other Commercial (specify): _____<br>**NOTE:** For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the **COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C)**. | ☐ Contested<br>    **NOTE:** If there are children under the age of 18, complete and attach the **MATRIMONIAL RJI Addendum (UCS-840M)**.<br>    For Uncontested Matrimonial actions, use the Uncontested Divorce RJI (**UD-13**). |
| **TORTS** | **REAL PROPERTY** Specify how many properties the application includes: _____ |
| ☐ Adult Survivors Act<br>☐ Asbestos<br>☐ Environmental (specify): _____<br>☐ Medical, Dental or Podiatric Malpractice<br>☐ Motor Vehicle<br>☐ Products Liability (specify): _____<br>☐ Other Negligence (specify): _____<br>☐ Other Professional Malpractice (specify): _____<br>☐ Other Tort (specify): _____ | ☐ Condemnation<br>☐ Mortgage Foreclosure (specify):  ☐ Residential    ☐ Commercial<br>Property Address: _____<br>    **NOTE:** For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the **FORECLOSURE RJI ADDENDUM (UCS-840F)**.<br>☐ Partition<br>    **NOTE:** Complete and attach the **PARTITION RJI ADDENDUM (UCS-840P)**.<br>☐ Tax Certiorari (specify):   Section: _____ Block: _____ Lot: _____<br>☐ Tax Foreclosure<br>☐ Other Real Property (specify): _____ |
| **SPECIAL PROCEEDINGS** | **OTHER MATTERS** |
| ☐ Child-Parent Security Act (specify): ☐ Assisted Reproduction ☐ Surrogacy Agreement<br>☒ CPLR Article 75 - Arbitration    [see **NOTE** in **COMMERCIAL** section]<br>☐ CPLR Article 78 - Proceeding against a Body or Officer<br>☐ Election Law<br>☐ Extreme Risk Protection Order<br>☐ MHL Article 9.60 - Kendra's Law<br>☐ MHL Article 10 - Sex Offender Confinement (specify):    ☐ Initial    ☐ Review<br>☐ MHL Article 81 (Guardianship)<br>☐ Other Mental Hygiene (specify): _____<br>☐ Other Special Proceeding (specify): _____ | ☐ Certificate of Incorporation/Dissolution    [see **NOTE** in **COMMERCIAL** section]<br>☐ Emergency Medical Treatment<br>☐ Habeas Corpus<br>☐ Local Court Appeal<br>☐ Mechanic's Lien<br>☐ Name Change/Sex Designation Change<br>☐ Pistol Permit Revocation Hearing<br>☐ Sale or Finance of Religious/Not-for-Profit Property<br>☐ Other (specify): _____ |

**STATUS OF ACTION OR PROCEEDING**    Answer YES or NO for every question and enter additional information where indicated.

|  | YES | NO |  |
|---|---|---|---|
| Has a summons and complaint or summons with notice been filed? | ☐ | ☒ | If yes, date filed: _____ |
| Has a summons and complaint or summons with notice been served? | ☐ | ☒ | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ☐ | ☒ | If yes, judgment date: _____ |

**NATURE OF JUDICIAL INTERVENTION**    Check one box only and enter additional information where indicated.

| | | | |
|---|---|---|---|
| ☐ Infant's Compromise | | | |
| ☐ Extreme Risk Protection Order Application | | | |
| ☐ Note of Issue/Certificate of Readiness | | | |
| ☐ Notice of Medical, Dental or Podiatric Malpractice | Date Issue Joined: _____ | | |
| ☐ Notice of Motion | Relief Requested: _____ | Return Date: _____ |
| ☒ Notice of Petition | Relief Requested: MISC. SPECIAL PROCEEDINGS | Return Date: 03/23/2023 |
| ☐ Order to Show Cause | Relief Requested: _____ | Return Date: _____ |
| ☐ Other Ex Parte Application | Relief Requested: _____ | |
| ☐ Partition Settlement Conference | | | |
| ☐ Poor Person Application | | | |
| ☐ Request for Preliminary Conference | | | |
| ☐ Residential Mortgage Foreclosure Settlement Conference | | | |
| ☐ Writ of Habeas Corpus | | | |
| ☐ Other (specify): | | | |

| RELATED CASES | List any related actions. For Matrimonial cases, list any related criminal or Family Court cases. If none, leave blank. If additional space is required, complete and attach the **RJI Addendum (UCS-840A)**. | | | |
|---|---|---|---|---|
| **Case Title** | **Index/Case Number** | **Court** | **Judge (if assigned)** | **Relationship to instant case** |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| PARTIES | | For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided. If additional space is required, complete and attach the **RJI Addendum (UCS-840A)**. | | | |
|---|---|---|---|---|---|
| **Un-Rep** | **Parties** <br> List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | **Attorneys and Unrepresented Litigants** <br> For represented parties, provide attorney's name, firm name, address, phone and email.  For unrepresented parties, provide party's address, phone and email. | **Issue Joined** <br> For each defendant, indicate if issue has been joined. | **Insurance Carriers** <br> For each defendant, indicate insurance carrier, if applicable. |
| ☐ | Name: Endurance Specialty Insurance Limited <br> Role(s): Plaintiff/Petitioner | MELISSA GINSBERG, BraunHagey & Borden LLP, 118 W. 22nd St.,12th Floor , New York, NY  10011, 6468299403, ginsberg@braunhagey.com | ☐ YES  ☒ NO | |
| ☐ | Name: Horseshoe Re Limited, on behalf of and for the benefit of its ... <br> Role(s): Defendant/Respondent | Peter Chaffetz, Chaffetz Lindsey LLP, 1700 Broadway, Fl. 33, New York, NY  10019 | ☐ YES  ☒ NO | |
| ☐ | Name: <br><br> Role(s) | | ☐ YES  ☐ NO | |
| ☐ | Name: <br><br> Role(s) | | ☐ YES  ☐ NO | |
| ☐ | Name: <br><br> Role(s) | | ☐ YES  ☐ NO | |
| ☐ | Name: <br><br> Role(s) | | ☐ YES  ☐ NO | |
| ☐ | Name: <br><br> Role(s) | | ☐ YES  ☐ NO | |
| ☐ | Name: <br><br> Role(s) | | ☐ YES  ☐ NO | |
| ☐ | Name: <br><br> Role(s) | | ☐ YES  ☐ NO | |
| ☐ | Name: <br><br> Role(s) | | ☐ YES  ☐ NO | |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER  RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated:   02/13/2023                                              MELISSA RAE GINSBERG
                                                                                    Signature

           4710711                                                      MELISSA RAE GINSBERG
    Attorney Registration Number                                      Print Name

*This form was generated by NYSCEF*

# Request for Judicial Intervention Addendum

UCS-840A (7/2012)

Supreme COURT, COUNTY OF New York

**Index No:**

**For use when additional space is needed to provide party or related case information.**

**PARTIES:**   For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in "Attorneys" space.

| Un-Rep | Parties<br><br>List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | Attorneys and Unrepresented Litigants<br><br>For represented parties, provide attorney's name, firm name, address, phone and email.  For unrepresented parties, provide party's address, phone and email. | Issue Joined<br><br>For each defendant, indicate if issue has been joined. | Insurance Carriers<br><br>For each defendant, indicate insurance carrier, if applicable. |
|---|---|---|---|---|
| ☐ | Name: Horseshoe Re Limited, on behalf of and for the benefit of its Separate Accounts HS0083 and HS0084<br>Role(s): Defendant/Respondent | Peter Chaffetz, Chaffetz Lindsey LLP, 1700 Broadway, Fl. 33, New York, NY  10019 | ☐ YES   ☒ NO | |

**RELATED CASES:**   List any related actions. For Matrimonial actions, include any related criminal and/or Famiy Court cases.

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF **New York**
_____x

Endurance Specialty Insurance Limited

Plaintiff(s)/Petitioner(s)

-against-
Horseshoe Re Limited

Defendant(s)/Respondent(s)
_____x

Index No. _____

RJI No. (if any) _____

UCS-840C
3/2011

## COMMERCIAL DIVISION
### Request for Judicial Intervention Addendum

**COMPLETE WHERE APPLICABLE** [add additional pages if needed]:

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

☐ Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g. unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g. sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)

☐ Transactions governed by the Uniform Commercial Code (exclusive of those concerning individual cooperative or condominium units)

☐ Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only

☐ Shareholder derivative actions — without consideration of the monetary threshold

☐ Commercial class actions — without consideration of the monetary threshold

☐ Business transactions involving or arising out of dealings with commercial banks and other financial institutions

☐ Internal affairs of business organizations

☐ Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters

☐ Environmental insurance coverage

☐ Commercial insurance coverage (e.g. directors and officers, errors and omissions, and business interruption coverage)

☐ Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures — without consideration of the monetary threshold

☒ Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues — without consideration of the monetary threshold

**Plaintiff/Petitioner's claim for compensatory damages** [exclusive of punitive damages, interest, costs and counsel fees claimed]:

$ _____

**Plaintiff/Petitioner's claim for equitable or declaratory relief** [brief description]:

Endurance Specialty Insurance Limited seeks an order (1) directing that the arbitration between Endurance and Horseshoe Re Limited, on behalf of and for the benefit of its Separate Accounts HS0083 and HS0084 (the "Arbitration") is stayed pending resolution of this special proceeding and appointment of a qualified and unbiased arbitrator, (2) removing Bernard Eder from serving as an arbitrator in the Arbitration, (3) appointing a qualified and unbiased arbitrator to replace Eder, and (4) granting such other and further relief as the Court may deem just and proper.

**Defendant/Respondent's counterclaim(s)** [brief description, including claim for monetary relief]:

**I REQUEST THAT THIS CASE BE ASSIGNED TO THE COMMERCIAL DIVISION. I CERTIFY THAT THE CASE MEETS THE JURISDICTIONAL REQUIREMENTS OF THE COMMERCIAL DIVISION SET FORTH IN 22 NYCRR § 202.70(a), (b) AND (c).**

Dated: **February 13, 2023**_____

_____
**SIGNATURE**

**Melissa Ginsberg**
_____
**PRINT OR TYPE NAME**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of ) | |
| ) | |
| ENDURANCE SPECIALTY INSURANCE ) | |
| LIMITED, ) | |
|     Petitioner ) | |
| ) | |
|    - and - ) | **ORDER TO SHOW CAUSE** |
| ) | |
| HORSESHOE RE LIMITED, on behalf of and ) | Index No. 650832/2023 |
| for the benefit of its Separate Accounts HS0083 ) | |
| and HS0084, ) | |
| ) | |
|     Respondents. ) | |

  **UPON** the annexed Verified Petition of Endurance Specialty Insurance Limited, verified on February 13, 2023; Affirmation of David A. Attisani, executed on February 13, 2023, and the exhibits thereto; and Petitioner's Memorandum of Law, dated February 15, 2023;

  **LET** Respondent Horseshoe Re Limited, on behalf of and for the benefit of its Separate Accounts HS0083 and HS0084 ("Horseshoe") or its attorneys appear and show cause before this Court, in IAS Part _____, Room _____, at the Courthouse located at 60 Centre Street, New York, New York, on February ____, 2023 at _____, or as soon thereafter as counsel may be heard, why an Order should not be entered pursuant to CPLR § 7502 staying the arbitration between Endurance and Horseshoe (the "Arbitration") pending resolution of this special proceeding, and for such other and further relief as this Court may deem just and proper.

  Good cause being alleged,

  **IT IS ORDERED** that pending the hearing and determination of this Order To Show Cause all proceedings in the Arbitration are stayed;

**IT IS FURTHER ORDERED** that a copy of this Order To Show Cause together with papers recited in the first paragraph hereof, shall be served upon Respondent's counsel at Chaffetz Lindsey LLP and upon the Court of Arbitration of the International Chamber of Commerce by email and overnight delivery on or before _____, and that such service shall be deemed good and sufficient; and

**IT IS FURTHER ORDERED** that answering papers, if any, shall be e-filed on or before _____, 2023; and

**IT IS FURTHER ORDERED** that reply papers, if any, shall be e-filed on or before _____, 2023.

ENTER:

_____
J.S.C.

**ORAL ARGUMENT DIRECTED:**

_____
J.S.C.

Case 1:23-cv-01831-JGK Document 1-1 Filed 03/02/23 Page 190 of 221

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of )<br><br>ENDURANCE SPECIALTY INSURANCE )<br>LIMITED, on behalf of itself, and its branches )<br>and affiliates, )<br>               Petitioners )<br> )<br>      - and - )<br> )<br>HORSESHOE RE LIMITED, on behalf of and )<br>for the benefit of its Separate Accounts HS0083 )<br>and HS0084, )<br> )<br>            Respondents. )<br>                   ) | Index No. 650832/2023 |

## **AMENDED AFFIRMATION OF DAVID A. ATTISANI**

I, David A. Attisani, an attorney admitted to practice in the State of New York, affirm pursuant to CPLR 2106(a) as follows:

1. I am an equity partner at the law firm of Choate, Hall & Stewart, LLP, where I have worked for thirty-one years. My colleagues and I represent Endurance in this matter. I am a member of the New York bar.

2. I submit this Affirmation in support of Endurance's (a) Verified Petition for relief concerning an arbitration pending between Endurance and Horseshoe Re Limited on behalf of and for the benefit of its Separate Accounts HS0083 and HS0084, and (b) Order to Show Cause for an interim stay of that arbitration pending resolution of this special proceeding.

3.      Attached as <u>Exhibit 1</u> is a true and correct copy of 2020 Catastrophe Aggregate Excess of Loss Reinsurance Contract No. XA200910M, which Endurance and Horseshoe executed on or about March 9, 2020.

4.      Attached as <u>Exhibit 2</u> is a true and correct copy of 2020 Catastrophe Aggregate Excess of Loss Reinsurance Contract No. XA200911M, which Endurance and Horseshoe executed on or about March 9, 2020.

5.      Attached as <u>Exhibit 3</u> is a true and correct copy of Endurance's arbitration demand dated February 1, 2022.

6.      Attached as <u>Exhibit 4</u> is a true and correct copy of Horseshoe's arbitration counter-demand dated March 3, 2022.

7.      Attached as <u>Exhibit 5</u> is a true and correct copy of Horseshoe's application to the ICC for appointment of an umpire dated June 29, 2022.

8.      Attached as <u>Exhibit 6</u> is a true and correct copy of Endurance's response to Horseshoe's application to the ICC for appointment of an umpire dated July 7, 2022.

9.      Attached as <u>Exhibit 7</u> is a true and correct copy of Endurance's consolidated reply to Horseshoe's application to the ICC for appointment of an umpire dated July 25, 2022. Endurance has redacted two sentences from Exhibit 7, because they describe Endurance's confidential arbitration position which is not material to the Court's consideration of Endurance's pending Petition.

10.     Attached as <u>Exhibit 8</u> is a true and correct copy of excerpted correspondence, dated October 6, 2022, from the Secretary General of the Court of Arbitration of the International Chamber of Commerce.

11. I have served as counsel in reinsurance arbitrations and other reinsurance/commercial disputes for roughly thirty years. In my experience, parties and appointing authorities do not advise umpire candidates or umpires of the identities of those parties that favored (or opposed) their appointments. It is also highly unusual in my experience for an umpire or umpire candidate subject to a bias challenge to contend in writing or otherwise that the subject challenge is unavailing and/or to argue to retain a pending appointment.

12. Attached as <u>Exhibit 9</u> is a true and correct copy of an email dated October 31, 2022, which was authored by Bernard Eder.

13. Attached as <u>Exhibit 10</u> is a true and correct copy of an email dated November 19, 2022, which was authored by Bernard Eder.

14. Attached as <u>Exhibit 11</u> is a true and correct copy of the ICC's "Reasons" dated February 9, 2023.

15. Attached as <u>Exhibit 12</u> is a true and correct copy of the Bermuda Arbitration Act of 1986.

16. Attached as <u>Exhibit 13</u> is a true and correct copy of *Raydon Underwriting Mgmt. Co. v. Stockholm Re (Bermuda) Ltd. ((in Liquidation))* 1998 Civil Jur. No. 23.

17. Attached as <u>Exhibit 14</u> is a true and correct copy of *Tracomin S.A. v. Gibbs Nathaniel (Canada) Ltd. and George Bridge*, 1 Lloyd's Rep. 586 [1985].

18. Attached as <u>Exhibit 15</u> is a true and correct copy of *High Seas Steamship (Pte) Ltd v. Kirupamurthy and Another*, EWHC (QC) Lexis Citation 1064 [1985].

19. On October 6, 2022, the ICC named Bernard Eder as Umpire in the arbitration pending between Endurance and Horseshoe.

20.     In late 2020, I served as lead counsel in an earlier arbitration involving parties other than Endurance and Horseshoe, where Bernard Eder was appointed Umpire. The party adverse to my client was, like Hudson here, a hedge fund.

21.     During the Umpire selection process in the prior case involving Bernard Eder, opposing counsel disclosed to me that he had engaged in *ex parte* contacts with unnamed potential umpires for the purpose of assessing their potential availability and interest in serving. After Eder's appointment, and understanding that I was constrained by duty to my client to question Eder's integrity, I asked Eder whether he was one of the potential umpires who had engaged in ethically inappropriate *ex parte* contacts. Eder replied that he had not done so and otherwise sought to retain his appointment.

22.     During the same prior arbitration, Eder issued preliminary scheduling rulings unfavorable to and over the objection of my client, which favored its hedge fund adversary.

23.     Eder also rejected my client's rational and legally supported election to consolidate the arbitration before Eder into a parallel U.S. arbitration. Thereafter, I nonetheless persuaded the U.S. arbitration panel to order consolidation of Eder's arbitration into the then-contemporaneous U.S. arbitration, which had the effect of terminating Eder's role as Umpire and depriving him of additional revenue emanating from an engagement of potentially protracted duration.

24.     On October 28, 2022, Endurance accordingly requested that the ICC replace Eder.

25.     By communication dated January 26, 2023, the ICC declined.

26.     By email dated February 15, 2023, I advised Eder of this proceeding and requested that he defer to it: "We kindly request that you forbear from taking any action until the Court has adjudicated the matter."

27.     By email response dated February 16, 2023, Bernard Eder said: (a) "we stay the current proceedings with liberty to apply to lift the stay on 7 days' notice by either party"; and (b) "[t]he Tribunal would therefore request that it be provided with an update by end May when it will review the future course of this arbitration".

28.     On February 13, 2023, Endurance filed this Petition challenging the ICC's appointment of a biased Umpire.  No similar application has been made in this court or any other judicial forum.

Signed under the pains and penalties of perjury on this 21st day of February 2023.

David A. Attisani

## CERTIFICATION OF WORD COUNT

I, David A. Attisani, hereby certify that the word count of this affirmation complies with the word limits of 22 N.Y.C.R.R. § 202.8-b and Commercial Division Rule 17. According to the word-processing system used to prepare this affidavit, the total word count for all printed text exclusive of the material omitted under 22 N.Y.C.R.R. § 202.8-b(b) and Commercial Division Rule 17 is 1,028 words.

Respectfully submitted,

David A. Attisani
CHOATE, HALL & STEWART LLP
2 International Place
Boston, MA 02110
(617) 248-5000
dattisani@choate.com

*Counsel for Petitioner*
*Endurance Specialty Insurance Limited*

Dated: February 21, 2023
        Boston, Massachusetts

6

DocuSign Envelope ID: Case 1:23-cv-01831-JGR   Document 1-1   Filed 03/02/23   Page 196 of 221



# TigerRisk Partners LLC

## MARKET REFORM CONTRACT

| | |
|---|---|
| **Reinsured:** | Endurance Specialty Insurance Limited, (Bermuda) on behalf of itself and on behalf of its branches, affiliates, Endurance Worldwide Insurance Limited (London, England) and its branch office, SI Insurance (Europe), SA, Lloyd's Syndicate Number 5151 (London, England), Endurance Assurance Corporation (New York, USA) and/or their Quota Share reinsurers if applicable, including any and/or all of the subsidiary or affiliate companies that are now or may hereafter come under the ownership, management and/or control of Sompo International Holdings Ltd. |
| **Type:** | **CATASTROPHE AGGREGATE EXCESS OF LOSS REINSURANCE CONTRACT** |
| **Period:** | **Loss Occurring during the twelve month period effective 1 January, 2020** |
| **Tiger Risk Reference:** | **XA200910M** |
| **Intermediary:** | **TigerRisk Partners LLC** |
| **NEW / RENEWAL:** | **Renewal** |

FILED: NEW YORK COUNTY CLERK 02/15/2023 01:27 PM INDEX NO. 650832/2023
NYSCEF DOC. NO. 25 RECEIVED NYSCEF: 02/15/2023

Tiger Risk Reference     XA200910M                    TigerRisk Partners LLC

---

# Risk Details

**Tiger Risk Reference:**   **XA200910M**

**Type:**   **CATASTROPHE AGGREGATE EXCESS OF LOSS REINSURANCE CONTRACT**

**Reinsured:**   Endurance Specialty Insurance Limited, (Bermuda) on behalf of itself and on behalf of its branches, affiliates, Endurance Worldwide Insurance Limited (London, England) and its branch office, SI Insurance (Europe), SA, Lloyd's Syndicate Number 5151 (London, England), Endurance Assurance Corporation (New York, USA) and/or their Quota Share reinsurers if applicable, including any and/or all of the subsidiary or affiliate companies that are now or may hereafter come under the ownership, management and/or control of Sompo International Holdings Ltd. (hereinafter referred to collectively as the "Reinsured").

**Reinsurer:**   The subscribing Insurance and/or Reinsurance Companies and/or Underwriting Members of Lloyd's (hereinafter referred to as the Reinsurers) for a participation as stated in the individual signing pages.

**Period:**   This Reinsurance Contract shall apply to losses occurring during the period from 1 January 2020 to 31 December 2020 both days inclusive, Local Standard Time at the place where the loss occurs.

**Class of Business:**   This Reinsurance Contract shall indemnify the Reinsured in respect of all policies and/or contracts of reinsurance for all NATURAL PERILS, as defined below, for Property Catastrophe, Risk and Pro-Rata losses derived from their Reinsurance Global Catastrophe Strategic Business Unit and their Reinsurance Global Property Strategic Business Unit occurring with the Territorial Scope hereon.

For the purposes of this Reinsurance Contract NATURAL PERILS shall be understood to include, but not be limited to Earthquake, Seaquake, Earthquake Shock, Seismic and/or Volcanic Disturbance/Eruption, Hurricane, Rainstorm, Storm, Storm Surge, Severe Storm, Winter Storm, Thunderstorm, Windstorm, Tropical Storm, Tempest, Tornado, Cyclone, Typhoon, Tidal Wave, Tsunami, Flood, Hail/Hailstorm, Winter Weather/Freeze, Winter Storm, Ice Storm, Weight of Snow, Avalanche, Meteor/Asteroid Impact, Landslip, Landslide, Mudslide, Bush Fire, Forest Fire, Wildfires/Brushfires, Lightning, Sinkhole Collapse and Earth Movement. Natural Perils losses shall include all ensuing losses arising directly or indirectly therefrom, which shall include, but not be limited to, ensuing collapse, water damage (including flood), fire and/or explosion following the Natural Peril and shall be included within the scope of coverage hereunder.

**Territorial Scope:**   As defined in the Limits section of this Reinsurance Contract hereunder.

**Limits:**   **Section A -** losses wheresoever occurring, but excluding Windstorm and Earthquake losses in Japan, Named Hurricane losses in the United States of America, Canada and the Caribbean, Windstorm losses in Europe (Europe Windstorm further defined as Extra-Tropical Cyclone by Perils AG) and Earthquake losses in the state of California part of the United States of America.

---

Effective: January 1, 2020
TR Ref: XA200910M
DJH – Final 1.01 / 15.01.20



FILED: NEW YORK COUNTY CLERK 02/15/2023 01:27 PM
NYSCEF DOC. NO. 25

| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
|---|---|---|

**EXCESS**

To pay in excess of an Ultimate Net Loss to the Reinsured of USD 75,000,000 Ultimate Net Loss, in the aggregate.

**LIMIT**

Up to a further USD 75,000,000 Ultimate Net Loss, in the aggregate.

Notwithstanding the foregoing, before any loss can be applied to the LIMIT of Section A set out above, the Reinsured's Ultimate Net Loss shall be first subject to an excess of USD 5,000,000.

**Section B** – Windstorm Losses in Japan Only

**EXCESS**

To pay in excess of an Ultimate Net Loss to the Reinsured of USD 75,000,000 Ultimate Net Loss, Each and Every Loss.

**LIMIT**

Up to a further USD 50,000,000 Ultimate Net Loss, Each and Every Loss.

**Reset Provision** – In respect of Section B only

The Reinsured's expected loss for the business covered hereunder for the period of this Reinsurance Contract (the "Expected Loss") shall be calculated by the Intermediary using the Catastrophe Model. The Reinsured's Expected Loss as of the Inception of this Reinsurance Contract (the "Initial EL") is:

3.31%;

If the Reinsured's Expected Loss for the business covered hereunder increases or decreases as of and at 1 April 2020 (the "Reset Date") from the Initial EL (a "Reset Event"), the attachment point of this Reinsurance Contract (the "Provisional Attachment Point") shall be reset so that the Reinsured's Expected Loss as of and at the Reset Date equals and is the same as the Initial EL (the "Adjusted Attachment Point"). If a Reset Event occurs, the Provisional Attachment Point of this Reinsurance Contract shall be revised to the "Adjusted Attachment Point," which shall apply with respect to any and all losses occurring hereunder from Inception to expiration of this Reinsurance Contract. Furthermore, this Reinsurance Contract shall be amended such that the Adjusted Attachment Point shall be endorsed in place of the relevant Retention(s). If the Expected Loss for the business covered does not increase or decrease as of and at the Reset Date from the Initial EL then no Reset Event has occurred and the Provisional Attachment Point shall not be reset.

Within 21 business days (being a day other than Saturday or Sunday that the banks in Bermuda are open for business) of the Reset Date, the Intermediary shall provide to the Reinsurer an Expected Loss calculation as of and at the Reset Date and, to the extent a Reset Event has occurred, the Reinsured shall also provide an Adjusted Attachment Point. When calculating the Expected Loss as of and at the Reset Date, the Intermediary shall use the same exposure coding, including



FILED: NEW YORK COUNTY CLERK 02/15/2023 01:27 PM
NYSCEF DOC. NO. 25

| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
|---|---|---|

secondary modifiers, used to determine the Initial EL and shall follow the same practice and standards in all material respects that were used for the input data used in determining the Initial EL. Within five business days of receipt of the Expected Loss calculation, the Reinsurer will review the Expected Loss calculation and any Adjusted Attachment Point and advise in writing whether the Reinsurer is in agreement with such calculation. The Reinsurer will be granted full access to the Intermediary's records for the purpose of confirming the Expected Loss calculation. The Reinsurer, at its option, may request a joint review of the Expected Loss calculation by the head of the Intermediary's modelling division (or an appropriate substitute) in lieu of the Intermediary's operational personnel.  In the event that the Reinsured and the Reinsurer cannot, after such review, agree on the Expected Loss calculation, it is hereby agreed that the Intermediary's Expected Loss calculation shall stand.

**Definitions:**

For all purposes of this Reinsurance Contract:

a) the term "Each and Every Loss" shall be understood to mean "each and every loss and/or occurrence and/or catastrophe and/or disaster and/or calamity and/or series of losses and/or occurrences and/or catastrophes and/or disasters and/or calamities arising out of one event".

b) "United States of America" shall be defined as the 50 states of the Union and the District of Columbia.

c) "Caribbean" shall be defined as all islands situated off North, Central and South America between Latitude 10 degrees North and 35 degrees North and Longitude 55 degrees West and 100 degrees West.

d) "Europe" shall be defined as Albania, Andorra, Armenia, Austria, Belarus, Belgium, Bosnia and Herzegovina, Bulgaria, Croatia, Cyprus, the Czech Republic, Denmark, Estonia, Faroe Islands, Finland, France, Georgia, Germany, Gibraltar, Greece, Hungary, Iceland, Ireland, Italy, Latvia, Liechtenstein, Lithuania, Luxembourg, Macedonia, Malta, Moldova, Monaco, Montenegro, the Netherlands, Norway, Poland, Portugal, Romania. San Marino, Serbia, Slovakia, Slovenia, Spain, Sweden, Switzerland, Turkey, the Ukraine, and the United Kingdom of Great Britain and Northern Ireland (together with the Channel Islands and the Isle of Man) and/or any other names by which such territories may become known.

e) "Named Hurricane" shall be defined as those windstorms that are allocated names (including Greek alphabet symbols) by the World Meteorological Organization (WMO) and/or United States National Weather Service (NWS) and/or tracked by the services of the National Oceanic and Atmospheric Administration (NOAA) and attain wind speeds in excess of 74 miles per hour or are rated Hurricane Category One or higher on the Saffir-Simpson Scale at landfall. Named Hurricane losses shall include all ensuing losses arising directly or indirectly therefrom, which shall include, but not be limited to, ensuing collapse, water damage (including flood), fire and/or explosion following the Named Hurricane and shall be included within the scope of coverage hereunder.

f) "Windstorm" shall be defined as windstorm. Windstorm losses shall include all ensuing losses arising directly or indirectly therefrom,



DocuSign Envelope ID: Case 1:23-cv-01831-JGK Document 1-1 Filed 03/02/23 Page 200 of 221

| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
|---|---|---|

which shall include, but not be limited to, ensuing collapse, water damage (including flood), fire and/or explosion following the Windstorm and shall be included within the scope of coverage hereunder.

g) "Earthquake" shall be defined as Earthquake, Seaquake, Tsunami, Earthquake Shock, Seismic and/or Volcanic Disturbance/Eruption. Earthquake losses shall include all ensuing losses arising directly or indirectly therefrom, which shall include, but not be limited to, ensuing collapse, water damage (including flood), fire and/or explosion following the Earthquake and shall be included within the scope of coverage hereunder.

**Aggregate Limit:** The maximum recoverable under each Section of this Reinsurance Contract is USD 75,000,000 and in all hereunder.

**Reinstatement Provisions:** Nil.

**Premium:** The Premium for this Reinsurance Contract shall be USD 29,250,000 (for 100%), payable within 10 business days of execution of the Trust Agreement.

The Reinsurer hereby agrees that the Premium, net of brokerage, shall be deposited directly by the Reinsured (or by the Intermediary as directed by the Reinsured) into the Trust Account (as defined in the Obligations Clause) when due.

**Premium Payment Terms:** None.

**Conditions:** The clauses hereunder are applicable to this Reinsurance Contract and are outlined in full in the following pages:

| Clause | Page |
|---|---|
| Ultimate Net Loss | 6 |
| Net Retained Lines | 6 |
| Currency Conversion | 6 |
| Offset | 6 |
| Aggregate Extraction | 7 |
| Inspection of Records | 7 |
| Notification of Loss | 7 |
| Loss Settlements | 8 |
| Extended Expiration | 8 |
| Extra Contractual Obligations | 8 |
| Loss in Excess of Policy Limits | 9 |
| Insolvency | 10 |
| Contracts (Rights of Third Parties) | 11 |
| Amendments and Alterations (LSW 319) | 11 |
| Errors and Omissions (LSW 321) | 11 |
| Confidentiality | 11 |
| Sanctions | 11 |
| Foreign Account Tax Compliance Act (FATCA) | 12 |
| Agency Agreement | 12 |
| Reinsurance Allocation | 12 |
| Multiple Reinsured | 13 |
| Severability | 13 |
| Data Privacy | 13 |
| Other Reinsurance | 15 |
| Mode of Execution | 15 |
| Intermediary | 15 |



FILED: NEW YORK COUNTY CLERK 02/15/2023 01:27 PM
NYSCEF DOC. NO. 25

**Tiger Risk Reference**      **XA200910M**          **TigerRisk Partners LLC**

**Ultimate Net Loss Clause**

The term "Ultimate Net Loss" shall mean the sum actually paid or payable by the Reinsured in settlement of losses or liability (including any Extra Contractual Obligations and Loss in Excess of Policy Limits as defined herein) after making deductions for all recoveries and all salvages that are actually received and all claims upon other reinsurances whether collected or not, and shall include all costs and adjustment expenses (including costs of litigation and legal expenses, if any) arising from the settlement of claims other than the salaries of employees and the office expenses of the Reinsured.

All salvages, recoveries or payments recovered or received subsequent to a loss settlement under this Reinsurance Contract shall be applied as if recovered or received prior to the aforesaid settlement, and all necessary adjustments shall be made by the parties hereto. Provided always that nothing in this clause shall be construed to mean that losses under this Reinsurance Contract are not recoverable until the Reinsured's Ultimate Net Loss has been ascertained.

Except as is otherwise provided for herein it is understood and agreed that recoveries under all Underlying Excess of Loss Reinsurances (as far as applicable) are for the sole benefit of the Reinsured and shall not be taken into account in computing the ultimate net loss or losses in excess of which this Reinsurance Contract attaches nor in any way prejudice the Reinsured's right of recovery hereunder.

Notwithstanding the foregoing, it is understood and agreed that reinsurances, if any, effected by Treaty Reinsurers (if applicable) protected hereunder shall not be taken into account in computing the ultimate net loss or losses in excess of which this Reinsurance Contract attaches, nor in any way affect the amounts recoverable hereunder.

**Net Retained Lines Clause**

This Reinsurance Contract shall protect only that portion of any insurance or reinsurance which the Reinsured, acting in accordance with its established practices at the time of the commencement of this Reinsurance Contract, retains net for its own account. The Reinsurers' liability hereunder shall not be increased due to any error or omission which results in the Reinsured's net retention being larger than it would normally have been nor by the Reinsured's failure to reinsure and maintain reinsurance in accordance with its established practice as aforesaid, nor by the inability of the Reinsured to collect from any other reinsurers any amounts which may have become due from them for any reason whatsoever.

**Currency Conversion Clause**

For the purpose of this Reinsurance Contract currencies other than the currency in which this Reinsurance Contract is written shall be converted into such currency at the rates of exchange used in the Reinsured's books or where there is a specific remittance for a loss settlement at the rates of exchange used in making such remittance.

**Offset Clause**

The Reinsured or the Reinsurers may elect to offset any amount, whether on account of premiums, claims or any other amount due from



FILED: NEW YORK COUNTY CLERK 02/15/2023 01:27 PM
INDEX NO. 650832/2023
NYSCEF DOC. NO. 25
RECEIVED NYSCEF: 02/15/2023

one party to the other in respect of this Reinsurance Contract.

However, in the event of the insolvency of any party hereto, offset shall only be allowed in accordance with applicable statutes and regulations.

**Aggregate Extraction Clause**

With regard to policies which provide an Aggregate Limit of Liability, it is understood and agreed that the Reinsured shall extract from such Aggregate Policy the amount of loss sustained by them arising from any one occurrence in order that such loss can be added to the Reinsured's losses from the same occurrence on other policies provided that the loss occurs during the period of this Reinsurance Contract.

For the purpose of this clause, the amount of a loss from one occurrence on an aggregate policy shall be deemed to be that percentage of the aggregate loss to the Reinsured on the original policy that the total loss to the Original Insured from the particular occurrence bears to the total aggregate losses to the Original Insured on the business protected.

**Inspection of Records Clause**

Provided that all undisputed billings have been paid, no further particulars shall be required by the Reinsurers, but the books of the Reinsured so far as they concern the policies and/or contracts falling within the scope of this Reinsurance Contract shall be open to the inspection of an authorised representative of the Reinsurers at any reasonable time during the continuance of this Reinsurance Contract or of liability hereunder.

For purposes of this Clause, an undisputed billing is one that remains unpaid more than 60 days from receipt by the Reinsurer and the Reinsurer has not provided a written response to the Reinsured specifying why it remains unpaid.

The Reinsurers or their duly appointed representatives may arrange for copies to be made, at the Reinsurers' expense, of any of the records or documents containing such information that they may require.

Further, it is understood and the Reinsurer agrees that such access will be subject to a reasonable confidentiality agreement and may be restricted, in certain circumstances, by confidentiality agreements between the Reinsured and its ceding company clients, or by government restrictions.

The right of inspection shall not be construed to allow Reinsurers the right to delay or withhold payment for any losses which fall due under this Reinsurance Contract in accordance with terms and conditions as stated herein.

**Notification of Loss Clause**

The Reinsured undertakes to advise Reinsurers as soon as possible of any circumstances likely to give rise to a claim hereunder and thereafter keep Reinsurers fully informed of any material developments regarding the claim.

The Reinsured shall upon receiving any formal notification of any loss(es) or occurrence(s) (including any potential loss(es) or



FILED: NEW YORK COUNTY CLERK 02/15/2023 01:27 PM
NYSCEF DOC. NO. 25
INDEX NO. 650832/2023
RECEIVED NYSCEF: 02/15/2023

| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
|---|---|---|

occurrence(s)) which may give rise to a claim recovery hereunder advise Reinsurers as soon as such formal notification is received.

**Loss Settlements Clause**

All loss settlements made by the Reinsured shall be binding upon Reinsurers provided such settlements are within the terms and conditions of this Reinsurance Contract, the true intent of this Reinsurance Contract being that the Reinsured shall follow the fortunes of the Reinsurer, and amounts falling to the share of the Reinsurers shall be payable by them upon reasonable evidence of the amount paid being given by the Reinsured.

**Extended Expiration Clause**

If this Reinsurance Contract should expire or be terminated whilst a loss covered hereunder is in progress, it is understood and agreed that subject to the other conditions of this Reinsurance Contract, the Reinsurers are responsible as if the entire loss or damage had occurred prior to the expiration or termination of this Reinsurance Contract, provided that no part of that loss is claimed against any renewal of this Reinsurance Contract.

**Extra Contractual Obligations Clause**

This Reinsurance Contract shall exclude all cover in respect of Extra Contractual Obligations, howsoever arising, such Extra Contractual Obligations being defined as any award made by a court of competent jurisdiction against an Insurer or Reinsurer, which award is not within the coverage granted by any insurance and/or reinsurance contract made between the parties in dispute.

Notwithstanding the foregoing, this Reinsurance Contract shall extend to cover any loss arising from a "Claims Related Extra Contractual Obligation":

a)  awarded against the Reinsured; or

b)  incurred by the Reinsured where he has paid his share of a "Claims Related Extra Contractual Obligation" awarded against one or more of his Co-Insurers.

Any recovery under this Reinsurance Contract in respect of "Claims Related Extra Contractual Obligation" shall only be for that part of any award which corresponds to the Reinsured's share of the insurance and/or reinsurance policy and/or contract giving rise to the award and all proportional protection effected by the Reinsured shall provide or shall be deemed to provide pro rata coverage for such obligations.

This Reinsurance Contract shall also extend to cover all loss from Extra Contractual Obligations howsoever arising where the loss is incurred by the Reinsured as a result of his participation in any insurance or reinsurance which provides cover for such loss, it being understood and agreed that such loss results from a contractual liability incurred by the Reinsured.

A "Claims Related Extra Contractual Obligation" shall be defined as the amount awarded against an Insurer or Reinsurer found liable by a court of competent jurisdiction to pay damages to an Insured or Reinsured in



FILED: NEW YORK COUNTY CLERK 02/15/2023 01:27 PM
NYSCEF DOC. NO. 25

Tiger Risk Reference      XA200910M                          TigerRisk Partners LLC

respect of the conduct of a claim made under an insurance and/or reinsurance policy and/or contract, where such liability has arisen because of:

a) the failure of the Insurer or Reinsurer to agree or pay a claim within the policy limits or to provide a defence against such claims as required by law; or

b) bad faith or negligence in rejecting an offer of settlement; or

c) negligence or breach of duty in the preparation of the defence or the conduct of a trial or the preparation or prosecution of any appeal and/or subrogation and/or any subsequent action resulting therefrom.

There shall be no liability under this Reinsurance Contract in respect of:

a) any assumption of liability by way of participation in any mutual scheme designed specifically to cover Extra Contractual Obligation; or

b) any Extra Contractual Obligation arising from an adjudicated finding of fraud of a director, officer or employee of the Reinsured acting individually or collectively or in collusion with an individual or corporation or with any other organisation or party involved in the presentation, defence or settlement or any claim.

Any loss arising under this Reinsurance Contract in respect of "Claims Related Extra Contractual Obligations" shall be deemed to be a loss arising from the same event as that giving rise to the claim to which the Extra Contractual Obligation is related; but recovery hereunder is subject to the Insurance and/or Reinsurance policy and/or contract which gives rise to the Extra Contractual Obligation falling within the scope of this Reinsurance Contract.

**Loss in Excess of Policy Limits Clause**

This Reinsurance Contract shall protect the Reinsured, within the limits hereof, in connection with Ultimate Net Loss in excess of the limit of its original policy, such loss in excess of the limit having been incurred because of failure by it to settle within the policy limit or by reason of alleged or actual negligence, fraud, or bad faith in rejecting an offer of settlement or in the preparation of the defence or in the trial of any action against its insured or reinsured or in the preparation or prosecution of an appeal consequent upon such action.

However, this Clause shall not apply where the loss has been incurred due to an adjudicated finding of fraud by a member of the Board of Directors or a corporate officer of the Reinsured acting individually or collectively or in collusion with any individual or corporation or any other organization or party involved in the presentation, defence or settlement of any claim covered hereunder.

For the purpose of this Clause, the word "loss" shall mean any amounts for which the Reinsured would have been contractually liable to pay had it not been for the limit of the original policy.

The Reinsured shall be indemnified in accordance with this Clause to the extent permitted by applicable law.



DocuSign Envelope ID: 2B6768B3-C9EC-431E-9F80-B0F899CFDF33   Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 205 of 221

| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
|---|---|---|

### Insolvency Clause

Where an Insolvency Event occurs in relation to the Reinsured the following terms shall apply (and, in the event of any inconsistency between these terms and any other terms of this Reinsurance Contract, these terms shall prevail):

1. Notwithstanding any requirement in this Reinsurance Contract that a Reinsured shall actually make payment in discharge of its liability to its policyholder before becoming entitled to payment from the Reinsurers:

    a) the Reinsurers shall be liable to pay the Reinsured even though the Reinsured is unable to actually pay, or to discharge its liability to, its policyholder; but

    b) nothing in this clause shall operate to accelerate the date for payment by the Reinsurers of any sum which may be payable to the Reinsured, which sum shall only become payable as and when the Reinsured would have discharged, by actual payment, its liability for its current net loss but for it being the subject of an Insolvency Event.

2. The existence, quantum, valuation and date for payment of any sums which the Reinsurers are liable to pay the Reinsured under this Reinsurance Contract shall be those and only those for which the Reinsurers would be liable to the Reinsured if the liability of the Reinsured had been determined without reference to any term in any composition or scheme of arrangement or any similar arrangement, entered into between the Reinsured and all or any part of its policyholders, unless and until the Reinsurers serve written notice to the contrary on the Reinsured in relation to any composition or scheme of arrangement.

3. The Reinsurers shall be entitled (but not obliged) to set-off, against any sum which it may be liable to pay the Reinsured, any sum for which the Reinsured is liable to pay the Reinsurers.

An Insolvency Event shall occur if:

A. i. (in relation to 1., 2., and 3. above) a winding up petition is presented in respect of the Reinsured or a provisional liquidator is appointed over it or if the Reinsured goes into administration, administrative receivership or receivership or if the Reinsured has a scheme of arrangement proposed in relation to all or any parts of its affairs, or

    ii. (in relation to 1. above) if the Reinsured goes into compulsory or voluntary liquidation.

or, in each case, if the Reinsured becomes subject to any other similar insolvency process (whether under the laws of England and Wales or elsewhere); and

B. the Reinsured is unable to pay its debts as and when they fall due within the meaning of Section 162 of the Bermuda Companies Act 1981 (or any statutory amendment or re-enactment of that section).



Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 206 of 221

Tiger Risk Reference    XA200910M    TigerRisk Partners LLC

**Contracts (Rights of Third Parties) Clause**

Nothing in this Reinsurance Contract shall in any manner create any obligations or establish any rights against the Reinsurer in favour of any third party or any persons not parties to this Reinsurance Contract.

**Amendments and Alterations Clause (LSW 319)**

Any amendments or alterations to this Reinsurance Contract that are agreed between the parties herein shall be automatically binding and shall be considered as forming an integral part of this Reinsurance Contract.

**Errors and Omissions Clause (LSW 321)**

Any inadvertent delays, omissions or errors made in connection with this Reinsurance Contract shall not be held to relieve either of the parties hereto from any liability which would have attached to them hereunder if such delay, omission or error had not been made, provided rectification be made as soon as practicable after discovery.

**Confidentiality Clause**

The Reinsurer, except with the express prior written consent of the Reinsured, shall not communicate, disclose or divulge to any third party, any knowledge or information that may be acquired as a result of its participation in the Reinsurance Contract. The restrictions as outlined in this Clause shall not apply to communication or disclosures that the Reinsurer is required to make to auditors, both internal and external, outside actuaries, consultants, retrocessionaires, legal counsel, Reinsurer's shareholders and capital providers, arbitrators involved in any arbitration procedures under this Reinsurance Contract or disclosures required upon subpoena or other duly-issued order of a court or other governmental agency or regulatory authority; however, such third parties are to be informed of these confidentiality restrictions by the Reinsurer. The Reinsurer shall not share, communicate or otherwise disseminate the Reinsured's confidential information obtained by virtue of its participation on this Reinsurance Contract with any employees not involved in this reinsurance transaction.

Any breach or threatened breach of this Clause will constitute a breach that might cause irreparable injury, not readily measured in money, and for which the Reinsured, without waiving any other remedies or rights at law or in equity, will be entitled to injunctive relief or other equitable relief. Any such right or remedy and any and all other rights or remedies provided for herein will be cumulative and not exclusive and in addition to any and all other rights or remedies which the Reinsured may have under this Reinsurance Contract or otherwise.

The Reinsurer will comply with all applicable data protection laws/regulations with respect to the handling and/or processing of Confidential Information, including personally identifiable information, in connection with this Reinsurance Contract and will ensure that any third parties to whom any Confidential Information is shared have appropriate information security safeguards in place consistent with applicable laws/regulations.



DocuSign Envelope ID: 2B67DBA1-C62E-4EAE-BF61-6FF0E9DC7DEA
Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 207 of 221

| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
|---|---|---|

### Sanctions Clause

Neither the Reinsured nor the Reinsurer shall be liable for any premium or loss under this Reinsurance Contract if it would result in a violation of any mandatory sanction, prohibition or restriction under the trade or economic sanctions, laws or regulations of any applicable jurisdiction.

### Foreign Account Tax Compliance Act (FATCA) Clause

A.   The Reinsurer will provide to the Reinsured its FATCA compliant documentation on or before the effective date of this Reinsurance Contract. To the extent the Reinsurer is subject to the deduction and withholding of premium payable hereon and has not provided the requisite filing form as set forth in the Foreign Account Tax Compliance Act (Sections 1471-1474 of the Internal Revenue Code), the Reinsurer agrees to allow such withholding from the premium payable under this Reinsurance Contract.

B.   For purposes hereof, such amounts withheld will not be subject to offset under the Offset Clause.

C.   The Reinsurer agrees to indemnify the Reinsured for any liability, expense, interest or penalty the Reinsured may incur by reason of the Reinsurer's breach of this Clause.

### Agency Agreement Clause

If more than one Reinsured company is named as a party to this Reinsurance Contract, the first named Reinsured will be deemed the agent of the other Reinsured companies for purposes of sending or receiving notices required by the terms and conditions of this Reinsurance Contract and for purposes of remitting or receiving any monies due any party.

### Reinsurance Allocation Clause

A.   While having no effect on the settlements or liabilities of the parties to this Reinsurance Contract, it is established that:

   1.   If a loss covered under this Reinsurance Contract involves multiple member companies, the Reinsured shall allocate the Reinsurer's limit of liability for the loss to each member company involved, proportionately, based on the percentage that the affected member company's loss bears to the total of all losses contributing to that loss; and

   2.   With respect to reinsurance premium due to the Reinsurers hereunder, each member company shall be responsible for its proportionate share of the reinsurance premium. The final reinsurance premium, as determined under the terms of this Reinsurance Contract, shall be apportioned to each member company by the Reinsured in the same proportion that each member company's subject premium bears to the total subject premium.

B.   Records of these allocations shall be maintained in sufficient detail to identify both the Reinsurer's loss obligations allocated to each member company and each member company's share of premium allocation.



DocuSign Envelope ID: ...
Case 1:23-cv-01831-JGK    Document 1-1    Filed 03/02/23    Page 208 of 221

Tiger Risk Reference        XA200910M                    TigerRisk Partners LLC

**Multiple Reinsured Clause**

This Reinsurance Contract is a composite agreement covering a number of separate legal entities within the Sompo International Holdings Ltd. group of companies. The conduct or misconduct of one legal entity comprising the Reinsured ceding policies hereto shall not affect the validity of the cover available to those other legal entities comprising the Reinsured ceding policies hereto. In the event of a dispute, or disputes, arising between the Reinsurer and one or more legal entities comprising the Reinsured, it is agreed hereon, that such dispute or disputes shall not prejudice the validity of the cover available to those other legal entities not in dispute.

**Severability Clause**

If any provision of this Reinsurance Contract shall be rendered illegal or unenforceable by the laws or regulations of any applicable jurisdiction, such provision shall be considered void in such jurisdiction, but this shall not affect the validity or enforceability of any other provision of this Reinsurance Contract or the enforceability of such provision in any other jurisdiction.

**Data Privacy Clause**

<u>Definitions</u>

A.  The terms data subject, personal data, controller, processor and processing, together with other terms defined in the General Data Protection Regulation (Regulation (EU) 2016/679) ("GDPR"), will have meanings as defined in the GDPR as read with the UK Data Protection Act 2018. For the avoidance of doubt, personal data includes sensitive personal data as defined in Article 9(1) of the GDPR.

<u>Processing</u>

B.  This Clause applies to all personal data processed by either party under, or in connection with, this reinsurance.

C.  Whilst the arrangements in place between the parties from time to time will determine the role of each party in respect of personal data from time to time, it is anticipated that, as between the Reinsured and the Reinsurer under this Reinsurance Contract:

1.  The Reinsured will be a controller where it is processing personal data in relation to placing reinsurance, administering claims and providing information to the Reinsurer for audit and/or inspection.

2.  The Reinsurer will be a controller where it is processing personal data in relation to consideration, review and settlement of reinsurance claims, and inspection and/or audit of reinsurance claim data.

D.  Neither party will act as a processor in respect of personal data unless expressly appointed as a processor by the other party. Should such an appointment become necessary, the parties will undertake all reasonable endeavours to agree in good faith



DocuSign Envelope ID: 2BC7A8D3-CA81-4A1A-8F42-B0FAB3F17D61

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 209 of 221

| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
|---|---|---|

processor obligations that comply with any applicable data protection legislation.

<u>Data Controller Obligations</u>

E. Where the Reinsured and the Reinsurer each act as a controller, each party will:

1. comply at all times with applicable data protection legislation, including without limitation, New York State Department of Financial Services Cyber Security Requirements for Financial Service Companies (23 NYCRR 500) (the "NYS Cyber Security Requirements"), including by maintaining appropriate written records of all processing of personal data as required by Article 30 of the GDPR;

2. not cause the other party to breach its respective obligations under the applicable data protection legislation, whether by act or omission;

3. ensure that it has the ability to lawfully process personal data and to lawfully transfer, disclose and grant access to personal data to the other party as required for the performance of this Reinsurance Contract;

4. ensure that the personal data transferred, disclosed or accessed by the other party is (i) accurate and (where necessary) kept up to date, (ii) relevant and adequate but not excessive, (iii) not retained by the providing party for longer than is necessary to enable the processing of personal data under this Reinsurance Contract, meeting the requirements set out in Article 5(1)(c) to (e) of the GDPR and the NYS Cyber Security Requirements;

5. maintain appropriate technical and organisational security measures, sufficient to (at least) comply with its obligations as a controller under any applicable data protection legislation and, in particular, complying with the measures in Article 32(1) of the GDPR considering the matters in Article 32(2) of the GDPR;

6. procure that all of its personnel who have access to or process personal data are subject to legally binding confidentiality obligations in relation to that personal data;

7. where it reasonably believes that a data subject, or the representative of a data subject, has made a subject access request or notice or complaint in connection with any matter relating to this Reinsurance Contract to it that should have been directed to the other party, promptly (and in any event within forty-eight 48 hours) notify the other party.

<u>Other Obligations</u>

F. Personal data received by the Reinsurer from the Reinsured will not be transferred to a third country without the Reinsurer having implemented appropriate safeguards in accordance with the applicable law and regulation (e.g. laws based on European Directive 95/46/CEP relating to the processing of Personal Data and / or its replacement Regulation 2016/679 on 25 May 2018 as



| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
|---|---|---|

amended from time to time), unless required to do so by European Union or Member State law to which the Reinsurer is subject; in such a case, the Reinsurer will inform the Reinsured prior to transfer to the extent it is legally permitted to do so.

G.   Personal Data will not be transferred to a processor or any third party without the Reinsured's prior written consent save for transfers within the European Union or to countries subject to an adequacy level of protection recognized by the European Commission (as updated from time to time) ("Authorized Location").  Notwithstanding the foregoing, the Reinsured may at any time request the Reinsurer to provide a list of retrocessionaires within the European Union or in Authorized Locations to whom the Personal Data has been transferred.  The Reinsurer must ensure the same data protection obligations as set out in this Reinsurance Contract apply to its processors or any other third party to whom the data is transferred by way of a contract or otherwise.

H.   To the extent permitted by the applicable law, each party will notify the other party without undue delay upon becoming aware of a breach of security leading to the accidental or unlawful destruction, loss, alteration, unauthorised disclosure of, or access to, Personal Data processed under, or in connection with, this Reinsurance Contract.

## Other Reinsurance Clause

The Reinsured shall be permitted to carry other reinsurance, recoveries under which shall inure solely to the benefit of the Reinsured and be entirely disregarded in applying all of the provisions of this Reinsurance Contract

## Mode of Execution Clause

A.   This Contract (including any addenda thereto) may be executed by any of the following methods:

1.   An original written ink signature of paper documents;

2.   Facsimile or electronic copies of paper documents showing an original ink signature; and/or

3.   Electronic signature technology employing computer software and a digital signature or digitizer pad to capture a person's handwritten signature in such a manner that the signature is unique to the person signing, is under the sole control of the person signing, is capable of verification to authenticate the signature and is linked to the document signed in such a manner that if the data is changed, such signature is invalidated.

B.   The use of any one or a combination of the methods set forth in paragraph A. above shall constitute a valid execution of this Contract.  This Contract may be executed in one or more counterparts, each of which, when duly executed, shall be deemed an original.

## Intermediary Clause

TigerRisk Partners LLC is hereby recognized as the Intermediary negotiating this Reinsurance Contract for all business hereunder.  All



FILED: NEW YORK COUNTY CLERK 02/15/2023 01:27 PM
NYSCEF DOC. NO. 25

INDEX NO. 650832/2023
RECEIVED NYSCEF: 02/15/2023

DocuSign Envelope ID: 2B47A881-07BE-4F4F-8E67-BCE480BC4F0E
Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 211 of 221

communications (including notices, statements, premiums, return premiums, commissions, taxes, losses, Loss Adjustment Expenses, salvages, and loss settlements) relating thereto shall be transmitted to the Reinsured or the Reinsurer through the Intermediary. Payments by the Reinsured to the Intermediary shall be deemed payment to the Reinsurer. Payments by the Reinsurer to the Intermediary shall be deemed payment to the Reinsured only to the extent that such payments are actually received by the Reinsured.

Brokerage for this Reinsurance Contract is 10.00% (ten percent) of the Premium payable to the Reinsurer(s) hereunder to TigerRisk Partners LLC

**Exclusions:**     This Reinsurance Contract shall exclude:

1. the Reinsured's interest whether direct or by way of reinsurance in a loss arising from a claim or claims against an insured by another party or parties.

   Notwithstanding the foregoing, this Reinsurance Contract shall not exclude:

   (a) any Physical Damage and/or Consequential Loss coverage contingent thereon affected by an insured on behalf of another party.

   (b) Workers Compensation and/or Employers Liability when written on a catastrophe basis.

2. liability arising out of any Reinsurance Assumed and Excess of Loss and/or Pro-Rata Reinsurances issued in the name of a Lloyd's Syndicate and/or of an insurance or reinsurance company, whether such liability is accepted directly or under any form of reinsurance from other Insurers and/or Reinsurers, and all such liability is excluded from the protection of this Reinsurance Contract and cannot be taken into account in arriving at the amount in excess of which this Reinsurance Contract attaches.

   The Reinsured shall be the sole judge as to which insurance or reinsurance companies come within the scope of this definition.

   Notwithstanding the foregoing, it is understood and agreed that:

   (a) Excess of Loss and/or Pro-Rata Reinsurances of Direct and Facultative Accounts and/or Pro-Rata Reinsurances of Pro Rata treaties covering Direct and/or Facultative Accounts.

   (b) Specific retrocessions of an original insurance company's or regional reinsurer's account and retrocessions written on a single, specific or regional territorial basis.

   (c) any Reinsurance of business underwritten by the Reinsured and accepted via Lloyd's Insurance Company S.A., Brussels or any business underwritten by the Reinsured and accepted on behalf of the Reinsured by an authorised entity, for regulatory, legislative or similar purposes.

   shall not fall within the scope of the above definition.



Tiger Risk Reference    XA200910M           TigerRisk Partners LLC

3. loss of or damage to property situated Offshore and all losses consequent upon such loss or damage.

For the purposes of this exclusion "Offshore" means:

(i) places where the tide ebbs and flows; and/or

(ii) other navigable waters or waterways which shall mean any water which is in fact navigable by ships or vessels, whether or not the tide ebbs and flows there, and whether or not there is a public right of navigation in that water.

Nothing contained herein shall exclude losses arising from bridges, tunnels, dams, piers, jetties and/or causeways and/or policies and/or contracts written to cover Fine Arts, Specie, Jewellery, Personal Effects, and other similar items including items covered under a Householders or Personal Lines policy and/or contract.

4. absolutely any loss, damage, claim, cost, expense, sum or other obligation of any kind or description directly or indirectly caused by, contributing to, or resulting from mould, fungus, mildew or spores.

This exclusion will apply regardless of whether or not:

i. the mould, fungus, mildew or spores is/are caused by, contributed to, or results from an insured peril;

ii. the Reinsured's original policy(ies) provide coverage;

iii. the Reinsured's original obligations are contractual, extra-contractual, or otherwise;

iv. the Reinsurance presentation is for settlement(s), judgement(s) or any other form of resolution.

5. all above ground transmission and distribution lines, including wire, cables, poles, pylons, standards, towers, other supporting structures and any equipment of any type which may be attendant to such installations of any description, for the purpose of transmission or distribution of electrical power, telephone or telegraph signals, and all communication signals whether audio or visual.

This exclusion applies to all equipment other than that which is on or within 1 (one) statute mile of an insured structure.

This exclusion applies both to physical loss or damage to the equipment and all business interruption, consequential loss, and/or other contingent losses related to transmission and distribution lines, other than contingent property damage/business interruption losses (including expenses), arising from loss and/or damage to lines of third parties.

6. Aviation War.

7. Aviation and Satellite business.

8. Workers Compensation business, but not in respect of Earthquake losses occurring in the United States of America.

9. Hail on Crops.



DocuSign Envelope ID: 2B67d6b3-c35c-4d46-8b66-b3d0f90f0f44

Case 1:23-cv-01831-JGK   Document 1-1   Filed 03/02/23   Page 213 of 221

| Tiger Risk Reference | XA200910M | | TigerRisk Partners LLC |
|---|---|---|---|

10. Life, Financial Guarantee and Insolvency business.

11. Loss or damage arising from contamination by biological and/or chemical substances.

12. Industry Loss Warranties.

13. third party liability as a result of Wildfire loss or losses under policies issued to any California Utilities or their captives.

Furthermore, this Reinsurance Contract shall also exclude business in accordance with the following established market referenced exclusion clauses:

i. Nuclear Energy Risks as per the Nuclear Energy Risks Exclusion Clause (Reinsurance) 1994 (Worldwide excluding U.S.A. and Canada) - NMA 1975a. (Japanese amendment).

ii. Nuclear Incident as per the Nuclear Incident Exclusion Clauses, Reinsurance – USA and Canada NMA 1590, NMA 1119, NMA 1166, NMA 1979a, NMA 1980a, NMA 1251.

iii. War and Terrorism as per the War and Terrorism Exclusion Clause (NMA2919).

iv. Information Technology Hazards Clarification Clause (NMA2912).

v. Information Technology Hazards (Risk) Exclusion Clause (NMA2928).

<u>Invalidation</u>

Should any arbitration, judicial or regulatory entity having jurisdiction invalidate any exclusion in the Reinsured's policy or the underlying policy on which the Reinsured's policy follows form that is also the subject of one or more of the exclusions herein, then loss for which the Reinsured is liable because of such invalidation will not be excluded hereunder.

<u>Incidental</u>

The exclusions enumerated herein shall not apply when they are merely incidental to the main operations or exposures of the insured, provided such main operations or exposures are also covered by the Reinsured and are not themselves excluded from the scope of this Reinsurance Contract.  The Reinsured shall be the sole judge of what is "incidental".

<u>Inadvertence</u>

Should the Reinsured, by reason of an inadvertent act, error, or omission, be bound to afford coverages excluded hereunder or should an existing insured extend its operations to include coverage excluded hereunder, the Reinsurer will waive the exclusion(s).  The duration of said waiver will not extend beyond the time that notice of such coverage has been received by the responsible underwriting authority of the Reinsured plus the minimum time period required thereafter for the Reinsured to terminate such coverage.

**Express Warranty:** It is hereby warranted that no loss shall attach hereunder unless the Reinsured sustains loss from two or more risks involved in the same loss event.



| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
| --- | --- | --- |

For the purposes of the above warranty, aa "risk" is defined as all values at one location including all business interruption and/or time element exposures whether by way of Contingent Business Interruption, Suppliers or Customers extensions.

**Special Acceptances:** Business which is beyond the terms, conditions or limitations of this Reinsurance Contract may be submitted to the Reinsurer in writing for special acceptance hereunder, and such business, if accepted in writing by the Reinsurer, shall be subject to all the terms, conditions and limitations of this Reinsurance Contract except as modified by the Special Acceptance. The Reinsurer shall provide the Reinsured with a five business day turnaround on all Special Acceptances hereunder. Policies submitted for special acceptance shall be deemed accepted by those Reinsurer(s) failing to respond within this timeframe. The five business day response time shall begin from the time the Special Acceptance is received by the Reinsurer.

**Limited Recourse and Bermuda Regulations:** The liability of the Reinsurer for the performance and discharge of all of its obligations, however they may arise, in relation to this Reinsurance Contract (together "Obligations" for purposes of this provision), shall be limited to and payable solely from the proceeds of realization of the assets of the Trust Account and accordingly there shall be no recourse to any other assets of Horseshoe Re Limited, whether or not allocated to any other separate account or the general account of Horseshoe Re Limited. In the event that the proceeds of realization of the assets of the Trust Account are insufficient to meet all Obligations, any Obligations remaining after the application of such proceeds shall be extinguished, and the Reinsured undertakes in such circumstances to take no further action against the Reinsurer in respect of any such Obligations. In particular, neither the Reinsured nor any party acting on its behalf shall petition or take any steps for the winding up or receivership of the Reinsurer or Horseshoe Re Limited.

Notwithstanding any matter referred to herein, the Reinsured understands and accepts that the Reinsurer is a separate account of Horseshoe Re Limited and that all corporate matters relating to the creation of the Reinsurer, capacity of the Reinsurer, operation and liquidation of the Reinsurer and any matters relating to the Reinsurer thereof shall be governed by, and construed in accordance with, the laws of Bermuda. The Reinsured has had the opportunity to take advice and to obtain all such additional information that it considers necessary to evaluate the terms, conditions and risks of entering into this Reinsurance Contract with the Reinsurer.

**Obligations Clause** The Reinsurer agrees to establish a Trust Account in accordance with the trust agreement entered into by Endurance Specialty Insurance Limited ("ESIL"), as representative for the Reinsured, and the Reinsurer (the "Trust Agreement") and to deposit therein sufficient Permitted Investments (as defined in the Trust Agreement) to cover 100% of its Obligations hereon.

The term "Obligations" shall mean:

(a)  During the Period of this Reinsurance Contract, USD 75,000,000 (for 100%) less any unpaid premium (net of Federal Excise Tax) and brokerage, less Ultimate Net Loss recovered from the Reinsurer;



| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
|---|---|---|

(b) On expiration of this Reinsurance Contract, it is agreed that the collateral will be released in accordance with the Collateral Release Clause.

The Reinsured and the Reinsurer further agree, notwithstanding anything to the contrary in this Reinsurance Contract, that said Trust Account may be drawn upon by ESIL or its successors in interest at any time, without diminution because of the insolvency of the Reinsured or the Reinsurer, but only for one or more of the following purposes:

1) To reimburse itself for the Reinsurer's share of unearned premiums on the account of cancellations, unless paid in cash by the Reinsurer;

2) To reimburse itself for the Reinsurer's share of losses and/or loss expense paid under the terms of policies reinsured hereunder, unless paid in cash by the Reinsurer;

3) To fund a separate cash account, apart from its other assets, in the name of the Beneficiary or any bank or trust company acceptable to the Reinsured and the Reinsurer, in the amount equal to the Reinsurer's Obligations, ten days prior to the effective date of termination of the Trust Account;

4) To refund to the Reinsurer any sum in excess of the actual amount required to fund the Reinsurer's Obligations, if so requested by the Reinsurer.

In the event the amount drawn by ESIL on any Trust Account is in excess of the actual amount required for 1), 2), or 3), the actual amount determined to be due, the Reinsured shall promptly return to the Reinsurer the excess amount so drawn. For the avoidance of doubt, any withdrawal of funds made by ESIL in accordance with the provisions of this Reinsurance Contract and the Trust Agreement shall satisfy the obligations of the Reinsurer to the Reinsured hereunder in an amount equal to such withdrawal.

**Collateral Release**    On the expiration of this Reinsurance Contract, if the Trust Account has not yet been terminated, the Reinsured shall calculate, on a monthly basis, how much, if any, of the collateral shall be released from the Trust Account, as follows:

1) For each potentially covered event, the Reinsured shall multiply the Loss Amount (the sum of [i] losses and loss expenses paid, [ii] reserves for losses reported and outstanding and [iii] reserves for losses incurred but not reported) by the appropriate Buffer Loss Factor from the table below, based upon the type of event and the number of months which have elapsed since the event. The product of this calculation shall be defined as the Buffered Loss Amount ("BLA").

2) The BLA will then be reduced by inuring reinsurance recoveries and the appropriate flat deductible to compute its contribution to the Presumed Ultimate Net Loss. The Presumed Ultimate Net Loss will equal the sum of these contributions.

3) The Presumed Ceded Loss will be defined as the lesser of the Presumed Ultimate Net Loss and the Limit of USD 75,000,000 (or



Tiger Risk Reference    XA200910M    TigerRisk Partners LLC

100%). An amount equal to the Presumed Ceded Net Loss less losses paid by the Reinsurer shall be retained in the Trust Account and any excess in the Trust Account over such amount shall be released to the Reinsurer.

| Buffer Loss Factor Table | | | |
|---|---|---|---|
| Number of Calendar Months Since Date of Event | Windstorm* / Brushfire | Earthquake & Fire Following | Other |
| 0 to 3 | 200% | 300% | 250% |
| > 3 to 6 | 150% | 200% | 175% |
| > 6 to 9 | 125% | 175% | 150% |
| > 9 to 12 | 110% | 150% | 130% |
| > 12 to 15 | 105% | 125% | 115% |
| > 15 to 18 | 100% | 120% | 110% |
| Thereafter | 100% | 100% | 100% |

\*    For the purpose of this Collateral Release provision, the term "Windstorm" shall include Hurricane, Rainstorm, Storm, Tempest, Tornado, Cyclone, Typhoon and Hail.

So long as there is any security on deposit in the Trust Account, the Reinsured shall perform the calculation set forth above within 10 business days after the expiration or the Risk Period and thereafter 10 business days after the end of each calendar month and deliver a report to the Reinsurer and the Trustee named in the Trust Agreement. Collateral will be adjusted monthly based on this calculation. To the extent the calculation indicates that collateral may be reduced, the Reinsurer shall deliver to the Trustee a 'Grantor Excess Withdrawal Notice', as defined in the Trust Agreement, which shall constitute a directive to return the excess collateral to the Reinsurer. Any release of collateral as outlined in this clause shall release the Reinsurer from any future liability under this Reinsurance Contract for that released amount.  It is further understood and agreed that if all Collateral is returned to the Reinsurer, then this shall constitute a full and final commutation of this Reinsurance Contract.

For the avoidance of doubt, any obligation to effect or procure the deposit of additional assets in the Trust Account shall be subject in all instances to the Limited Recourse and Bermuda Regulations clause.

In the event that collateral remains in the Trust Account 24 months following the expiration of this Reinsurance Contract, the Reinsurer shall have the option to commute this Reinsurance Contract at the Reinsured's estimated Ultimate Net Loss (including incurred but not reported) by sending the Reinsured written notice thereof.

Arbitration:    All matters in difference between the Reinsured and the Reinsurers (hereinafter referred to as "the parties") in relation to this Reinsurance Contract, including its formation and validity, and whether arising during or after the period of this Reinsurance Contract, shall be referred to an arbitration tribunal in the manner hereinafter set out.

Unless the parties agree upon a single arbitrator within thirty days of one



DocuSign Envelope ID: Case 1:23-cv-01831-JGK Document 1-1 Filed 03/02/23 Page 217 of 221

receiving a written request from the other for arbitration, the claimant (the party requesting arbitration) shall appoint their arbitrator and give written notice thereof to the respondent. Within thirty days of receiving such notice the respondent shall appoint their arbitrator and give written notice thereof to the claimant, failing which the claimant may apply to the appointor hereinafter named to nominate an arbitrator on behalf of the respondent.

Should the arbitrators fail to agree, then they shall within thirty days of such disagreement appoint an umpire to whom the matter in difference shall be referred. Should the arbitrators fail within such period to appoint an umpire, then either of them or either of the parties may apply to the appointor for the appointment of an umpire.

Unless the parties otherwise agree, the arbitration tribunal shall consist of persons who are active or retired lawyers with not less than ten (10) years' experience in insurance or reinsurance law or active or retired officers of insurance or reinsurance companies, and will not have a personal or financial interest in the parties or the outcome of the arbitration. For the avoidance of doubt, the arbitrators will be completely impartial and disinterested in their respective appointing parties and in the result of the arbitration.

The arbitration tribunal shall have power to fix all procedural rules for the holding of the arbitration including discretionary power to make orders as to any matter which it may consider proper in the circumstances of the case with regard to pleadings, discovery, inspection of documents, examination of witnesses and any other matter whatsoever relating to the conduct of the arbitration and may receive and act upon such evidence whether oral or written strictly admissible or not as it shall in its discretion think fit.

The appointor shall be the Secretary General for the time being of the Court of Arbitration of the International Chamber of Commerce.

Each party shall bear the expense of its own arbitrator, and shall jointly and equally bear with the other the expense of the Umpire and of the arbitration. In the event that the two arbitrators are chosen by one party, as provided above, the expenses of the arbitrators, the Umpire and the arbitration shall be equally divided between the two parties.

The seat of the arbitration shall be in Hamilton, Bermuda and the arbitration tribunal shall apply the laws of the state of New York as the proper law of this Reinsurance Contract.

The arbitration shall be conducted under, and the arbitration tribunal shall be governed by, the provisions of the Bermuda Arbitration Act 1986 and/or any statutory modifications or amendments thereto for the time being in force.

The award of the arbitration tribunal shall be in writing and binding upon the parties who hereby covenant to carry out the same. If a party fails to carry out the award the other(s) may apply for its enforcement to a court of competent jurisdiction in any territory in which the party in default is domiciled or has assets or carries on business.

**Choice of Law and Jurisdiction:**

Except with respect to the Seperate Accounts Company status of the Reinsurer which is governed by the laws of Bermuda, this Reinsurance Contract, subject to the Arbitration Clause contained herein, is subject to



Case 1:23-cv-01831-JGK Document 1-1 Filed 03/02/23 Page 218 of 221

| Tiger Risk Reference | **XA200910M** | **TigerRisk Partners LLC** |
|---|---|---|

the laws of the state of New York and Bermuda jurisdiction.

**Service of Suit Clause**

In respect of Endurance Assurance Corporation only, this Clause only applies to Reinsurers domiciled outside of the United States and/or unauthorized in any state, territory, or district of the United States having jurisdiction over the Reinsured. Nothing in this Clause will be construed to override the provisions of the Arbitration Clause. This Clause is intended as an aid to compelling arbitration, or enforcing such arbitration, or arbitral award, and not as an alternative to the Arbitration Clause for resolving disputes arising out of this Reinsurance Contract.

It is agreed that in the event of the failure of the Reinsurer hereon to perform its obligations hereunder, the Reinsurer hereon, at the request of the Reinsured, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this Clause constitutes or should be understood to constitute a waiver of the Reinsurer's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Mendes & Mount, LLP, 750 Seventh Avenue, New York, New York 10019-6829, and that in any suit instituted, the Reinsurer will abide by the final decision of such court or of any appellate court in the event of an appeal.

The above-named are authorized and directed to accept service of process on behalf of the Reinsurer in any such suit and/or upon the request of the Reinsured to give a written undertaking to the Reinsured that they will enter a general appearance upon the Reinsurer's behalf in the event such a suit will be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Reinsurer hereon hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Reinsured or any beneficiary hereunder arising out of this Reinsurance Contract, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

| **Recording, Transmitting and Storing Information:** | Where the Intermediary maintains risk and claim, the data, information or documents may be held electronically. |
|---|---|
| **Reinsurer Contract Documentation:** | The document contained herein illustrates the full terms and conditions to which the participating Reinsurers have agreed and constitutes the Contract Document.<br><br>Reinsurers' acceptance of a share in this Reinsurance Contract, whether by direct signature of the attached Signing Schedule(s) (whether attached hereto or otherwise), or by correspondence, shall constitute their formal signature of this Reinsurance Contract and no further documentation shall be issued. |



DocuSign Envelope ID: Case 1:23-cv-01831-JGK Document 1-1 Filed 03/02/23 Page 219 of 221

**Tiger Risk Reference**       **XA200910M**                    **TigerRisk Partners LLC**

Evidence of cover will be provided to the Reinsured in the form of a fully
scanned copy of this Reinsurance Contract.

Signed Lines available to Reinsurers at inception and written
confirmation to be sent to them within thirty (30) days of inception.

**Order Hereon:**       20.000% of Limit

---

## Information

**Information:**       Reinsured's 2020 Information seen and noted by Reinsurers hereon.

FILED: NEW YORK COUNTY CLERK 02/15/2023 01:27 PM
NYSCEF DOC. NO. 25

Tiger Risk Reference          XA200910M                                    TigerRisk Partners LLC

---

## Reinsured Signing Schedule

**IN WITNESS WHEREOF**, the parties hereto have caused this Reinsurance Contract to be executed by their duly authorized representatives.

Signed for and on behalf of:

**Endurance Specialty Insurance Limited, (Bermuda) on behalf of itself and on behalf of its branches, affiliates, Endurance Worldwide Insurance Limited (London, England) and its branch office, SI Insurance (Europe), SA, Lloyd's Syndicate Number 5151 (London, England), Endurance Assurance Corporation (New York, USA) and/or their Quota Share reinsurers if applicable, including any and/or all of the subsidiary or affiliate companies that are now or may hereafter come under the ownership, management and/or control of Sompo International Holdings Ltd.**

In _____ this _____ day of _____, 201__

BY: *John Del Col*   3/9/2020
    370292EE2EC646B...

TITLE: ____General Counsel_____

REFERENCE NO.: _____

---

| Tiger Risk Reference | XA200910M | TigerRisk Partners LLC |
|---|---|---|

## Reinsurer Signing Schedule

**Attaching to and forming Tiger Reference:** XA200910M

**Type:**        CATASTROPHE AGGREGATE EXCESS OF LOSS REINSURANCE
               CONTRACT

**Reinsured:**   Endurance Specialty Insurance Limited, (Bermuda) on behalf of itself and
               on behalf of its branches, affiliates, Endurance Worldwide Insurance
               Limited (London, England) and its branch office, SI Insurance (Europe),
               SA, Lloyd's Syndicate Number 5151 (London, England), Endurance
               Assurance Corporation (New York, USA) and/or their Quota Share
               reinsurers if applicable, including any and/or all of the subsidiary or
               affiliate companies that are now or may hereafter come under the
               ownership, management and/or control of Sompo International Holdings
               Ltd. (hereinafter referred to collectively as the "Reinsured").

The Subscribing Reinsurer hereby agrees to the terms and conditions of the reinsurance as contained
in the attached Contract. The Intermediary is allowed to subsequently apportion signed lines as respects
the layers below. The signed lines shall be notified to the Subscribing Reinsurer separately.

For and on behalf of:

**SIGNED LINES:**

| Written Line % | Signed Line % [Entered by Intermediary] | Reference |
|---|---|---|
|  |  |  |

**Authorised Signatory** _M. Rocio_          **Date** Mar. 6, 2020

HORSESHOE RE LIMITED ON BEHALF OF
AND FOR THE BENEFIT OF ITS
SEPARATE ACCOUNT  H S0083

USD  15,000,000 (20%)

